IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RANDOLPH SMITH,

                  Plaintiff,

                                   Civil Action No.
                                   9:06-CV-00401 (FJS/DEP)

         v.

DR. LESTER WRIGHT, Deputy Commissioner
for Health Services; DR. PAULANO, Chief
Medical Officer, Great Meadows Correctional
Facility; DR. SILVERBERG, Physician, Great
Meadows Correctional Facility; JANE DOE,
Acting Nurse Administrator, Great Meadows
Correctional Facility; and JOHN DOE, Director
of Ministerial Services,

                  Defendants.

_____

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

RANDOLPH SMITH, *Pro Se*
810 East 152nd Street
Apt. 616
Bronx, NY 10455

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      CATHY Y. SHEEHAN, ESQ
Attorney General of the State          Assistant Attorney General
of New York
The Capitol
Albany, NY 12224

HON. DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT, RECOMMENDATION AND ORDER</u>

*Pro se* plaintiff Randolph Smith, a former New York state prison inmate, brings this action against three named individuals and two unidentified "Doe" defendants pursuant to 42 U.S.C. § 1983 claiming violation of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution as well as the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  In support of his claims Smith maintains that he was unlawfully placed and kept in medical keeplock based upon his refusal, on religious grounds, to submit to a Purified Protein Derivative ("PPD") test for tuberculosis ("TB").[1] Plaintiff contends that the current version of the controlling prison policy for TB testing, even though it allows for alternative testing of religious

---

[1]      The PPD test involves injection of a TB derivative between layers of the skin.  In the event of a reaction to the injection, including skin thickening with a measurable induration, it is determined the individual has most likely been infected with latent tuberculosis, meaning that he or she has been exposed to TB and as a result has contracted the disease even though not necessarily exhibiting its symptoms. *See generally Selah v. Goord,* 255 F. Supp. 2d 42, 45-46 (N.D.N.Y. 2003). DOCCS inmates are required to undergo PPD testing at three different points: upon entering into prison, annually thereafter, and additionally in the event the inmate is identified as part of a contact trace.  *Id.* at 54.

objectors, unlike earlier versions, is unconstitutional both as drafted and as was applied to his particular situation since it resulted in his confinement in segregated housing for some seven months due to his religious-based refusal to be tested.  As relief, plaintiff's amended complaint seeks both compensatory and punitive damages as well as declaratory relief.

Currently pending before the court is defendants' motion to dismiss plaintiff's amended complaint for failure to state a claim upon which relief may be granted.  At the heart of defendants' motion is their contention that plaintiff's complaint fails adequately to set forth their involvement in the constitutional violations alleged to support a finding of liability.

Having carefully considered both defendants' motion to dismiss and plaintiff's opposition, I recommend a finding that plaintiff has not alleged sufficient facts to state plausible cause of action under the Eighth Amendment and the due process clause of the Fourteenth Amendment, but that his First Amendment and RLUIPA claims are sufficiently pleaded to pass muster under the controlling standard.  I also recommend dismissal of certain of plaintiff's claims against the defendants based upon the lack of their involvement in the conduct giving rise to the particular

cause of action, of certain claims based upon qualified immunity, and of

plaintiff's remaining claims for prospective relief for lack of standing.

I.      BACKGROUND[2]

        Prior to September 2010 when, according to publically available

information, he was released on parole, plaintiff was an inmate entrusted

to the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS") (formerly the New York State

Department of Correctional Services, or the "DOCS").[3]   At the times

relevant to his claims, plaintiff was designated by the DOCCS to the Great

Meadows Correctional Facility ("Great Meadows"), located in Comstock,

---

[2]        In light of the procedural posture of the case, the following recitation of facts has been drawn principally from plaintiff's complaint, Dkt. No. 1, as well as the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 52, to the extent they are consistent with the allegations set forth in his complaint. *See Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.). While plaintiff's amended complaint is the operative pleading and the object of defendants' motion, superceding his earlier filed complaint, *see Harris v. City of New York*, 186 F.3d 243, 249 (2d Cir. 1999), I have also considered the contents of plaintiff's initial complaint when evaluating the plausibility of his claims. *Hale v. Rao*, No. 9:08-CV-1612, 2009 WL 3698420, at *3 n.8 (N.D.N.Y. Nov. 3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.)

[3]        *See* nysdocslookup.docs.state.ny.us (screenshot attached); *see also* Amended Complaint (Dkt. No. 36) (notifying the court of the plaintiff's present apartment address listed on the docket sheet).

New York. Plaintiff is a practicing Rastafarian. Amended Complaint (Dkt. No. 36) ¶ 11.

Among the DOCCS policies in effect at the relevant times is a provision, on occasion referred to as DOCCS Health Services Policy No. 1.18, requiring TB testing for DOCCS inmates.[4]  *See generally* Amended Complaint (Dkt. No. 36).  Under the DOCCS TB testing policy, as revised effective on June 21, 2004, inmates who refuse PPD testing are put on tuberculin hold and offered testing daily for one week, weekly for one month, and thereafter monthly until acceptance.  *See* DOCCS Health Services Policy No. 1.18 at § IV.  Inmates placed on tuberculin hold receive monthly medical assessments and weight checks, and chest x-

---

[4]        The DOCCS' Health Services Policy No. 1.18 was submitted to the court in connection with an earlier motion for summary judgment.  *See* Klopf Decl. (Dkt. No. 12-4) Exh. A.  Although the policy is not attached as an exhibit to plaintiff's complaint, the court nonetheless may properly take judicial notice of it since it is prominently referenced in and forms an integral part of plaintiff's amended complaint, and in fact appears in the record in this case.  *See Holowecki v. Federal Express Corp.*, 440 F.3d 558, 565-66 (2d Cir. 2006); *Coleman v. B.P. Sulzle, Inc.,* 402 F. Supp. 2d 403, 417 (N.D.N.Y. 2005).

        The DOCCS' TB testing protocol was first established in November of 1991, based upon findings issued by the New York State Department of Health and the Centers for Disease Control of the United States Public Health Service.  *Jolly v. Couglin*, 76 F.3d 468, 471 (2d Cir. 1996).  The DOCCS TB testing policy, the centerpiece of which is yearly PPD testing of inmates, was modified somewhat in 1996 in light of the Second Circuit's decision in *Jolly.  Reynolds v. Goord,* 103 F. Supp. 2d 316, 328-331 (S.D.N.Y. 2000).

5

rays every six months.  *Id.*  Inmates whose monthly assessments and

chest x-rays are all negative for TB may be released one year after

admission to tuberculin hold.  *See id.*  While on tuberculin hold, an inmate

is required to remain in his or her cell at all times with the exception of one

hour of solitary recreation daily and three solitary showers per week.  *See

id.*; *see also Redd v. Wright,* 597 F.3d 532, 533 (2d Cir. 2010).

The policy at issue includes a specific provision for those inmates

with religious objections to the PPD testing.  DOCCS Health Services

Policy No. 1.18 at § VII.  Where an inmate refuses the PPD test for this

reason, he or she will be placed on tuberculin hold immediately, pending a

determination by the DOCCS as to the legitimacy of the objection, which

determination is to be made within sixty days.  *See id.*  The Chief Medical

Officer ("CMO") of the DOCCS is responsible for evaluating the situation,

including the results of an investigation that is required to be conducted by

the DOCCS Director of Ministerial Services, and determine what

accommodation, if any, is possible; the inmate must be informed of that

determination within sixty days of the commencement of the TB hold.  *See

id.*  If it is determined that the inmate's sincerely held religious beliefs

precludes his or her submission to PPD testing, the policy allows the CMO

to order a blood test as an accommodation, which is to be performed as expeditiously as possible.  *See* DOCCS Health Services Policy No. 1.18 at § VII.  The inmate may be released from TB hold when the results of the blood test, chest x-ray, and physical examination do not indicate the presence of latent TB.

Because as a practicing Rastafarian plaintiff's religious beliefs prohibit the injection of foreign substances into his body, apparently as a preemptive measure plaintiff objected to PPD testing on religious grounds through "grievance channels" on January 12, 2006, requesting that alternative procedures be utilized to screen him for the disease. Amended Complaint (Dkt. No. 36) ¶ 11.  Plaintiff was formally summoned to the clinic at Great Meadow for TB testing on January 25, 2006, and again on February 24, 2006; on both occasions he refused to be tested on religious grounds and requested alternative testing consistent with his beliefs.  *Id.* at ¶¶ 12-13.  Following the second refusal, plaintiff was placed in medical keeplock on TB hold. [5,6] *Id.* at ¶ 13.

---

[5]      Plaintiff's original complaint cited February 24, 2006 as the date of his first refusal to be tested.  *See* Complaint (Dkt. No. 1) p. 3.

[6]      Generally speaking, keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities*.  Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord*, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*);

7

While in keeplock plaintiff submitted several grievances and less formal complaints regarding his circumstances, on each occasion emphasizing that he was entitled to alternative testing. *See generally* Amended Complaint (Dkt. No. 36). Just two days after his placement in medical keeplock, plaintiff submitted a formal complaint to DOCCS Commissioner Glenn Goord, asserting that he was unlawfully being held in keeplock.[7] *Id.* at ¶ 14. Having received no response to either his January 12, 2006 grievance or his February 26, 2006 complaint to the DOCCS Commissioner, on February 28, 2006 plaintiff filed a second grievance, reiterating his objection to medical keeplock and requesting an alternative procedure for the testing. *Id.* at ¶ 15.

Plaintiff pursued the issue further by submitting a complaint on March 1, 2006 to Stephen Bernardi, the DOCCS Deputy Commissioner

---

*Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir. 1995)). The DOCCS TB testing policy has a specific provision dictating the parameters of TB keeplock. *See* Health Services Policy No. 1.18 § IV.A.4.c.

[7]     Former DOCCS Commissioner Goord was originally named as the sole defendant in this action, but was dismissed from the action on motion for summary judgment based upon lack of personal involvement. *See* Dkt. Nos. 22, 27. That determination was upheld on appeal to the United States Court of Appeals for the Second Circuit, although the matter was remanded with instructions to permit the plaintiff to amend his complaint to assert claims against other defendants more directly responsible for any alleged religious deprivations. *See* Mandate, dated June 10, 2010 (Dkt. No. 32).

for policy and compliance, regarding his circumstances.  Amended
Complaint (Dkt. No. 36) ¶ 16.  Plaintiff followed that with a second formal
complaint to Commissioner Goord on March 28, 2006, objecting to the
manner in which the DOCCS Health Services Policy No. 1.18 was being
administered at Great Meadow, arguing that the plain and unambiguous
terms regarding alternative testing for religious objectors was being
disregarded.  *Id.* at ¶ 19.

Plaintiff commenced this action on March 29, 2006, complaining of
the manner in which Health Services Policy No. 1.18 was being applied in
his case.  Amended Complaint (Dkt. No. 36) ¶ 20.  On that same date,
Smith received an answer from the superintendent at Great Meadow,
denying his January 12, 2006 grievance.  *Id.* at ¶ 21.

Plaintiff subsequently received a decision from the Central Office
Review Committee ("CORC") denying his February 28, 2006 grievance.
Amended Complaint (Dkt. No. 36) ¶ 22.  The following day, Smith
complained to Commissioner Goord regarding the denial, arguing that his
grievance was based on two federal court opinions, both finding the
practice under Health Services Policy No. 1.18 of holding prisoners in

confinement for lengthy periods after exercising religious beliefs in connection with TB testing to be unconstitutional.[8]  *Id.* at ¶ 23.

Not satisfied with the responses to his grievances and still in medical keeplock, plaintiff continued to file complaints. On August 1, 2006, plaintiff lodged a complaint with Dr. Lester Wright, the DOCCS Deputy Commissioner for Health Services, complaining that the failure of prison officials to provide him with an alternative testing procedure was infringing on his religious beliefs and demanding immediate intervention and corrective action.  Amended Complaint (Dkt. No. 36) ¶ 26.  That complaint was referred to Steven Van Buren, the Regional Heath Services Administrator for the DOCCS.  *Id.* at ¶ 27.  By letter dated August 22, 2006, Van Buren advised the plaintiff that his complaint regarding misapplication of Health Services Policy No. 1.18 was being denied. Upon receipt of that denial, plaintiff filed a formal complaint with an unnamed member of the Great Meadows medical staff, arguing that he

_____

[8]      Although the plaintiff does not specify in his amended complaint the cases referenced in his communication to the Commissioner, it may be that he is relying upon *Reynolds v. Goord*, 103 F. Supp. 2d 316 (S.D.N.Y. 2000) (denying defendants' motion for summary judgment with regard to the plaintiff's First Amendment challenge to the 1996 health services policy) and *Selah v. Goord*, 255 F. Supp. 2d 42 (granting the plaintiff's motion for a preliminary injunction preventing the DOCS from administering the PPD test to him during the pendency of that lawsuit based upon his sincerely held religious beliefs and finding that plaintiff may succeed on a First Amendment challenge to the policy as applied to him).

should be released from keeplock since it was clear from x-ray results that he did not pose a risk to the general prison population. *Id.* at ¶ 28.

On September 11, 2006, plaintiff received a written communication from Steven H. Schwartz, Assistant Attorney General, which included a "declaration of special interest in this action."[9]  Amended Complaint (Dkt. No. 36) ¶ 29.  That month plaintiff learned that the DOCCS Health Services Policy No. 1.18 had been misapplied in his case apparently as a result of a misinterpretation of the policy by a nurse administrator at Great Meadows.  Amended Complaint (Dkt. No. 36) ¶ 29.  A second x-ray was taken of plaintiff on September 12, 2006, and an alternative blood test was administered on September 20, 2006.  *Id.* at ¶¶ 29-32.   The TB hold of the plaintiff was rescinded on October 6, 2006 by Dr. Paulano, a defendant in the action, and plaintiff was released to general population. *Id.* at ¶ 33.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on March 29, 2006, soon after being confined to medical keeplock, and was thereafter granted leave to proceed *in forma pauperis*.  Dkt. Nos. 1, 6.  The only named defendant in

---

[9]      Since this letter is not before the court it is unclear precisely what it contained, and specifically what is meant by the plaintiff when utilizing that phrase.

Smith's original complaint, which asserted violations of his rights under the RLUIPA and to the free exercise of his religion under the First Amendment, was former DOCCS Commissioner Goord.

Defendant Goord answered the complaint and soon thereafter moved for summary judgment on the ground that plaintiff had not made any showing of his personal involvement in any constitutional deprivations. Dkt. No. 12. The court granted defendant's motion and dismissed the complaint in its entirety.  Dkt. Nos. 22, 27.  Upon appeal to the United States Court of Appeals for the Second Circuit, however, while the judgment dismissing defendant Goord from the action was affirmed, the Second Circuit remanded the action to this court with instructions to allow plaintiff an opportunity to amend his complaint in effort to state claims against individual staff members at Great Meadows responsible for the alleged misapplication of the controlling DOCCS policy.  Dkt. No. 32.

On September 17, 2010, plaintiff filed an amended complaint naming as defendants, in both their official and individual capacities, Dr. Lester Wright, Deputy Commissioner for Health Services for the DOCCS; Dr. Paulano, the chief medical officer at Great Meadows; Dr. Silverberg, plaintiff's primary care provider; John Doe, the DOCCS Director for

Ministerial Services; and Jane Doe, an acting nurse administrator at Great Meadows. Dkt. No. 36.

In response to plaintiff's amended complaint, the newly-named defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) for its dismissal on the grounds that 1) the plaintiff has failed to state a cognizable claim under the First, Eighth, or Fourteenth Amendments; 2) plaintiff has failed to establish their personal involvement in the constitutional violations alleged; 3) the state officials sued in their official capacities are entitled to Eleventh Amendment immunity; and 4) the defendants are protected from suit by the doctrine of qualified immunity. Dkt. No. 49.  Plaintiff has since responded in opposition to the defendants' motion. Dkt. No. 52.

Defendants' motion is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Standard of Review

13

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft*, 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile Twombly does not require heightened fact pleading of

specifics, it does require enough facts to 'nudge [plaintiffs'] claims across

the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502

F.3d 47, 50 (2d Cir.2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct.

at 1974).

      In deciding a Rule 12(b)(6) dismissal motion, the court must accept

the material facts alleged in the complaint as true and draw all inferences

in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.

Ct. 1733, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292,

300 (2d Cir.2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003);

*Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y.2005) (Kahn, J.).

The burden undertaken by a party requesting dismissal of a complaint

under Rule 12(b)(6) is substantial; the question presented by such a

motion is not whether the plaintiff is likely ultimately to prevail, " 'but

whether the claimant is entitled to offer evidence to support the claims.' "

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d

435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69

F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

      When assessing the sufficiency of a complaint against this

backdrop, particular deference should be afforded to a *pro se* litigant,

whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus*, 551 U.S. 89, 94 127 S. Ct. 2197, 2200 (2007) (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); see also Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

    B.    <u>Eleventh Amendment Immunity</u>

      In their motion defendants' seek dismissal of all claims against them in their official capacities, arguing that as state officials they are entitled to the immunity afforded under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[10] *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[11] *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991). Moreover, it is

---

[10]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

[11]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

clear Congress did not abrogate New York's Eleventh Amendment immunity by enacting section 1983. *Quern v. Jordan*, 440 U.S. 332, 343-45, 99 S. Ct 1139, 1147-49 (1979).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).   Those claims are therefore subject to dismissal.  The defendants are not, however, necessarily entitled to dismissal of all claims asserted against them in their official capacities; plaintiff's complaint seeks declaratory relief and appropriate equitable relief, which could in theory include an injunction against defendants' implementation of Health Services Policy No. 1.18 in the event that it is found to be unconstitutional as written.  To the extent such declaratory and equitable relief may be available to the plaintiff, the defendants are properly named in their official capacities for purposes of effectuating that relief.  *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437, 124 S. Ct. 899, 903 (2004) ("[T]he Eleventh Amendment permits suits for

prospective injunctive relief against state officials acting in violation of federal law.") (citations omitted).

    C.    <u>Eighth Amendment Claim</u>

Among the claims raised by the plaintiff is one bottomed on the Eighth Amendment's prohibition against cruel and unusual punishment. That claim is based upon plaintiff's contention that by subjecting him to keeplock confinement for in excess of seven months, exposing him to conditions normally reserved for those committing serious acts of misconduct warranting disciplinary action, he was subjected to cruel and unusual punishment.  Defendants now seek dismissal of that claim.

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102, 104, 97 S. Ct. at 290, 291*; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle*)*.*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct.

2392, 2400 (1981)).  To satisfy their obligations under the Eighth

Amendment, prison officials must "ensure that inmates receive adequate

food, shelter, and medical care, and must take reasonable measures to

guarantee the safety of inmates."  *Farmer*, 511 U.S. at 832, 114 S. Ct. at

1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194,

3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth

Amendment by inflicting cruel and unusual punishment must satisfy both

objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255,

268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL

889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[12]  Addressing the objective

element, to prevail a plaintiff must demonstrate that the conditions of his

confinement result in unquestioned and serious deprivations of basic

human needs.  *Delisser v. Goord*, No. 09CV00073FJSGLS, 2003 WL

133271 at *6 (N.D.N.Y. Jan. 15, 2003)  (Scullin, S.J. and Sharp, M.J.)

(citing *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.1985)).  With

respect to the subjective element, a plaintiff must also demonstrate that

the defendant had "the necessary level of culpability, shown by actions

_____

[12]      Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

20

characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In this instance, plaintiff's complaint does not provide factual context regarding his keeplock confinement.  The complaint does not indicate, for example, whether Smith was confined to a regular cell in general population, or instead to a special housing unit ("SHU") cell at Great Meadow during the TB isolation.[13]  Nor does his complaint disclose whether he was in a single or double cell, or whether he was afforded the recreation and shower privileges to which he was entitled under the DOCCS TB policy.[14]  More importantly, other than the loss of movement and privileges, plaintiff does not allege any condition to which he was subjected that resulted in the deprivation of a basic human need.  *See*

---

[13]     Prisoners may be placed in SHU for a variety of reasons, including though not limited to those relating to discipline.  *Lee v. Coughlin*, 26 F. Supp. 2d 615, 618 (S.D.N.Y. 1998)  (quoting, *inter alia*, 7 N.Y.C.R.R. § 301.6); 7 N.Y.C.R.R. § 301.7.  Inmates in SHU are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  They are allowed two showers per week and one of hour of outdoor exercise per day, are entitled to unlimited legal visits and one non-legal visit per week, have access to counselors and sick call, and additionally can participate in cell study programs and receive books from the library.  *Id.*

[14]     Health Services Policy §1.18(IV)(A) (4)(c) provides that "[i]nmates on Tuberculin Hold must remain in their cell at all times except for one hour of solitary recreation per day and three solitary showers per week. Leaving their cell for telephone calls is not permitted. Any exception to the above must be cleared through the Deputy Commissioner/Chief Medical Officer or designee."

*Delisser*, 2003 WL 133271 at *6; *Lee v. Frederick*, 519 F. Supp. 2d. 320,

327 (W.D.N.Y. 2007).  This omission is fatal, particularly in view of cases

holding that confinement in keeplock under normal conditions does not

violate the Eighth Amendment's prohibition against cruel and unusual

punishment.  *See, e.g, Bunting v. Nagy*, 452 F. Supp.2d 447, 455

(S.D.N.Y. 2006) (citing *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.

2004)); *Harris v. Russett*, No. 02 Civ. 6481, 2006 WL 2239693, at *3

(S.D.N.Y. Aug. 4, 2006) (citing *Sealey v. Gittner*, 197 F.3d 578, (2d Cir.

1999)).

    In addition to failing to meet the objective prong of the Eighth

Amendment test, plaintiff's allegations similarly fail to establish the

requisite degree of subjective culpability on the part of the defendants.

Plaintiff's complaint, as amended, makes only conclusory allegations of

"reckless indifference" in the grievance process, resulting in the denial of

his request for alternative testing and, ultimately, his prolonged

confinement in medical keeplock.  Although reckless indifference could

suffice to support an Eighth Amendment claim if coupled with allegations

of a subjective awareness of a substantial risk of harm to the inmate,

*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Farmer*, 511

22

U.S. at 839-40, 114 S. Ct. 1970), it is clear that this allegation is directed at the procedural remedies within the prison, not the physical conditions experienced while in keeplock.  Nothing in the complaint alleges or even suggests that any defendant deliberately misapplied Heath Services Policy No. 1.18 in order to punish Smith, or that such punishment was intended to subject him to an excessive risk of harm. Instead, the pleadings show, at best, only that someone at Great Meadows seemingly failed to properly follow the DOCCS TB testing procedures. For these reasons, I find plaintiff's allegations insufficient to support a plausible cruel and unusual punishment claim under either the objective or subjective prong of the Eighth Amendment test, and therefore recommend that plaintiff's Eighth Amendment claims be dismissed.[15]

      D.    <u>Fourteenth Amendment Claim</u>

---

[15]     To the extent plaintiff's complaint can be read to make a claim under the Eighth Amendment for verbal harassment to which he may have been subjected as a result of his failure to submit to the PPD screening test, it is well-established that such complaints are insufficient to give rise to a constitutional claim. *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. and DiBianco, M.J. ) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation"). Nor do threats amount to a constitutional violation.  *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995).

As a separate cause of action, plaintiff's complaint alleges violations of his right to substantive due process under the Fourteenth Amendment, a claim that defendants argue is also insufficiently stated. The basis for this claim is plaintiff's contention that by arbitrarily and capriciously overlooking the plain terms and language of Health Services Policy No. 1.18, prison medical personnel at the Great Meadows violated his right to substantive due process. When broadly construed, it seems that plaintiff's complaint also alleges a potential procedural due process claim challenging the constitutionality of the procedures outlined in Health Services Policy No. 1.18 with regard to placement in keeplock confinement. Both of these due process claims fail as a matter of law.

1.   Substantive Due Process

The due process clause of the Fourteenth Amendment contains both substantive and procedural elements. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975 (1990). The substantive component of the Fourteenth Amendment "bars certain arbitrary and wrongful government action regardless of the fairness of the procedures used to implement them." *Id.* at 125, 110 S. Ct. at 983 (internal quotations and citation omitted). "Substantive due process protects individuals against

24

government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994) (internal quotations and citations omitted) (citing cases). To establish a violation of substantive due process rights, "a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin v. Vil. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S .Ct. 1708 (1998)). The first step in a substantive due process analysis is to identify the constitutional right at stake." *Excell v. Woods*, No. 9:07-CV0305, 2009 WL 3124424, at *23 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J. and Lowe, M.J.) (citing *Lowrance*, 20 F.3d at 537).  It should be noted, parenthetically, that there are few circumstances arising in the context of prison life that rise to the level of shocking and suffice to state a substantive due process violation. *Shuler v. Brown*, No. 07-CV-0937, 2009 WL 790973, at *9 (N.D.N.Y. Mar. 23, 2009) (McAvoy, S.J. and Lowe, M. J.).

Placement in medical keeplock for objecting to PPD testing on religious grounds, while potentially within the ambit of the protection afforded under the First Amendment, is not the sort of condition of prison life that implicates substantive due process, nor does Health Policy No. 1.18 create a substantive right to alternative testing.  *Cf. Barnes v. Craft*, No. 9:04-CV-1269, 2008 WL 3884369, at *5 (N.D.N.Y. Aug. 18, 2008) (Mordue, C.J. and Lowe, M. J.) (finding that the DOCCS beard exemption policy did not create a substantive due process right).  Moreover, even if the court were to ultimately find that the Health Services Policy No. 1.18 did create a substantive due process right, any attempt to allege a substantive due process violation nonetheless must fail.  At best, based upon the allegations in plaintiff's complaint, it seems clear that defendants' failure to follow Health Services Policy No. 1.18 amounts to nothing more than incorrect or ill-advised conduct and falls far short of the type of conscience-shocking behavior that would support a substantive due process claim.  *See Lowrance*, 20 F.3d at 537. For these reasons, I recommend the plaintiff's substantive due process claim under the Fourteenth Amendment be dismissed.[16]

_____

[16]     There is yet another reason why a substantive due process claim would fail in the case. The Supreme Court has repeatedly held, "if a constitutional claim is

2.    Procedural Due Process

Although plaintiff's second cause of action specifically claims only a substantive due process violation, when liberally construed the complaint could be interpreted to have embedded within it a procedural due process claim.  *See, e.g.*, Amended Complaint (Dkt. No. 36) ¶ 37 (alleging "that the policy's procedures are even inconsistent with the minimum due process requirement afforded . . . for the most serious disciplinary matters calling for the very form of restrictions plaintiff was subject to without due process of law.").  As plaintiff notes, subjecting a prison inmate to a period of seven months of disciplinary confinement would ordinarily be deemed a sufficient liberty interest deprivation to trigger procedural due process rights.  *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000); *Bunting v. Nagy*, 452 F. Supp. 2d 447, 455-56 (S.D.N.Y. 2006) (citing cases); *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 219 (2d Cir. 2001). Similarly, an inmate placed in administrative confinement segregation for

_____

covered by a specific constitutional provision . . . it must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, n.7, 117 S. Ct. 1219 n.7 (1997) (citing *Graham v. Conner*, 490 U.S. 386, 394, 109 S. Ct. 1870, 1871 (1989)); *see also Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). Here, plaintiff's claim relating to the denial of alternative testing because of his religious objection to the PPD test is more appropriately analyzed under the First Amendment and the RLUIPA.

27

such reasons as a need for protection for seven months would also be entitled to basic due process rights, including an initial hearing and periodic reviews.  *See Davis v. Barrett*, 576 F.3d 129 (2d Cir. 2009) (holding that forty-one days in administrative confinement could represent the deprivation of a cognizable liberty interest, depending upon the conditions to which the plaintiff inmate was subjected).  Plaintiff's complaint suggests that he, on the other hand, was not afforded the same safeguards despite being placed in keeplock confinement based upon his exercise of his First Amendment rights.  This could form the basis for a plausible procedural due process claim.

The concept of procedural due process under the Fourteenth Amendment is a flexible one, with its requirements being dependent upon the nature of the deprivation at issue and the process associated with it. In a prison setting, an inmate who is subject to the deprivation of a constitutionally significant liberty interest is entitled under the Fourteenth Amendment to notice and an opportunity to be heard.  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' "  *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902

(1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965)).

I will assume for the sake of argument that plaintiff's medical keeplock confinement for a period of approximately seven months, with a corresponding loss of privileges, constituted the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's due process protections.[17]   Plaintiff was therefore entitled to both notice and a meaningful opportunity to be heard with regard to that deprivation.   *Sira*, 380 F.3d at 69.

Under Health Services Policy No. 1.18, before being placed in keeplock confinement for refusing to be tested for TB, an inmate must "be carefully counseled about the importance of [the] test."  Health Services Policy No. 1.18 at § IV.A.4.  The policy also requires that inmates on TB hold be offered testing "daily for one week, weekly for one month and monthly thereafter until the inmate accepts testing or prophylaxis" going

---

[17]     While some courts have analyzed procedural due process claims stemming from keeplock confinement under principles ordinarily applicable to disciplinary or administrative SHU confinement, *e.g.*, *Delisser*, 2003 WL 133271, at *7 (N.D.N.Y. Jan. 15, 2003), others have concluded that ordinary keeplock confinement conditions are not sufficiently atypical or significant hardships in relation to the ordinary incidents of prison life to trigger the protections of the Fourteenth Amendment.  *See*, *e.g.*, *Luis v. Coughlin*, 935 F. Supp. 218, 220-22 (W.D.N.Y. 1996).

on to provide that "[i]nmates can agree to testing/prophylaxis at any time."

*Id.* at § IV.A.4.ii..  Accordingly, assuming the validity of Health Service

Policy No. 1.18 – a matter that has yet to be determined – "the

requirements of due process were met, in that plaintiff had both notice of

the reason for his keeplock confinement and the means of ending it."

*Rossi v. Goord*, No. 9:00-CV-1521, 2006 WL 2811505, at *8 (N.D.N.Y.

Sep. 28, 2006) (Kahn, J. and Peebles, M.J.).  Under these circumstances,

no reasonable factfinder could conclude that plaintiff was denied

procedural due process in connection with its medical keeplock

confinement.  Accordingly, I recommend dismissal of plaintiff's procedural

due process claim .

    E.    <u>Plaintiff's Religious Freedom Claims</u>

       The centerpiece of plaintiff's complaint is his claim that he was

deprived of his religious liberties deriving from two different sources – the

RLUIPA and the First Amendment.[18]  In their motion defendants appear to

--------

      [18]    That amendment provides, in pertinent part, that "Congress shall make
no law respecting an establishment of religion, or prohibiting the free exercise thereof."
U.S. CONST. AMEND. I.  The RLUIPA, provides, in pertinent part, that

> no government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to an
> institution . . . . even if the burden results from a rule of
> general applicability, unless the government demonstrates
> that imposition of a burden on that person – 1) is in

focus their argument solely upon the First Amendment claim and fail to address the sufficiency of plaintiff's claim under the RLUIPA.

Defendants' contention that plaintiff's First Amendment claim lacks merit, *see* Defendants' Memorandum (Dkt. No. 49-1) at p. 6, which is presented in two succinct paragraphs, does not appear to invite the court at this early stage to weigh the proprietary of DOCCS Health Services Policy No. 1.18, either as drafted or as applied to the plaintiff, under the First Amendment or the RLUIPA.  Instead, the focus of the defendants' argument is upon the alleged lack of personal involvement on the part of the four named defendants in the constitutional deprivations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of*

_____

furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). To establish a violation of the RLUIPA a plaintiff must prove that prison officials, through their actions, have substantially burdened his or her religious exercise through actions not found to promote a compelling governmental interest advanced through the least restrictive means. *Pilgrim v. Artus*, No. 07-cv-1001, 2010 WL 3724883, at *10 (N.D.N.Y. Mar. 18, 2010) (Treece, M.J.), *report and recommendation adopted*, 2010 WL 3724881 (N.D.N.Y. Sep. 17, 2010) (Sharpe, J.). The RLUIPA places a higher burden on the defendants than does the First Amendment, which requires only a burden that is "reasonably related to legitimate penological interests." *Id.*

*Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,*

568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct.

1282 (1978)).  As the Supreme Court has noted, a defendant may only be

held accountable for his or her actions under section 1983.  *Iqbal*, 129 S.

Ct. at 1952.  In order to prevail on a section 1983 cause of action against

an individual, a plaintiff must show some tangible connection between the

constitutional violation alleged and that particular defendant.  *See Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). That requirement may be

satisfied by showing that the defendant 1) directly participated in the

alleged violation; 2) after being informed of the violation through a report

or appeal, was in a position to remedy the wrong, and failed to do so; 3)

created a policy or custom under which unconstitutional practices

occurred, or allowed the continuance of such a policy or custom; 4) was

grossly negligent in supervising subordinates who committed the wrongful

acts; or 5) exhibited deliberate indifference to others' rights by failing to

act on information indicating that unconstitutional acts were occurring.

*Barnes v. Fedele*, 760 F. Supp. 2d 296, 304 (W.D.N.Y. 2011) (citing *Colon*

*v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995)) (other citation omitted).[19]

---

[19]     Although in their motion defendants have not actively challenged the
plaintiff's RLUIPA claims, it should be noted that the Second Circuit has yet to address

Before evaluating the level of personal involvement for each of the named defendants it is important to understand the extent of plaintiff's claims.  Plaintiff's complaint alleges that the current version of the DOCCS Health Services Policy No. 1.18, while since 2004 incorporating an alternative procedure for religious objectors, nonetheless still impinges upon the rights of objecting inmates under the First Amendment and the RLUIPA by virtue of the testing procedures specified.  *See* Amended Complaint (Dkt. No. 36) ¶¶ 40-41.  Smith also alleges that the policy was unconstitutionally applied to him since the alternative testing for religious objectors available under the testing policy was not provided to him by local prison officials at Great Meadows.  *Id.* at ¶¶ 43-46.  These two

---

whether personal involvement is a prerequisite to a claim under the RLUIPA. *Pilgrim*, 2010 WL 37224883 at *14.  Courts in this district and elsewhere have held that it is. *Id.* (citing *Joseph v. Fischer*, No. 08 Civ. 2824, 2009 WL 3321011, at *18 (S.D.N.Y. Oct 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases)); *Hamilton v. Smith*, No. 9:06-CV-0805, 2009 WL 3199520, at *9 (N.D.N.Y. Sept. 30, 2009) (Suddaby, J.) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland*, 2009 WL 2940069, at *2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill*, No. 2:07-CV-1076, 2009 WL 890521, *3 (S.D. Ohio Mar. 31, 2009); *Alderson v. Burnett*, No. 1:07-CV-1003, 2008 WL 4185945, at *3 (W.D. Mich. Sep. 8, 2008)); *see also Keesh v. Smith*, 9:04-CV-799, 2011 WL 1135931, at *11 (N.D.N.Y. Feb. 2, 2011) (Baxter, M.J.) (citations omitted), *report and recommendation adopted*, 2011 WL 1135929 (Mar. 25, 2011) (Mordue, C.J.).

claims are conceptually distinct for purposes of analysis of the level of participation of the four named defendants.

       1.   <u>Dr. Lester Wright</u>

      Plaintiff's amended complaint names Dr. Wright, the DOCCS Deputy Commissioner for Health Services and the agency's CMO, as a defendant.  Dr. Wright's alleged involvement includes having developed the current DOCCS TB policy and maintaining responsibility for its enforcement.  As was stated in the court's prior report and recommendation, all indications show that Dr. Wright did hold primary authority and responsibility for protecting the health of inmates and administering DOCCS health policies.  Indeed, as was noted, it is Dr. Wright's signature that appears on the TB testing policy now at issue. *See Fox v. Poole*, No. 06CV148, 2008 WL 1867939, at *8 (W.D.N.Y. Apr. 24, 2008).  Accordingly, to the extent the plaintiff asserts that the DOCCS policy is unconstitutional as drafted, Dr. Wright is open to exposure on that claim, for purposes of both declaratory and injunctive relief and for damages, subject to his claim of entitlement to qualified immunity.

      Turning to plaintiff's claim that the policy is unconstitutional as was applied to him, the basis for asserting liability against Dr. Wright stems

from a complaint sent by Smith to defendant Wright on August 1, 2006

placing him on notice that Smith had been on TB hold since February of

that year and requesting immediate intervention.  Investigation into the

matter was apparently delegated by Dr. Wright to Steven Van Buren, the

DOCCS Regional Health Services Administrator, who responded to

plaintiff's complaint.  It is well-established that the receipt by a high

ranking DOCCS official of correspondence from an inmate complaining of

a constitutional deprivation and the forwarding of that correspondence to

an appropriate staff member for investigation and response is insufficient

to trigger a finding of personal involvement.  *See Barnes,* 760 F. Supp. 2d

at 305.

Plaintiff also alleges, in conclusory fashion, that by virtue of his

position Dr. Wright has the responsibility to enforce the TB testing policy

and to ensure that the policy is properly carried out.  This broad allegation

is similarly insufficient to establish a plausible claim against Dr. Wright as

relates to the policy as applied to Smith.  *See Richardson v. Goord*, 347

F.3d 431, 435 (2d Cir. 2003); *see also Wright*, 21 F.3d at 501 (a

supervisor cannot be liable for damages under section 1983 solely by

virtue of being a supervisor; there is no *respondeat superior* liability under that provision).

In sum, I find that Dr. Wright is entitled to dismissal of plaintiff's claims regarding the application of the DOCS TB testing policy to his circumstances, but not with regard to his contention that the policy, as presently drafted, remains constitutionally infirm.

### 2.   Dr. Silverberg

Plaintiff's amended complaint names Dr. Silverberg, his primary health care provider during the relevant times, as a defendant.  Amended Complaint (Dkt. No. 36) ¶ 9.  Dr. Silverberg's involvement in the constitutional deprivation allegedly included a responsibility to provide, upon request, the alternative procedures to test plaintiff for TB.  *Id.* Plaintiff alleges he was taken for an examination by Dr. Silverberg on March 24, 2006, and that later, on September 14, 2006, he was again sent to see Dr. Silverberg to discuss alternative testing.  *Id.* at ¶¶ 18, 131. Plaintiff does not allege any other specific facts regarding his interaction with Dr. Silverberg.

I find that at this early procedural juncture, these allegations are sufficient to establish the existence of a plausible constitutional claim

against Dr. Silverberg insofar as plaintiff has alleged that the DOCS TB testing policy, as applied to his circumstances, violated his rights under the First Amendment and the RLUIPA.  There is no basis, however, to conclude that Dr. Silverberg bears responsibility for development of Health Services Policy No. 1.18, and he therefore lacks responsibility with regard to plaintiff's claim that the policy is unconstitutional as drafted.

### 3.    Dr. Paulano

Plaintiff's amended complaint identifies Dr. Paulano as the "head doctor" at Great Meadows.  Amended Complaint (Dkt. No. 36) ¶ 8.  Dr. Paulano's involvement in the violations alleged included supervising and training the medical staff in the Great Meadows medical unit and implementing the TB testing policy through his medical staff.  *Id.*  Plaintiff alleges that on October 6, 2006 Dr. Paulano discussed with him the results of the Quanteferon Blood Test administered to Smith and released him from TB Hold.  *Id.* at ¶ 33.  Dr. Paulano also informed plaintiff that the procedure would be repeated the following year.  *Id.* The plaintiff does not allege any other specific facts concerning his interaction with Dr. Paulano. These allegations are insufficient to establish Dr. Paulano's personal

involvement in either the drafting of the allegedly unconstitutional TB testing policy or its application to plaintiff's circumstances.

F.    Qualified Immunity

Seizing upon the lack of clarity regarding the interplay between the DOCCS TB testing policy and the rights guaranteed to inmates under the First Amendment and the RLUIPA, in the alternative defendants seek a finding that they are entitled to qualified immunity from suit in this action. Failing to appreciate the distinction between claims for damages, which may properly be dismissed based upon qualified immunity, and claims seeking other forms of relief including declaratory and injunctive, which are not, defendants assert that "all claims against the defendants" are subject to dismissal on the basis of qualified immunity.  *See* Defendants' Memorandum (Dkt. No. 49-1) p. 11.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is

38

the objective inquiry whether a reasonable officer could have believed that

[his or her actions were] lawful, in light of clearly established law and the

information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567

F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615,

119 S. Ct. 1692 (1999)). The law of qualified immunity seeks to strike a

balance between the need to hold government officials accountable for

irresponsible conduct and the need to protect them from "harassment,

distraction, and liability when they perform their duties reasonably."

*Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), the

Supreme Court "mandated a two-step sequence for resolving government

official's qualified immunity claims." *Pearson*, 555 U.S. at 232, 129 S. Ct.

at 816. The first step required the court to consider whether, taken in the

light most favorable to the party asserting immunity, the facts alleged

show that the conduct at issue violated a constitutional right,[20] *Kelsey*, 567

F.3d at 61, with "the second step being whether the right is clearly

established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577

---

[20]     In making the threshold inquiry, "[i]f no constitutional right would have
been violated were the allegations established, there is no necessity for further
inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151.

F.3d 415, 430 n.9 (citing *Saucier*).[21]  Expressly recognizing that the

purpose of the qualified immunity doctrine is to ensure that insubstantial

claims are resolved prior to discovery, the Supreme Court recently

retreated from the prior *Saucier* two-step mandate, concluding in *Pearson*

that because "[t]he judges of the district courts and courts of appeals are

in the best position to determine the order of decisionmaking [that] will

best facilitate the fair and efficient disposition of each case", those

decision makers "should be permitted to exercise their sound discretion in

deciding which of the . . .  prongs of the qualified immunity analysis should

be addressed first in light of the circumstances of the particular case at

hand."[22]  *Pearson*, 555 U.S. at 236, 242, 129 S. Ct. at 818, 821.  In other

words, as recently emphasized by the Second Circuit, the courts "are no

longer *required* to make a 'threshold inquiry' as to the violation of a

---

[21]     In *Okin*, the Second Circuit clarified that the "'objectively reasonable'
inquiry is part of the 'clearly established' inquiry", also noting that "once a court has
found that the law was clearly established at the time of the challenged conduct and
for the particular context in which it occurred, it is no defense for the [government]
officer who violated the clearly established law to respond that he held an objectively
reasonable belief that his conduct was lawful." *Okin*, 577 F.3d at 433 n.11 (citation
omitted).

[22]     Indeed, because qualified immunity is "an immunity from suit rather than
a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806
(1985), the Court has "repeatedly . . . stressed the importance of resolving immunity
questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231,
129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 524 (1991)
(per curiam)).

constitutional right in a qualified immunity context, but we are free to do

so." *Kelsey*, 567 F.3d at 61 (citing *Pearson*, 129 S. Ct. at 821) (emphasis

in original).

For courts engaging in a qualified immunity analysis, "the question

after *Pearson* is 'which of the two prongs . . . should be addressed in light

of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430

n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be

appropriate in those cases where 'discussion of why the relevant facts do

not violate clearly established law may make it apparent that in fact the

relevant facts do not make out a constitutional violation at all.'" *Kelsey*,

567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

The Second Circuit has instructed that for purposes of the qualified

immunity inquiry, the constitutional right at stake must be defined

narrowly.  *McCarroll v. Federal Bureau of Prisons*, No. 08-CV-1343, 2010

WL 4609379, at *5 (N.D.N.Y. 2010) (Lowe, M.J.) (citing *Redd*, 597 F.3d at

532).  Generally speaking, the right at issue in connection with both of

plaintiff's claims is Smith's right under the First Amendment and the

RLUIPA to a religious exemption from the PPD test requirement under

Health Services Policy No. 1.18.  The most recent Second Circuit decision

41

to address the issue, involving events that occurred in 2001, held that the

right to religious exemption from such testing was not well-established at

that time. *Redd*, 597 F.3d at 536; *see also McCarroll*, 2010 WL 4609379,

at *5-6 (holding that the right to submit a saliva or hair sample rather than

a blood sample was not clearly established or foreshadowed by any

Second Circuit or Supreme Court ruling).

In *Redd*, the plaintiff was placed in TB hold in 2001 after refusing to

undergo a PPD test on religious grounds. *Redd*, 597 F.3d at 534.  The

1996 policy then in effect, unlike the 2004 version, did not contain a

religious objector exception.  *Id*.  The district court determined that the

1996 policy was unconstitutional as applied,[23] but held that the defendants

in that case were entitled to qualified immunity and dismissed plaintiff's

First Amendment and RLUIPA claims.[24]  *Id*.  The court reasoned that

conflict among the state and lower federal courts on the issue

demonstrated that the right at issue was not clearly established.  *Id*.

---

[23]     "The district court also concluded in a footnote that the 1996 Policy violated the RLUIPA, which 'imposes a standard of strict scrutiny upon burdens on the free exercise of religion of incarcerated persons in state prisons.' " *Redd*, 597 F.3d at 534-35 (quoting *Redd v. Wright*, No. 9:04-CV-00401(N.D.N.Y. filed Aug. 9, 2006) at 7 n.9).

[24]     Unlike plaintiff's complaint in this action, *Redd*'s complaint sought only money damages and did not request declaratory or injunctive relief.  *Redd,* 597 F.3d at 534.

On appeal, the Second Circuit declined the opportunity to determine whether Redd's rights were violated under the First Amendment and RLUIPA. *Id.* at 536 (citing *Pearson*, 121 S. Ct at 808). Instead, the court held that at the time Redd was confined, it had not been clearly established that the 1996 policy, or any substantially similar policy, was invalid under either the First Amendment or RLUIPA. *Redd*, 597 F.3d at 536. Moreover, the court held that its earlier decision in *Jolly* had not clearly foreshadowed a holding that the 1996 policy would be facially invalid under either the First Amendment or the RLUIPA, and furthermore, that neither *Jolly* nor the district court decision in *Reynolds* had signaled that the 1996 policy, as applied to Redd, violated Redd's free exercise right under the RLUIPA or the First Amendment. *Id.* at 537-38. Accordingly, the Second Circuit affirmed the district court's determination that the defendants were entitled to qualified immunity with regard to Redd's claims under the First Amendment and the RLUIPA.

Though the events giving rise to plaintiff's complaint occurred some five years later than those in *Redd*, the Second Circuit's decision in that case dictates the same result here. Presumably to accommodate the potential First Amendment and RLUIPA concerns of religious objectors, in

2004 the DOCCS amended its TB testing policy to include an alternative

testing provision for religious objectors.  Having reviewed that policy

against the backdrop of existing caselaw, I conclude that no reasonable

prison official could have understood the policy, as currently drafted, as

unlawfully impinging upon the First Amendment and RLUIPA rights of

inmates.  In this regard the law has not matured significantly since *Redd*.

No decision of the Supreme Court or Second Circuit issued prior to 2006,

when plaintiff was relegated to TB hold, would have alerted someone such

as Dr. Wright to any alleged First Amendment or the RLUIPA violation

associated with the 2004 testing policy.  In fact, *Redd*, in which the court

expressly declined to address whether the earlier version of the policy

violates the First Amendment or the RLUIPA, was not decided until some

three years later and seems, at this time, to be the last word on this

issue.[25]  Accordingly, I recommend a finding that Dr. Wright, the only

defendant potentially exposed with regard to the as-written claim, be

entitled to qualified immunity exempting him from liability for damages,

---

[25]     Despite exhaustive research, the court has not identified a more recent
decision within the Second Circuit, even at the district court level, addressing the
validity of either the1996 or the 2004 policy on free exercise grounds.

though not for equitable relief potentially awardable against him in his official capacity.

Turning to plaintiff's as-applied challenge, unlike the policy at issue in *Redd*, the more recent 2004 policy provides for accommodation for those with religious objections to the PPD test, requiring that an inmate be advised within sixty days of being placed in TB hold as to what accommodation, if any, will be made.  While it is undisputed that this provision of the 2004 policy was not followed with regard to plaintiff, that failure in and of itself is insufficient to support a constitutional challenge.[26] Moreover, like the plaintiff in *Redd*, Smith "can point to no relevant case law declaring the [2004] Policy, or any substantially similar policy, invalid under either the First Amendment or RLUIPA", nor has any case clearly

---

[26]     A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).  "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson*, 01-CV-1039, 2008 WL 4416411, at *6 n.24 (N.D.N.Y. Sept. 24, 2008) (Hurd, J.) (internal quotation marks and citation omitted).  Notably, with regard to the policy at issue, even where it is determined that the inmate's religious belief forbidding the PPD testing is sincerely held, the policy does not require alternative testing.  Instead, to the extent the policy provides that the CMO "may" order a blood test, it appears to be in the discretion that DOCCS official to allow that to occur.  In light of the discretion afforded the CMO, it is not at all clear in this case that the delay in providing plaintiff with an alternative test violated Health Service Policy No. 1.18.

foreshadowed that result.[27]  *Redd*, 597 F.3d at 536.    Accordingly, I conclude that defendant Silverberg, the only named defendant potentially exposed to liability for damages with regard to the as–applied claim, should be afforded qualified immunity.

      G.    Standing

In view of the foregoing, all that remains of plaintiff's claims is his cause of action against Dr. Wright alleging that the current DOCCS TB testing policy is unconstitutional on its face and seeking declaratory and injunctive relief.  Although not raised by defendants in their motion, it appears that since he has been released from prison, plaintiff lacks standing to pursue this claim.

"In every federal case, the party bringing the suit must establish standing to prosecute the action."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S. Ct. 2301, 2308 (2004).  "In essence the

---

[27]      As the *Redd* court observed, "the factual predicate that led the court to grant a preliminary injunction in *Jolly*-Jolly's confinement for three and a half years, . . . significantly differs from the facts in this case", *Redd*, 597 F.3d at 532 (citation omitted), in which Smith was held in keeplock for less than eight months.  "*Jolly* specifically declined to draw a line as to the length of confinement beyond which a constitutional violation would occur."  *Id.* (citing *Jolly*, 76 F.3d at 478 n.5).  Likewise, *Reynolds* did not "foreshadow a ruling that DOCCS lacked a compelling interest in implementing a TB hold policy", in that it did not address "the compelling interest in administering an effective TB program or compiling health information on inmates."  *Id.* at 537-38 (citing *Reynolds*, 103 F. Supp. 2d at 340).

question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S .Ct. 2197, 2205 (1975).  The standing requirement is born partly of " 'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.' " *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315 (1984) (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178-1179 (D.C. Cir. 1982) (Bork, J., concurring)).  "Standing 'is an essential and unchanging part of the case-or-controversy requirement of Article III.' " *Central States Southeast and Southwest Areas Heath and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 197 (2d Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)).  As such, standing directly implicates the court's subject matter jurisdiction, and may therefore be raised by the court *sua sponte*. *Id.*

To establish standing to pursue injunctive or declaratory relief, a plaintiff must show that he or she has sustained or is in danger of immediately sustaining an injury as a result of the challenged official

conduct.  *MacNamara v. City of New York*, No. 04 Civ. 9216 (RJS)(JCF), 2011 WL 1991144, at *11 (S.D.N.Y. May 19, 2011) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)) (other citation omitted).  "[The s]tanding doctrine. . .generally precludes a § 1983 plaintiff from obtaining injunctive relief unless she can demonstrate that she is likely to be subjected to the same conduct in the future, a showing that can be very difficult to make."  *Ciraolo v. City of New York*, 216 F.3d 236, 248 (2d Cir. 2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06, 103 S. Ct. 1660 (1893)).

In this case, plaintiff is no longer within the custody of the DOCCS, having been released from prison in September 2010 and therefore is no longer subject to Health Services Policy No. 1.18 and the requirement that he undergo PPD testing.  Because Smith is no longer incarcerated and does not face the likelihood of being subjected to this policy in the future, his request for declaratory and prospective injunctive relief must be dismissed for lack of standing.  *Brown v. City of New York*, No. 09 CV 1809(RJD)(MG), 2010 WL 60914, at * 2 (E.D.N.Y. Jan. 8, 2010) (citing *Shain*, 356 F.3d at 215)*; Thomas v. New York State Dep't of Corr. Servs.*, No. 00 Civ. 7163(NRB), 2006 WL 435718, at *1 n.2 (S.D.N.Y. Feb. 23, 2006) (citing *Shain*).

48

H.     Motion to Stay Discovery

In addition to seeking dismissal of plaintiff's claims, defendants also move order pursuant to Federal Rule of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss.  Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1).   When exercising the discretion conferred under Rule 26(c), in response to a motion to stay discovery during the pendency of a dismissal motion, a court must determine whether the party seeking the stay has established the existence of "good cause" for the requested delay.  *Chesney v. Valley Stream Union Free Sch. Dist.*, 236 F.R.D. 113, 115 (E.D.N.Y. 2006); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002).  The mere filing of a dismissal motion, without more, does not guaranty entitlement to such a stay.  *Spencer Trask*, 206 F.R.D. at 368 (citations omitted); *see Moran v.*

49

*Flaherty*, No. 92 Civ. 3200, 1992 WL 276913, at *1 (S.D.N.Y. Sept. 25,

1992) ("[D]iscovery should not be routinely stayed simply on the basis that

a motion to dismiss has been filed.").

Among the factors which inform the analysis of whether to grant a

stay of discovery, in the face of a dispositive motion, are the burden of

responding to the contemplated discovery, and the strength of the

dispositive motion forming the basis for the stay request.  *Chesney*, 236

F.R.D. at 115*; Spencer Trask, LLC*, 206 F.R.D. at 368.  The court must

also consider any unfair prejudice which may be suffered by the party

seeking to engage in discovery during the pendency of the dismissal

motion.  *OMG Fidelity, Inc. v. Sirius Techs., Inc.*, 239 F.R.D. 300, 304-305

(N.D.N.Y. 2006) (citing *Chesney*, 236 F.R.D. at 115).

Here, defendants have filed a persuasive motion which warrants a

stay of discovery.  Issue has not been joined in the action, and the court

has not yet to issue its standard Rule 16 pretrial scheduling order in the

case.  Moreover, there is no indication that plaintiff has sought to

commence discovery in the last six months.  It therefore appears unlikely

that prejudice will result from staying discovery pending the final

determination of this motion.  I therefore grant defendant's motion to stay discovery pending the final determination of this motion.

IV.    SUMMARY AND CONCLUSION

Clearly the DOCCS has a strong, legitimate interest in containing contagious diseases, including TB, within its facilities.  *See Lee v. Frederick,* 519 F. Supp. 2d at 326 (citing *Word v. Croce*, 230 F. Supp. 2d at  511 ("[T]here is no dispute that NYDOCS has a legitimate interest, in containing Tuberculosis.") and *Jolly v. Coughlin*, 76 F.3d at 477 (correctional officials have an affirmative obligation to protect inmates from infectious diseases)).  Plaintiff maintains, however, that the means by which the DOCCS has chosen to address TB in its prisons has resulted in his experiencing constitutional deprivations and denial of his rights under the RLUIPA.

Plaintiff's complaint in this action asserts multiple constitutional challenges to both the current DOCCS TB testing protocol, despite its inclusion of an alternative provision for religious objectors, and the application of the policy to him, resulting in TB hold for seven months and a significant delay in offering the alternative procedure to him, claiming violations of the First, Eighth, and Fourteenth Amendments to the United

States Constitution as well as the RLUIPA.  Having carefully reviewed plaintiff's complaint, I conclude that it fails to state plausible Eighth Amendment and due process claims, but that it does assert potentially viable First Amendment and RLUIPA causes of action against all or some of the named defendants.  Nonetheless, I find that all defendants other than Dr. Wright are entitled to dismissal with regard to the plaintiff's facial challenge to Health Services Policy No. 1.18.  With regard to plaintiff's as-applied challenge to that policy, Drs. Wright and Paulano are entitled to dismissal of those claims based upon lack of personal involvement, and Dr. Silverberg is entitled to qualified immunity.  I further find that Dr. Wright is entitled to a finding of good faith immunity precluding all claims for damages against him individually, but that he is not entitled to dismissal of plaintiff's declaratory and potential injunctive claims against him in his official capacity on that basis; those claims for prospective relief, however, are subject to dismissal due to plaintiff's lack of standing.[28]

_____

[28]     Ordinarily, when a *pro se* action is dismissed *sua sponte*, the plaintiff should be allowed to amend his or her complaint.  *See Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999).  However, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile) (citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.")  (affirming, in part, dismissal of claim with prejudice)

Accordingly, it is hereby respectfully

RECOMMENDED, that plaintiff's motion to dismiss (Dkt. No. 49) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety; and it is further

ORDERED that pending final disposition of this motion, all discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is further hereby ORDERED that the clerk of the court serve a

---

(citation omitted); *cf. Gomez*, 171 F.3d at 796 (granting leave to amend is appropriate "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."). Here, for the reasons discussed above, I find that the deficiencies with plaintiff's claim are substantive, and that providing an opportunity to amend would therefore be futile.

copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 31, 2011
            Syracuse, NY

New York State    State Agencies    Search all of NY.gov

# Department of Corrections and Community Supervision

SKIP TO CONTENT

Google™ Custom Search

**About DOCS**
DOCS Home Page
Find a Facility
Contact DOCS
**Inmate Info**
Inmate Lookup
Inmate Info
Family Guide
Guía para la Familia
Program Services
PREA
**Victim Services**
Victim Services
Servicios Victima
**News**
News Room
Reports/Publications
Jobs Available
Directives
Rules & Regulations
Contracts
**Related Info**
Related Links
Corcraft
Criminal Justice

DOCS

## Inmate Population Information Search

Please specify one or more of the following:

- Use Name alone or in combination with birth year. More on Name Search
- DIN or NYSID are meant to be used alone - not in combination with name or birth year. More Detailed Instructions

Who's Listed Here? | About Youthful Offenders | Hours of Operation for Inmate Lookup

**Last Name:**

**First Name:**

**Middle Init:**

**Name Suffix:**        (SR, JR, etc.)

**Birth Year:**        (Optional, see above)

**DIN:**    -    -        (Department ID Number, format 99-A-9999, example 95-A-9876)

**NYSID:**        -    (For Criminal Justice Use Only; New York State ID Number)

For comments or questions about the inmate lookup capability, please visit the Contact Us page.

Home     Privacy Policy     Accessibility Information     Contact DOCS     Disclaimer



Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John HALE, Plaintiff,
v.
Jadow RAO; J. Ireland; Mack/s/Revell; R. Furnia; J.
Silver; John Doe # 1; John Doe # 2; Jane Doe # 1; Jane
Doe # 2; Jane Doe # 3; and Jane Doe # 4, Defendants.
**No. 9:08-CV-612.**

Nov. 3, 2009.

John Hale, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Richard Lombardo, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, John Hale, brought this civil rights action in
March 2008, pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated September 29, 2009, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motions to dismiss
(Docket No. 27) be granted in part and denied in part as
follows: (1) the motion to dismiss should be granted to the
extent that plaintiff asserts claims for money damages
against defendants in their official capacities; and (2) the
motion should be denied to the extent that defendants
moved to dismiss plaintiff's Eighth Amendment claim
against defendant Rao, and moved to dismiss the
complaint against defendant Rao on the ground of
qualified immunity. The Magistrate Judge further
recommended that the motion to dismiss for failure to

prosecute, or in the alternative for an order compelling
plaintiff's responses (Docket No. 36), be denied. No
objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Lowe, the
Report-Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss (Docket No. 27) is
GRANTED IN PART and DENIED IN PART;

    a. The motion to dismiss is GRANTED to the extent
that plaintiff asserts claims for money damages against
defendants in their official capacities; and

    b. The motion is DENIED to the extent that
defendants moved to against defendant Rao on the
ground of qualified immunity;

2. Defendants' motion to dismiss for failure to prosecute,
or in the alternative, for an order compelling plaintiff's
responses (Docket No. 36) is DENIED;

3. This matter is referred back to the Magistrate Judge for
any further proceedings.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**

GEORGE H. LOWE, United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court.

Currently pending is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), seeking dismissal of the complaint in its entirety against Defendant Dr. Jadow Rao and against Defendants J. Ireland, R. Furnia, Mack Reyell, J. Silver, and Rao in their official capacities. Dkt. No. 27. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

Also pending is a Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. Dkt. No. 36. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

For the reasons discussed below, I recommend that the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) be granted, in part, and denied, in part. I also recommend that the Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff's responses be denied.

## I. MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND 12(c)

### A. BACKGROUND

**\*2** Plaintiff John Hale alleges that eleven employees ("Defendants") of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment when (1) in or around May of 2006, Defendants Ireland, Revell, Furnia, and Silver physically assaulted and injured him without provocation at Clinton Correctional Facility ("C.F."), and (2) between May of 2006 and February of 2008, the remaining seven Defendants (Dr. Rao, John Does 1-2, and Jane Does 1-4)

were deliberately indifferent to his resulting serious medical needs at Clinton, Southport, Elmira and Attica C.F.s. Complaint at ¶¶ 16-27.

Plaintiff states that he has exhausted his administrative remedies. Complaint at ¶ 29. Plaintiff has submitted copies of decisions from the Central Office Review Committee of the Inmate Grievance Program. Dkt. No. 5, Exhibits. Plaintiff also included a copy of a decision from the Superintendent of Attica C.F. *Id.*

## B. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN1] or (2) a challenge to the legal cognizability of the claim. [FN2]

> FN1. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr .S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN2. *See Swierkiewicz v. Sorema N.A.,* 534 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12(b)(6)'s requirement of stating a cognizable claim and Rule 8(a)'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN3] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN4] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN5]

FN3. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v.*

*Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (citation omitted).

FN4. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN5. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

**\*3** It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN6 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"FN7 In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN6. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN7. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.FN8 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN9 Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN10 Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.FN11 In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."FN12

> FN8. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response affidavit on motion to dismiss)). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but also on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN9. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

> FN10. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

> FN11. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN12. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN13] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN14] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN15] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN16]

FN13. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") (internal quotation marks and citation omitted); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN14. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord,*

*Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN15. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN16. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

Defendants also move pursuant to Fed.R.Civ.P. 12(c). Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)."[FN17]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

FN17. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

## C. ANALYSIS

### 1. Eighth Amendment

Reading the complaint generously, Plaintiff alleges that he complained to Defendant Rao, Health Services Director at Attica C.F., about his "medical problems," which included (1) the injuries he sustained during the alleged May 2006 incident, such as persistent vomiting of blood and urinating of blood, (2) surgical staples in his stomach, and (3) swollen ribs.[FN18] Complaint at ¶ ¶ 16-27. Plaintiff alleges that in response, Dr. Rao stated that he did not believe Plaintiff's complaints, consistently "denied" Plaintiff's complaints, and called Plaintiff " 'crazy.' " *Id.* at ¶¶ 26, 27. Plaintiff claims that as a result, he has endured pain, suffering, and injuries. *Id.*

FN18. Specifically, Plaintiff states, "It should be noted that *Plaintiff has been complaining about all of the above medical problems* [which include the injuries sustained during the alleged assault, the surgical staples, and swollen ribs] to medical staff here at Attica C.F. *including Defendant Dr. Rao* ... and ever since he was beaten by the Defendant Officers Ireland, Reyell, Furnia, and Silver *he has been throwing up blood and urinating blood yet the Defendants consisting* [sic] *denied his complaints;* resulting in Plaintiff's pain and suffering, and further injuries." Complaint at ¶ 27 (emphasis added).

**\*4** Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim against Defendant Rao. Dkt. No. 27-2 at pp. 3-6.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

medical condition is sufficiently serious." *Id.* A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

**\*5** If the claim is that treatment was provided but was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment claim, the defendant's behavior must be "wanton." Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,*

143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

Regarding the objective component, the complaint alleges that Defendant Rao provided Plaintiff with inadequate or no medical care after learning of Plaintiff's physical complaints, including persistent vomiting of blood and urinating of blood. Vomiting of blood and urinating of blood are indications of serious medical needs. *See Morgan v. Maass,* No. 94-35834, 1995 WL 759203, at \*2 (9th Cir. Dec. 26, 1995) (finding that vomiting blood constituted a serious medical need); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926, at \*3 (M.D.Fla. Oct. 4, 2006) (finding that "[e]ven to a lay person, it is obvious that blood in the urine is an indication of a serious medical need."). Thus, the allegations in the complaint satisfy the objective component.

**\*6** Regarding the subjective component, the complaint alleges that Defendant Rao was aware that Plaintiff had serious medical needs, but consciously and intentionally disregarded or ignored those needs. Dkt. No. 1. Thus, the allegations in the complaint satisfy the subjective component.

Defendants argue that Plaintiff's complaint is conclusory and fails to contain specific allegations of fact indicating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

a deprivation of rights as against Defendant Rao. Dkt. No. 27-2, at p. 5. The Court disagrees. Plaintiff specifically stated that he informed Defendant Rao about his "medical problems," which included vomiting of blood and urinating of blood, but that Dr. Rao expressed disbelief, consistently "denied" Plaintiff's complaints, and stated that Plaintiff was "crazy." Complaint at ¶ 27. Plaintiff has set forth more than a simple conclusory allegation.

In light of the foregoing, the Court declines to conclude at this stage that Plaintiff has failed to state a claim for deliberate medical indifference against Defendant Rao.[FN19] Accordingly, the motion to dismiss the Eighth Amendment claim against Defendant Rao should be denied.

> FN19. *See Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657, at *7 (E.D.N.Y. Aug. 21, 2008) (citing *Chance,* 143 F.3d at 703-04 (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.... It may be that Chance has no proof whatsoever of this improper motive, and that lack of proof may become apparent at summary judgment. But even if we think it highly unlikely that Chance will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ....") (citations and quotation marks omitted) (other citations omitted); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 559 (S.D.N.Y.2008) (finding that amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of prescribed course of treatment was ineffective, and declined to do anything to attempt to improve plaintiff's situation besides re-submitting MRI request forms) (citing *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at *23 (S.D.N.Y. Apr. 3, 2008) (despite plaintiff's sparse allegations as to defendant's conduct, at the 12(b)(6) stage plaintiff sufficiently alleged facts supporting a plausible claim that defendant

was deliberately indifferent to plaintiff's medical needs)).

**2. Qualified Immunity**

Defendant Rao asserts that he is entitled to dismissal on the ground of qualified immunity. Dkt. No. 27-2 at pp. 6-8.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992).[FN20] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir.2007) (citations omitted). [FN21] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).[FN22] As the Supreme Court has explained,

> FN20. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v.. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN21. *See also Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (citation omitted); *Davis v. Scherer,* 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN22. *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

**\*7** [T]he qualified immunity defense ... provides ample

protection to all but the plainly incompetent or those who knowingly violate the law.

... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[FN23]

> FN23. *See also Hunter v. Bryant,* 502 U.S. 224, 299 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

Here, after liberally reviewing the complaint, accepting all of its allegations as true, and construing them in Plaintiff's favor, the Court declines to conclude that Defendant Rao is entitled to qualified immunity at this stage. As noted, Plaintiff alleges that he informed Dr. Rao of his "medical problems," including persistent vomiting of blood and urinating of blood, but Dr. Rao stated that he did not believe Plaintiff's complaints, consistently denied Plaintiff's complaints, and called Plaintiff " 'crazy,' " which resulted in pain, suffering, and injuries. Complaint at ¶¶ 26-27. Therefore, the motion to dismiss the complaint on the ground of qualified immunity should be denied.[FN24]

> FN24. *See Beeks,* 2008 WL 3930657, at \*9 (citing *See McKenna,* 386 F.3d at 437-38 (affirming district court's denial of qualified immunity at motion to dismiss stage on deliberate indifference claim, "[h]owever the matter may stand at the summary judgment stage, or perhaps at trial....") (other citations omitted)).

### 3. Eleventh Amendment

Defendants Ireland, Furnia, Reyell, Silver, and Rao argue

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

that to the extent the complaint seeks damages against them in their official capacities, the claim is barred by the Eleventh Amendment. Dkt. No. 27-2 at pp. 8-9.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U .S. 139, 142-47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN25] Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

FN25. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v . Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages

against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also* *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.").

**\*8** Here, each of the represented Defendants has an official position with DOCS. Therefore, any claims for money damages against these Defendants in their officials capacities are barred by the Eleventh Amendment and should be dismissed.

## II. MOTION TO DISMISS FOR LACK OF PROSECUTION, OR IN THE ALTERNATIVE, FOR AN ORDER COMPELLING RESPONSES

Defendants argue that the complaint should be dismissed on the ground that Plaintiff has failed to prosecute this action. Dkt. No. 36. Defendants argue that in the alternative, Plaintiff should be compelled to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. *Id.*

### A. ANALYSIS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

Rule 41 of the Federal Rules of Civil Procedure provides, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed.R.Civ.P. 41(b). As a result, Fed.R.Civ.P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the Court. Id.

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN26] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute under Rule 41(b):

FN26. See Merker v. Rice, 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN27]

FN27. See Shannon v. GE Co., 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41(b) dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) (citation and internal quotation marks omitted).

As a general rule, no single one of these five factors is dispositive.[FN28] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for

dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN29]

FN28. See Nita v. Conn. Dep't of Env. Protection, 16 F.3d 482 (2d Cir.1994).

FN29. See, e.g., Robinson v. Middaugh, 95-CV-0836, 1997 WL 567961, at *1 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); see also N.D.N.Y. L.R. 41.2(b) ( "Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

**1. Address Changes**

As to the first factor (the duration of Plaintiff's "failures") Defendants argue that Plaintiff was transferred to several different facilities, but failed to update the Court and defense counsel of his changes of address. Dkt. No. 36-2, Lombardo Decl., at ¶¶ 4-5, 7-12 & Dkt. Nos. 49, 50. Defendants argue that the action should be dismissed for this reason alone. Dkt. No. 36-8.

*9 Plaintiff has failed at times to update the Court and defense counsel as to his address changes. His most recent failure occurred on July 6, 2009 when he was transferred from Green Haven C.F. to Auburn C.F., and subsequently to Wende C.F., where he now remains. Dkt. No. 50-2, Stachowski Decl., at ¶¶ 3-5. Plaintiff failed to update the Court and defense counsel as to these changes. Thus, Plaintiff's failure to provide an updated address has persisted since July 6, 2009 (less than three months). Generally, it appears that durations of this length (i.e., less than four months) are not long enough to warrant dismissal.[FN30]

FN30. N.D.N.Y. L.R. 41.2(a) ("[P]laintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution.");

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

*Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

The Court notes that Plaintiff has been subject to frequent transfers. Since August 7, 2008, Plaintiff was transferred on seven occasions. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 4-11; Dkt. No. 50-2, Stachowski Decl. at ¶¶ 4-5. Three of the transfers occurred within a span of six days. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 7-11.

Moreover, whether Plaintiff was mentally and physically capable of providing written updates of all of his address changes is unclear. Plaintiff noted in his opposition papers that he was diagnosed as suffering from schizophrenia; has "borderline intellectual" functioning; [FN31] and is unable to read or write; therefore Plaintiff's submissions to the Court are written by others. Dkt. No. 39. Plaintiff also stated that at times he has been "prohibited from possessing any type of writing utensil." Dkt. No. 41. Plaintiff further stated that while at Central New York Psychiatric Center, "any legal work whatsoever" was discouraged and "not facilitate[d]." *Id.* In light of the foregoing, I find that the first factor weighs against dismissal of Plaintiff's complaint.

> FN31. Plaintiff submitted copies of medical records indicating that he was diagnosed as suffering from, *inter alia,* schizophrenia, paranoid type; has borderline intellectual functioning; and has an IQ of 71. Dkt. No. 5.

As to the second factor (whether plaintiff had received notice that further delays would result in dismissal), I find that Plaintiff has received notice that his failure to provide his current address may result in dismissal. *See* Dkt. No. 12 at 4 *(Order stating that "Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action")* (emphasis in original); N.D.N.Y. L.R. 41.2(b) (stating, "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action.") [FN32] As a result, I find that the second factor weighs in favor of dismissal of Plaintiff's

complaint.

> FN32. I note that, to assist *pro se* litigants, the Clerk of the Court for the Northern District of New York has provided to all correctional facilities in New York State copies of the Northern District's Local Rules of Practice and *Pro Se* Manual.

Regarding the third factor (whether defendants are likely to be prejudiced by further delay), I am unable to find, based on the current record, that Defendants are likely to be prejudiced by a delay in the proceedings. While any delay that occurs theoretically impairs the Defendants' memories, the preservation of evidence, and the ability to locate witnesses, [FN33] Defendants have not argued that any delay has occurred due to Plaintiff's failure to update his address. As a result, I find that the third factor weighs against dismissal of Plaintiff's complaint. [FN34]

> FN33. *See, e.g., Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

> FN34. *See Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348, at *2 (S.D.N.Y. Feb. 5, 1997) (declining to dismiss action for failure to prosecute or failure to comply with court orders where plaintiff had failed to meet discovery deadlines, and noting that the fact that plaintiff "has been in lock-down and transferred to another facility during the pendency of this action also counsels leniency toward [the plaintiff's] delays") (citing *Jones v. Smith,* 99 F.R.D. 4, 14-15 (M.D.Pa.1983) (granting *pro se* plaintiff final opportunity to comply with orders of court, despite repeated wilful, dilatory and contumacious tactics), *aff 'd* 734 F.2d 6 (3d Cir.1984)).

*10 Regarding the fourth factor (striking the balance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard), I find that Plaintiff's right to receive a further chance to be heard in this matter, at this point, outweighs the need to alleviate congestion on the Court's docket. Moreover, Defendants point to no delay caused by Plaintiff's failure to update his address. As a result, I find that the fourth factor weighs against dismissal of Plaintiff's complaint.

With regard to the fifth factor (whether the judge has adequately assessed the efficacy of lesser sanctions), I find that a strong reminder to Plaintiff of his obligation to provide a current address might be effective and is warranted. Plaintiff, who alleges that he suffers from schizophrenia and is unable to read and write, Dkt. No. 39, has been responsive to prior Orders from the Court,[FN35] and has shown an interest in prosecuting this action. *See* Dkt. Nos. 39, 41 (Plaintiff's Opposition Papers). As a result, I find that the fifth factor weighs against dismissal of Plaintiff's complaint.

> FN35. *See* Dkt. Nos. 7-11 (Report-Recommendation and Order; Plaintiff's Inmate Authorization Forms; Application to Proceed *In Forma Pauperis;* and Signed Last Page of Complaint).

Weighing these five factors together, I conclude that they tip the scales against dismissing Plaintiff's complaint (one of the factors weighing in favor of such dismissal and four of the factors weighing against such dismissal).[FN36] Dismissal based on a lack of prosecution is a harsh remedy to be used only in extreme situations. The Court does not currently view the present case to be in such a situation. For these reasons, I recommend that Defendants' Motion to Dismiss based on Plaintiff's failure to provide a current address (Dkt. No. 36) be denied.

> FN36. *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir.1993); *see also Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254, at * 3 (2d Cir. Sept. 7, 2005) (remanding case to district court to make further factual findings concerning the plaintiff's lack of responsiveness and concerning his confinement

in a prison psychiatric ward where district court dismissed for failure to prosecute).

**2. Responses to Scheduling Order**

Defendants argue that if the Court does not dismiss the complaint for a failure to prosecute, the Court should issue an order requiring Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's mandatory pretrial discovery and scheduling order dated November 18, 2008 ("Scheduling Order"). Dkt. No. 36-8, Memo. of Law at pp. 3-4.

The Scheduling Order provided, in relevant part, as follows:

**I. Discovery**

**A.** *Documents.* Within sixty (60) days of the date of this order:

**1.** *Plaintiff(s)* shall provide to counsel for defendant(s) copies of all:

**a.** Documents and other materials which plaintiff(s) may use to support the claims in the complaint;

**b.** Correspondence, grievances, grievance appeals, and other documents relating to requests for administrative remedies or the inability or failure to exhaust such remedies; and

**c.** Complaints and petitions filed by plaintiff(s) in any other cases in any court relating to the same issues raised in the complaint in this action or, if such documents are not within the possession of plaintiff(s), plaintiff(s) shall provide to counsel for defendant(s) a list of any such legal proceedings stating the court in which the proceeding was filed, the caption of the case, and the court number.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**\*11** Dkt. No. 26, at pp. 1-2.

Defendants admit that they received "what purported to be plaintiff's response to paragraph I(A)(1) of the [Scheduling Order]" in a letter to defense counsel from Plaintiff. Dkt. No. 36-2, Lombardo Decl., at ¶ 19 & Dkt. No. 36-6, Ex. C. In that letter, Plaintiff asserted the following:

Pursuant to paragraph I(A) of the court's mandatory pretrial discovery and scheduling order dated Nov. 18, [20]08[:]

a. Documents and materials which plaintiff will use to support the claims in this complaint is [sic] the complete Medical Records for the period of June 14, 2006 to present, and current Tier III documents and pictures surrounding the incident which you forwarded to me pursuant to mandatory pretrial discovery, in addition enclosed please find Lab work report of specimen done on plaintiff which will also be use[d].

Plaintiff has complied with the court's mandatory pretrial discovery and scheduling order pursuant to paragraph I(A) so your office no longer has to seek dismissal of the complaint for failure to prosecute.

Dkt. No. 36-6, Ex. C.

Defendants view this letter as being nonresponsive to paragraphs I(A)(1)(b) and (c). However, regarding paragraph I(A)(1)(b), Plaintiff specifically stated in the above-quoted letter that he "will use the complete medical records for the period of June 14, 2006 to present, and *current Tier III documents and pictures surrounding the incident which you forwarded to me.*" Dkt. No. 36-6, Ex. C at p. 1 (emphasis added). Moreover, Plaintiff stated in his March 23, 2009 letter to defense counsel that he filed grievances while in Attica C.F., but that he was no longer "in possession of those grievances" because his property was lost while he was at Central New York Psychiatric Center. [FN37] Dkt. No. 39 at p. 2. Plaintiff also stated that he has "no money in his account," therefore he has been unable to obtain copies of his grievances, as well as medical records. *Id.* Accordingly, Plaintiff has responded

to paragraph I(A)(1)(b). He stated that he no longer possesses the grievances he filed at Attica C.F.; he is unable to afford copies; and he intends to use the documents that defense counsel sent to him. To the extent that defense counsel is arguing that Plaintiff must provide copies of the same documents defense counsel has already provided Plaintiff, Dkt. No. 36-7, Ex. D at p. 2, this argument is unavailing.

FN37. Plaintiff also asserts that he no longer has a copy of the complaint in this action. Dkt. No. 41, at ¶ 8. Accordingly, the Clerk will be directed to provide a copy of the complaint to Plaintiff.

Regarding paragraph I(A)(1)(c), Plaintiff stated in his March 23, 2009 opposition letter that "[t]here is no other complaints or petitions filed by plaintiff in any other cases in any other court [sic]." Dkt. No. 39, at p. 2. Plaintiff reiterated this response in a supplemental opposition letter dated March 31, 2009 by stating that "there are no other known complaints, petitions, etc. filed by plaintiff in any other court with regards to the claims raised in [this case]." Dkt. No. 41, [FN38] at ¶ 6. Accordingly, Plaintiff has responded to paragraph I(A)(1)(c).

FN38. To the extent that Plaintiff is seeking permission to amend his complaint via his supplemental opposition letter, (Dkt. No. 41), Plaintiff's request must be in the form of a motion. *See* N.D.N.Y. Local Rule 7.1.

**\*12** In light of the foregoing, Defendants' request for an order compelling responses to paragraphs I(A)(1)(b) and (c) of the Scheduling Order should be denied as moot.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) (Dkt. No. 27) be GRANTED in part and DENIED in part. The motion to dismiss should be granted to the extent that Plaintiff asserts claims for money damages against Defendants in their official capacities. The motion should be denied to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

the extent that Defendants moved to dismiss Plaintiff's Eighth Amendment claim against Defendant Rao, and moved to dismiss the complaint against Defendant Rao on the ground of qualified immunity; and it is further

**RECOMMENDED** that the Motion to Dismiss for Failure to Prosecute or in the alternative for an Order compelling Plaintiff's responses (Dkt. No. 36) be DENIED; and it is further

**ORDERED,** *that Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action;*

**ORDERED,** that the Clerk update Plaintiff's address to reflect that he is currently incarcerated at Wende Correctional Facility; FN39 and it is further

FN39. Defendants' letter to the Court dated August 21, 2009 indicates that Plaintiff is now incarcerated at Wende C.F. Dkt. No. 50.

**ORDERED,** that the Clerk serve (1) copies of the electronically-available-only opinions cited herein; FN40 (2) a copy of the Complaint (Dkt. No. 1); and (3) a copy of this Report-Recommendation and Order on Plaintiff.

FN40. Those decisions include *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878 (S.D.N.Y. Nov. 17, 1997); *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119 (E.D.N.Y. Oct. 24, 2002); *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864 (2d Cir. Aug. 12, 2008); *Morgan v. Maass,* No. 94-35834, 1995 WL 759203 (9th Cir. Dec. 26, 1995); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926 (M.D.Fla. Oct. 4, 2006); *Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657 (E.D.N.Y. Aug.21, 2008); *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616 (S.D.N.Y. Apr. 3, 2008); *Robinson v. Middaugh,* 95-CV-0836, 1997 WL

567961 (N.D.N.Y. Sept. 11, 1997); *Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348 (S.D.N.Y. Feb. 5, 1997); and *Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254 (2d Cir. Sept. 7, 2005).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Hale v. Rao
Slip Copy, 2009 WL 3698420 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Larry TINSLEY, Plaintiff,
v.
Gary GREENE, Deputy Superintendent of Great
Meadow Correctional Facility; Jim Lanfear,
Maintenance Supervisor, Great Meadow Correctional
Facility; Gary Yule, Corrections Officer, Great Meadow
Correctional Facility; and David Roberts, Senior
Counselor, Great Meadow Correctional Facility,
Defendants.
**No. 95-CV-1765 (RSP/DRH).**

March 31, 1997.

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General,
Darren O'Connor, Assistant Attorney General, of counsel,
for Defendants.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a
report-recommendation and order by Magistrate Judge
David R. Homer, duly filed on the 13th day of September,
1996. Dkt. No. 24. Following ten days from the service
thereof, the clerk has sent me the entire file, including any
objections thereto. Plaintiff Larry Tinsley filed objections.
Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer
advises that Tinsley failed to establish or raise a genuine
issue of material fact regarding the nature of his

confinement. Report-recommendation, Dkt. No. 24, at
9-10. There is no dispute that prison officials confined
Tinsley to keeplock and loss of some privileges for 60
days after they conducted a search of his cell, found a
marijuana cigarette in the cell, and found Tinsley guilty of
possessing a controlled substance after a Tier III
disciplinary hearing. Tinsley's conviction and sentence
were affirmed on administrative appeal. In his lawsuit
under 42 U.S.C. § 1983, Tinsley raises several charges to
the manner in which defendants conducted the search and
disciplinary hearing. However, Tinsley failed to specify in
any manner that his punishment posed an "atypical and
significant hardship on [him] in relation to the ordinary
incidents of prison life." *Sandin v. Connor*, 515 U.S. 472,
----, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ---- (1995).
Without this showing, plaintiff failed to allege a
deprivation of his Fourteenth Amendment due process
liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley
makes general attacks regarding the alleged bias of
Magistrate Judge David Homer and argues that the
magistrate judge has misconstrued his claims. Plaintiff
also asks me to reconsider defendants' summary judgment
motion and review plaintiffs memorandum opposing the
motion. However, Tinsley has not raised any allegation
regarding the nature of his punishment, which is the
threshold issue under *Sandin*. I have reviewed the entire
file in this matter, including plaintiff's many submissions,
and I find that he failed to raised any issue of fact to
support an alleged deprivation of his due process liberty
interests. Magistrate Judge Homer's thorough
report-recommendation is neither biased nor a
mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of September
13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary
judgment is denied as moot, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

ORDERED that defendants' motion for summary judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.
HOMER, United States Magistrate Judge.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

*2 Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by

Corrections Officer Rando and defendant Yule and was supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [FN2] and was given a contraband receipt for the cigarette that was removed from his cell.

> FN2. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [FN3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

> FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); Walker v. Bates, 23 F.3d 652, 654 (2d Cir.1994), cert. denied, 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the

statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

was found in Tinsley's cell. Testimony during hearing by Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

**\*3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

### 1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3-7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[FN4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

> FN4. New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1-.7 (1995).

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See Orellana v. Kyle, 65 F.3d 29, 31-32 (5th Cir.1995), cert. denied, 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996)* ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the deprivation complained of was solely confinement in segregated housing. *See, e.g., Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir.1996)* (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott, 71 F.3d 192, 193 (5th Cir.1995), cert. denied, 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996)* (segregation without more implicates no liberty interest); *Rimmer-Bey v. Brown, 62 F.3d 789, 790-91 (6th Cir.1995)* (placement in administrative segregation not atypical and significant in context of life sentence).

*4 Several judges in this district have adopted this position. *See Polanco v. Allan, No. 93-CV-1498, 1996 WL 377074, at *2 (N.D.N.Y. July 5, 1996)* (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91-CV-510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky, 899 F.Supp. 923, 927 (N.D.N.Y.1995)* (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94-CV-530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94-CV-1119

(N.D.N.Y. Jan. 10, 1996) (Report-Recommendation of M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96-2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91-CV-1445 (N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey, No. 95-CV-1620, 1996 WL 227859, at *2 (N.D.N.Y. May 2, 1996)* (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff's confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g., Bryan v. Duckworth, 88 F.3d 431, 433-34 (7th Cir.1996)* (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain, 77 F.3d 372, 374 n. 3 (11th Cir.1996)* (noting *Sandin* decided by only 5-4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood, 66 F.3d 1097, 1101 (9th Cir.1995)* (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See Rodriguez v. Phillips, 66 F.3d 470, 480 (2d Cir.1995)*. It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996); Samuels v. Mockry, 77 F.3d 34, 37-38 (2d Cir.1996); see also Giakoumelos v. Coughlin, 88 F.3d 56, 62 (2d Cir.1996)* (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare Silas v. Coughlin, No. 95-CV-1526, 1996 WL 227857, at *1 (N.D.N.Y. April 29, 1996)* (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

interpretation of *Sandin* mandated further fact-finding as to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

**\*5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ----, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927-28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ----, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302-05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ----, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock, including plaintiff, are the same regardless of the reason for placement there. *Id.* at pts. 302-05.[FN5]

> FN5. Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular program offered at an institution. *Cf. Meacham v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

**\*6** 515 U.S. at ---- - ----, 115 S.Ct. at 2299-2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

other inmates or guards such that keeplock confinement imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under *Sandin.* Accordingly, defendants' motion on this ground should be granted.

2. Due Process

Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are

confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

**\*7** Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official.[FN6]

> [FN6.] A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. N.Y. Comp.Codes R. & Regs. tit. 7, § 251-3.1(b) (1995). The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Fourth, plaintiff claims that defendant Roberts failed to provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. [FN7]

> [FN7.] Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

### 3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. [FN8] In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. [FN9] Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

> [FN8.] In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the

marijuana five hours after the search was conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

> [FN9.] Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

### 4. Qualified Immunity

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

**\*8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656-57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.

### III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted.[FN10]

> FN10. Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in

response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

### IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

*9 Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Tinsley v. Greene

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 🔑 **25**

170A Federal Civil Procedure
    170AI In General
        170AI(B) Rules of Court in General
            170AI(B)1 In General
                170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases

District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4]** Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In general. Most Cited Cases

Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5]** Attorney and Client 45 ☞ 62

45 Attorney and Client
   45II Retainer and Authority
      45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak654 Construction
            170Ak657.5 Pro Se or Lay Pleadings
               170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ☞ 2546

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2546 k. Weight and sufficiency.
Most Cited Cases

Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6]** Civil Rights 78 ☞ 1304

78 Civil Rights
   78III Federal Remedies in General
      78k1304 k. Nature and elements of civil actions.
Most Cited Cases

To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7]** Prisons 310 ☞ 317

310 Prisons
   310II Prisoners and Inmates
      310II(H) Proceedings
         310k316 Exhaustion of Other Remedies
            310k317 k. In general. Most Cited Cases

In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8]** Prisons 310 ☞ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 ☞ 1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 ☞ 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** ☞     1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** ☞     192

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞     1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** ☞     1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** ☞     192

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ☞     1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** ☞     2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases

Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
       350HVII(H) Conditions of Confinement
          350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
       170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 ☞ 1355

78 Civil Rights
    78III Federal Remedies in General
       78k1353 Liability of Public Officials
         78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases

Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 ☞ 1358

78 Civil Rights
    78III Federal Remedies in General
       78k1353 Liability of Public Officials
         78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
       170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
             170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 ☜ 1358

78 Civil Rights
   78III Federal Remedies in General
     78k1353 Liability of Public Officials
      78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A ☜ 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
       170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
**\*347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **349 at the NCCC,** FN2 plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.FN3 (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> **FN8.** Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> **FN9.** Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> **FN10.** Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

### III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **\*353** by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

#### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the *356 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*357 Hayes, 84 F.3d at 620 (internal citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In Salahuddin v. Goord, the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); see also Jones v. Westchester County Dep't of Corr. Medical Dep't, 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware *358 of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

### 2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

#### a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription**359** of medication for plaintiff's renal disease.

#### i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra*.

> FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall,* 295 Fed.Appx. 102, 103 (8th Cir.2008) (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

**[15][16]** Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010) ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr.,* No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[Plaintiff's] claims that Defendants failed **\*361** to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009) ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange,* 248 Fed.Appx. 232, 237 (2d Cir.2007) ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen,* 205 F.3d 1094, 1097 (8th Cir.2000) ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009) ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984)] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### 2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Cornell DELISSER, Plaintiff,
v.
Glenn S. GOORD, Commissioner of Docs; Daniel A.
Senkowski, Superintendent, Clinton Correctional
Facility; J. Mitchell, Nurse Administrator, Clinton
Correctional Facility; Kang Maeng Lee, Health Services
Director, Clinton Correctional Facility; M.D. Ruby,[FN1]
Doctor at Clinton Correctional Facility; F. Bushey,
Family Services Coordinator, Clinton Correctional
Facility; R. Girdich, First Deputy Superintendent/Acting
Superintendent, Clinton Correctional Facility; Lester N.
Wright, Chief Medical Officer for Docs; Stephen M.
Bernardi[FN2], Deputy Commissioner of Policy and
Compliance Review; and R. Faulkner, Captain; Clinton
Correctional Facility, Defendants.

> FN1. Service must be made upon a defendant
> within 120 days of filing the complaint or any
> claims against that defendant will be dismissed.
> Fed.R.Civ.P. 4(m). Since M.D. Ruby and
> Stephen M. Bernardi have never been served,
> this court lacks jurisdiction over them, and this
> court recommends dismissal of these defendants.

> FN2. See Footnote 1.

No. CIV902CV00073FJSGLS.

Jan. 15, 2003.

State prisoner brought § 1983 action against prison
officials, alleging violations of his First, Eighth, and
Fourteenth Amendment rights arising from his refusal to
submit to tuberculosis (TB) screening test. On defendants'
motion to dismiss for failure to state a claim, the District
Court, Scullin, J., referred the matter to Gary L. Sharpe,
United States Magistrate Judge, who reported and
recommended that: (1) defendants were entitled to
qualified immunity against prisoner's First Amendment

freedom of religion claim; (2) complaint failed to allege
deliberate indifference to a serious medical need; (3)
placement in medical keeplock was not cruel and unusual
punishment; (4) placement in medical keeplock did not
implicate prisoner's liberty interests so as to trigger due
process protections; and (5) personal involvement of
defendants in alleged constitutional deprivations was a
prerequisite to an award of damages under § 1983.

Report and recommendation filed.

West Headnotes

**[1] Civil Rights 78 🔑 1376(7)**

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and
Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their
Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))
State prison officials would not reasonably have
known that placing inmate in medical keeplock for 41
days for his refusal, on religious grounds, to submit to a
tuberculosis (TB) screening test, and subsequently for
another 52 days when he refused to accept medication for
tuberculosis after he agreed to submit to the test and tested
positive, was a violation of his First Amendment freedom
of religion rights at the time the conduct occurred in July
and October, 1999, and thus, the prison officials were
entitled to qualified immunity against the inmate's § 1983
claim for violation of his First Amendment rights.
U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 🔑 1395(7)**

78 Civil Rights

78III Federal Remedies in General
78k1392 Pleading

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

78k1395 Particular Causes of Action
78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
(Formerly 78k235(7))

State prisoner's complaint failed to allege facts sufficient to satisfy either the subjective or objective elements required to establish a § 1983 claim against prison officials for deliberate indifference to a serious medical need, where the prisoner, who was initially placed in medical keeplock for 41 days for his refusal, on religious grounds, to submit to a tuberculosis (TB) screening test, and who subsequently agreed to submit to the test and tested positive, provided no specifics concerning his medical condition, failed to indicate that he was in pain or that any of the defendants ignored a condition which created a substantial risk of harm to him, and failed to allege sufficient facts to indicate how any of the named defendants were deliberately indifferent to his medical needs. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

[3] Prisons 310 ☞ 220

310 Prisons

310II Prisoners and Inmates
310II(E) Place or Mode of Confinement
310k215 Nature of Offense, Offender, or Sentence
310k220 k. Disability or Illness. Most Cited Cases
(Formerly 310k17(2))
Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment. Most Cited Cases

State prisoner's alleged placement in medical keeplock for his refusal to take tuberculosis (TB) screening test and TB medication after he took the test and tested positive, and alleged denial of his regular commissary privileges during his time in medical keeplock, was not cruel and unusual punishment, absent any demonstration that the conditions of his confinement

resulted in unquestioned and serious deprivations of basic human needs. U.S.C.A. Const.Amend. 8.

[4] Constitutional Law 92 ☞ 4823

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)11 Imprisonment and Incidents Thereof
92k4823 k. Medical Care and Treatment. Most Cited Cases
(Formerly 92k272(2))
Constitutional Law 92 ☞ 4824

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)11 Imprisonment and Incidents Thereof
92k4824 k. Discipline and Classification. Most Cited Cases
(Formerly 92k272(2))
Prisons 310 ☞ 220

310 Prisons

310II Prisoners and Inmates
310II(E) Place or Mode of Confinement
310k215 Nature of Offense, Offender, or Sentence
310k220 k. Disability or Illness. Most Cited Cases
(Formerly 310k13(4))

State prisoner's liberty interests were not implicated, so as to trigger due process protections, when he served periods of 41 and 52 days under medical keeplock, first when he refused, on religious grounds, to submit to a tuberculosis (TB) screening test, and subsequently when he refused to accept medication for tuberculosis after he agreed to submit to the test and tested positive; his relatively short period of confinement did not constitute an atypical or significant hardship. U.S.C.A. Const.Amend. 14.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

[5] Civil Rights 78 ☞ 1335

78 Civil Rights

78III Federal Remedies in General
78k1334 Persons Liable in General
78k1335 k. In General. Most Cited Cases
(Formerly 78k204.1)
Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. 42 U.S.C.A. § 1983.

Cornell Delisser, Wyoming Correctional Facility, Attica, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Office of the Attorney General, The Capitol, Albany, NY, for the Defendants.

Sean D. Quinn, Assistant Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
I. *Introduction*

**\*1** This matter has been referred to the undersigned for a Report-Recommendation by the Honorable Frederick J. Scullin, Jr., Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Plaintiff, *pro se,* Cornell Delisser ("Delisser") brings this action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights under the First, Eighth and Fourteenth Amendments. On February 22, 2002, the defendants filed a motion to dismiss (Dkt.Nos.28-29), and Delisser responded (Dkt. No. 33). For the foregoing reasons, the motion to dismiss should be granted.
II. *Procedural Background*

On January 17, 2002, Chief United States District Court Judge Michael B. Mukasey, Southern District of New York, found Delisser's complaint deficient and ordered that he amend it. Judge Mukasey rejected Delisser's complaint because he failed to show that a constitutional violation occurred, or that the named defendants were somehow personally involved in the alleged violation. Delisser was permitted sixty days to amend his complaint to set forth allegations demonstrating how each named defendant was deliberately indifferent to his medical needs. Thereafter, Delisser filed two amended complaints in the Southern District. On January 22, 2002, this case was transferred to the Northern District of New York.

In this motion, the defendants argue that Delisser failed to allege a constitutional violation. They argue that they are entitled to qualified immunity and, in any event, the DOCS Tuberculin Hold ("TB Hold") [FN3] policy is reasonably related to a legitimate penological objective. Finally, they argue that Delisser has failed to allege personal involvement of the named defendants. The court shall address each of these issues *seriatim.*

FN3. Delisser calls this "medical keeplock."

III. *Facts*

On July 26, 1999, Delisser was asked to take a Purified Protein Derivative (PPD) test for tuberculosis screening. He refused to submit to the PPD test for religious reasons. [FN4] Delisser informed unnamed "John Doe" physicians that he had taken a Bacille Calmette-Guerin [FN5] vaccine just prior to entering the United States from Jamaica in 1978. Delisser informed the doctors that he would be willing to submit to an x-ray examination or an oral swab test as an "alternative" test screening. The doctors disregarded his request and he was placed in medical keeplock [FN6] until August 30, 1999. Delisser spent 41 days in medical keeplock and he was released on August 30, 1999, after he agreed to submit to the PPD test.

FN4. Delisser belongs to the Rastafari religion.

FN5. Delisser alleges that this vaccine causes him to test false positive for TB.

FN6. Delisser claims that he was confined to his cell.

Subsequently, Delisser tested positive for TB (*see Pl. ['s] Resp. to Motion to Dismiss P. 6* ). On October 21, 1999, Delisser's refusal to accept medication for the treatment of tuberculosis caused him to be placed in medical keeplock again. Delisser claims that during this time, he was denied "regular" commissary privileges.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

Delisser claims that he spent a total of 52 days in medical keeplock.

### IV. *Discussion*

#### A. *Legal Standard*

**\*2** Federal Rules of Civil Procedure 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." In other words, the court should dismiss the complaint pursuant to Rule 12(b)(6), if it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *S.E.C. v. U.S. Environmental, Inc.,* 155 F.3d 107, 110 (2d Cir.1998). "The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998)(*quoting Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). Therefore, in analyzing a motion to dismiss, the facts alleged by a plaintiff are assumed to be true and must be liberally construed in the light most favorable to him. *See e.g., Easton v. Sundram,* 947 F.2d 1011, 1014-15 (2d Cir.1991).

The court must "confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." ' *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (*quoting Allen v. West Point-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *Hayden v.. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999). "Moreover, 'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendants' motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (1995)(*citation omitted).* With this standard in mind, the court turns to the sufficiency of Delisser's claims. [FN7]

FN7. Delisser quotes parts of DOCS' Tuberculosis Policy and the defendants provide the court with a copy of DOCS' Tuberculosis Policy. (*See Defs.* ['] *Aff. B.*).

#### B. *Qualified Immunity*

Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It also protects officials from "the burdens of costly, but insubstantial, lawsuits." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999)(*quotation marks and internal citations omitted* ).

The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)(*citations omitted* ). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640, 107 S.Ct. at 3039; *Keane,* 196 F.3d at 332. In other words, "in evaluating whether a right was clearly established at the time a § 1983 defendant acted [the court must determine]: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." ' *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002). *See also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

**\*3** Additionally, the Second Circuit has held that a court may dismiss a claim based upon qualified immunity without first deciding the substantive claims therein. *See Home v. Coughlin,* 191 F.3d 244 (2d Cir.1999). Also within this decision, the Second Circuit suggested that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

qualified immunity issue should be addressed before the substance of a claim. The court will now consider the defendants' claim that they are entitled to qualified immunity.

1. *First Amendment Claim*

In *Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996), the court found that Jolly had demonstrated a likelihood of success on the merits of his Eighth Amendment claim where he had been confined to medical keeplock for three-and-a-half years and had only been allowed out of his cell for one ten-minute shower per week. In response to this ruling, DOCS amended its policy to limit an inmates's period of confinement on TB Hold to one year, and to allow more exercise and shower time to such inmates. In *Word v. Wright,* 1999 U.S. Dist. LEXIS 22047, at *14 (W.D.N.Y. Sept. 15, 1999), the court noted that the Second Circuit had not yet ruled on whether the new TB Hold policy was constitutional. In that case, the court held that the TB Hold policy did not deprive the inmate of basic human needs violative of the Eighth Amendment. *Word,* 1999 U.S. Dist. Lexis 22047, at *15.

In *Giles v. Coughlin,* 1997 U.S. Dist. LEXIS 11129 (S.D.N.Y. Aug. 1, 1997), the district court found that DOCS' TB Hold policy [after the 1996 changes] did not violate the Eighth Amendment. In *Dorsey v. McQuillian,* 1997 WL 772779, at *3 (S.D.N.Y. Dec.15, 1997), the district court held that the defendants were entitled to summary judgment based on qualified immunity since the "right to be free from [TB Hold] on First Amendment grounds (assuming such right exists) ha [d] never been established."

On the other hand, recently, in *Reynolds v. Goord,* 103 F.Supp .2d 316 (S.D.N.Y.2000), the district court found that the plaintiff showed a clear and substantial likelihood of proving at trial that his First Amendment rights would be violated by application of the TB Hold policy. Moreover, the district court held that "even if plaintiff's confinement in TB Hold was not a loss of a First Amendment freedom, his placement on TB Hold for the exercise of his religious beliefs is a substantial burden on his constitutional right that cannot be adequately compensated monetarily." *Id.* at 337.

In this case, Delisser claims that the defendants violated his First Amendment right to freedom of religion when they placed him in medical keeplock for refusing a PPD test on religious grounds. He further argues that alternative TB tests were available like x-rays and oral swabs instead of the PPD test. Delisser contends that the defendants deliberately violated his right when they placed him in TB Hold rather than offer him an alternative TB test. Furthermore, Delisser contends that their implementation of the TB Hold policy was not objectively reasonable.

**\*4** The defendants maintain that they are entitled to qualified immunity because Delisser cannot demonstrate that they were aware that they were violating a clearly established right at the time of their conduct. They further argue that their entitlement to qualified immunity is not precluded by *Reynolds.* They maintain that Delisser cannot rely on *Reynolds* to show that his constitutional rights were clearly established under the circumstances, since that case was decided a year after the time period at issue.

[1] This court finds that the defendants are entitled to dismissal based on qualified immunity as to Delisser's First Amendment claim. Delisser would have the court focus on the clearly established First Amendment right to free expression of religion. Indeed, "the Second Circuit has approved of the following definition of religion: 'the feeling, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine.'' *Selah v. Goord,* 2002 WL 73231, at *4 (N.D.N.Y. Jan.2, 2002). However, the issue before the court is whether the defendants knew or should have known that placing Delisser in TB Hold for refusing a PPD test based on religious grounds was a violation of his rights at the time the conduct occurred.

This court finds that the defendants are entitled to qualified immunity since this right was not clearly established during the period in question. On July 20, and October 21, 1999, a reasonable official would not have known that placing Delisser on TB Hold for refusing to submit to a PPD test violated his First Amendment rights. Moreover, as the defendants point out, *Reynolds* was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

decided after the incident in question occurred. Accordingly, this court recommends the dismissal of Delisser's First Amendment claim based on qualified immunity.

C. *Eighth Amendment claim*

1. *Medical Condition*

The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. *See Estelle v. Gamble,* 429 U.S. at 102, 97 S.Ct. at 290. Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103, 97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

**\*5** In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. *See West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies

in proof of "deliberate indifference to serious medical needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). " 'The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998)(*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

[2] In this case, it is clear from the record that Delisser has failed to allege sufficient facts to satisfy either the objective or subjective element of an Eighth Amendment medical indifference claim. As the defendants point out, Delisser has failed to provide any specifics concerning his medical condition. Moreover, Delisser has failed to indicate that he was in pain or that any of the defendants ignored a condition which created a substantial risk of harm to him. Lastly, he fails to allege sufficient facts to indicate how any of the named defendants were deliberately indifferent to his medical needs.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

This court finds that these allegations fail to establish that the defendants were deliberately indifferent to Delisser's medical needs. He was initially placed in medical keeplock due to his refusal to submit to a TB test. In Delisser's response to the motion to dismiss, he informs the court that he indeed tested positive for TB (*see Pl. ['s] Resp. to Motion to Dismiss P. 6* ). Delisser further concedes that despite testing positive for TB, he refused to take the medication since there were serious side effects.

**6** Even if Delisser's allegation concerning the side effects to the medication are considered true, there is nothing in the record which shows that the defendants knew of and disregarded an excessive risk to Delisser's health or safety. Delisser's allegations fail to demonstrate deliberate indifference in violation of his Eighth Amendment. Accordingly, this court recommends the dismissal of Delisser's Eighth Amendment deliberate indifference to his medical need claim.

2. *Prison Conditions*

As previously noted, in order to prevail on a claim that the conditions of confinement constitute cruel and unusual punishment, a plaintiff must satisfy both an objective element and a subjective element. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). To satisfy the objective element, a "plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs ." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (*citing Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399; *see also, Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977 (holding that prison officials' acts must deprive inmate of "the minimal civilized measure of life's necessities").

The subjective element requires a plaintiff to show that the prison official acted with a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977 (*quoting Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991)). In cases involving prison conditions, the state of mind is one of "deliberate indifference." *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977 (*quoting Wilson,* 501 U.S. at 302-03, 111 S.Ct. at 2321). Nevertheless, conditions that are restrictive and harsh are

an element of the penalty that criminal offenders pay to society for their offenses. *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399.

[3] Although, the complaint is not a model of clarity, Delisser appears to be claiming that being placed in medical keeplock for his refusal to take the TB test and TB medication was cruel and unusual punishment. The only prison condition he complains about involves the denial of his "regular" commissary privileges which were revoked during his time in medical keeplock.

This court finds that these allegations are without merit. Delisser does not mention any conditions which purportedly violate his rights. Even if his "regular" commissary privileges were revoked, this allegation fails to demonstrate that the conditions of his confinement resulted in unquestioned and serious deprivations of basic human needs violative of the Eighth Amendment. Accordingly, this court recommends the dismissal of all of Delisser's Eighth Amendment claims.

D. *Fourteenth Amendment Claim* [FN8]

> **FN8.** Delisser claims that his equal protection rights have been violated. The equal protection clause directs state actors to treat similarly situated people alike. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). "To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)(*citations omitted* ). Here, Delisser presents no evidence that the policy discriminated against a particular class of inmates. Thus, this court recommends that Delisser's equal protection claim should be dismissed.

For a plaintiff to prevail on a § 1983 claim for denial of due process, a prisoner must establish both that the disciplinary confinement or restraint creates " 'an atypical and significant hardship" ' on the inmate in relation to the ordinary incidents of prison life and that "the state has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (*quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995)). A disciplinary sanction does not meet the Sandin "atypical and significant hardship" standard unless it is "onerous." *Jenkins,* 179 F.3d at 28.

**\*7** Furthermore, an inmate's liberty interests is implicated "only if the discipline he received affected the duration of his sentence in an unexpected manner, or if the punitive confinement involved a 'dramatic departure from the basic conditions of [the] indeterminate sentence.' " *Giano v. Goord,* 9 F.Supp.2d 235, 240 (W.D.N.Y.1998) (*quoting Sandin,* 515 U.S. at 485, 115 S.Ct. at 2301). However, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Id.* at 28. Nevertheless, the Court of Appeals has recently suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. *See Colon v. Howard,* 215 F.3d 227, 231-32 (2d Cir.2000).[FN9]

> FN9. In *Colon,* the court discussed *Sealey v. Giltner,* 116 F.3d 47 (2d Cir.1997), in which confinement of 101 days was held not to have met the *Sandin* standard. *Colon,* 215 F.3d at 231-232. Judge Newman, expressing "only [his] own views on this issue and not those of the panel," advocated "a bright-line rule that confinement in normal SHU conditions of more than 180 days meets the *Sandin* standard." *Id.* at 232. Conversely, confinement of 180 days or less would not meet the *Sandin* standard. Among the other reasons for his belief that a bright-line rule would be appropriate in the context of *Sandin* claims, Judge Newman observed that "the district judges of this Circuit would significantly benefit from use of a standard that would permit prompt dismissal of many cases where the facts alleged in the complaint demonstrate that the duration and conditions of confinement do not exceed an announced standard." *Id.* at 233.

On the other hand, if a prisoner satisfies both of these

elements, the Court then addresses " 'whether the deprivation of that liberty interest occurred without due process of law.' " *Sealey,* 116 F.3d at 51 (*quoting Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996)). The Second Circuit has emphasized that the *Sandin* analysis entails both a consideration of the duration of the challenged confinement as well as a fact-intensive examination of the conditions of that confinement. *See e.g., Ayers v. Ryan,* 152 F.3d 77, 83 (2d Cir.1998); *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). Although *Sandin* dealt with punitive confinement, the Second Circuit has held that its analysis also applies to administrative segregation. *Arce,* 139 F.3d at 334-35.

[4] In this case, it appears that Delisser served two different terms of medical keeplock: one for 41 days and the second term for 52 days (*see Pl. ['s] Resp. Motion to Dismiss P. 6* ). This court finds that even if Delisser's allegations were true concerning his time in keeplock, his due process claim fails to satisfy the *Sandin* test. His relatively short period of confinement does not constitute an atypical or significant hardship. Since this court finds that there is no liberty interest implicated herein, it is unnecessary to determine if he received due process. Accordingly, this court recommends the dismissal of Delisser's Fourteenth Amendment claim.

E. *Personal Involvement*

[5] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Servs. of the City of New York,* 436 U.S. 658, 690-695, 98 S.Ct. 2018, 2035-2038, 56 L.Ed.2d 611 (1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)

(Cite as: 2003 WL 133271 (N.D.N.Y.))

appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (*citing Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**\*8** The defendants maintain that Delisser has failed to allege their personal involvement. They point out that Delisser fails to allege any acts on the part of Doctor Kang Maeng Lee [FN10] ("Lee") and F. Bushey ("Bushey"). They claim that the only allegations as to the remaining defendants is that they received letters from Delisser or that they sent him responses to his letter.

> FN10. In Delisser's complaint, he mentions that he met with the "Head of the Infectious Unit" but fails to state who that was. It may well be that he means Dr. Lee, however, this conclusion is not readily apparent.

This court finds that Delisser fails to show that Bushey and Lee were personally involved. The court notes that *pro se* complaints must be liberally construed, however, there is nothing in the complaint which purports to show that these defendants were personally involved in any alleged constitutional violation. Dismissal as to the remaining defendants should be denied since it appears that they may have been involved. Accordingly, as an additional ground to grant dismissal, this court recommends the dismissal of defendants Bushey and Lee from this suit.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendants' motion to dismiss (Dkt. No. 28) be GRANTED in regards to defendants D. Ruby and Stephen M. Bernardi since they were never served and this court lacks jurisdiction over them; and it is further

RECOMMENDED, that the defendants' motion to dismiss (Dkt. No. 28) be GRANTED as to all of the defendants over which this court has jurisdiction based on Qualified Immunity as to Delisser's First Amendment claim; and it is further

RECOMMENDED, that the defendants' motion to

dismiss (Dkt. No. 28) be GRANTED as to all of the defendants over which this court has jurisdiction in Delisser's Eighth Amendment claim; and it is further

RECOMMENDED, that the defendants' motion to dismiss (Dkt. No. 28) be GRANTED as to all of the defendants over which this court has jurisdiction in Delisser's Fourteenth Amendment claim; and it is further

RECOMMENDED, as an additional basis for granting dismissal, that the defendants' motion to dismiss (Dkt. No. 28) be GRANTED as to defendants Lee and Bushey since Delisser's complaint fails to show that these defendants were personally involved in the alleged constitutional violation; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Delisser v. Goord
Not Reported in F.Supp.2d, 2003 WL 133271 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2239693 (S.D.N.Y.)

(Cite as: 2006 WL 2239693 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Damecha HARRIS, Plaintiff,
v.
Walter RUSSETT, Correctional Lieutenant;
Quackenbush, Correctional Lieutenant, Defendants.
No. 02 Civ. 6481 LTS/DCF.

Aug. 4, 2006.
*MEMORANDUM OPINION AND ORDER*

SWAIN, J.

**\*1** *Pro se* Plaintiff Damecha Harris ("Harris" or "Plaintiff"), a New York State prisoner, brings this action pursuant to 42 U.S.C. § 1983. Plaintiff asserts that Defendants Lieutenant Walter Russett ("Russett") and Lieutenant Quackenbush ("Quackenbush") (collectively, "Defendants") violated his constitutional due process rights when they placed him in keeplock at the Green Haven Correctional Facility of the New York State Department of Correctional Services ("Green Haven"). The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

Defendants move for summary judgment dismissing Plaintiff's Complaint in its entirety, or in the alternative, for summary judgment on the basis of qualified immunity. Plaintiff cross-moves for summary judgment. The Court has reviewed and considered carefully all of the parties' submissions and arguments. For the following reasons, Defendants' motion for summary judgment dismissing the Complaint is granted and Plaintiff's cross-motion for summary judgment is denied.

*BACKGROUND*

The following material facts are undisputed unless otherwise stated. On May 2, 2000, a misbehavior report was written up against Mr. Harris. The misbehavior report charged Plaintiff with the destruction of a locker within his cell, possession of a weapon, and with attempting to injure himself with a piece of metal from the locker. (Decl. of Daniel Schulze, Ex. B ("Ex.B") at D11.) Plaintiff was brought taken to Green Haven's Psychiatric Satellite Unit and placed in an observation cell. (Decl. of Daniel Schulze, Ex. A-Deposition of Damecha Harris ("Harris Dep.") at 31.) Later that day, Plaintiff became the subject of a second misbehavior report, when an officer charged him with possession of a weapon, tampering with state property and self-injury. (Ex. B at D13.) The report stated that Harris was discovered holding a nail and threatening to cut himself. *Id.* It was determined that the nail had come from a wall fixture in the cell. *Id.* Plaintiff remained in the observation cell until May 4, 2000, when it was determined that he was not at risk of committing suicide. (Defendants' Rule 56.1 Statement ("Def.56.1") ¶ 4; Harris Dep. at 18-19.) He was transferred to the dormitory section of the mental health unit at that point. (Def. 56.1 ¶ 4; Harris Dep. at 19.)

Harris remained in the dormitory until May 10, 2000, when a cell became available in the general population. (Def. 56.1 ¶ 4; Harris Dep. at 18.) At that time, he was transferred back to the general population and placed under keeplock restrictions.[FN1] (Def. 56.1 ¶ 6.) The restrictions that Harris mentions in association with his keeplock confinement include limits of one hour of recreation per day, three showers per week, one visit per week, and denial of personal property, telephone, commissary and personal food privileges. (Harris Dep. at 22; Pl.'s Aff. in Resp. at ¶ 21.) That same day, Plaintiff received misbehavior reports for both of the incidents that had occurred on May 2. (Def. 56.1 ¶¶ 6-7; Ex. B at D11, D13; Harris Dep. at 20.) Five days later, on May 15, 2000, a hearing was conducted concerning the first incident charged. (Def. 56.1 ¶ 8; Harris Dep. at 19.) Harris was offered assistance with his hearing (Ex. B at D28) as well as opportunities to call witnesses and introduce evidence. He did not avail himself of these offerings. (Def. 56.1 ¶ 9; Harris Dep. at 25-26.) After the hearing, Plaintiff was found guilty on both of the charges relating to the first incident (destruction of property and self-infliction of bodily harm) and was sentenced to 180 days in keeplock confinement. (Def. 56.1 ¶ 9; Ex. B at D21-23.) Plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2239693 (S.D.N.Y.)

(Cite as: 2006 WL 2239693 (S.D.N.Y.))

was provided with a copy of the hearing disposition. (Ex. B at D23.)

> FN1. Mr. Harris contends that his keeplock confinement began on May 5, while he was in the dormitory. (Harris Dep. at 21.) However, the indisputable evidence indicates otherwise. He was housed in the dormitory section of the Psychiatric Satellite Unit until May 10, and the evidence, including Plaintiff's deposition testimony, demonstrates that, while in the dormitory, Plaintiff was not subjected to keeplock restrictions. (Harris Dep. at 21; Decl. of Daniel Schulze, Exhibit C-Decl. Of John Culkin ("Culkin Decl.") ¶ 4.) In keeplock, an inmate is confined to his cell for twenty-three hours per day. In the dormitory an inmate is permitted to interact with the other inmates, watch television and watch movies. (Harris Dep. at 21; Culkin Decl. ¶ 4.)

**\*2** On May 22, 2000, a hearing was held regarding the second set of charges. (Def. 56.1 ¶ 11; Ex. B at D14-15.) Plaintiff was afforded all of the same opportunities as at the first hearing and, while he did choose to receive assistance for the hearing, he did not elect to call any witnesses or introduce any evidence. (Def. 56.1 ¶¶ 12-13; Ex. B at D65-71, D53-56; Harris Dep. at 24-26.) Plaintiff was found guilty of two of the charges, and he was sentenced to an additional 90 days of keeplock confinement with 60 days suspended. (Def. 56.1 ¶ 14.)

Plaintiff appealed his confinement to the Director of Special Housing, Donald Selsky. (Def. 56.1 ¶ 15; Ex. B at D3-10.) The first hearing decision was reversed on the grounds that the superintendent conducting the hearing had not properly considered Plaintiff's mental health status. (Def. 56.1 ¶ 15; Ex. B at D1-2.) The second hearing decision was also overturned on appeal on the same grounds. (Def. 56.1 ¶ 15; Ex. B at D32-33.) The second reversal was made on September 18, 2000, and Plaintiff was released from keeplock confinement on that same day. (Def. 56.1 ¶ 15; Ex. B at D32-33; Harris Dep. at 32.) Plaintiff had spent a total of approximately 141 days in keeplock by that date.

*DISCUSSION*

*Summary Judgment Standard*

Summary judgment is appropriately granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* A fact is material to a ruling on summary judgment "if it 'might affect the outcome of the suit under the governing law,' " and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Evidence must be construed in the light most favorable to the non-moving party, *Holtz,* 258 F.3d at 69, and, when considering a claim brought by a *pro se* plaintiff, the Court must read the pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999)) (citation and internal quotation marks omitted in original). Still, a *pro se* plaintiff does have the "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen,* 351 F.3d at 50 (quoting *Jorgensen v. Epic/Sony Records,* No. 00 CIV. 9181(JFK), 2002 WL 31119377 at \*2 (September 24, 2002 S.D.N.Y.) (vacated in part by *Jorgensen v. Epic/Sony Records,* 351 F.3d 46 (2d Cir.2003)). A plaintiff opposing summary judgment "has the burden of providing similar support setting forth specific facts about which a genuine triable issue remains." *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989). Thus, conclusory statements do not provide a sufficient basis for a non-moving party to resist summary judgment. *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

*Due Process*

**\*3** In order to prove a violation of due process, a plaintiff must demonstrate "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (quoting *Giano v. Selsky,* 37 F.Supp.2d 162, 167 (N.D.N.Y.1999)). A

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2239693 (S.D.N.Y.)

(Cite as: 2006 WL 2239693 (S.D.N.Y.))

liberty interest is implicated by the imposition of prison discipline when (1) such discipline "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. 472, 484 (1995), and (2) "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Arce v. Walker,* 139 F.3d 329, 334 (2d Cir.1998).

To determine whether a disciplinary method imposes an "atypical and significant hardship," a court must consider " 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (internal citation omitted).

The Second Circuit has held that "normal" keeplock-type conditions (including 23-hour per day confinement in a special housing unit, limitation to three showers per week and loss of privileges), even if imposed for a period of up to 101 days, do not constitute "atypical" conditions of confinement potentially implicating a liberty interest. *Id.* at 589. *See also Palmer v. Richards,* 364 F.3d at 65. A period of confinement between 101 and 305 days is considered to be an "intermediate duration," and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship. *Id.*

In the instant case, two misbehavior reports were written regarding Plaintiff's conduct on May 2, 2000, and he was moved into the Psychiatric Satellite Unit that same day. In relation to the misbehavior reports, Plaintiff was placed in keeplock confinement on May 10,[FN2] and he received copies of the misbehavior reports that same day. The hearing for the first charge was held on May 15, and the hearing for the second charge was held on May 22. Thus, he was in keeplock confinement for five days before

having a hearing. Plaintiff asserts that the delay between the writing of the misbehavior reports and receipt of them upon his placement in keeplock, and the delay between his receipt of the misbehavior reports and the hearings on his charges, amounted to violations of due process.

FN2. The days Plaintiff spent in the Psychiatric Satellite Unit dormitory are not considered as part of the duration of keeplock because the facts of record, including Harris' own testimony, indicate that Plaintiff was not subject to the restrictions of keeplock confinement at that point. He was permitted to watch television and interact with the other inmates. *See supra* note 1.

**\*4** Plaintiff's claim as to the delay between the writing and the delivery of the misbehavior reports fails because he suffered no deprivation of liberty on account of the reports prior to the date on which they were given to him. Plaintiff's due process claims concerning the delay between the commencement of keeplock and the first disciplinary hearing also fails because Plaintiff was confined to keeplock on account of the charges for only five days-well short of the 101-day threshold for atypicality-pending his first hearing. Furthermore, no New York State statute or regulation grants inmates a protected liberty interest in avoiding such a period of confinement prior to the provision of procedural due process. The relevant New York State regulation provides that:

Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement ... but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee."

7 N.Y.C.R.R. section 251-5-1(a). It further provides that "the disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee." *Id.* at (b). Since Plaintiff's first hearing was held within 13 days of the writing of the misbehavior report and within five days of his placement in keeplock, his confinement fell within the regulatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2239693 (S.D.N.Y.)

(Cite as: 2006 WL 2239693 (S.D.N.Y.))

parameters.

Finally, although there appears to have been technical noncompliance with the regulation in that the period between the preparation of the second misbehavior report (May 2) and the hearing on that set of charges (May 22) exceeded 14 days, no due process claim is made out because Plaintiff suffered no deprivation of a liberty interest on account of those charges in the interim. To the extent he was confined beyond the 14 day period, it was on account of the May 15, 2000 adjudication of the first set of charges.[FN3]

> [FN3.] Not only was the pre-hearing period of confinement brief (five days), there is no evidence that the conditions of confinement were atypical. In fact, Plaintiff's deposition testimony acknowledges that the conditions were typical of keeplock. Plaintiff had previous been placed in keeplock on at least one unrelated occasion and acknowledges that the conditions of this period of confinement were essentially the same. (Harris Dep. at 23.) A brief period of confinement to keeplock under "normal" conditions does not constitute an atypical and significant hardship. *See* *Palmer,* 364 F.3d at 65 (noting that confinement to keeplock for less than 101 days will not implicate a liberty interest under normal conditions); *Sealey,* 197 F.3d at 589 (finding that a 101-day period of confinement to a Special Housing Unit (SHU) is not an atypical and significant hardship); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (holding that a twelve-day period of pre-hearing confinement was not a deprivation of a liberty interest).

On this record, therefore, even when viewed in the light most favorable to the Plaintiff, no reasonable fact-finder could find that Plaintiff was denied due process in connection with a deprivation of a liberty interest. Accordingly, Defendants are entitled as a matter of law to summary judgment dismissing Plaintiff's Complaint. For substantially the same reasons, Plaintiff's cross-motion for summary judgment is denied. In light of the Court's determination on the due process issue, it need not address the question of qualified immunity

*CONCLUSION*

For the foregoing reasons, Defendant's motion for summary judgment dismissing Plaintiff's complaint is granted, and Plaintiff's cross-motion for summary judgment is denied. The Clerk of Court is respectfully requested to enter judgment in Defendants' favor and close this case. The Court also certifies pursuant to 28 U .S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See* *Coppedge v. United States,* 369 U.S. 438, 444 (1962).

**\*5** SO ORDERED.

S.D.N.Y.,2006.

Harris v. Russett
Not Reported in F.Supp.2d, 2006 WL 2239693 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated

December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all other issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1)

Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. Hudson at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. Id. at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. James v. Coughlin, 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); Reyes v. Koehler, 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. Hudson at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. Romano v. Howarth, 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; de minimis use of force does not, however, give rise to an Eighth Amendment claim. Hudson at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. Access to the Courts

Plaintiff alleges that he was denied access to the courts as

a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

*5 Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." Smith v. O'Connor, 901 F.Supp. 644, 649 (S.D.N.Y.1995); see Morello v. James, 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. Lewis v. Casey, 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming arguendo that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

### E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

### F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at \*7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at \*4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

### G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at \*5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy Superintendent; Lt. Battle, Officer of the Adjustment Committee; Officer York; Officer Kimak, Auburn Corr. Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington, Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol, Albany, New York, for defendants, Lisa Renee Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Gustave J. Di Bianco, duly filed on the 18th day of September, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report

recommendation was returned to the court undelivered because the plaintiff is no longer at the address listed in the court's file, which is the last address plaintiff instructed the court to use. By Order filed November 22, 1995, Magistrate Judge Gustave Di Bianco ordered that plaintiff "promptly notify the Clerk's Office of any change in his address." Dkt. No. 3 at 4. The same order provided that "failure to keep such office apprised of [plaintiff's] current address will result in the dismissal of the instant action." *Id.* I do not rely on plaintiff's failure to notify the court of his current address as a basis for dismissing the action; I merely note that plaintiff cannot in the future claim, in reliance on his failure to receive a copy of the report-recommendation, that he was deprived of the opportunity to file objections due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report.

3. The Clerk serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, United States District Judge pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

### DISCUSSION

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. Facts**

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote

letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

**3. Respondeat Superior**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See* Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995); Watson v. McGinnis, 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

> FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

> FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did ***not*** present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the ***length*** of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See* Frasier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); Samuels v. Mockry, 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See* Campo v. Keane, 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see* Moolenaar v. Finn, No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no ***possibility*** of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". Campo, 913 F.Supp. at 821 (citing McKinnon v. Patterson, 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See* Marino v.. Klages, No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); Delany v. Selsky, 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a ***Tier II*** hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

### 5. Verbal Harassment

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Brown v. Croce, 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

### 6. Retaliation

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of ***substantive due process.*** The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. Jones v. Coughlin, 45 F.3d 677, 679-80 (2d Cir.1995); Franco v. Kelly, 854 F.2d 584, 589-90 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994).* Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

## 7. Eighth Amendment

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))


Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.


N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Mortimer EXCELL, Plaintiff,
v.
Robert K. WOODS, Supt., Upstate C.F.; N. Bezio, Dep.
Supt., Upstate C.F.; Glenn S. Goord, Comm'r, Docs;
Lucien J. LeClaire, Jr., Dep. Comm'r, Docs; Donnie
Wood, C.O., Upstate C.F.; Brian Lewis, C.O ., Upstate
C.F.; Timothy Ramsdell, C.O., Upstate C.F.; John
Moore, Corr. Supervisor, Upstate C.F.; Kenneth
McLaughlin, Dir. of Ops., Inspector Gen.; D. Quinn,
Captain, Upstate C.F.; R.N. Maria Travers, Nurse,
Upstate C.F.; Gary Steinberg, C.O., Auburn C.F.; Dr.
Lester Wright, Assoc. Comm'r, Docs; Brad Smith, C.O.,
Auburn C.F.; Joseph Belliner, Dep. Supt., Auburn C.F.;
Jeffrey Clafflin, C.O., Auburn C.F.; John Burge, Supt.,
Auburn C.F.; Joseph Wolczyk, Hearing Officer, Auburn
C.F.; Donald Hess, C.O., Auburn C.F.; D. Selsky, Dir.
of Special Housing, Docs; Gordon Simons, C.O.,
Auburn C.F., Brian Fischer; Comm'r, Docs; Richard
Roy, Inspector Gen.; Alan Croce, Chairman, Comm'n of
Corr., and Comm'r, Div. of Parole; Daniel Stewart,
Chairman, Comm'r, Comm'n of Corr.; Vernon Manley,
Comm'r, NYS Div. of Parole; Thomas Grant, Comm'r,
NYS Div. of Parole; John Capacci, NYS Div. of Parole;
Maria Tirone, Dep. Supt., Upstate C.F.; Ashley Allen,
Corr. Counselor, Upstate C.F.; Linda A. Hayes, KBSI,
Upstate C.F.; Patricia Salvage, Auburn C.F.; Raymond
Head, Lt., Auburn C.F.; James Anctil, Lt., Upstate C.F.;
R.N. Nancy Smith, Nurse Administrator, Upstate C.F.;
Labetz, Correctional Supervisor, Auburn C.F.; William
Devito, C.O., Auburn C.F.; J. Sourwine, C.O., Auburn
C.F.; Michael Bray, C.O., Auburn C.F.; Kevin Premo,
C.O., Upstate C.F.; Darrin Corrigeux, C.O., Upstate
C.F.; Sheila Sauve, C.O., Upstate C.F.; and M.
Mackdonal, C.O., Upstate C.F., Defendants.
No. 9:07-CV-0305 (GTS/GHL).

Sept. 29, 2009.

Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adele M. Taylor-Scott, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil
rights action filed by Mortimer Excell ("Plaintiff") against
forty-three employees of several New York State
departments and/or agencies ("Defendants") pursuant to
42 U.S.C. § 1983 are the following: (1) a motion, filed by
thirty-six of the Defendants, to dismiss part of Plaintiff's
Second Amended and Supplemental Complaint for failure
to state a claim pursuant to Fed.R.Civ.P. 12(b)(6); (2)
United States Magistrate Judge George H. Lowe's
Report-Recommendation recommending that the motion
be granted in part and denied in part; (3) Plaintiff's
Objections to those portions of the
Report-Recommendation recommending dismissal; and
(4) Plaintiff's fourth motion for the appointment of
counsel. (Dkt.Nos.67, 84, 87, 93.) For the reasons set forth
below, the Report-Recommendation is accepted and
adopted in its entirety; Defendants' motion is granted in
part and denied in part; Plaintiff's Second Amended and
Supplemental Complaint is dismissed in part, as detailed
in the "Ordered" Clauses of this Decision and Order; and
Plaintiff's fourth motion for the appointment of counsel is
denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Pleadings in This Action**

On March 23, 2007, Plaintiff filed his original Complaint
in this action pursuant to 42 U.S.C. § 1983, asserting
numerous claims arising out of his confinement at Auburn

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

and Upstate Correctional Facilities between approximately August 9, 2005, and March 16, 2007 (the date of the Complaint). (Dkt. No. 1, at 36.) On April 18, 2007, the Court required Plaintiff to file an Amended Complaint. (Dkt. No. 6.) On May 17, 2007, Plaintiff filed an Amended *and Supplemental* Complaint asserting similar claims arising out of his confinement at Auburn Correctional Facility between approximately May 5, 2005, and May 14, 2007 (the date of the Amended and Supplemental Complaint). (Dkt. No. 10.) On July 3, 2007, with leave of the Court, Plaintiff filed a Second Amended and Supplemental Complaint asserting similar claims arising out of his confinement at Auburn and Upstate Correctional Facilities between approximately June 17, 2005, and July 3, 2007 (the date of the Second Amended and Supplemental Complaint). (Dkt. No. 17.)

Generally, in his Second Amended and Supplemental Complaint, Plaintiff alleges that, on at least five separate occasions, between approximately June 17, 2005, and July 3, 2007, correctional officers at Auburn and Upstate Correctional Facilities harassed him based on his race and religion. (*See generally* Dkt. No. 17.) As a result, Plaintiff brings claims arising under First, Fourth, Eighth and Fourteenth Amendments, against forty-three employees of several New York State departments and/or agencies, listed in the caption of this Decision and Order. (*Id.*) In his Report-Recommendation, Magistrate Judge Lowe accurately and thoroughly recites the allegations, and prayer for relief, of Plaintiff's Second Amended and Supplemental Complaint. (*See* Report-Recommendation at Parts I.B. and I.C.) As a result, that recitation is incorporated by reference herein.

**B. Plaintiff's Related Action**

**\*2** In his Report-Recommendation, Magistrate Judge Lowe also accurately and thoroughly recites the allegations, claims and procedural posture of Plaintiff's Complaint in a previously filed action that is currently pending in this Court before the undersigned-*Excell v. Burge,* 05-CV1231-GTS-GJD (N.D.N.Y.). (*See* Report-Recommendation at Part I.A.) As a result, that recitation is incorporated by reference herein. The Court would note two additional facts regarding that action's procedural posture.

First, although this fact is not expressly stated in Magistrate Judge Lowe's Report-Recommendation, Senior United States District Judge Lawrence E. Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See Excell v. Burge,* 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). Then, after being assigned the case on October 2, 2008, the undersigned denied Plaintiff's motion for reconsideration of Judge Kahn's decision and order on January 21, 2009. *See Excell v. Burge,* 05-CV-1231, 2008 WL 152585 (N.D.N.Y. Jan. 21, 2009) (Suddaby, J.).

Second, after Magistrate Judge Lowe issued his Report-Recommendation in this action, the undersigned scheduled trial in the action of *Excell v. Burge,* 05-CV-1231, for December 14, 2009, and appointed *pro bono* trial counsel for Plaintiff.

**C. Defendants' Motion to Dismiss**

On March 6, 2008, thirty-six of the forty-three Defendants in this action filed a motion to dismiss part of Plaintiff's Second Amended and Supplemental Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 67.) [FN1] In his Report-Recommendation, Magistrate Judge Lowe accurately summarizes Defendants' arguments on their motion to dismiss. (*See* Report-Recommendation at Part I.D.) As a result, that summary is incorporated by reference herein.

FN1. To the extent that the current motion is filed on behalf of Defendants who had already filed an Answer to Plaintiff's Second Amended and Supplemental Complaint (*see* Dkt. No. 66), that motion is properly brought under Fed.R.Civ.P. 12(c), which governs the entry of judgment on the pleadings. However, courts analyzing a motion filed under Rule 12(c) must apply the same standard as that applicable to a motion filed under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994); *Wynn v. Uhler,* 941

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

After being granted two extensions of time by Magistrate Judge Lowe to file a response to the motion, Plaintiff filed a lengthy response on June 30, 2008, and July 7, 2008. (Dkt.Nos.74, 75.) More specifically, Plaintiff's response consisted of thirty pages of singled-spaced legal argument and affidavit testimony, as well as forty-nine pages of exhibits. (*Id.*) Liberally construed, the crux of Plaintiff's response is that Defendants' motion should be denied for three reasons: (1) his lengthy Second Amended and Supplemental Complaint and his declaration in response to Defendants' motion provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); (2) his response exhibits and his declaration in response to Defendants' motion, demonstrate genuine issues of material fact for trial; and (3) Defendants have failed to comply with Plaintiff's discovery requests. (*Id.*)

*3 On March 12, 2009, Magistrate Judge Lowe issued a Report-Recommendation recommending that the motion be granted in part and denied in part. (Dkt. No. 84.) Familiarity with the specific recommendations and analysis therefor offered in Magistrate Judge Lowe's Report-Recommendation is assumed in this Decision and Order. (*See* Report-Recommendation at Part III.)

On March 27, 2009, Plaintiff filed his Objections to those portions of the Report-Recommendation recommending dismissal. (Dkt. No. 87.) [FN2] Liberally construed, the crux of Plaintiff's Objections argue that the undersigned should reject Magistrate Judge Lowe's Report-Recommendation for two reasons: (1) Plaintiff's lengthy Second Amended and Supplemental Complaint, his declaration in response to Defendants' motion, and his Objections to Magistrate Judge Lowe's Report-Recommendation provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); and (2) Plaintiff's response exhibits, his declaration in response to Defendants' motion, and his verified Objections to Magistrate Judge Lowe's Report-Recommendation demonstrate genuine issues of material fact for trial. (*Id.*)

FN2. The Court notes that, on March 20, 2009, Plaintiff filed a document entitled "Declaration," which was mistakenly docketed as an "Objection" to the Report-Recommendation.

(Dkt. No. 85.) The Court concludes that the Declaration does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation, and it constitutes evidence (which is immaterial on a motion to dismiss). (*Id.*) The Court notes also that, on March 25, 2009, Plaintiff filed a "Respon[se] to Opposition of Defendants ['] Memorandum Motion for Preliminary Injunctive Relief," which was incorrectly docketed as a "Supplemental Objection" to the Report-Recommendation. (Dkt. No. 86.) The Court concludes that this document does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation but Plaintiff's then-pending motion for preliminary injunction. (*Id.*) *As a result, the Clerk's Office is directed to re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," to re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and to re-docket Dkt. No. 87 as "Objection to Report-Recommendation."*

**D. Plaintiff's Fourth Motion for Counsel**

On June 2, 2009, Plaintiff filed his fourth motion for the appointment of counsel. (Dkt. No. 93.) Plaintiff's first three such motions were filed on May 27, 2008, June 2, 2008, and March 4, 2009, and were denied on December 29, 2008, and April 7, 2009. (Dkt.Nos.71, 72, 80, 82, 88.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard of Review of a Report-Recommendation**

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN3. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN4. *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not

be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

**B. Standard Governing a Motion to Dismiss for Failure to State a Claim**

Magistrate Judge Lowe thoroughly and correctly recited the legal standard governing a motion to dismiss for failure to state a claim, including the standard governing such motions to dismiss pleadings drafted by *pro se* litigants. (*See* Report-Recommendation at Part II.) As a result, that standard is incorporated by reference herein.

**III. ANALYSIS**

**A. Defendants' Motion to Dismiss**

**\*4** As indicated above in Part I.C. of this Decision and Order, Plaintiff's Objections do not contain specific challenges to those portions of the Report-Recommendation recommending the partial denial of Defendants' motion to dismiss. Thus, the Court reviews those portions of the Report-Recommendation for only clear error. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental Complaint, and the referenced portions of Magistrate Judge Lowe's Report-Recommendation), the Court concludes that the referenced portions of the Report-Recommendation are well-reasoned and not clearly erroneous. As a result, the Court accepts and adopts these portions of the Report-Recommendation for the reasons stated therein.

With regard to the one portion of Magistrate Judge Lowe's Report-Recommendation to which Plaintiff's Objections do specifically challenge-i.e., Magistrate Judge Lowe's recommendation that Defendants' motion to dismiss be partially granted-a *de novo* review is appropriate. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Complaint, the referenced portion of Magistrate Judge Lowe's Report-Recommendation, and Plaintiff's Objections, the Court concludes that the referenced portion of the Report-Recommendation is correct in all respects. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court also accepts and adopts this portion of the Report-Recommendation for the reasons stated therein. The Court would add only five points.

First, contrary to Plaintiff's reading of Magistrate Judge Lowe's Report-Recommendation, the vast majority of Magistrate Judge Lowe's recommendations were not premised on a failure by Plaintiff to allege sufficient facts for purposes of Fed.R.Civ.P. 8(a). Rather, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question, though factually detailed, were simply not cognizable under Fed.R.Civ.P. 12(b)(6). (*See* Report-Recommendation at Part II [describing the two grounds on which a defendant may move to dismiss for failure to state a claim].) [FN5] As a result, his argument that he provided a "short and plain statement of [his] claim," as required by Fed.R.Civ.P. 8(a), is almost entirely irrelevant.

> FN5. More specifically, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question were not actionable under the following legal authorities: (1) the proscription against duplicitous and malicious prosecutions, pursuant to Fed.R.Civ.P. 11(b)(2), the first-in-time rule, and the Court's inherent power to manage its docket; (2) the principle of sovereign immunity under the Eleventh Amendment; (3) the doctrine of absolute immunity; (4) the requirement that supervisors be personally involved in constitutional violations under 42 U.S.C. § 1983; (5) the legal standard governing substantive and procedural due process claims arising from prison disciplinary hearings under the Fourteenth Amendment; (6) the legal standard governing access-to-courts claims arising under the First Amendment; (7) the legal standard governing free-exercise claims arising under the First Amendment; (8) the legal standard governing unreasonable-search claims arising under the Fourth

Amendment; (9) the legal standard governing due process claims arising from the receipt of a false prison misbehavior report in prison under the Fourteenth Amendment; (10) the intra-corporate conspiracy doctrine; and (11) the legal standard governing claims of deliberate indifference to a serious medical need and inadequate prison conditions arising under the Eighth Amendment. (*See* Report-Recommendation at Part III.)

Second, contrary to Plaintiff's understanding of the legal standard governing motions to dismiss under Fed.R.Civ.P. 12(b) (6), extrinsic evidence cannot be considered by the Court when deciding such motions. *See* Fed.R.Civ.P. 12(d). Nor can matters outside the four corners of the pleadings be considered by the Court when deciding such motions, with a few exceptions. Here, the Court finds none of the exceptions are applicable. The exhibits and declarations on which Plaintiff relies in opposition to Defendants' motion were not exhibits to his lengthy Second Amended and Supplemental Complaint. (*See* Dkt. No. 17, Part 1.) Thus, they are not deemed part of that pleading pursuant to Fed.R.Civ.P. 10(c). Moreover, Plaintiff has already had three chances to amend his operative pleading in this action. As a result, he has no absolute right, under Fed.R.Civ.P. 15(a)(2), to constructively amend it through the Court's consideration of the materials in question. Finally, Plaintiff has not shown that the materials in question are sufficiently consistent with the allegations of his Second Amended and Supplemental Complaint. [FN6] As a result, it would not be appropriate for the Court to consider them out of an extension of special solicitude to Plaintiff. [FN7] For all these reasons, it is irrelevant (for purposes of the motion to dismiss currently pending before the Court) whether or not Plaintiff has submitted response exhibits, a declaration in response to Defendants' motion, and verified Objections to Magistrate Judge Lowe's Report-Recommendation, which demonstrate genuine issues of material fact for trial.

> FN6. The Court notes that, under the circumstances, considering the materials in question would result in piecemeal litigation, requiring Defendants, in their Answer or Amended Answer (*see* Dkt. No. 66), to admit or deny-at their peril-facts never plausibly alleged in Plaintiff's Second Amended and Supplemental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Complaint.

FN7. The Court notes that an additional reason it should not treat his Objections as effectively amending his Second Amended and Supplemental Complaint is that such a treatment would contravene the rule that a district court will ordinarily refuse to consider material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, supra,* note 3 of this Decision and Order.

**\*5** Third, Plaintiff neglects to mention, in his Objections, that several of the dismissals recommended by Magistrate Judge Lowe are dismissals *with leave to amend.* Such a recommendation is extremely generous to Plaintiff, who has already had three chances to amend his operative pleading in this action, and who, on one occasion, took the opportunity to file a *supplemental* pleading without prior leave of the Court. (*Compare* Dkt. No. 15 *with* Dkt. No. 17.) *See* Fed.R.Civ.P. 15(d); Local Rule 7.1(a)(4). While the Court accepts Magistrate Judge Lowe's recommendation, *the Court cautions Plaintiff that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

Fourth, as stated above in Part I.B. of this Decision and Order, although this fact is not relied on in Magistrate Judge Lowe's Report-Recommendation, Judge Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See* Excell v. Burge, 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). As a result, Plaintiff's litigation of those claims in this action are precluded for the additional reason of res judicata, also known as claim preclusion.

Fifth, and finally, in addition to the intracorporate-conspiracy-doctrine cases cited by Magistrate Judge Lowe, the Court relies on the cases cited by the undersigned in *Murray v. Pataki,* 03-CV-1263,

2009 WL 981217, at \*4 & n. 11 (N.D.N.Y. Apr. 9, 2009) (Suddaby, J.).

**B. Plaintiff's Motion to Appoint Counsel**

Plaintiff's fourth motion for the appointment of counsel is denied for the same reasons that his third such motion was denied by Magistrate Judge Lowe on April 7, 2009. (Dkt. No. 88.) More specifically, after carefully reviewing the file in this action, the Court finds as follows: (1) it appears as though, to date, Plaintiff has been able to effectively litigate this action; (2) it appears that the case does not present issues that are novel or more complex than those raised in most prisoner civil rights actions; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial (as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants), it is highly probable that this Court will appoint trial counsel at the final pretrial conference (should this case survive the filing of any further dispositive motions); and (4) the Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

**ACCORDINGLY,** it is

**\*6 ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 84) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 67) is *GRANTED* **in part** and *DENIED* **in part;** and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are *DISMISSED* without leave to amend:

(1) all claims against Defendants Devito, Head, Labetz, Simons, and Sourwine;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

(2) the First Amendment religion claims alleged in ¶¶ 1-26 of the Second Amended and Supplemental Complaint against Defendant Hess;

(3) all claims against Defendant Burge;

(4) all claims against Defendants in their official capacities;

(5) all claims against Defendants Manley, Grant, and Capacci;

(6) the claim against Defendant Croce regarding his decision to deny Plaintiff parole;

(7) the claims against Defendants Goord, Burge, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they ignored complaints and grievances;

(8) the procedural due process claims against Defendants Salvage, Hayes, and Allen;

(9) the Fourth Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(10) the conspiracy claims against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(11) the conspiracy claim against Defendant Lewis arising from the June 17, 2006, request for a urine sample;

(12) the conspiracy claim against Defendants R. Woods and Anctil arising from Anctil's May 19, 2007, threats; and

(13) the claim that Defendant McDonald used "racial and discrimination and indecent and profane language"; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are **DISMISSED** with leave to amend:

(1) the claims against Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they falsified documents in response to Plaintiff's grievances;

(2) the substantive due process and First Amendment access to the courts claims against Defendants Salvage, Hayes, and Allen;

(3) the due process claim against Defendants B. Smith and Claflin arising from the August 23, 2005, misbehavior report;

(4) the due process claim against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(5) the due process claim against Defendant Lewis arising from the June 22, 2006, misbehavior report;

(6) the Eighth Amendment medical care claims against Defendants Moore and Travers arising from Plaintiff's discovery of glass in his food;

(7) the Eighth Amendment claims arising from Anctil's May 19, 2007, threats;

(8) the Eighth Amendment conditions of confinement claim against Defendant McDonald arising from the denial of food and spitting in Plaintiff's coffee; and

**\*7** (9) the Eighth Amendment medical care claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

against Defendant McDonald arising from her interference with Plaintiff's medical interview; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) hereby survive Defendants' motion to dismiss:

(1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test;

(2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test;

(3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report;

(5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and

(6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements; and it is further

**ORDERED** that, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff shall file, for the Court's review and acceptance, a **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT,** in which he asserts the six claims described in the preceding paragraph, and in which he amends the nine claims that have been hereby dismissed with leave to amend; and it is further

**ORDERED** that, after Plaintiff's Third Amended and Supplemental Complaint, Defendants shall file an Answer (or an Amended Answer, if appropriate) in accordance with the Federal Rules of Civil Procedure; and it is further

**ORDERED** that Plaintiff's fourth motion for the appointment of counsel (Dkt. No. 93) is **DENIED;** and it is further

**ORDERED** that the Clerk's Office shall re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and re-docket Dkt. No. 87 as "Objection to Report-Recommendation."

*Plaintiff is advised that, should his Third Amended and Supplemental Complaint fail to state a claim with regard to the nine claims that have been hereby dismissed with leave to amend, those claims will be sua sponte dismissed by the Court. Plaintiff is also advised that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is a motion by some of the Defendants to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 67.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

**A. Plaintiff's complaint in Case No. 9:05-CV-1231 (GTS/GJD)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*8** On September 28, 2005, Plaintiff Mortimer Excell filed a previous action in this Court. *Excell v. Burge,* No. 9:05-CV-1231 (GTS/GJD) *("Burge"* ). The operative complaint in that case alleges that on five separate occasions, correctional officers at Auburn Correctional Facility harassed Plaintiff based on his race and religion. (*Burge* Dkt. No. 7.)

Specifically, the *Burge* complaint alleges that on June 17, 2005, officers G. Simons and Labetz taunted Plaintiff with religious and racial epithets, threw his religious headgear ("Tsalot-Kob") on the ground, and threatened to harm Plaintiff if he filed any grievances. (*Burge* Dkt. No. 7 at ¶¶ 1-8.) The officers then issued a misbehavior report charging Plaintiff with violating various disciplinary rules. *Id.* at ¶ 9. After a disciplinary hearing, Plaintiff was found guilty of the charges. *Id.* at ¶ 10. Plaintiff filed an administrative appeal with John W. Burge, the superintendent of the facility, which was denied. Plaintiff's written complaint to DOCS commissioner Glenn Goord was 'neglected.' *Id.* at ¶ 11.

On July 20, 2005, officer Hess removed Plaintiff from a religious studies class and informed him that he was not allowed to wear a colored Tsalot-Kob. When Plaintiff protested that DOCS directives allowed him to wear a colored Tsalot-Kobb, Hess summoned several officers, who returned Plaintiff to his cell and placed him on keeplock status. (*Burge* Dkt. No. 7 at ¶ 12.) Plaintiff subsequently received a misbehavior report charging him with "out of place." *Id.* at ¶ 13. Plaintiff was found not guilty after a disciplinary hearing, but did not receive a copy of the written disposition. *Id.* at ¶ 14.

On July 26, 2005, officer Simons approached Plaintiff in the mess hall, began calling him racially derogatory names, and ordered him to remove his Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 15.) Simons and two other officers then removed Plaintiff from the mess hall, confiscated his Tsalot-Kob, and returned him to his cell on keeplock status. *Id.* at ¶ 16. Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id.* at ¶ 17. After a disciplinary hearing, Plaintiff was found not guilty. *Id.* at ¶ 18.

On August 4, 2005, officer Devito removed Plaintiff from

his religious class and demanded to know why he was wearing a colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 20.) Devito threatened to kill Plaintiff if he filed any complaints against him. *Id.* He then went into the class and stated that the organization would not be allowed to continue to operate if Plaintiff remained in the organization. *Id.* Devito returned Plaintiff to his cell and placed him on keeplock status. *Id.* at ¶ 21. Devito subsequently issued Plaintiff a misbehavior report charging Plaintiff with refusing a direct order. *Id.* at ¶ 22. Plaintiff was found not guilty after a disciplinary hearing. *Id.* at ¶ 23. However, when he requested a written disposition, hearing officer Head told him to "get the fuck out [of] the hearing office [FN1]." *Id.*

> [FN1]. Because a motion to dismiss tests the face of a plaintiff's complaint, this Report-Recommendation includes many direct quotes from Plaintiff's complaint. Any grammatical errors or idiosyncratic turns of phrase are Plaintiff's, not the Court's.

**\*9** On August 9, 2005, officer Sourwine approached Plaintiff in the mess hall and ordered him to remove his colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 24.) When Plaintiff showed Sourwine a copy of the DOCS directive allowing colored Tsalot-Kobs, Sourwine began calling Plaintiff racially derogatory names. *Id.* Officer Bray then approached Plaintiff, began calling Plaintiff racially derogatory names, said he did not "give a dam[n] fuck about ... the Directive," and ordered Plaintiff to leave the mess hall. *Id .* Bray returned Plaintiff to his cell and placed him on keeplock status. *Id.* Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id .* at ¶ 25. At the disciplinary hearing on the charges, hearing officer Head would not allow Plaintiff to present a defense and ordered that Plaintiff be removed from the hearing room. *Id.* at ¶ 26. Plaintiff was found guilty of the charges. *Id.*

In addition to these five incidents, Plaintiff alleged that he had filed a grievance against officer G. Steinberg for mail theft, sexual harassment, and threats. (*Burge* Dkt. No. 7 at ¶ 30.) However, Plaintiff did not name Steinberg as a defendant in the *Burge* action. Rather, he stated that he was simply 'notifying' the Court about the incident. *Id.* The Court did not interpret the *Burge* complaint as making

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

any allegations against Steinberg. (*Burge* Dkt. No. 52 at 8.)

The *Burge* case has proceeded past the summary judgment stage. On summary judgment, the Court dismissed all claims against Head and the First Amendment religion claims against Hess, Devito, Bray, and Sourwine. Retaliation claims against those defendants remain pending.

**B. Plaintiff's complaint in this case**

On March 23, 2007, Plaintiff filed the case pending before the undersigned. The operative complaint is the amended complaint filed on July 9, 2007. (Dkt. No. 17) ("the complaint.") The first 27 paragraphs of the complaint's statement of facts repeat, nearly verbatim, the allegations of the *Burge* case. (Compare Dkt. No. 17 at ¶¶ 1-27 with *Burge* Dkt. No. 7 at ¶¶ 1-30.) In addition, the complaint includes allegations about the lack of response to Plaintiff's complaints and grievances, the denial of Plaintiff's parole, and ten other incidents of mistreatment by staff.

1. *Allegations against Defendants Hess, Bellinger, Steinberg, Smith, Claflin, Wolczyk, Salvage, Goord and Burge re: urine sample, cell search and falsified transcript*

On August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess, whom Plaintiff had not seen for two or three weeks. *Id.* As Plaintiff was being escorted, Defendant Joseph Bellinger [FN2] told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" the July 20, 2005, misbehavior report. *Id.*

FN2. The complaint refers to this defendant as "Joseph Bellnier." (Dkt. No. 17 at A-5.) I have used the spelling provided in Defendants' motion

to dismiss.

*\*10 While Plaintiff was giving the urine sample, Defendants Steinberg, B. Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, B. Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.*

On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty after an August 25, 2005, disciplinary hearing conducted by Defendant Joseph Wolczyk at which Plaintiff was not allowed to present a defense. *Id.* He was sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

On August 26, 2005, Plaintiff filed complaints with Defendants Goord and Burge. He did not receive a response. (Dkt. No. 17 at ¶ 32.)

Plaintiff appealed his disciplinary sentence through the prison appeals system and filed an Article 78 proceeding in state court. (Dkt. No. 17 at ¶ 33.) Plaintiff alleges that defendant stenographer Patricia Salvage "falsified the transcri[pt] of the Tier Three hearing ... in an effort to cover up staff misconduct ." *Id.*

I construe the complaint as asserting the following causes of action as a result of these events: (1) a retaliation claim against Defendants Hess and Bellinger; (2) a First Amendment religion claim, a Fourth Amendment claim, and substantive and procedural due process claims against Defendants Steinberg, B. Smith, and Claflin; (3) a procedural due process claim against Defendant Wolczyk [FN3]; and (4) a First Amendment access to the courts claim, a substantive due process claim, and a procedural due process claim against Defendant Salvage.

FN3. Defendant Wolczyk has answered the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

complaint. (Dkt. No. 66.)

2. *Allegations against Defendants Premo, Wood, and Corrigeux re: falsified drug test*

On April 29, 2006, Plaintiff was moved into a cell with an inmate who had a long history of drug use. (Dkt. No. 17 at ¶ 38.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a urine specimen. Premo said "Albany" had requested the sample. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered to submit urine specimens. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive." (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood drafted the report in a way that ensured that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) Defendant N. Bezio conducted a disciplinary hearing on May 25, 2006. (Dkt. No. 17 at ¶ 40.) As part of his defense, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. *Id.* Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

**11 I construe the complaint as asserting the following causes of action as a result of these events: (1) a Fourth Amendment claim, a conspiracy claim, and a due process claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants Wood and Corrigeux.

3. *Allegations against Defendants Lewis, Moore, Ramsdell and Woods re: drug test*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff, citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis said to another officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* Plaintiff complained verbally to the building supervisor, Defendant Moore, and filed a written complaint with Defendant R. Woods. *Id.*

On June 22, 2006, Defendant Lewis issued a misbehavior report charging Plaintiff with refusing a direct order. (Dkt. No. 17 at ¶¶ 42, 45.) On July 10, 2006, Defendant T. Ramsdell and another officer escorted Plaintiff to a disciplinary hearing. (Dkt. No. 17 at ¶ 45.) When Plaintiff protested, Defendant Ramsdell and another officer told Plaintiff that "if he do[es] not stop his jail house lawyer shit and plead guilty they will issue[ ] the Plaintiff [another] false misbehavior report." *Id.* When Plaintiff refused and began to present a defense, Defendant Ramsdell and the other officer ordered the hearing officer to stop the hearing tape. *Id.* They threatened Plaintiff with bodily harm, escorted him back to his cell, and ordered him to assume the frisk position. *Id.* While Plaintiff was positioned against the wall, the officers put all of his personal items on the floor, including his Bible [FN4], and removed Plaintiff's pillow and toilet paper. *Id.* Plaintiff immediately verbally complained to the housing supervisor. (Dkt. No. 17 at ¶ 46.)

FN4. Plaintiff does not claim that Defendant Ramsdell violated his First Amendment rights. (Dkt. No. 17 at 56.)

On July 11, 2006, Plaintiff filed a "complaint to Defendant Woods and a grievance against Defendant Ramsdell" regarding the July 10 hearing room incident. (Dkt. No. 17 at ¶ 48.) Plaintiff alleged that Ramsdell acted in retaliation for a grievance Plaintiff filed against N. Bezio on July 9, 2006. *Id.*

On July 12, 2006, Plaintiff received a copy of a not guilty disposition from the July 10 hearing. (Dkt. No. 17 at ¶ 47.)

I construe the complaint as asserting the following causes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

of action as a result of these events: (1) a substantive due process claim, a procedural due process claim, and a conspiracy claim against Defendant Lewis; and (2) an Eighth Amendment claim, a substantive due process claim, and a procedural due process claim against Defendant Ramsdell.[FN5]

> [FN5.] Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

4. *Allegations against Defendants Moore and Travers re: glass in food*

On June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.*

**\*12** On June 30, 2006, Defendants Moore and Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

I construe the complaint as asserting Eighth Amendment medical care claims against Defendants Moore and Travers as a result of these events.

5. *Allegations against Defendants Bezio, LeClair, Ramsdell, and Sauve re: excessive force*

As mentioned above, on July 9, 2006, Plaintiff filed a grievance complaint against Defendant N. Bezio. (Dkt. No. 17 at ¶ 45.) On July 12, 2006, Plaintiff received a misbehavior report. (Dkt. No. 17 at ¶ 47.)

On July 21, 2006, Defendant Bezio commenced a disciplinary hearing. (Dkt. No. 17 at ¶ 49.) He denied Plaintiff's requests for the video of the July 10 hearing and copies of the July 11 complaint letters and grievance. *Id.*

On July 24, 2006, Plaintiff filed a complaint against

Defendant Bezio with Defendant LeClaire. (Dkt. No. 17 at ¶ 50.) Plaintiff requested that Bezio be removed as his hearing officer. *Id.*

On July 27, 2006, Defendants Ramsdell and Sheila Sauve and five other officers arrived at Plaintiff's cell to escort him to a disciplinary hearing. (Dkt. No. 17 at ¶ 51.) Ramsdell ordered Plaintiff to turn his back to the cell door and put his hands behind his back and through the slot in the door. *Id.* Plaintiff complied, and Sauve applied mechanical restraints. *Id.* Plaintiff told Defendants that the restraints were too tight. *Id* . Ramsdell pat frisked Plaintiff "in a very hostile and sexual assault manner that offended Plaintiff['s] manhood and offend[ed] his dignity." *Id.* When Plaintiff arrived at the hearing room, Defendant Bezio told him to stop resisting. *Id.* Ramsdell and Sauve then pushed Plaintiff into the wall and tried to break Plaintiff's right index finger. *Id.* Defendant Bezio and five other officers pushed Plaintiff's face into the wall until it "burst open" and bled. *Id.* Plaintiff's wrists were also bleeding. *Id.* Plaintiff was escorted back to his cell and his legal documents were not returned. *Id.* Plaintiff did not receive medical care despite filing numerous complaints. (Dkt. No. 17 at ¶¶ 51, 58.)

Bezio found Plaintiff guilty of all charges and sentenced him to six months' SHU confinement, three months' loss of good time, and six months' loss of recreation, commissary, packages, and telephone privileges. (Dkt. No. 17 at ¶ 51.)

Plaintiff alleges that Defendant Linda A. Hayes, the stenographer for the hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 77.[FN6])

> [FN6.] Plaintiff alleges that Defendant Hayes also "knowingly and willfully ma[d]e a false official report" on another occasion, but it is not clear from the complaint to which disciplinary hearing Plaintiff is referring. (Dkt. No. 17 at ¶ 79.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment, substantive due process, and procedural due process claims against Defendant Bezio[FN7]; (2) Eighth Amendment claims against Defendants Ramsdell[FN8] and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Sauve [FN9]; and (3) First Amendment access to the court, substantive due process, and procedural due process claims against Defendant Hayes.

> FN7. Defendant Bezio has answered the complaint. (Dkt. No. 66.)

> FN8. As noted above, Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

> FN9. Defendant Sauve has answered the complaint. (Dkt. No. 66.)

6. *Allegations against Defendants Ramsdell, Bezio, Allen, Goord and Selsky re: false misbehavior report and transcription*

**\*13** On July 28, 2006, Defendant Ramsdell and officer Comstock issued misbehavior reports charging Plaintiff with refusing a direct order, violating lock in/lock out procedures, violent conduct, interference with employees, and harassment. (Dkt. No. 17 at ¶ 52.) Officer Comstock's report "said he had only written [it] because he was ordered to do so by Defendant Bezio." *Id.* The disciplinary hearing on the charges was conducted on several dates in August 2006. (Dkt. No. 17 at ¶ 53.) The hearing officer, Defendant D. Quinn, denied Plaintiff's requests to present evidence. *Id.* Plaintiff did not immediately receive a disposition document or any determination of guilt. *Id*

On October 15, 2006, Plaintiff filed a grievance with Defendant Goord. (Dkt. No. 17 at ¶ 54.) In response, Defendant Selsky sent Plaintiff a copy of a disposition from an August 29 hearing. *Id.* Plaintiff had been found guilty and sentenced to three months' SHU confinement, three months' loss of good time, and three months' loss of recreation, commissary, packages and telephone privileges. *Id.* Plaintiff alleges that Defendant Ashley Allen, the stenographer for the August 29 hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 78.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) substantive due process, procedural due process, and conspiracy claims against Defendants Ramsdell and Bezio [FN10]; (2) a procedural due process claim against Defendant Quinn [FN11]; and (3) First Amendment access to the courts, substantive due process, and procedural due process claims against Defendant Allen.

> FN10. As noted above, Defendants Ramsdell and Bezio have answered the complaint. (Dkt. No. 66.)

> FN11. Defendant Quinn has answered the complaint. (Dkt. No. 66.)

7. *Allegations against Defendant Travers re: bloody bowel movements*

On May 8, 2007, Plaintiff filed a sick call request regarding stomach pain, heart pain, and blood in his bowel movements. (Dkt. No. 17 at ¶ 65.) On May 9, 2007, a nurse gave Plaintiff three stool sample test cards. *Id.* On May 11, 2007, Plaintiff returned the three stool sample cards to Defendant Travers. (Dkt. No. 17 at ¶ 65.) On May 12, 13, and 14, 2007, Plaintiff filed sick call requests regarding heart pain and bloody bowel movements. *Id.* When Plaintiff asked Travers about the stool sample cards, she said that Plaintiff would soon see a nurse-practitioner because the samples had blood in them. *Id.* Travers would not give Plaintiff any pain killers. *Id.* Plaintiff filed "numerous" complaints against Nurse Travers and had blood in his bowel movements for nine months but never received care. (Dkt. No. 17 at ¶ 58, 65.)

I construe the complaint as asserting an Eighth Amendment medical care claim against Defendant Travers as a result of these events. I note that Defendants have explicitly declined to move to dismiss this cause of action. (Dkt. No. 67-4 at 21, 22 n. 4.)

8. *Allegations against Defendants McDonald, Woods and Fisher re: spitting in coffee cup, interfering with medical interview, and profane language*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*14** On May 9, 2007, Plaintiff filed a grievance against Defendant Michele McDonald [FN12] for spitting in his coffee cup, interfering with a medical interview and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I construe the complaint as asserting Eighth Amendment medical care and conditions of confinement claims against Defendant McDonald.

> FN12. The complaint refers to this defendant as "Macdonal." (Dkt. No. 17 at ¶ 62.) I have used the spelling provided in Defendants' motion to dismiss.

9. *Allegations against Defendants Woods, Anctil and Tirone re: laughing at Plaintiff's report of pain and the misbehavior report alleging threats by Plaintiff*

On May 17, 2007, Defendant Woods walked by Plaintiff's cell. (Dkt. No. 17 at ¶ 66.) Plaintiff complained about his heart and stomach pains and the blood in his bowel movements. *Id.* Woods laughed in Plaintiff's face and walked away. *Id.* That same day, Plaintiff filed a complaint with Woods, stating that he was receiving cruel and unusual punishment and that "he would not just sit and be physically assaulted ... he will start to fight back to protect hi [m]self and he will not let these defendants kill him and he do not try to take one of them with him and he will feel better to die fighting for his justice." *Id.* On May 21, 2007, Defendant Anctil issued a misbehavior report charging Plaintiff with violent conduct and threats [FN13] (Dkt. No. 17 at ¶ 68.) Defendant Tirone presided over the disciplinary hearing on June 7, 2007. (Dkt. No. 17 at ¶ 69.) Plaintiff protested that the hearing was untimely. He asked to see a copy of any extension. Tirone denied that request and Plaintiff's requests to present documentary evidence and witnesses. *Id.* Tirone found Plaintiff guilty and sentenced him to nine months' SHU confinement and nine months' loss of recreation, packages, telephone and commissary privileges. *Id.*

> FN13. To the extent that this allegation raises any due process claim against Defendant Anctil on the basis that Defendant Anctil issued a false misbehavior report, I dismiss that claim *sua*

*sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) for two reasons. First, it is clear from the face of the complaint that Plaintiff did, in fact, make threats. Thus, the report was not false. Second, as discussed at length below, even if the report were false, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997).

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment medical care and substantive due process claims against Defendant Woods; and (2) a procedural due process claim against Defendant Tirone [FN14].

> FN14. Defendant Tirone has answered the complaint. (Dkt. No. 66.)

10. *Allegations against Defendants Woods and Anctil regarding threats of physical force*

On May 19, 2007, Woods sent Defendant Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) The complaint does not describe this event in any more detail. I liberally construe the complaint as asserting the following causes of action as a result of this event: (1) Eighth Amendment and conspiracy claims against Defendant Anctil; and (2) substantive due process and conspiracy claims against Defendant Woods.

**C. Plaintiff's prayer for relief**

Plaintiff requests (1) a declaration that Defendants violated his rights under the First, Eighth and Fourteenth Amendments; (2) "compensatory damages from each one of the defendants in their individual capacity and in their official capacity" of $14 million; (3) "punitive damages from each defendant in their individual capacity and official capacity in the amount of $20 million"; (4) a permanent injunction preventing Defendants "from depriving the Plaintiff of his programs he need for parole release, and the right to adequate medical care and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

right to receive his adequate rehabilitation adjustment programs and all his good time that was stolen from the Plaintiff ... and to stop deny Plaintiff his outside correspondence with acts of mail theft and stop physical assault ... and put things in his food to harm him and stop using false misbehavior reports to keep Plaintiff's false confinement and stop putting mentally ill inmates in the same cell with Plaintiff or other inmate like Charles Ramball because his child mother is his woman." (Dkt. No. 17 at A-60 FN15.)

FN15. Page numbers refer to the handwritten page numbers in the upper right-hand corner of the complaint.

**D. Summary of Grounds in Support of Defendants' Motion**

*15 Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No 67.) Defendants argue that (1) the causes of action against Defendants Burge, Devito, Head, Hess, Labetz, Simmons and Sourwine arising out of the events of June 17-August 18, 2005, should be severed and dismissed because they are duplicative of the *Burge* action; (2) the claims against supervisory personnel in their official capacities are barred by the Eleventh Amendment; (3) Defendants Manley, Grant, Capacci and Croce have absolute immunity barring the claims regarding the denials of parole; (4) the complaint insufficiently alleges personal involvement by Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright and N. Smith; (5) the complaint does not state a cause of action against stenographers Linda Hayes, Patricia Salvage and Ashley Allen; and (6) the complaint fails to state a cause of action against Defendants Steinberg, Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Anctil or Travers. (Dkt. No. 67-4.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."

Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); FN16 or (2) a challenge to the legal cognizability of the claim.FN17

FN16. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN17. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12[b][6] ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN18] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN19] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN20]

FN18. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

FN19. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair

notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN20. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN21] However, it is well established that even this liberal notice pleading standard "has its limits." [FN22] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN23]

FN21. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN22. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN23. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 FN24 (2007).FN25 Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN24. All citations to the *Bell Atlantic* decision will be to the S.Ct. cite rather than the U.S. cite because page numbers are not available for the U.S. version.

FN25. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

*16 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id .*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).FN26 The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).FN27

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN26. *See, e.g., Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir.2008)* (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." ) [emphasis in original].*

FN27. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008)* (in pro se action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008)* (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a

claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007)* [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [FN28] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN28. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." Id. at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN29] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN30] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN29. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN30. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v.*

*Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*17** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [FN31] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN32] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN33] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [FN34] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN35]

FN31. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN32. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN33. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN34. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN35. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008

WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN36] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN37] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN38] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN39]

FN36. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN37. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN38. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN39. *Stinson v. Sheriff's Dep't of Sullivan Cty.,*

499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Allegations in Paragraphs 1-27 of the Amended Complaint**

Defendants argue that any claims arising from the allegations in Paragraphs 1-27 of the complaint should be dismissed because they are duplicative of the allegations in the *Burge* case. (Dkt. No. 67-4 at 10-11.) With the exception of Paragraph 27, Defendants are correct.

As a general rule, "[w]here there are two competing lawsuits, the first suit should have priority." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989) (quoting *Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc.,* 804 F.2d 16, 19 (2d Cir.1986)) (alteration in original). This rule "embodies considerations of judicial administration and conservation of resources" by avoiding duplicative litigation ... *Id.* at 80. We have recognized only two exceptions to the first-filed rule: (1) where the "balance of convenience" favors the second-filed action, see, e.g., *Motion Picture Lab. Technicians Loc. 780,* 804 F.2d at 19; *Remington Prods. Corp. v. Am. Aerovap, Inc.,* 192 F.2d 872, 873 (2d Cir.1951), and (2) where "special circumstances" warrant giving priority to the second suit, see, e.g., *First City Nat'l Bank,* 878 F.2d at 79.

**\*18** *Employers Ins. of Wausau v. Fox Entertainment Group, Inc.,* 522 F.3d 271, 275 (2d Cir.2008). Claims are duplicative if they arise from the same nucleus of fact. *See Alden Corp. v. Eazypower Corp.,* 294 F.Supp.2d 233, 235 (D.Conn.2003).

Here, the claims in Paragraphs 1-26 of the operative complaint (Dkt. No. 17) are duplicative of Plaintiff's claims in Case No. 9:05-CV-1231 GTS/GJB because they allege precisely the same facts. Neither the balance of convenience nor any special circumstance warrants giving priority to this suit. Rather, giving priority to this suit would undermine the judicial resources that have already been devoted to the *Burge* action, which has proceeded

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

past the summary judgment stage. Therefore, I recommend that the Court dismiss the claims set forth in Paragraphs 1-26 of the operative complaint without leave to amend.

Paragraph 27, however, does not arise from the same nucleus of fact as a pending claim in the *Burge* case. Although Plaintiff alleged in that action that he had filed a grievance against officer Steinberg for mail theft, sexual harassment, and threats (*Burge* Dkt. No. 7 at ¶ 30), Plaintiff did not name Steinberg as a defendant and the Court did not construe the complaint as raising a claim against Steinberg. (*Burge* Dkt. No. 52 at 8.) Here, on the other hand, Plaintiff named Steinberg as a defendant (Dkt. No. 17 at A-7) and alleged that Steinberg violated his First Amendment rights. (Dkt. No. 17 at 56.) Therefore, I recommend that Defendants' motion to dismiss the allegations in Paragraph 27 be denied.

**B. Eleventh Amendment**

Plaintiff requests damages from Defendants "in their individual capacity and in their official capacity." (Dkt. No. 17 at A-60.) Defendants argue that Plaintiff's claims against the supervisory Defendants in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 67-4 at 11-12.) Defendants are more than correct: Plaintiff's claims against *all* of the Defendants in their official capacities are barred by the Eleventh Amendment [FN40]

FN40. The Court has the authority to dismiss the claims against the non-supervisory Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B) and Federal Rule of Civil Procedure 12(h)(3).

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890);

*Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06 (1984).

**\*19** The Eleventh Amendment bars suits against state officials acting in their official capacities. [FN41] All DOCS employees, not merely supervisors, are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at \*2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3). Here, the face of the complaint alleges that each Defendant has an official position with DOCS or the Division of Parole. (Dkt. No. 17 at ¶ 3.) Therefore, any claims against the Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court dismiss those claims without leave to amend.

FN41. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ( "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) [citing cases].

### C. Absolute Immunity for Parole Decisions

Plaintiff alleges that he was wrongfully denied parole twice. At Plaintiff's first parole hearing on November 8, 2005, the parole record stated that Plaintiff had pleaded guilty to three crimes. (Dkt. No. 17 at ¶ 71.) Plaintiff informed the commissioners-Defendants Vernon J. Manley, Thomas Grant, and John C. Capacci-that he had not pleaded guilty and that one of the charges had been dismissed on appeal. *Id.* Plaintiff told the commissioners that DOCS officials had imposed "numerous false disciplinary sanctions" and denied Plaintiff his programming and that Plaintiff's life was in danger if he remained in prison. (Dkt. No. 17 at ¶ 72.) Plaintiff's parole was denied. *Id.*

On November 14, 2006, Plaintiff appeared for his second parole hearing. (Dkt. No. 17 at ¶ 75.) One of the commissioners was Defendant Croce. *Id.* Plaintiff provided documentation to the commissioners that the underlying charges against him were the result of a false police report and that DOCS officials had repeatedly brought false disciplinary charges against him and denied

him access to the law library. *Id.* Parole was denied. (Dkt. No. 17 at ¶ 76.)

Plaintiff claims that Defendants Manley, Grant, and Capacci violated his rights by considering false documents when denying him parole. (Dkt. No. 17 at ¶¶ 71-74 and pp. 58-59.) He claims, further, that Defendant Croce violated his rights by serving as a parole commissioner at a time when he was "knowingly and willfully" disregarding Plaintiff's complaints about his treatment. (Dkt. No. 17 at ¶¶ 75-76 and pp. 58-59.)

Defendants Manley, Grant, Capacci, and Croce argue that they are absolutely immune from liability for damages regarding their decisions to deny parole. (Dkt. No. 67-4 at 12-13.) Defendants are correct.

**\*20** State actors are entitled to some degree of immunity from liability for damages for their official acts. Most actors receive qualified immunity, but a limited number are entitled to absolute immunity. *Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir.1998). Parole board officials are "absolutely immune from liability for damages when [deciding] to grant, deny, or revoke parole because this task is functionally comparable to that of a judge." *Scotto,* 143 F.3d at 111 (internal citations and punctuation omitted). A parole hearing officer is entitled to absolute immunity even if he acted erroneously or maliciously. *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999). *See also Farid v. Bouey,* 554 F.Supp.2d 301, 317-18 (N.D.N.Y.2008). Moreover, injunctive relief against parole board officials is not available unless the plaintiff demonstrates that the officials violated a federal decree or that declaratory relief is not available [FN42]. *Id.* at 318.

> FN42. Plaintiff requests injunctive relief, but it is not clear from the complaint whether or not Plaintiff is requesting injunctive relief against Defendants Manley, Grant, Capacci, and Croce. (Dkt. No. 17 at A-60.) Defendants did not address the issue of immunity from claims for injunctive relief. I raise this issue *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B).

Here, Plaintiff's claims against Defendants Manley, Grant,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Capacci, and Croce are premised on their decision to deny him parole. These Defendants are absolutely immune. Moreover, because Plaintiff has not alleged that these Defendants violated a federal decree or that declaratory relief is unavailable, Plaintiff has not stated a claim for injunctive relief against these Defendants. Thus, I recommend that all claims against Defendants Manley, Grant, and Capacci be dismissed and that the claims arising from the denial of parole against Defendant Croce be dismissed without leave to amend.

**D. Personal Involvement**

Defendants argue that the complaint insufficiently alleges that Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith were personally involved in any alleged constitutional violation. (Dkt. No. 67-4 at 13-15.)

The allegations against these defendants focus on their handling of Plaintiff's grievances and complaints. Plaintiff alleges both that these Defendants acted passively by "knowingly and willfully disregarding Plaintiff's complaints" (Dkt. No. 17 at ¶¶ 32, 34, 55, 59, 60-62, 64, 70) and that they actively interfered with his grievances and complaints by falsifying documents and "causing the filing of false misbehavior reports." (Dkt. No. 17 at ¶¶ 44, 57-59.)

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN43] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN44] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, some "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN45] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN46] Rather, supervisory personnel may be considered "personally

involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN47]

FN43. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN44. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN45. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN46. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN47. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*21** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). District Court decisions in this Circuit have established that:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable ... At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.

*Walker v. Pataro*, No. 99 CIV. 4607, 2002 WL 664040, at *12-13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions) [FN48].

> FN48. The undersigned will provide a copy of the *Walker v. Pataro* decision to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76, 2009 WL 399215 (2d Cir. Feb. 19, 2009).

Here, as discussed above, Plaintiff alleges both that the supervisory Defendants ignored his complaints and that they took action by falsifying documents. I recommend that the claims that Defendants merely ignored complaints be dismissed without leave to amend. Regarding Plaintiff's claims that the supervisory Defendants falsified documents in response to grievances, I find those allegations conclusory. The complaint does not include any facts supporting those allegations, relying instead on legal conclusions masquerading as factual conclusions. Such conclusory allegations do not state a claim. *Rolon v. Henneman,* 517 F.3d 140, 148-49 (2d Cir.2008). I therefore recommend that these claims be dismissed with leave to amend.

## E. Stenographers

Plaintiff has named stenographers Patricia Salvage, Linda A. Hayes, and Ashley Allen as defendants. (Dkt. No. 17 at ¶¶ 33, 77-79.) In their motion to dismiss, Defendants assert that Plaintiff "does not allege that defendant stenographers altered or erred in transcribing exactly what took place at the hearings. Rather, it appears that plaintiff is alleging that they violated his rights by memorializing the purported falsity of the underlying allegations and the alleged wrongdoing of the hearing officers." (Dkt. No. 67-4 at 15.) Contrary to Defendants' assertion, the complaint does allege that the stenographers altered the transcripts. For example, Plaintiff alleges that Defendant Salvage "falsified the transcribed (*sic* ) of the Tier Three Hearing Transcript ... to contempt [an] Article 78 Procedure." (Dkt. No. 17 at ¶ 33.) He alleges that Defendant Hayes' transcript of the July 27, 2006, disciplinary hearing "is all a falsification ... in a effort to cover-up staff misconduct and this transcribed (*sic* ) .... is false information" that will "prevent the Acting Supreme Court Justice of Franklin County Court to performing a lawful duty with this falsification of the records of her transcribed information that is false." (Dkt. No. 17 at ¶ 77.) He alleges that Defendant Allen prepared a "false transcribed document in a effort to cover-up staff misconduct ... to obstruct ... the Supreme Court Justice in their function with Plaintiff Article 78 proceeding ... to prevent the court from performing a lawful duty with the true and accurate transcribed documents of this Tier Three Hearing." (Dkt. No. 17 at ¶ 78.) It appears to the undersigned that Plaintiff is, indeed, alleging that the stenographers falsified transcripts and that they did so to prevent a New York state court from reviewing Plaintiff's disciplinary sentences in Article 78 proceedings.

*22 Construed accordingly, the complaint appears to allege that the stenographers violated Plaintiff's procedural and substantive due process rights and his right of access to the courts. Defendants argue that Plaintiff has failed to state a claim against the stenographers. (Dkt. No. 67-4 at 15-16.) Defendants are correct.

### 1. Procedural Due Process

The Supreme Court has held that in the context of a prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

disciplinary hearing, procedural due process requires that (1) the inmate receive advance written notice of the disciplinary charges; (2); the inmate be allowed to call witnesses and present documentary evidence; and (3) the fact finder prepare a written statement describing the evidence relied upon and the reasons for the determination. *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974). A transcript of the disciplinary hearing is not constitutionally required. *Dixon v. Goord,* 224 F.Supp.2d 739, 744-45 (S.D.N.Y.2002). Courts have repeatedly held that the Fourteenth Amendment does not require any administrative review of disciplinary convictions [FN49]. Moreover, courts have repeatedly held that, where such administrative review is conducted, the Fourteenth Amendment does not require the review of (much less the existence of) a tape recording or transcript of the disciplinary hearing [FN50]. Even where a party claims that a transcript was deliberately tampered with, there is no procedural due process violation if the state provides adequate post-deprivation remedies. *Curro v. Watson,* 884 F.Supp. 708, 717-19 (E.D.N.Y.1995) (prisoner who alleged that court reporters deliberately altered the transcript of his criminal trial did not state procedural due process claim because New York provides a procedure for challenging inaccuracies in trial transcripts). In New York, a prisoner who disputes the accuracy of the transcript of a disciplinary hearing may raise that issue in an Article 78 proceeding. N.Y. C.P.L.R. § 7804(d) (McKinney 1994).

FN49. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 563-570 (1974) (not listing right to appeal among due process requirements of disciplinary hearing), *accord, Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004); *Amato v. Ward,* 41 N.Y.2d 469, 473, 393 N.Y.S.2d 934, 937 (N.Y.1977) ("This type of administrative review [of prison disciplinary hearings pursuant to New York State regulations] is not required by the Federal Constitution.") (citing *Wolff v. McDonnell),* accord, *Giovanni v. Lynn,* 48 F.3d 908, 911 n. 7 (5th Cir.1995) ("Nor, indeed, is provision for appeal, following an [otherwise] adequate [disciplinary] hearing, required under the more stringent standards of *Wolff v. McDonnell ....*").

FN50. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) ("According to *Wolff,* the only written or audio record of a disciplinary

hearing that must be maintained to comply with minimal due process standards is a written statement describing the evidence relied upon and the reason for the determination.... The Court therefore agrees with Defendants that any alleged defect in the tape would not rise to the level of a constitutional violation."); *Cherry v. Selsky,* 99-CV-4636, 2000 U.S. Dist. LEXIS 9451, at *15-16 (S.D.N.Y. July 7, 2000) ("This allegation [that defendant failed to review the audio tape recording of the disciplinary hearing, prior to affirming the decision of the hearing officer], without more, is insufficient to state a claim for violation of a liberty interest."); *Afrika v. Selsky,* 750 F.Supp. 595, 600, 602 (S.D.N.Y.1990) (granting defendant's motion for summary judgment because, among other reasons, plaintiff had no liberty interest in the review of an audio tape of his disciplinary hearing as part of his administrative appeal, stating that "because both the hearing and review reached the minimal standards, [defendant] did not violate [plaintiff's] liberty interest in not being confined without due process"); *Brito v. Coughlin,* No. 88-CV-8064, 1989 WL 241718, at *2 (S.D.N.Y. July 31, 1989) ("[The due process clause] does not require, however, that a transcript be made or given to an inmate after a disciplinary hearing.").

Thus, because Plaintiff was not constitutionally entitled to a transcript and because he could have challenged any deficiencies in the transcripts in his Article 78 proceeding, he has not stated a claim. I therefore recommend that the Court dismiss Plaintiff's procedural due process claims against the stenographers without leave to amend.

2. *Substantive Due Process/Access to Courts*

Construed liberally, Plaintiff's complaint raises substantive due process and First Amendment access to the courts claims against the defendant stenographers. I will analyze these claims together. The substantive component of the Due Process Clause "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch,* 494 U.S. 113, 125 (1990) (internal quotations marks and citation omitted). "Substantive due process protects

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotations marks and citations omitted).

**\*23** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. *Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 123-25 (1992)). "Substantive due process embraces an individual's right of access to the courts." *Curro,* 884 F.Supp. at 719. Prisoners' right to access to the courts includes proceedings to "attack their sentences, directly or collaterally, and ... to challenge the conditions of their confinement." *Lewis v. Casey,* 518 U.S. 343, 355 (1996). "[A]n Article 78 petition that challenges an inmate's ... SHU confinement is an action for which access to the courts is constitutionally guaranteed .... [because it] relates directly to the conditions of confinement." *Collins v. Goord,* 438 F.Supp.2d 399, 417 (S.D.N .Y.2006). Plaintiff claims that the defendant stenographers thwarted his efforts to pursue Article 78 proceedings by providing false transcriptions. (Dkt. No. 17 at ¶¶ 33, 77, 78.) Thus, the constitutional right at stake is the right of access to the courts.

In order to state a claim for denial of access to the courts, Plaintiff must allege that the stenographers "hindered his efforts to pursue a legal claim." *Collins,* 438 F.Supp.2d at 416 (citing *Lewis,* 518 U.S. at 351). Similarly, in order to state a cause of action for substantive due process, a plaintiff must allege that he suffered "some tangible harm." *Curro,* 884 F.Supp. at 720. *See also Collins,* 438 F.Supp.2d at 415-16 (plaintiff alleging violation of right to access to the courts must allege an "actual injury."). Plaintiff has not alleged any tangible harm. Plaintiff does not allege that he was not successful in his Article 78 proceedings. Even if he was unsuccessful in those proceedings, he does not allege that any such failure stemmed from the transcriptions. *Compare Collins,* 438 F.Supp.2d at 417 (prisoner adequately alleged tangible harm where he alleged that his Article 78 proceeding was dismissed when prison officials failed to provide him with necessary copies of documents). Therefore, Plaintiff has not stated a substantive due process or First Amendment access to the courts claim against Defendants Salvage, Hayes, or Allen and I recommend that these claims be

dismissed with leave to amend [FN51].

> **FN51.** Defendants also argue that any claim against the stenographers is barred by the doctrine of qualified immunity. (Dkt. No. 67-4 at 15-16.) In light of my finding that Plaintiff has not stated a claim, I have not addressed this argument.

**F. Failure to state a cause of action against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald**

Defendants argue that Plaintiff has failed to state a claim against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald. (Dkt. No. 67-4 at 16-23.)

*1. Bellinger and Hess*

Defendants argue that Plaintiff has failed to state a claim against Defendants Bellinger and Hess. (Dkt. No. 67-4 at 16-17.) I disagree.

Regarding Defendants Bellinger and Hess, the surviving paragraphs of the complaint allege that on August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess. *Id.* Plaintiff had not seen Hess for two or three weeks prior to August 22. *Id.* As Plaintiff was being escorted, Defendant Bellinger told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" a July 20, 2005, misbehavior report. *Id.*

**\*24** Defendants argue that Plaintiff has failed to state a retaliation claim against Defendant Hess because (1) Plaintiff was not, in fact, deterred from filing grievances, writing letters of complaint, or filing lawsuits; and (2) the allegations regarding a possible retaliatory motive are implausible [FN52]. (Dkt. No. 67-4 at 16-17.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN52. Defendants also argue, cursorily and without citation to authority, that these claims should have been raised in an amended complaint in the *Burge* case.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

Defendants argue that Plaintiff has not properly alleged that Hess took adverse action because the "complaint makes it clear that [Plaintiff] was not deterred, in any way from filing grievances, writing letters of complaint, o[r] filing new actions in the federal District Courts for relief of his alleged grievances." (Dkt. No. 67-4 at 17.) Defendants essentially argue that this Court should apply a *subjective* test: was Plaintiff actually deterred? However, the Second Circuit defines " ' adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003) (emphasis in original). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. The issue of whether the facts "demonstrate that [a defendant's actions] would deter a reasonable inmate from pursuing grievances" should not be determined at the motion to dismiss stage. Rather, a prisoner plaintiff should be allowed "the opportunity to develop [those] facts." *Davis,* 320 F.3d at 354 (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (abrogated on other grounds by *Porter v. Nussle,* 534 U.S. 516 (2002))). Therefore, dismissal is not appropriate on this ground at this stage in the litigation.

Defendants argue that Plaintiff cannot establish a causal

connection between Plaintiff's defense of the disciplinary charge and Hess' actions because Plaintiff "admits that he had not seen defendant for two or three weeks" before the urine test. (Dkt. No. 67-4 at 16.) The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). The Second Circuit has, however, found that lapses of time far longer than two or three weeks are sufficient to support a cause of action for retaliation. *Espinal v. Goord,* 554 F.3d 216, 228 (2d Cir.2009) (the "passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers ... is sufficient to support an inference of a causal connection"); *Gorman-Bakos,* 252 F.3d at 555 (lapse of five months between protected activity and retaliation may show a causal connection); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir.1980) (lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection). As explained above, Rule 8 requires a plaintiff to provide "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Bell Atlantic,* 127 S.Ct. at 1965. Plaintiff alleges that Hess wrongfully interfered with his right to wear a colored Tsalot-Kob, that Hess issued a false misbehavior report after that incident, and that Plaintiff was found not guilty of the disciplinary charges. (Dkt. No. 17 at ¶¶ 12-14.) It is not implausible that, based on these events, Hess would have the motive to retaliate. Moreover, the "two or three" weeks that Plaintiff alleges had passed since he last saw Defendant Hess appear to be the two or three weeks between the time Plaintiff was found not guilty of the disciplinary charges on July 23, 2005 (Dkt. No. 17 at ¶ 14), and the encounter on August 22. These facts plausibly suggest that Defendant Hess took his first opportunity to retaliate [FN53]. Accordingly, Plaintiff has stated a claim for retaliation against Defendant Hess and I recommend that Defendants' motion to dismiss this claim be denied.

FN53. By finding that such an allegation is "plausible," I express no opinion on whether this allegation can be established by evidence and/or survive a more stringent inquiry.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*25** Defendants argue that Plaintiff has not stated a retaliation claim against Defendant Bellinger because "insulting, disrespectful, or sarcastic comments are considered *de minimus,* and are not actionable." (Dkt. No. 67-4 at 17.) Defendants are correct that insulting comments generally do not rise to an actionable level. *Davis,* 320 F.3d at 353. If Defendant Bellinger were simply a correctional officer who had made the comment to other officers, the undersigned would be inclined to agree that the claim should be dismissed. However, the complaint alleges that Defendant Bellinger was the Deputy Superintendent of Auburn Correctional Facility. (Dkt. No. 17 at A-5.) As such, the complaint construed liberally alleges that the Deputy Superintendent of the facility ordered subordinate officers to falsify the results of a drug test. This is more than a mere insulting comment. Accordingly, I recommend that Defendants' motion to dismiss the retaliation claim against Defendant Bellinger be denied.

2. *Steinberg, B. Smith, and Clafin*

Defendants argue that Plaintiff has failed to state a cause of action against Defendants Steinberg, B. Smith, or Claflin. (Dkt. No. 67-4 at 17-18.) I find that Defendants are partially correct.

Regarding Defendants Steinberg, B. Smith and Claflin, Plaintiff alleges that while he was giving the urine sample ordered by Hess, Defendants Steinberg, Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.* On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty and sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

Construed liberally, the complaint alleges that these Defendants violated Plaintiff's First, Fourth and Fourteenth Amendment rights. Defendants have not moved to dismiss Plaintiff's allegation that these Defendants violated his First Amendment rights by throwing his religious headgear in the toilet. I find that Plaintiff's First Amendment claim is sufficient to withstand a *sua sponte* review pursuant to 28 U.S.C. § 1915(e)(2)(B). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest." The complaint sufficiently alleges, for the purposes of *sua sponte* review, that the wearing of the Tsalot-Kob is a part of Plaintiff's sincerely held Rastafarian beliefs, that throwing Plaintiff's Tsalot-Kobs in the toilet infringed that belief, and that there was no legitimate penological reason for throwing the Tsalot-Kobs in the toilet. Therefore, I recommend that Defendants be directed to answer this claim.

**\*26** Defendants argue that Plaintiff has failed to state a cause of action against Defendants B. Smith, Steinberg, and Claflin because (1) prisoners have no Fourth Amendment right of protection against unreasonable searches; and (2) prisoners have no constitutional right to be free from being falsely accused. (Dkt. No. 67-4 at 17-18 .) Defendants are correct, with the exception of the false accusation claim against Defendant Steinberg.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U .S. 602, 619 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." *Skinner,* 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

[citations omitted], *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer* 468 U.S. 517, 526 (1984); *see also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N .D.N.Y. March 31, 1997) (Pooler, J., adopting Report-Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."). Therefore, Plaintiff has not stated a Fourth Amendment claim against Defendants Steinberg, B. Smith or Claflin and I recommend that this claim be dismissed without leave to amend.

Plaintiff has not stated a Fourteenth Amendment due process claim against Defendants Smith or Claflin. "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing [FN54]." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. The complaint does not allege that Smith or Claflin acted in retaliation. Read extremely broadly, however, it does suggest that Steinberg had a retaliatory motive because it states that four days prior to the search, Plaintiff filed a grievance against Steinberg. (Dkt. No. 17 at ¶ 27.) Therefore, I recommend that the due process claims be dismissed as to Defendants Smith and Claflin with leave to amend but that Defendants' motion to dismiss the false accusation claim against Defendant Steinberg be denied.

FN54. Plaintiff alleges that he was not allowed to present a defense at the disciplinary hearing. (Dkt. No. 17 at ¶ 30.)

3. *Corrigeux, Premo, and D. Wood*

**\*27** The complaint alleges that on April 29, 2006, Plaintiff was moved into a cell with an inmate who had a long history of drug use. (Dkt. No. 17 at ¶ 3 8.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a random urine specimen. Premo said "Albany" had made the request. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered by a non-defendant correctional officer to submit a random urine specimen. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive of cocaine and cannabinoid." (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood listed the date that he took the specimens as May 11 rather than May 9 so that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) As part of his defense at the ensuing disciplinary hearing, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. (Dkt. No. 17 at ¶ 40.) Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

I have construed the complaint as asserting (1) a Fourth Amendment claim, a due process claim, and a conspiracy claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants D. Wood and Corrigeux.

Defendants have not moved to dismiss the Fourth Amendment claim against Defendant Premo. I find that the claim is sufficient to withstand initial review pursuant to 28 U.S.C. § 1915(e)(2)(B). Urinalysis testing constitutes a search subject to the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614 (1989); *Harris v. Keane,* 962 F.Supp. 397, 407 (S.D.N.Y.1997). However, if the intrusion into one's privacy is found to be minimal, the expectation of privacy is minimal, and there is a governmental reason advanced supporting a search, then the search will not violate one's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Fourth Amendment rights. It is equally well-established that a prisoner's right to be free from unreasonable searches is diminished once he or she steps through the prison door. Harris, 962 F.Supp. at 407. Pursuant to New York Regulations, as long as the testing is not done with an intent to harass, a corrections officer may order an inmate to submit to urine testing "[w]hen correctional staff has reason to believe the inmate has used drugs ..., when correctional staff receives information from a source that the inmate is currently under the influence of or has recently used ... drugs ..., [or] as part of a computer-generated program for random testing of all inmates [or those] inmates who have been found guilty of drug ... related misconduct in the previous two-year period." N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(a)(1), (4), (7), (8); see also Rodriguez v. Coughlin, 795 F.Supp. 609 (W.D.N.Y.1992) (holding that two random drug tests within a twelve-month period, both producing negative results, did not constitute a constitutional violation). Here, the complaint alleges that Defendant Premo told Plaintiff that the May 7, 2006, drug test was a "random request made by Albany," but that at the disciplinary hearing Premo and Corrigeux represented that Corrigeux had requested the test. (Dkt. No. 17 at ¶¶ 36, 39.) These facts raise a sufficient inference of an intent to harass to survive initial review. The undersigned expresses no opinion about whether the evidence will support these facts or whether this allegation can withstand a more stringent inquiry.

**\*28** Defendants argue that the due process and conspiracy claims against Defendants Corrigeux, Premo, and D. Wood must be dismissed because (1) prisoners have no right to be free from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest; and (2) under the intracorporate conspiracy doctrine, DOCS officials are legally incapable of conspiring together. (Dkt. No. 67-4 at 19-20.) Defendants are correct.

As discussed above, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (citing Freeman v. Rideout, 808 F.2d 949, 951 [2d Cir.1986] ); accord, Pittman v. Forte, 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it

in constitutional violations which occur at a subsequent disciplinary hearing [FN55]." Williams v. Smith, 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." Boddie, 105 F.3d at 862; accord, Murray v. Pataki, 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

> FN55. The hearing was conducted by Defendant Bezio, but the complaint does not allege any facts suggesting that Defendant Bezio conducted the hearing improperly.

None of the facts alleged in the complaint plausibly suggest that Defendants Premo, Corrigeux, or D. Wood acted in retaliation for Plaintiff's exercise of a constitutional right. Therefore, I recommend that all claims against these officers regarding the filing of false reports be dismissed with leave to amend.

The complaint alleges that Defendants are all DOCS employees. (Dkt. No. 17 at 1-A9.) The intra-agency conspiracy doctrine precludes conspiracy claims "against officers, agents, or employees of a single corporate entity." Farid v. Bouey, 554 F.Supp.2d 301, 324 (N.D.N.Y.2008) (granting summary judgment where prisoner claimed conspiracy between Board of Parole and various BOP commissioners to deprive him of his civil rights). "The intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances." Id. (citing Everson v. New York City Transit Auth., 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002)). Therefore, I recommend that all conspiracy charges be dismissed without leave to amend.

4. Lewis

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff,

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis then said to another officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* On June 22, 2006, Plaintiff received a misbehavior report charging him with refusing a direct order. (Dkt. No. 17 at ¶ 42.) I have construed the complaint as asserting a due process claim and a conspiracy claim against Defendant Lewis.

**\*29** Defendants move to dismiss the claims against Lewis on the same grounds as asserted regarding Defendants Corrigeux, Premo and Wood. (Dkt. No. 67-4 at 18, 20.) As with those Defendants, the complaint fails to state a due process claim against Defendant Lewis because Plaintiff has not alleged any facts plausibly suggesting that Lewis acted with a retaliatory motive. Therefore, I recommend that this claim be dismissed with leave to amend. Moreover, the complaint fails to state a claim for conspiracy because Lewis and the other officer are both DOCS employees. Therefore, I recommend that this claim be dismissed without leave to amend.

5. *Moore*

The complaint alleges that on June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.* I have construed the complaint as asserting an Eighth Amendment medical care claim against Defendant Moore.

Defendants argue that Plaintiff has not stated an Eighth Amendment claim against Defendant Moore because Plaintiff "did not know whether or not he swallowed glass, and he alleges no subjective facts from which to infer that he was in 'serious medical need' on June 29 or June 30, 2006 ... and thus, that Sergeant Moore ... knew of, and disregarded, an excessive risk to his health or safety." (Dkt. No. 67-4 at 21.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the

plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Here, Plaintiff has not sufficiently alleged that Moore was deliberately indifferent to a serious medical need. Plaintiff has not alleged that he had a serious medical need. He alleges that while eating his food he felt a piece of glass in his mouth. He removed the glass, inspected his food, and found three more pieces of glass. (Dkt. No. 17 at ¶ 43.) He does not allege that he swallowed glass or that he was cut by the piece of glass that he placed in his mouth. Rather, he merely alleges that "he did not know if any of the glass went down his belly." *Id.* While his fear that he *may* have swallowed glass is understandable, that fear, without more, is insufficient to constitute a serious medical need for Eighth Amendment purposes because fear, in and of itself, will not produce death, degeneration, or extreme pain. Given the lack of a serious medical need, the complaint does not allege facts plausibly suggesting that Moore was deliberately indifferent. Moreover, there is no allegation that Moore placed the glass in Plaintiff's food. *Cf. Robles v. Coughlin,* 725 F.2d 12 (2d Cir.1983) (allegation that defendants contaminated prisoners' food with glass sufficiently stated an Eighth Amendment claim to withstand initial review). Therefore, I recommend that the Eighth Amendment medical care claim against Defendant Moore be dismissed with leave to amend.

6. *Travers*

**\*30** Plaintiff complains that Defendant Travers denied him medical care on two occasions: (1) on June 30, 2006, after he discovered glass in his food (Dkt. No. 17 at ¶ 44); and (2) in May 2007, when Plaintiff reported bloody bowel movements. (Dkt. No. 17 at ¶¶ 58, 65.) Explicitly declining to move to dismiss the claims arising from the May 2007 incident (Dkt. No. 67-4 at 22, n. 1), Defendants move to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

dismiss Plaintiff's Eighth Amendment claim regarding the June 30 glass incident. (Dkt. No. 67-4 at 21.)

Regarding that incident, the complaint alleges that on June 30, 2006, Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

Defendants argue that Plaintiff has failed to state an Eighth Amendment claim against Nurse Travers because (1) Plaintiff has not alleged a serious medical need; (2) prisoners do not have a right to the treatment of their choice, and an inmate's disagreement over proper treatment does not create a constitutional claim; and (3) an allegation of medical negligence does not raise a constitutional claim. (Dkt. No. 67-4 at 21-22.)

As discussed above with regard to Defendant Moore, Plaintiff has not alleged that he suffered a serious medical need after discovering glass in his food. Therefore, I recommend that the Eighth Amendment claim against Defendant Travers arising from the events described in ¶ 44 of the complaint be dismissed with leave to amend.

### 7. *Anctil*

The complaint alleges that on May 19, 2007, Woods sent Defendant J. Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) Although this allegation is extremely unclear, I have construed the complaint as alleging that Defendant Anctil violated Plaintiff's Eighth Amendment rights and conspired with Defendant Woods.

Defendants move to dismiss Plaintiff's claims against Defendant Anctil. Defendants argue that verbal harassment, abuse and threats do not amount to violations of constitutional rights. (Dkt. No. 67-4 at 22.) Defendants are correct. "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). The complaint alleges that Anctil used "intimidation" and

"threats" and "promises" of physical force, not that Anctil actually harmed Plaintiff. Therefore, the complaint fails to state an Eighth Amendment claim against Defendant Anctil and I recommend that the claim be dismissed with leave to amend.

Further, as discussed above, it is legally impossible for DOCS employees to be found liable for conspiring together. Woods and Anctil are both DOCS employees. Therefore, the complaint fails to state a conspiracy claim against Defendant Anctil and I recommend that the claim be dismissed without leave to amend.

### 8. *McDonald*

**\*31** The complaint alleges that on April 30, 2007, Plaintiff filed a complaint with Defendant Woods stating that Defendant McDonald had used racially abusive language to Plaintiff and denied him his food tray. (Dkt. No. 17 at ¶ 63.) On May 9, 2007, Plaintiff filed a grievance against Defendant McDonald for spitting in his coffee cup, interfering with a medical interview, and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I have construed the complaint as alleging that Defendant McDonald violated Plaintiff's Eighth Amendment medical care and conditions of confinement rights.

In the Second Circuit, a prisoner's allegation that prison officials served unsanitary, spoiled or contaminated food is sufficient to state an Eighth Amendment claim, so long as he or she alleges that he or she suffered a "distinct and palpable injury". *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Harris v. Ashlaw,* No. 9:07-CV-0358, 2007 WL 4324106, at * 5 (N.D.N.Y. Dec. 5, 2007). Here, Plaintiff has not alleged that he suffered any injury as a result of being denied food or drinking the allegedly contaminated coffee. Therefore, Plaintiff has failed to state an Eighth Amendment claim against Defendant McDonald arising from this incident and I recommend that the claim be dismissed with leave to amend. [FN56]

FN56. Defendants cite two unpublished Northern District of New York cases for the proposition that "Plaintiff's conclusory allegation ... that [McDonald] spit into his coffee cup is

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

insufficient to state a constitutional ... claim."
(Dkt. No. 67-4 at 23.) Neither of the cases cited
by Defendants found that a prisoner's allegation
that a correctional officer spit into his food failed
to state an Eighth Amendment claim. Rather,
both of those cases were decided on summary
judgment and the Court dismissed the claims
because the prisoner failed to *substantiate* them
with evidence. *Chavis v. Kienert,* No.
9:03-CV-0039, 2005 U.S. Dist. LEXIS 41920, at
*65-66 (N.D.N.Y. Sept. 30, 2005); *Zimmerman
v. Seyfert,* No. 9:03-CV-1389, 2007 U.S. Dist.
LEXIS 52388, at *80-81 (N.D.N.Y. July 19,
2007). Defendants provided copies of the
decisions to Plaintiff in accordance with Local
Rule 7.1(a)(1). The undersigned will provide a
copy of the *Harris v. Ashlaw* opinion to Plaintiff
in light of the Second Circuit's recent decision in
[Lebron v. Sanders, 557 F.3d 76, 2009 WL
399215 (2d Cir. Feb. 19, 2009)](.).

Plaintiff's bare allegation that McDonald interfered with a
medical interview is insufficient to state an Eighth
Amendment medical care claim. As discussed above, a
plaintiff asserting such a claim must allege that he or she
suffered from a serious medical condition. Plaintiff has
made no such allegation. It is not even clear from the
complaint what type of medical interview McDonald
allegedly interfered. Therefore, I recommend that the
Eighth Amendment medical care claim against Defendant
McDonald be dismissed with leave to amend.

Regarding Plaintiff's claim that McDonald used "racial
and discrimination and indecent profane language," as
noted above, "[i]t is well established that mere threatening
language and gestures of a custodial officer do not ...
amount to constitutional violations." [Alnutt v. Cleary, 913
F.Supp. 160, 165 (W.D.N.Y.1996)](.) (punctuation omitted).
Therefore, I recommend that this claim be dismissed
without leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss
for failure to state a claim (Dkt. No. 67) be **GRANTED IN
PART AND DENIED IN PART;**

**RECOMMENDED** that the following claims be
dismissed without leave to amend: (1) all claims against
Defendants Devito, Head, Labetz, Simons, and Sourwine;
(2) the First Amendment religion claims alleged in ¶ 1-26
of the complaint against Defendant Hess, because they are
duplicative of the claims in Case No.
9:05-CV-1231(GTS/GJD); (3) all claims against
Defendant Burge; (4) all claims against Defendants in
their official capacities; (5) all claims against Defendants
Manley, Grant, and Capacci; (6) the claim against
Defendant Croce regarding his decision to deny Plaintiff
parole; (7) the claims against Defendants Goord, Burge,
Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire,
Wright, and N. Smith alleging that they ignored
complaints and grievances; (8) the procedural due process
claims against Defendants Salvage, Hayes, and Allen; (9)
the Fourth Amendment claim against Defendants
Steinberg, B. Smith, and Claflin arising from their August
22, 2005, search of Plaintiff's cell; (10) the conspiracy
claims against Defendants Premo, D. Wood, and
Corrigeux arising from the May 2006 drug tests; (11) the
conspiracy claim against Defendant Lewis arising from the
June 17, 2006, request for a urine sample; (12) the
conspiracy claim against Defendants R. Woods and Anctil
arising from Anctil's May 19, 2007, threats; and (13) the
claim that Defendant McDonald used "racial and
discrimination and indecent and profane language."

**\*32 RECOMMENDED** that the following claims be
dismissed with leave to amend: (1) the claims against
Defendants Goord, Fischer, Roy, McLaughlin, Croce,
Stewart, LeClaire, Wright, and N. Smith alleging that they
falsified documents in response to Plaintiff's grievances;
(2) the substantive due process and First Amendment
access to the courts claims against Defendants Salvage,
Hayes, and Allen; (3) the due process claim against
Defendants B. Smith and Claflin arising from the August
23, 2005, misbehavior report; (4) the due process claim
against Defendants Premo, D. Wood, and Corrigeux
arising from the May 2006 drug tests; (5) the due process
claim against Defendant Lewis arising from the June 22,
2006, misbehavior report; (6) the Eighth Amendment
medical care claims against Defendants Moore and
Travers arising from Plaintiff's discovery of glass in his
food; (7) the Eighth Amendment claims arising from
Anctil's May 19, 2007, threats; (8) the Eighth Amendment
conditions of confinement claim against Defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

McDonald arising from the denial of food and spitting in Plaintiff's coffee; and (9) the Eighth Amendment medical care claim against Defendant McDonald arising from her interference with Plaintiff's medical interview.

**RECOMMENDED** that Defendants be directed to answer the following claims: (1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test; (2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test; (3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell; (4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report; (5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and (6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN57]

FN57. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present

additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Excell v. Woods
Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))



Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony SHULER, Plaintiff,
v.
BROWN, et al., Defendant.
**No. 07-CV-0937.**

March 23, 2009.

West KeySummary
**Civil Rights 78 🗝 1395(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases
An inmate failed to state a § 1983 claim for a violation of
his right to privacy. The inmate did not allege precisely
what medical information he believed that his counselor
had revealed to a corrections officer. Thus, the court could
not determine from the face of the complaint whether the
inmate suffered from an "unusual" condition that would be
protected by his right to privacy. Moreover, the inmate did
not allege that his condition, whatever it might be, was
revealed to other inmates. 42 U.S.C.A. § 1983.

Anthony Shuler, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., of Counsel,
New York, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was
referred to the Hon. George H. Lowe, United States
Magistrate Judge, for a Report-Recommendation pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No
objections to the February 2, 2009
Report-Recommendation have been raised. After
examining the record, this Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice. Accordingly, this Court adopts
the Report-Recommendation for the reasons stated therein.
Defendant's motion for judgment on the pleadings is
GRANTED and Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to
42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule 72.3(c) of the Local Rules of
Practice for this Court. Plaintiff Anthony Shuler alleges
that two employees of the New York State Department of
Correctional Services ("DOCS") [FN1] violated his
constitutional rights when one revealed statements he
made during a counseling session and the other, based on
that revelation, issued a misbehavior report that resulted in
a 60-day disciplinary sentence. (Dkt. No. 1.)

FN1. Plaintiff's complaint also named DOCS as
a defendant. (Dkt. No. 1 at ¶ I(B).) The Court
dismissed DOCS as a defendant upon initial
review of the complaint. (Dkt. No. 6.)

Currently pending is Defendants' motion for judgment on
the pleadings pursuant to Federal Rule of Civil Procedure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

12(c) [FN2]. (Dkt. No. 16.) After Defendants filed the pending motion, Plaintiff requested a voluntary dismissal without prejudice. (Dkt. No. 19.) The Court denied that request. (Dkt. No. 21.) Plaintiff has not opposed the pending motion despite having been granted an extension of time to do so and being advised of the consequences of failing to do so. (Dkt. No. 21.) Because I find that Plaintiff's complaint fails to state a cause of action, I recommend that Defendants' motion for judgment on the pleadings be granted.

> FN2. Defendants' memorandum of law suggests that the Court find the complaint "wholly insubstantial and frivolous" and dismiss it for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). (Dkt. No. 16-2 at 4-5.) That suggestion did not appear in the notice of motion, the title page of the memorandum of law, or the introduction to the memorandum of law. Accordingly, I decline Defendants' suggestion and will address Plaintiff's complaint solely under Federal Rule of Civil Procedure 12(c).

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Liberally construed, the complaint alleges as follows:

On August 25, 2006, Plaintiff went to see his Mental Health Unit counselor, Defendant V. Brown. (Dkt. No. 1 at ¶ II(D).) Thereafter, Defendant Brown informed Defendant Sergeant R.J. Ballard that Plaintiff had behaved inappropriately toward her. (Dkt. No. 1 at 16.) On September 25, 2006, Defendant Ballard issued a misbehavior report. The report stated that when Defendant Ballard interviewed Plaintiff about Defendant Brown's allegations, Plaintiff "began yelling 'I'll do or say what I want to these females. I'm 41 years old and I'll do what I want.' " (Dkt. No. 1 at 10.) After a Tier III hearing on the misbehavior report, Plaintiff was sentenced to 60 days of keeplock along with loss of commissary, package and phone privileges. (Dkt. No. 1 at 17.)

On October 19, 2006, Plaintiff filed an inmate grievance. (Dkt. No. 1 at 8.) He complained that Defendant Brown had revealed the contents of their September 25, 2006, counseling session to Defendant Ballard. *Id.* He requested that Defendant Brown "take or retake a course in patient confidentiality." *Id.* He also asked "to have no future female as my counselor, since it makes me feel very uncomfortable to deal with the other sex on that level." *Id.* The grievance was denied. (Dkt. No. 1 at 16.)

**\*2** Plaintiff appealed his disciplinary sentence. (Dkt. No. 1 at 11-13.) On November 27, 2006, after Plaintiff had completed his keeplock sentence, DOCS reversed the disciplinary sentence. (Dkt. No. 1 at 15.)

In his complaint, Plaintiff alleges that Defendants violated his civil rights by violating his right to privacy and unlawfully detaining him in keeplock. (Dkt. No. 1 at ¶ II(D).) Liberally construed, Plaintiff's complaint raises a right-to-privacy claim against Defendant Brown and procedural and substantive due process claims against Defendant Ballard. Plaintiff requests $1 million in damages. (Dkt. No. 1 at ¶ V.)

### B. Summary of Grounds in Support of Defendants' Motion For Judgment on The Pleadings

Defendants argue that (1) Plaintiff has not stated a right-to-privacy claim because he has not alleged that he suffers from a medical condition "unusual" enough to warrant privacy protection; (2) even if Plaintiff had alleged a cognizable privacy interest, the face of the complaint reveals that Defendant Brown's disclosure was reasonably related to legitimate penological interests; (3) the complaint fails to state a due process claim because the face of the complaint reveals that Plaintiff was granted a hearing and given the opportunity to rebut the charges against him [FN3]; and (4) they are entitled to qualified immunity. (Dkt. No. 16-2.) Because I find that the complaint fails to state a cause of action, I will not address Defendants' argument regarding qualified immunity.

> FN3. Defendants devoted only a four-sentence footnote to their argument regarding Plaintiff's due process claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

## II. ANALYSIS

### A. First Basis for Dismissal: Facial Merit of Defendants' Unopposed Motion

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion for judgment on the pleadings was properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(c). [FN4]

> FN4. *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] is a more limited endeavor than a review of a contested motion for judgment on the pleadings. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [FN5] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [FN6]

> FN5. *See, e.g., Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *see also* Race Safe Sys. v. Indy Racing League, 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3]); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

> FN6. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1 [3], "the court must review the motion to determine whether it is *facially meritorious*" ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, 2007 WL 894375, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28-29 & n. 40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336, 2007 WL 189021 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

Here, I find that Defendants have met their lightened burden on their unopposed motion given Defendants' cogent, and legally supported, legal arguments set forth in their memorandum of law. (Dkt. No. 16.) I note that this Court has, on numerous occasions, granted motions to dismiss based on a similar facial analysis of a defendant's legal arguments (and a plaintiff's claims).[FN7]

FN7. *See, e.g., Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Local Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and the reasons set forth in defendants' motion papers), adopted by* 96-CV-1269, 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.); *Munoz v. Coombe,* 95-CV-1191, 1996 U.S. Dist. LEXIS 15107, at *3 (N.D.N.Y. Aug. 21, 1996) (Hurd, M.J.), *adopted by* 95-CV-1191, 1996 U.S. Dist. LEXIS 15108, 1996 WL 589369, at *2 (N.D.N.Y. Oct. 11, 1996) (Pooler, J.) (rejecting plaintiff's objections, explaining that "Local Rule 7.1(b) permits the court to grant an unopposed motion"); *Owens v. Long,* 95-CV-0604, 1996 U.S. Dist. LEXIS 6520, at *2 (N.D.N.Y. March 11, 1996) (Hurd, M.J.), *adopted by* 95-CV-0604, 1996 U.S. Dist. LEXIS 4807 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.).

**\*3** For these reasons, I recommend that the Court grant Defendants' motion for judgment on the pleadings.

**B. Alternative Basis for Dismissal: Substantive Merit of Defendants' Motion**

In the alternative, I recommend dismissal based on the sort of detailed scrutiny of Defendants' legal arguments that would be appropriate on a *conteste* d motion for judgment on the pleadings.

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter. .,* 448 F.3d 518, 521 (2d Cir.2006). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN8] or (2) a challenge to the legal cognizability of the claim.[FN9]

FN8. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN9. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, 2004 WL 2613993, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, 2002 WL 313156, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN10] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and

provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN12]

FN10. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN11. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN12. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN13] However, it is well established that even this liberal notice pleading standard "has its limits."[FN14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN15]

FN13. See, e.g., Swierkiewicz, 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN14. 2 Moore's Federal Practice § 12.34[1][b] at 12-61 (3d ed.2003).

FN15. See, e.g., Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); accord, Dura Pharm., 125 S.Ct. at 1634-1635, Christopher v. Harbury, 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234-235 (2d Cir.2004), Gmurzynska v. Hutton, 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y., No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-Swierkiewicz decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, see Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after Swierkiewicz, of certain cases from within the Second Circuit interpreting Rule 8(a)(2). See Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of Domond v. INS, 244 F.3d 81 [2d Cir.2001],

after that case was "implicitly overruled by the Supreme Court" in INS v. St. Cyr, 533 U.S. 289 [2001] ).

Most notably, in the recent decision of Bell Atlantic Corporation v. Twombly, the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN16] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the plausibility of an actionable claim. Id. at 1965-74.

FN16. The Court in Bell Atlantic further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Bell Atlantic, 127 S.Ct. at 1969.

*4 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. Id. at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." Id . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. Id. at 1965 [citations omitted]. What this means, on a practical level,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[FN17] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN18]

FN17. *See, e.g., Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir.2008)* (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki, 07-CV-2537, 2008 U.S.App. LEXIS 2241, 2008 WL 269100, at \*14 (2d Cir. Feb. 1, 2008)* (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98, n. 2 (2d Cir.2007)* ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007)* (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

FN18. *See, e.g., Jacobs v. Mostow, 281 F. App'x 85, 87 (2d Cir. March 27, 2008)* (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp., 521 F.3d 202, 215-16 (2d Cir.2008)* (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN19] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN19. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongly terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN20] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*[FN21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN20. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN21. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*5** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN26]

> FN22. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia*, *Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN23. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN24. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN25. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN26. *Cuoco,* 222 F.3d at 112 (finding that

repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN27] it does not completely relieve a *pro se* plaintiff of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. FN28 Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. FN29 Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." FN30

FN27. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008)* ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN28. See *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord,* *Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord,* *Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN29. See *McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to

comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf.* *Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN30. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

1. *Privacy*

a. *Cognizable privacy interest*

Plaintiff alleges that Defendants violated his right to privacy. (Dkt. No. 1 at ¶ II(D).) Defendants argue that Plaintiff has not stated a cause of action. (Dkt. No. 16-2 at 5-7.) Defendants are correct.

There is a constitutional right of privacy FN31 that protects the individual interest against disclosure of personal matters such as one's medical condition. *Whalen v. Roe,* 429 U.S. 589, 598-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), the Second Circuit applied *Whalen* to hold that individuals who are HIV positive "clearly possess a constitutional right to privacy regarding their condition." The Second Circuit has extended this protection to prisoners. *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). These decisions do not create an absolute right of privacy regarding a prisoner's medical condition. Rather, the prisoner's privacy interest will vary with the prisoner's medical condition. *Id.* at 111; *Doe v. City of New York,* 15 F.3d at 267. This privacy interest is at its zenith when the prisoner suffers from an "unusual"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

condition, such as HIV or transsexualism, that is "likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell,* 175 F.3d at 111. Courts have refused to recognize a protected privacy interest where a prisoner's medical condition is not "unusual." *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (W.D.N.Y.2003). Courts have also refused to recognize a protected privacy interest where there is no evidence that a prisoner's condition was revealed to other inmates. *Leon v. Johnson,* 96 F.Supp.2d 244, 252 (W.D.N.Y.2000) [FN32].

> FN31. The Supreme Court has ruled that "a right to privacy ... [is] derived from the Fourteenth Amendment or the 'penumbra' of other constitutional rights." *Webb v. Goldstein,* 117 F.Supp.2d 289, 296 (E.D.N.Y.2000) (citing *Whalen v. Roe,* 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)).

> FN32. Defendants have not cited, and the Court has not found, authority specifically addressing the standard to be applied where a prison mental health official allegedly reveals statements made by a prisoner during a counseling session. However, the logic underlying the disclosure-of-medical-condition cases—that prisoners have a reduced right to privacy that arises only in unusual situations, such as those that implicate a prisoner's safety-is applicable here.

*6 Here, Plaintiff has not alleged precisely what medical information he believes Defendant Brown revealed. He states that "the contents" of his August 25, 2006, session with Brown were disclosed and that "the information released was not a threat to the facility, staff or the inmate population." (Dkt. No. 1 at 8.) Thus, this Court cannot determine from the face of the complaint whether Plaintiff suffers from an "unusual" condition that would be protected by his right to privacy. Moreover, Plaintiff does not allege that his condition, whatever it may be, was revealed to other inmates. Therefore, Plaintiff has not alleged a cognizable privacy interest.

b. *Legitimate penological interest*

Even if Plaintiff had alleged a cognizable privacy interest, his right to privacy claim would be subject to dismissal for failure to state a claim because the face of the complaint reveals that Defendant Brown had a legitimate penological interest in revealing information from her counseling session with Plaintiff.

Prison officials may reveal a prisoner's medical condition, even an "unusual" medical condition that is protected by the zenith of the prisoner's right to privacy, if the disclosure is "reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112. A court can determine whether a prison official's actions were "reasonably related to legitimate penological interests" on a motion to dismiss. See e.g. *Webb v. Goldstein,* 117 F.Supp.2d 289 (E.D.N.Y.2000).

Here, the face of the complaint reveals that Defendant Brown had legitimate penological reasons for revealing information from her session with Plaintiff. During the session with Defendant Brown, Plaintiff allegedly engaged in "inappropriate sexual behavior/conduct." (Dkt. No. 1 at 10.) Reporting this incident to a correctional officer was reasonably related to the legitimate penological interest of protecting prison personnel from potential threats. See e.g. *Choice v. Coughlin,* No. 94 Civ. 8307, 1996 WL 325627 (S.D.N.Y. June 11, 1996) (prisoner's letter regarding his romantic feelings for a civilian medical employee at prison was "fundamentally inconsistent with the legitimate penological interests of the facility" because it presented "a potential threat to the safety and security of [the employee] and other prison staff.").

Therefore, it is recommended that Plaintiff's cause of action for invasion of his right to privacy be dismissed.

2. *Due Process*

Plaintiff does not explicitly allege that Defendants violated his due process rights. However, the complaint states that Defendant Ballard "wrote up a fabricated misbehavior report that led to me being sentenced to 60 days of keeplock." (Dkt. No. 1 at ¶ II(D).) Liberally construing the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

complaint, I have deemed this to be a claim that Defendants violated Plaintiff's procedural and substantive due process rights.

a. *Procedural due process*

In order to state a claim for violation of his procedural due process rights, Plaintiff must allege facts plausibly suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

**\*7** As Defendants note, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.) The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 WL 965345, at \*8 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted]. Here, Plaintiff does not claim that the misbehavior report was issued in retaliation for Plaintiff's exercise of a constitutional right. Accordingly, the complaint does not state a claim for a procedural due process violation based on the filing of an allegedly false misbehavior report.

The complaint could also be construed as stating a procedural due process claim based on the length of Plaintiff's keeplock detention. Although Defendants did not address this claim, I will do so *sua sponte* under 28 U.S.C. § 1915(e)(2). An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU [FN33]." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

> [FN33.] Although keeplock confinement and SHU confinement are not identical detention statuses, the Second Circuit has applied the same procedural due process analytical framework to both. See e.g. *Palmer v. Richards,* 364 F.3d 60, 66-67 (2d Cir.2004).

In the Second Circuit, determining whether a disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN34]." *Palmer,* 364 F.3d at 65. For confinements of an "intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64-65. Disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life." *Palmer,* 364 F.3d at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)).

> [FN34.] "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

**\*8** Here, Plaintiff alleges that he served 60 days in keeplock. Accordingly, a protected liberty interest is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

implicated only if Plaintiff was confined under conditions "more severe" than "normal" SHU conditions. Plaintiff has alleged no such conditions. Compare *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (plaintiff alleged that while in the SHU he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes); *Palmer,* 364 F.3d at 66 (plaintiff alleged that he suffered unusual SHU conditions such as being deprived of his property, being mechanically restrained whenever he was escorted from his cell, and being out of communication with his family); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (plaintiff alleged that he was confined to his cell for 24 hours a day, not permitted to shower for weeks at a time, denied hygiene products, and denied utensils); *Wheeler v. Butler,* 209 F.App'x 14 (2d Cir.2006) (plaintiff alleged that he was denied the use of his hearing aids during his SHU confinement). Therefore, Plaintiff has not sufficiently alleged that his confinement in keeplock deprived him of a protected liberty interest.

District courts in the Second Circuit are split on whether a prisoner can state a procedural due process cause of action when he alleges that he served less than 101 days in the SHU but does not allege conditions more severe than normal SHU conditions. Compare *Gonzalez-Cifuentes v. Torres,* No. 9:04-cv-1470 GLS/DRH, 2007 WL 499620, at * 3 (N.D.N.Y. Feb.13, 2007) ("The Second Circuit has held that at least where the period of confinement exceeded thirty days, refined fact-finding is required to resolve defendants' claims under *Sandin.* No such fact-finding can occur ... on a motion to dismiss") and *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ("Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions ... However, such detailed factual allegations are not necessary to withstand a motion to dismiss ... Since Smart has alleged that she was confined for seventy days, she has met her burden in alleging the deprivation of a protected liberty interest") with *Alvarado v. Kerrigan,* 152 F.Supp.2d 350 (S.D.N.Y.2001) (granting motion for judgment on the pleadings where prisoner's allegations about the conditions of his 93-day SHU confinement failed to "elevate his confinement to the level of deprivation required under *Sandin* ); *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at *7 (S.D.N.Y. Dec.2, 2004) (granting motion to dismiss with leave to amend because plaintiff's "due process claim arising out of two months' confinement in the SHU ...

cannot survive the *Sandin* test absent further allegations") *Tookes v. Artuz,* No. 00 Civ. 4969 RCC HBP, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("No such additional egregious circumstances are pled here. Indeed, the complaint is devoid of any allegations regarding the circumstances of plaintiff's confinement. Nor has [plaintiff] responded to the defendants' motion in order to provide further detail. Therefore, dismissal of plaintiff's due process claims is appropriate"); and *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382, at *5 (S.D.N.Y. May 17, 2000) (dismissing case with prejudice where the complaint contained "no allegations whatever regarding the conditions of [prisoner's 66-day] confinement."). The Second Circuit has never addressed this issue directly [FN35].

FN35. While the Second Circuit has stated that "development of a detailed record will assist appellate review" of SHU cases and that "development of a detailed record of the conditions of the confinement relative to ordinary conditions is required," it has done so only in cases involving "intermediate" SHU confinements of 101 to 305 days. *Colon,* 215 F.3d at 232; *Palmer,* 364 F.3d at 64-65. Even in this "intermediate" context, where a detailed record is "required," the Second Circuit has not remanded a case for further development of the record absent an allegation of severe SHU conditions. For example, in *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007), the plaintiff was confined to a super-restrictive housing unit for six months. He sued, arguing in part that his procedural due process rights were violated. The defendants moved to dismiss. The district court denied the motion, finding that the plaintiff had alleged the deprivation of a liberty interest. The defendants brought an interlocutory appeal. The Second Circuit affirmed, finding that "the Plaintiff's confinement of more than six months fell in the intermediate range, thereby requiring inquiry into the conditions of his confinement, which he *sufficiently alleges* to have been severe." *Iqbal,* 490 F.3d at 163 (emphasis added).

*9 The undersigned agrees with the *Alvarado, Sales, Tookes,* and *Prince* courts that a motion to dismiss can be

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU conditions. The undersigned adopts this view for two reasons. First, as discussed at length above, Rule 8 requires that a complaint include factual allegations that raise a right to relief above the speculative level to the plausible level. Where a prisoner contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory is purely speculative. Second, the Second Circuit's manner of reviewing motions to dismiss in SHU confinement cases suggests that dismissal is the better course. In its cases, the Second Circuit has focused on the *content* of the prisoner's allegations regarding SHU conditions rather than establishing a bright-line rule that a determination of whether conditions were "atypical and significant" cannot be resolved on a Rule 12(b)(6) motion. For example, in *Ortiz,* the district court granted the defendants' motion to dismiss a case in which a prisoner complained of a 90-day SHU confinement. The Second Circuit reversed, not because the *Sandin* issue can never be decided at the motion to dismiss stage, but because *the prisoner had alleged the existence of "conditions in SHU far inferior to those prevailing in the prison in general."* Ortiz, 380 F.3d at 655 (emphasis added). Plaintiff's bare allegation that his procedural due process rights were violated by his 60-day keeplock confinement is insufficient to state a claim. Therefore, I recommend that Plaintiff's procedural due process claim be dismiss with leave to amend.

b. *Substantive due process*

Given the special solicitude due to *pro se* civil rights plaintiffs, I have deemed the complaint to include a substantive due process claim and will address it *sua sponte* under 28 U.S.C. § 1915(e)(2). Defendants have not addressed any possible substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process. In *Sandin,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs. Sandin, 515 U .S. at 479 n. 4, 484. Courts have also noted that a prison official's refusal to obey a state court order to release a prisoner from disciplinary confinement may violate the prisoner's right to substantive due process. Johnson v. Coughlin, No. 90 Civ. 1731, 1997 WL 431065, at *6 (S.D.N.Y. July 30, 1997); Arce v. Miles, No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991).

**\*10** Plaintiff's complaint does not allege facts plausibly suggesting that Defendants' actions were arbitrary, conscience-shocking or oppressive in the constitutional sense. As discussed above, the complaint does not indicate that Plaintiff was held in unusual keeplock conditions. Moreover, Plaintiff does not allege that Defendants refused to obey a state court order to release him from disciplinary confinement. Therefore, the complaint fails to state a claim for violation of Plaintiff's right to substantive due process and I recommend that the claim be dismissed with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 16) be *GRANTED* with leave to amend.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

**been, but was not, presented to the Magistrate Judge in the first instance.** [FN36]

> FN36. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Shuler v. Brown
Slip Copy, 2009 WL 790973 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Wayne BARNES, Plaintiff,
v.
Lt. CRAFT; Sgt. J. O'Keefe; C.O. C. Hodges; and G. Goord, Commissioner of the New York State Department of Correctional Services, Defendants.
No. 9:04-CV-1269.

Aug. 18, 2008.
Wayne Barnes, Hackensack, NJ, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 24th day of July, 2008. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The Defendants' motion for summary judgment (Dkt. No. 43) is granted.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Wayne Barnes ("Plaintiff"), while an inmate, commenced this *pro se* civil rights action on November 1, 2004, against four employees of the New York State Department of Correctional Services ("Defendants"), pursuant to 42 U.S.C. § 1983. (Dkt. No. 9 [Plf.'s Am. Compl.].) Generally, Plaintiff's Amended Complaint alleges that Defendants violated his rights under the First, Eighth and Fourteenth Amendments by confining him to the Special Housing Unit ("S.H.U.") at Ulster Correctional Facility ("Ulster C.F.") between March 12, 2004, and March 17, 2004, without providing him a hearing, in response to his refusal to shave his full beard, for which he claims he possessed, at the time, a valid exemption issued by the New York State Department of Correctional Services ("DOCS") due to his need to maintain the beard in order to engage in Rastafarian spiritual practices. (*Id.*) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 43.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. BACKGROUND**

**A. Plaintiff's Amended Complaint**

Liberally construed, Plaintiff's Amended Complaint asserts the following factual allegations, in pertinent part.

In late 2003, while Plaintiff was incarcerated in the New York State Department of Correctional Services ("DOCS"), he was "passing through" Ulster Correctional Facility ("Ulster C.F."), wearing a full beard.[FN1] C.O.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

Hodes [FN2] stopped Plaintiff and ordered him to shave his beard. [FN3] Plaintiff informed C.O. Hodes that he had received a written permit from DOCS exempting him from DOCS' rule that beards may be no more than one inch in length (hereinafter "DOCS' one-inch beard rule"). [FN4] C.O. Hodes called Wyoming C.F. (the correctional facility at which Plaintiff was regularly housed, and which was responsible for maintaining Plaintiff's records at the time), and was informed that Plaintiff indeed had such a written exemption on file. [FN5] As a result, C.O. Hodes permitted Plaintiff to pass through Ulster C.F. without having to shave his beard. [FN6]

FN1. (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

FN2. I note that, although Plaintiff's Amended Complaint refers to this individual as "C.O. C. Hodges" (Dkt. No. 9), Defendants have previously identified this individual as "C.O. Hodes" (Dkt. No. 19, Part 2 at 1 [Defs.' Mem. of Law in Support of Motion to Dismiss] ), and Plaintiff has previously requested that the Court amend his Amended Complaint accordingly (Dkt. No. 22, at 10 [Plf.'s Mem. of Law in Opp. to Motion to Dismiss] ).

FN3. (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

FN4. (Id. at ¶ 7(a).)

FN5. (Id.)

FN6. (Id.)

**\*2** Then, during the afternoon of March 12, 2004, while again passing through Ulster C.F., Plaintiff was again stopped by C.O. Hodes and ordered to shave his beard. [FN7] Plaintiff asked C.O. Hodes whether he did not remember Plaintiff from the previous time he had passed through Ulster C.F. [FN8] Plaintiff explained that he was the inmate who had received a written exemption from DOCS' one-inch beard rule. [FN9] C.O. Hodes responded that, at Ulster C.F., a permit does not matter and that if Plaintiff did not cut his beard he would have to go to the "box" until he cut it. [FN10] Despite having been given a copy of the written exemption (by an unidentified person at an

unidentified point in time), and knowing that Plaintiff was exempt from DOCS' one-inch beard rule regarding beards, C.O. Hodes sought to incarcerate Plaintiff in the "box" at Ulster C.F. [FN11]

FN7. (Id. at ¶ 7(a) & Exs. 1, 2 [attaching "Administrative Segregation Recommendation" dated 3/12/04, and complaint letter from Plaintiff dated 4/13/04].)

FN8. (Id. at ¶ 7(a).)

FN9. (Id.)

FN10. (Id.)

FN11. (Id.)

Toward this end, C.O. Hodes called Sgt. O'Keefe and informed him that Plaintiff was refusing to cut his beard and claiming that he had an exemption on file due to the fact that he was a "practicing and registered Rastafarian." [FN12] Plaintiff informed Sgt. O'Keefe that previously, when Plaintiff had been passing through Ulster. C.F., C.O. Hodes had learned that Plaintiff did indeed have an exemption on file. [FN13] Plaintiff also informed Sgt. O'Keefe that the Ulster C.F. "Intake Draft" has a copy of the permit from DOCS in Albany, New York. [FN14] Sgt. O'Keefe responded that, at Ulster C.F., a permit from Albany holds no weight and that if Plaintiff continued to refuse to cut his beard he would be sent to Ulster C.F.'s Special Housing Unit ("S.H.U.") until he cut his beard, regardless of any such permit. [FN15]

FN12. (Id. at ¶ 7(b) & Ex. 2 [attaching complaint letter from Plaintiff dated 4/13/04].)

FN13. (Id. at ¶ 7(b).)

FN14. (Id. at ¶ 7(a), (b).)

FN15. (Id. at ¶ 7(b).)

As a result, at approximately 3:40 p.m. on March 12, 2004, Sgt. O'Keefe signed an "Administrative Segregation Recommendation," stating that the reason for his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

recommendation was that "[Plaintiff] refused to shave his beard to one inch during the incoming draft process. [Plaintiff] claims he has an exemption on file." FN16 At some point thereafter, Lt. Craft signed the "Administrative Segregation Recommendation," authorizing Plaintiff's confinement in S.H.U. pending a hearing on the recommendation.FN17 The bottom of the "Administrative Segregation Recommendation" form stated as follows:

FN16. (*Id.* at Ex. 1 [attaching "Administrative Segregation Recommendation" dated 3/12/04].)

FN17. (*Id.*)

**Notice to Inmate:** A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V. You will be entitled to call witnesses on your own behalf, provided that doing so does not jeopardize institutional safety or correctional goals.

If restricted pending a hearing on this recommendation, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement.FN18

FN18. (*Id.*)

Between March 12, 2004, and March 17, 2004, Plaintiff remained in the Ulster C.F. S.H.U., during which time he was subjected to the following restrictive conditions, among others: the continuous confinement in his cell, the continuous isolation from the general prison population, the continuous denial of use of prison facilities (such as the libraries, gym, etc.), and sleep deprivation due to the 24-hour lighting in his cell and the loud noise of the air-conditioning system above his cell.FN19

FN19. (*Id.* at ¶¶ 5, 7 & Exs. 2, 4 [attaching complaint letter from Plaintiff dated 4/13/04, and a letter from Plaintiff dated 5/23/04].)

**\*3** On March 17, 2004, Plaintiff sent a letter of complaint to an unidentified person at Ulster C.F., complaining about the harsh conditions to which he was being subjected in S.H.U.FN20 Plaintiff alleges that he sent

this letter to "the hearing officer" (and/or perhaps to an unspecified lieutenant),FN21 although he acknowledges that no hearing had yet been held.FN22 Plaintiff never received a response to his letter.FN23 However, on or about March 17, 2004, Plaintiff was released from S.H.U. and returned to Wyoming C.F.FN24 No hearing was ever held.FN25

FN20. (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04].) I note that Plaintiff does not attach to his Amended Complaint a copy of this March 17, 2004, letter.

FN21. (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter to "the hearing officer (Lt./etc.)" and letter from Plaintiff dated 6/16/04 alleging that he sent the 4/17/04 letter to "the 'hearing officer' "].)

FN22. (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter "prior to a hearing"].)

FN23. (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 stating *inter alia* "I have yet to have ... a response from the hearing officer regarding this issue," and letter from Plaintiff dated 6/16/04 stating *inter alia* "I have never gotten a response from the hearing officer"].)

FN24. (*Id.* at Exs. 2, 4, 6 [attaching complaint letter from Plaintiff dated 4/13/04, letter from Plaintiff dated 5/23/04, and letter from Plaintiff dated 6/16/04].)

FN25. (*Id.* at ¶¶ 5, 7(c) & Ex. 4 [attaching letter from Plaintiff dated 5/23/04].)

Although Plaintiff's Amended Complaint references only the First Amendment (in asserting a retaliation claim), I liberally construe that pleading as attempting to raise an inadequate prison-conditions claim under the Eighth Amendment, and a procedural due process claim under the Fourteenth Amendment, given his special status as a *pro se* civil rights litigant, and given various of the statements made in his Amended Complaint and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

documents attached to that pleading.[FN26]

> FN26. (*See, e.g., id.* at ¶ 5 & Ex. 4 [attaching his letter dated 5/23/04, complaining that there was "no hearing" with regard to his confinement in the Ulster C.F. S.H.U.]; *id.* at Exs. 2 & 4 [attaching his letters dated 4/13/04 and 5/23/04, complaining about the allegedly "harsh," "degrading" and "inhumane" conditions in the Ulster C.F. S.H.U.].)

**B. Defendants' Motion for Summary Judgment**

Defendants argue that the Court should grant their motion for summary judgment for six reasons: (1) Plaintiff's Fourteenth Amendment procedural due process claim should be dismissed because he has failed to establish that his six-day stay in administrative segregation created a sufficient liberty interest to give rise to such a claim; (2) Plaintiff's Eighth Amendment claim of inadequate prison conditions should be dismissed because he has failed to establish either that he experienced a sufficiently serious deprivation or that Defendants acted with a sufficiently culpable state of mind; (3) Plaintiff's First Amendment retaliation claim should be dismissed because he failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature; (4) in the alternative, Plaintiff's claims against Defendants Goord and Craft should be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged; (5) in the alternative, Plaintiff's claims against all Defendants should be dismissed because, based on the current record, they are protected from liability by the doctrine of qualified immunity, as a matter of law; and (6) in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) of the Local Rules of Practice for this Court because of Plaintiff's failure to keep the Court apprised of his current address. (Dkt. No. 43, Part 12 [Defs.' Mem. of Law].)

Plaintiff has opposed Defendants' motion. (Dkt. No. 48.)

**II. RELEVANT LEGAL STANDARD**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN27] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN28]

> FN27. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN28. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

*4 However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN29] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN30] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN31]

> FN29. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN30. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading....."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN31. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

It should be noted that, where a non-movant fails to adequately oppose a properly supported factual assertion made in motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN32] Moreover, to be sufficient to create a factual issue for purposes of a summary judgment motion, statements made in an affidavit or deposition testimony must (among other things) not be conclusory.[FN33] Such statements are conclusory if, for example, their assertions lack any supporting evidence or are too general.[FN34]

FN32. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN33. *See* Fed.R.Civ.P. 56(e) (requiring that

non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN34. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

## III. ANALYSIS

**A. Whether Plaintiff's Fourteenth Amendment Procedural Due Process Claim Should Be Dismissed Because He Has Failed to Establish that His Six-Day Stay in Administrative Segregation Created a Sufficient Liberty Interest to Give Rise to Such a Claim**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

In 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Defendants argue that the short duration of Plaintiff's stay in Administrative Segregation at Ulster C.F., coupled with the rather ordinary conditions of that segregated confinement, do not create a sufficient liberty interest to give rise to a Fourteenth Amendment procedural due process claim. (Dkt. No. 43, Part 12, at 2-6 [Defs.' Mem. of Law].)

Plaintiff responds with a three-part argument: (1) he possessed a protected liberty interest because he possessed a valid DOCS-issued beard exemption when he was placed in administrative segregation; (2) he need not show *Sandin v. Connor'* s "atypical and significant hardship" requirement because the injury that he experienced consisted of the retaliatory conduct itself; and (3) in any event, his stay in Administrative Segregation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" because (a) the conditions of his stay in Administrative Segregation were sufficiently harsh, and (b) those conditions were not "ordinary" to him since he was otherwise incarcerated in the general population of a medium-security correctional facility. (Dkt. No. 48, at 15-16 [Pages 14 and 15 of Plf.'s Response Mem. of Law].)

**\*5** With respect to Plaintiff's first argument, the fact that he possessed a DOCS-issued beard exemption does not create a protected liberty interest for purposes of a procedural due process claim. *Lee v. Quillar,* 04-CV-1203, 2007 U.S. Dist. LEXIS 50894, at \*5-7, 2007 WL 2069942 (E.D.Cal. July 13, 2007) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge that he failed to cut his beard, even though charge contravened medical authorization permitting prisoner to wear beard), *adopted by,* 2007 U.S. Dist. LEXIS 61480, 2007 WL 2340235 (E.D.Cal. Aug. 16, 2007).[FN35] This is because, in 1995, the United States Supreme Court shifted a court's focus, when

conducting a procedural due process analysis, from the language of the particular authority allegedly giving rise to the protected liberty interest alleged (e.g., a state law or regulation) to the nature of the deprivation alleged. *Sandin v. Connor,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).[FN36] Specifically, as stated earlier, in 1995, the Supreme Court held that a liberty interest protected by the Fourteenth Amendment's Due Process Clause will generally be limited to freedom from a restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84.

FN35. *See also Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 52797, at \*2, 14-21, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge and conviction-even assuming disciplinary charge had been issued in contravention of medical permit-since deprivation following conviction did not result in an atypical and significant hardship).

FN36. *See also Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N. Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Before continuing to Plaintiff's second argument, a few words are appropriate about any *substantive* due process claim he may be trying to assert in his Amended Complaint.[FN37] As an initial matter, I do not liberally construe Plaintiff's Amended Complaint (which essentially challenges the way DOCS' beard policy was implemented) as alleging a violation of his right to *substantive* due process.[FN38] Even if I were to so construe Plaintiff's Amended Complaint, I would have difficulty finding that the issuance of a DOCS' beard exemption (without the issuance of a court order) created such a right of substantive due process. *See Johnson v. Coughlin,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

90-CV-1731, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 (S.D.N.Y. July 30, 1997) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.").FN39

FN37. The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-26 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

FN38. Setting aside the lack of factual allegations in Plaintiff's Amended Complaint plausibly suggesting a substantive due process claim, I note that, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the ... Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392-94 [1989] ) . H e r e , P l a i n t i f f ' s failure-to-honor-his-beard-exemption claim is

more appropriately analyzed as a First Amendment retaliation claim, an Eighth Amendment inadequate-prison-conditions claim, and/or a Fourteenth Amendment procedural due process claim. Thus, there is no need to analyze that claim as a Fourteenth Amendment substantive due process claim.

FN39. *Cf. Young v. Goord,* 192 F. App'x 31, 33 (2d Cir.2006) ("[I]t is at least reasonable to read Rule 110.32 [the DOCS regulation governing inmates' beard length, which permits DOCS-issued exemptions] *not* to create a substantive right to a religious exemption from the beard-length policy ....") [emphasis in original].

Furthermore, even if I were able to find that the issuance of a DOCS' beard exemption alone created such a right of substantive due process, I would have difficulty finding evidence in the record that Defendants' actions were not simply "incorrect or ill-advised" but were "arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense." *Lawrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action). I note that prison beard-length policies generally appear to have a legitimate penological objective-whether it be to facilitate inmate identification, prevent hygiene problems, or minimize the need for contact between guards and the inmate during searches.FN40 Here, the record indicates that accurate identification was one of the penological objectives of the beard-length policy in question.FN41

FN40. *Cf. Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ( "[N]umerous courts have held that Directive 4914's initial shave requirement serves a legitimate penological interest in maintaining prison security and a record of prisoners' appearances in case of escape.") [collecting cases].

FN41. (Dkt. No. 43, Part 5, at 2 [Ex. C to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

McCartin Decl., attaching Directive 4914, stating, "It is the purpose of this directive to ensure that inmate appearance will be regulated sufficiently to maintain accurate identification of each individual"].)

**\*6** With respect to Plaintiff's second argument, I have found no cases suggesting that *Sandin'* s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of due process violations.[FN42]

FN42. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at \*3-5 (E.D.Ark. Dec.7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at \*4-5 (W.D.Mich. Aug.28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of

retaliation claim).

With regard to Plaintiff's third argument, the fact that the conditions of his Administrative Segregation were restrictive, and the fact that he "ordinarily" was incarcerated in the general population of a medium-security correctional facility, do not, in and of themselves, create a question of fact regarding whether his stay in Administrative Segregation, coupled with the conditions of that segregated confinement, gave rise to a Fourteenth Amendment claim. Rather, in determining whether Plaintiff's six-day stay in Administrative Segregation imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," the Court must determine what the conditions of that six-day Administrative Segregation were, as established by the record evidence, and then compare the imposition of those conditions for six days to "the ordinary incidents of prison life."

Here, Plaintiff has adduced at least *some* record evidence that, during the time in question, he experienced the following conditions of confinement. First, prior to entering his cell in S.H.U. on March 12, 2004, Plaintiff was strip searched and "handled very rigorously...." (Dkt. No. 43, Part 3, at 33-34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) Plaintiff was told that, if he took his hands off the wall, he would "be beaten up[,] but not [in] those words." (*Id.* at 34.)

Second, during his confinement in Administrative Segregation, from March 12, 2004, to March 17, 2004, Plaintiff was alone in his cell, and he never left his cell. (Dkt. No. 43, Part 3, at 33, 36 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) He was locked in his cell twenty-four (24) hours a day for all six days he spent in Administrative Segregation. (*Id.* at 39.) In addition, Plaintiff did not participate in recreation period, nor was he afforded the opportunity to shower. (*Id.* at 38-39; *see also* Plf.'s Decl. in Opp., ¶ 25.)

Third, Plaintiff's cell in Administrative Segregation was approximately five feet by ten feet in size. (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) It contained one bed, one toilet, and no shower. (*Id.*) The lights were on in the cell twenty-four

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

(24) hours a day. (*Id.* at 37.) What Plaintiff thinks was an "air-conditioning system" made a loud noise almost constantly that vibrated the cell. (*Id.*) While in the cell, Plaintiff was "deprived of sleep" and he felt "claustrophobic." (Plf.'s Decl. in Opp., ¶ 25.)

Fourth, although it was wintertime, the cell was "very hot" and "too hot." (Dkt. No. 43, Part 3, at 37 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) If the window was open, the cell would feel too cold to Plaintiff. (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) Plaintiff felt comfortable only when wearing just a t-shirt, although "it still would be too humid." (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

**\*7** Fifth, during his six-day stay in Administrative Segregation, Plaintiff "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)

Sixth, and finally, during his confinement in Administrative Segregation, Plaintiff possessed his "State[-issued] green[ ] clothing]," received three meals a day, and was permitted to mail at least one letter. (Dkt. No. 43, Part 3, at 36, 38 [Exhibit A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 21.)

No record evidence exists that, during the six-day period at issue, Plaintiff was subjected to any substandard cell conditions (e .g., regarding bedding, cleanliness, etc.), or poor treatment (e.g., unwarranted searches, beatings, denial of meals, etc.), other than the previously described conditions and poor treatment. (*See* Plf.'s Decl. in Opp., ¶ 25; Dkt. No. 43, Part 3, at 39-40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Under these circumstances, I find that no record evidence exists that the duration and conditions of Plaintiff's stay in Administrative Segregation at Ulster C.F. created a protected liberty interest to give rise to a Fourteenth Amendment due process claim. Generally, the conditions experienced by Plaintiff in Administrative Segregation were the same as, or perhaps slightly more harsh than, the conditions ordinarily experienced in disciplinary confinement in a correctional facility within

the New York State DOCS.[FN43] *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing 7 N.Y. Comp.Codes R. & Regs. §§ 304.1-304.14)

> **FN43.** I note that, in his deposition, Plaintiff testified that he had "spoken to several prisoners of the treatment you get [in S.H.U. confinement]" and that he "was subject to ... that type of treatment." (Dkt. No. 43, Part 3, at 34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Finally, numerous courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in a Special Housing Unit ("S.H.U.") of *far* more than six (6) days, even where the conditions of confinement in the Special Housing Unit were, to varying degrees, more restrictive than those in the prison's general population. *See, e.g., Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and *somewhat more severe than those of general population"* did not rise to the level of atypicality) [emphasis added].[FN44] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population [FN45] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility.[FN46]

> **FN44.** *See also Spence v. Senkowski,*

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (N.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN45. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7

NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN46. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

**\*8** For all of these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

process claim.

**B. Whether Plaintiff's Eighth Amendment Claim of Inadequate Prison Conditions Should Be Dismissed Because He Has Failed to Establish Either that He Experienced a Sufficiently Serious Deprivation or that Defendants Acted with a Sufficiently Culpable State of Mind**

Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must demonstrate two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

To satisfy the seriousness requirement, a plaintiff must demonstrate that the conditions of his confinement deprived him of "the minimal civilized measure of life's necessities" or an "unquestioned and serious deprivation of basic human needs." *Farmer,* 511 U.S. at 834; *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). As the Supreme Court has rather famously observed, "[T]he Constitution does not mandate comfortable prisons," and "conditions [that] are restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 349.

To satisfy the deliberate-indifference requirement, a plaintiff must demonstrate that the defendants acted with a state of mind of "deliberate indifference to inmate health or safety...." [FN47] This means a state of mind "more blameworthy than negligence." [FN48] Rather, it means that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." [FN49] In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, leads to liability." [FN50]

FN47. *Farmer,* 511 U.S. at 834.

FN48. *Id.* at 835.

FN49. *Id.* at 837.

FN50. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Farmer,* 511 U.S. at 841).

**1. Sufficient Seriousness**

Here, I find no record evidence that the conditions of Plaintiff's six-day stay in Administrative Segregation were *sufficiently serious* for purposes of the Eighth Amendment in that they deprived him of *the minimal civilized measure of life's necessities,* such as food, water, or a toilet. To the contrary, Plaintiff testified in his deposition that his cell contained "the bare necessities." (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) For example, he testified that his cell was equipped with a toilet, a bed, lights, heat, an "air-conditioning system," and a window. (*Id.* at 35, 37-38.) In addition, he testified that he possessed a t-shirt and his "State[-issued] greens"; he received three meals a day; and he was able to mail a letter. (*Id.* at 36, 38; *see also* Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 21.)

*9 Granted, Plaintiff has adduced some evidence that, during the six-day time period, he was denied the opportunity to exercise outside, the ability to shower, and (when his window was open) a certain degree of warmth. (Dkt. No. 43, Part 3, at 35, 38-39 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.) However, these deprivations for six days were simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation. *See Trammel v. Keane,* 338 F.3d 155, 158-159, 164 (2d Cir.2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing-seventeen days-was not long enough); *Scot v. Merola,* 555 F.Supp. 230, 231-234 (S.D.N.Y.1983) (granting defendants' Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area without heat where windows were broken,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

and temperature dropped below fifty degrees).[FN51]

FN51. *See also Lock v. Clark,* 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at *1, 11-12, 1992 WL 559660 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to the level of a constitutional violation."). (*See also* Dkt. No. 43, Part 12, at 8 [Defs.' Mem. of Law, citing cases].)

Furthermore, Plaintiff has adduced evidence that he "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp ., ¶ 25.) However, he has not adduced evidence that (1) he needed such attention or (2) he requested such attention. (*Id.*) As a result, he has adduced no evidence that, during the time in question, either (1) medical attention was, to him, one of "life's necessities," or (2) he was *denied* such attention after requesting it. *Trammell,* 338 F.3d at 164 ("Although Trammell's requests to be taken from his cell for medical evaluation were not granted, the record shows that the defendants were mindful of, not indifferent to, his health and ensured that his basic 'health or safety' was not at risk.").

For these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish a deprivation that was sufficiently serious.

**2. Deliberate Indifference**

Because I have already found that an adequate ground exists upon which to recommend the dismissal of Plaintiff's Eighth Amendment claim of inadequate prison conditions, the Court need not analyze Defendants' alternative Eighth Amendment argument that Plaintiff has failed to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F. However, in the interest of thoroughness, I will briefly analyze that claim.

Defendants focus their argument on the fact that none of them had any control over, or even knew about, the allegedly inadequate conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation. (Dkt. No. 43, Part 12, at 7-9 [Defs.' Mem. of Law].)

**\*10** Plaintiff responds with a three-part argument: (1) Defendant Hodes acted with the requisite mental state because he knew on March 12, 2004, that Plaintiff had a DOCS-issued beard exemption (due to his previous encounter with Plaintiff in late 2003); (2) Defendants Craft and O'Keefe acted with the requisite mental state because they recklessly failed to take the easy step of checking if he had a beard exemption; and (3) each Defendant, after causing Plaintiff to be confined to Administrative Segregation, failed to "[ ]check [ ]" up on him there. (Dkt. No. 48, at 16-17 [Pages 15 and 16 of Plf.'s Response Mem. of Law].)

I can find no record evidence that any Defendant knew of the allegedly inadequate prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F. before they caused Plaintiff to be confined there. Furthermore, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

Plaintiff may have adduced some evidence that Defendants Hodes and O'Keefe turned a blind eye to the written exemption inside the top of his "draft bag" upon his arrival at Ulster C.F. on March 12, 2004. (Dkt. No. 43, Part 3, at 17-28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) However, that evidence does not constitute evidence that Defendants Hodes and O'Keefe possessed a reckless mental state with regard to the prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C .F.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

**C. Whether Plaintiff's First Amendment Retaliation Claim Should Be Dismissed Because He Failed to Establish that the Adverse Action Allegedly Taken Against Him Was Anything More than *De Minimis* in Nature**

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*11 *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against

the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

Defendants focus their First Amendment argument on the assertedly *de minimis* nature of the adverse action, the fact that it was not accompanied by any threat of future such adverse action, and the fact that Plaintiff subjectively expected that the adverse action would be brief (at the time it was taken). (Dkt. No. 43, Part 12, at 12-15 [Defs.' Mem. of Law].) In response, Plaintiff focuses on, among other things, the nature of the deprivations he unjustifiably experienced during his confinement in Administrative Segregation. (Dkt. No. 48, at 18-19 [Pages 17 and 18 of Plf.'s Response Mem. of Law].)

In making their argument, Defendants attempt to distinguish the facts of the current case from the facts of a Second Circuit case finding that a question of fact existed as to the *de minimis* nature of a nine-day keeplock confinement, *which was accompanied by threat of future misbehavior reports. See Gill v. Tuttle,* 93 F. App'x 301, 303 (2d Cir.2004). I agree that this sort of additional adverse action by a defendant is an adequate ground upon which to distinguish *Gill v. Tuttle* and similar cases.[FN52] Granted, I have found some district court cases (from within the Second Circuit) ruling that a question of fact existed as to the *de minimis* nature of keeplock confinements that do not appear to have been accompanied by such additional adverse action. [FN53] However, the keeplock confinements in those cases were somewhat longer than was the keeplock confinement in this action.

FN52. *See, e.g., Keesh v. Goord,* 04-CV-0271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct.1, 2007) (question of fact existed as to *de minimis* nature of Correction Officer Ekpe's keeplock confinement of plaintiff for one day, during which, according to the record evidence [specifically, Plf.'s Ex. 9], Correction Officer

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

Ekpe "may have ... deprived [plaintiff] of meals") [citations omitted]; *see also Keesh v. Goord,* 04-CV-0271, Verified Complaint, ¶ "IV.W." (W.D.N.Y. filed Apr. 7, 2004) (swearing that Def. Ekpe and officials "refused to provide me with my meal").

FN53. *See, e.g., Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) (Kahn, J.) ("At this stage of the action [i.e., the pleading stage], Plaintiff's claim that he was placed in keeplock for 7 1/2 days is properly construed as alleging adverse action") [citations omitted]; *Bartley v. Collins,* 95-CV-10161, 2006 U.S. Dist. LEXIS 28285, at *22, 2006 WL 1289256 (S.D.N.Y. May 12, 2006) ("Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days.") [citations omitted]; *Wells v. Wade,* 96-CV-1627, 2000 WL 1239085, at *4 (S.D.N.Y. Aug.31, 2000) ("[A] rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing 'keeplock' confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") [internal quotations omitted].

I have also found some cases in which a plaintiff was taken to a Special Housing Unit ("S.H.U."), as was Plaintiff in the current action.[FN54] These cases suggest that, generally, a *transfer* to a housing unit may be a type of adverse action that is more than *de minimis.*[FN55] However, these cases too appear to be somewhat distinguishable because they invariably involve a formal *transfer* (i.e., change in residence) to a Special Housing Unit for a long period of time.[FN56]

FN54. (*See* Dkt. No. 43, Part 11, ¶ 12 [Defs.' Rule 7.1 Statement, asserting that Plaintiff was "place[d] in administrative segregation status in the Special Housing Unit ... at Ulster Correctional Facility...."]; Dkt. No. 43, Part 9, ¶¶ 8, 10 [O'Keefe Decl., stating that "I was directed

to have the plaintiff taken to SHU on administrative segregation status ..." and "plaintiff was placed in the SHU on March 12, 2004 ..."].)

FN55. *See Allah v. Poole,* 506 F.Supp.2d 174, 187 (W.D.N.Y.2007) ( "C]ourts have held that transfers to other facilities or housing units can satisfy the adverse-action requirement ....") [collecting cases]; *Chavis v. Struebel,* 317 F.Supp.2d 232, 238-39 (W.D.N.Y.2004) ("[T]ransferring an inmate to another housing unit or to a psychiatric facility ... satisfies the adverse action requirement.") [citations omitted].

FN56. *See, e.g., Walker v. Pataro,* 99-CV-4607, 2002 WL 664040, at *8-9 (S.D.N.Y. Apr.23, 2002) (question of fact exists as to *de minimis* nature of permanent transfer to different housing unit in general population, which resulted in loss of higher-paying prison job).

**\*12** Here, there was no long-term transfer to the Ulster C.F. S.H.U. Rather, Plaintiff was taken to the Ulster C.F. S.H.U. (during his transportation through Ulster C.F.) for what was intended to be, and what Plaintiff *understood* would be, a brief period of time.[FN57] There is no admissible record evidence that Defendants *knew* the duration of, or (allegedly) substandard conditions of, the confinement that Plaintiff would ultimately experience in the Ulster C.F. S.H.U.[FN58] Moreover, there is no admissible record evidence that Plaintiff ended up staying in S.H.U. for six days *because of* the acts of Defendants O'Keefe or Craft (or any Defendant).[FN59] Rather, the admissible record evidence suggests that the delay in Plaintiff's release from S.H.U. was caused by (1) the delay of the Inmate Records Coordinator in reviewing Plaintiff's file (presumably in DOCS' Central Files) to determine whether he was correctly stating that he had an exemption for his beard, and/or perhaps (2) Plaintiff's own delay in sending a letter to his Administrative Segregation hearing officer regarding his release.[FN60]

FN57. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing that "After I contacted the facility Watch Commander on March 12, 2004 and

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard. The Inmate Records Coordinator was going to be the individual to check the records."]; Dkt. No. 43, Part 3, at 18, 22-23 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that, during the time in question, he was being "transported through Ulster [C.F.]" on his way back from "court appearances in New York City"]; Dkt. No. 43, Part 3, at 45 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before March 17, 2004, "because I figure I would have been out of the box before this because they would have verified that I had a permit but apparently that didn't happen."].)

FN58. (Dkt. No. 43, Part 8, ¶¶ 7-11 [Craft Decl.]; Dkt. No. 43, Part 9, ¶¶ 8, 10-11 [O'Keefe Decl.]; Dkt. No. 43, Part 10, ¶¶ 10, 12-13 [Hodes Decl.]; Dkt. No. 43, Part 3, at 40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; *see also* Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 15 [stating, "Plaintiff posses[es] no information or knowledge" in response to Defendants' Rule 7.1 factual assertion that "[f]rom March 12, 2004 until March 17, 2004, none of [D]efendants w[as] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"].) I note that the only role that Defendants O'Keefe and Craft played in Plaintiff's confinement to S.H.U. was in the initial decision to take Plaintiff to S.H.U.-Defendant O'Keefe recommending that Plaintiff be subject to Administrative Segregation, and Defendant Craft authorizing Plaintiff's pre-hearing confinement to Administrative Segregation. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I

on administrative segregation status...."]; Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., alleging that Def. Craft "failed to ... see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 10, ¶ 10 [Hodes Decl., swearing, "I played no role in a decision to place plaintiff into administrative segregation in the Ulster SHU. That decision was made by others...."].)

FN59. (*See* Dkt. No. 43, Part 10, ¶ 12 [Hodes Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 9, ¶ 10 [O'Keefe Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl., swearing that, during Plaintiff's confinement to S.H.U., he had no involvement in the conditions of that confinement].)

FN60. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard. The Inmate Records Coordinator was going to be the individual to check the records. ... ]; Dkt. No. 9, at 18 [Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft, indicating that Plaintiff would be "confined pending a determination on [the] recommendation," a hearing would "be conducted within 14 days of [the] recommendation," and that Plaintiff could "write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

statement on the need for continued confinement"]; Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before March 17, 2004, "because I figure I would have been out of the box before this because they would have verified that I had a permit but apparently that didn't happen. And, so, ... I wrote that letter to [the Lieutenant or Hearing Officer who would be conducting his Administrative Segregation Hearing] and I gave it to the Officer for mailing."].)

As a result, I find some guidance in a case from the U.S. District Court for the Western District of New York that recently recognized the rather common-sense point of law that, when considering whether or not adverse action is *de minimis* for purposes of a First Amendment retaliation claim, it is appropriate for a court to focus on the adverse action *caused by the defendant or defendants in question* (rather than whatever bad things happened to the plaintiff following the taking of adverse action by the defendant or defendants). In *Coleman v. Sutton,* a prison doctor transferred a prisoner to the prison's infirmary, where-because of the prisoner's own refusal to stay in the infirmary-he was then transferred to the prison's Special Housing Unit. *Coleman v. Sutton,* 530 F.Supp.2d 451, 452-53 (W.D.N.Y.2008). The Western District held that the prisoner's transfer to S.H.U. was not sufficiently adverse to constitute adverse action (for purposes of the prisoner's First Amendment retaliation claim against the correctional officer) since that transfer was caused not by the correctional officer but by the plaintiff's own refusal to stay in the prison's infirmary. *Coleman,* 530 F.Supp.2d at 453.

Here, as in *Coleman,* while Plaintiff's *initial placement* in S.H.U. was caused by Defendants O'Keefe and Craft, Plaintiff's stay there *for six days* was caused not by those Defendants but by other events. Under the circumstances, I can find no record evidence that Plaintiff's being taken to S.H.U. pending the Ulster C .F. Inmate Records Coordinator's review of Plaintiff's file (to determine whether he was correctly stating that he had an exemption for his beard) was an action that was sufficiently adverse to deter a similarly situated individual

of ordinary firmness from exercising his constitutional rights (i.e., by continuing to wear a beard of more than an inch in length as a tenet of his Rastafarian religion).

**\*13** For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's First Amendment retaliation claim because he has failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature.

**D. Whether, in the Alternative, Plaintiff's Claims Against Defendants Goord and Craft Should Be Dismissed Because Plaintiff Has Failed to Establish that They Were Personally Involved in the Constitutional Violations Alleged**

Because I have already concluded that no constitutional violations occurred in which any Defendant (including Defendants Goord and Craft) could have been personally involved, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against Defendants Goord and Craft be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged. However, in the interest of thoroughness, I will analyze that argument (and assume, for the sake of argument, that constitutional violations did occur in which they could have been personally involved).

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN61] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN62] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN63] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN64] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

violation after being informed of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing or supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring.[FN65]

FN61. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN62. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN63. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN64. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN65. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007) (setting forth five prongs); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (setting forth four prongs).

## 1. Defendant Goord

In their Rule 7.1 Statement, Defendants have asserted that "Defendant Goord was not personally involved in any of the actions that lead to the plaintiff's confinement in the Ulster Correctional Facility SHU from March 12, 2004 until March 17, 2004," supporting that assertion with a record citation. (Dkt. No. 43, Part 11, ¶ 23 [Defs.' Rule 7.1 Statement, citing pages 28-29 of Plaintiff's depo. trans.].) Setting aside the fact that Defendants' assertion is too much like a conclusion of law, I find that the deposition transcript to which they cite does not go so far as to say

that Defendant Goord "was not personally involved" in the constitutional violations alleged. (Dkt. No. 43, Part 3, at 28-31 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

*14 Rather, fairly and reasonably read, Plaintiff's deposition transcript says that Defendant Goord's involvement was limited to the fact that (1) he had (presumably) created two conflicting rules and/or policies (i.e., a rule or policy requiring a prisoner to physically possess on his person his written beard-exemption during a prison transfer and a rule or policy prohibiting the prisoner from physically possessing property on their person during a prison transfer), and (2) he had (presumably) failed to property instruct or train his subordinates as to how to resolve that conflict without violating the prisoner's rights. (*Id.*) Clearly, this is meant to assert that Defendant Goord was personally involved through the third and fourth means of personal involvement described above-(1) the creation, or allowed continuance, of a policy or custom under which the violation occurred, and/or (2) gross negligence in the managing or supervising of subordinates who caused the violation.

However, Defendants are correct that Plaintiff's deposition testimony contains no evidence of any other of the five sorts of personal involvement described above-(1) direct participation in the alleged constitutional violation, (2) a failure to remedy the violation after being informed of it through a report or appeal, or (3) the exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. Therefore, having established this specific fact for purposes of their summary judgment motion, Defendants were entitled to have the fact either admitted by Plaintiff or denied by him with an accurate record citation. N.D.N.Y. L.R. 7.1(a)(3). Plaintiff denies the assertion. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 23.) However, the only "evidence" he cites in support of that denial are those portions of his Amended Complaint, Opposition to Defendants' Motion to Dismiss for Failure to State a Claim, and Objections to my previous Report-Recommendation, wherein he "charge[d]" Defendant Goord with "actions" and "inactions" causing Plaintiff's injuries. (*Id.*)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

Such a general citation is not the "specific citation to the record where the factual issue arises" that is required by Local Rule 7.1(a)(3). As a result, the Court need not, and I recommend that it decline to, *sua sponte* sift through the 52 pages of Plaintiff's verified Objections to my previous Report-Recommendation in a quest for a specific factual assertion by Plaintiff that Defendant Goord was personally involved in one of the three ways described in the previous paragraph of this Report-Recommendation. (Among other things, the chance of Plaintiff having personal knowledge of such facts is extremely unlikely, in light of his other allegations.) Furthermore, Plaintiff's Opposition to Defendants' Motion to Dismiss does not constitute evidence because it was not verified. (Dkt.Nos.22.) Finally, his Amended Complaint generally may constitute evidence since it is verified. (Dkt. No. 9.) However, the portion of his Amended Complaint in which he refers to Defendant Goord (in a footnote in Paragraph "7.D.") is not sufficiently specific as to Defendant Goord's "actions and inactions" to constitute admissible evidence based on personal knowledge to successfully oppose a motion for summary judgment. *See* Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge ...."); *see also, supra,* notes 33-34 of this Report-Recommendation.

**\*15** As a result, Plaintiff has effectively admitted the narrowed fact described above-that there contains no record evidence that Defendant Goord (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, or (3) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. I will turn, then, to Plaintiff's theory that Defendant Goord was personally involved because he (1) created, or allowed to continue, a policy or custom under which the violation occurred, and/or (2) was grossly negligent in the managing or supervising of subordinates who caused the violation.

Plaintiff points to no admissible record evidence of a *DOCS-wide* rule or policy, created or promulgated by Defendant Goord, prohibiting the prisoner from physically possessing property on their person during a prison transfer. (Dkt. No. 48, at 17-18 [Pages 16 and 17 of Plf.'s

Response Mem. of Law].) Nor does Plaintiff point to any admissible record evidence of a DOCS-wide rule or policy, created or promulgated by Defendant Goord, requiring a prisoner to physically possess *on his person* his written beard-exemption during a prison transfer. (*Id.*) [FN66] Nor does Plaintiff point to any record evidence that Defendant Goord failed to properly instruct or train his subordinates as to how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. (*Id.*) [FN67] The only "evidence" that Plaintiff has is (1) the fact of Defendant Goord's position as the "boss of Corrections," [FN68] and the (2) occurrence of the (presumed) violation in question. (*Id.*) This sort of liability (premised on the theory that a supervisor must have been liable because his subordinate did something wrong) is precisely the sort of *respondeat superior* liability that is not allowed under 42 U.S.C. § 1983.

> FN66. I note that the written beard-exemption in question, issued by Deputy Commissioner Lucien J. Leclaire, Jr., on December 8, 2003, merely states, "This letter should be retained by you and will serve as your statewide beard and mustache exemption permit." (Dkt. No. 43, Part 6.)

> FN67. For example, Plaintiff points to no admissible record evidence that incidents such as the one at issue in this action had previously occurred and been brought to Defendant Goord's attention, or that he had otherwise known of a need to instruct correctional officers on how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. In addition, I note that defense counsel asked Plaintiff in his deposition, "Do you have any evidence or reason to believe that Commissioner Goord instructs Officers not to walk ten feet away to check a draft bag to determine if the permit is available in that draft bag [as Plaintiff asserts it was in this circumstance]" (Dkt. No. 43, Part 3, at 30 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) In pertinent part, Plaintiff responded, "I don't know exactly what he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

instructs them...." (*Id.*)

FN68. (Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

## 2. Defendant Craft

In their Rule 7.1 Statement, Defendants have asserted the following facts, in pertinent part: (1) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft was not] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"; (2) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft had no] interaction with [Plaintiff] while he was in the Ulster Correctional Facility SHU"; (3) "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 until March 17, 2004"; (4) "Plaintiff did not write to [D]efendant Craft requesting to be released from the Ulster Correctional Facility SHU until March 17, 2004"; (5) "Defendant Craft never received [P]laintiff's March 17, 2004 letter"; and (6) "[o]n the same morning that [P]laintiff wrote to [D]efendant Craft, [P]laintiff was in fact released from the Ulster Correctional Facility SHU and was transported back to Wyoming Correctional Facility." (Dkt. No. 43, Part 11, ¶¶ 14-15, 19-22 [Defs.' Rule 7.1 Statement].) Moreover, Defendants have supported each factual assertion with one or more accurate record citations. (*Id.*) FN69

FN69. In an apparent typographical error, I note that Defendants mistakenly cited Paragraphs 8 through 10, rather than Paragraph 11, of Defendant Craft's declaration in support of the first factual assertion listed above. (*See* Dkt. No. 43, Part 11, ¶ 15 [Defs.' Rule 7.1 Statement]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl.].)

\*16 In his Rule 7.1 Response, Plaintiff states "[d]eny" with regard to each of the six factual assertions listed above. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶¶ 14-15, 19-22.) However, Plaintiff's assertions following each of these "denials" render the denials ineffective for purposes of Local Rule 7.1(a)(3), which requires that, in order to successfully controvert a fact asserted in a Statement of Material Facts, the non-movant must, among other things, (1) "specifically controvert[ ]" the facts in question, and/or (2) "set forth a specific citation to the record where the

factual issue arises." N.D.N.Y. L.R. 7.1(a)(3).

In particular, with regard to the first factual assertion, Plaintiff acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 15.) With regard to the second factual assertion, Plaintiff states only that Defendant *O'Keefe* spoke to an unidentified correction officer in the Ulster C.F. S.H.U. on March 12, 2004, and in any event Plaintiff provides no record citation in support of this assertion. (*Id.* at ¶ 14.) With regard to the third factual assertion, he effectively *admits* that assertion, stating, "Plaintiff never spoke to Defendant Craft." (*Id.* at ¶ 19.) FN70 He also effectively admits the fourth factual assertion, stating that he did not write the letter in question until March 17, 2004. (*Id.* at ¶ 20.) FN71 With regard to the fifth factual assertion, he again acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 21.)

FN70. Apparently, Plaintiff takes issue with only the word "until" in the factual assertion contained in Paragraph 19 of Defendants' Rule 7.1 Statement, which he interprets as implying that Plaintiff did in fact speak to Defendant Craft on March 17, 2004. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 19.) If so, I find that this controversy can be eliminated by simply construing Defendants' factual assertion as reading "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 *through* March 17, 2004," which is clearly the fact that Defendants are intending to assert. (*See* Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 43, Part 8, ¶¶ 8-10 [Craft Decl.] .)

FN71. Again, apparently, Plaintiff takes issue with only part of the factual assertion in question, asserting that he addressed the letter to the "Lt./Hearing Officer," and not to Defendant Craft. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 20.) If so, I find that he cites no record evidence controverting his deposition testimony that he *intended* the letter to go to Defendant Craft. (Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating, "I ... did write the Lieutenant Craft. I don't ... think at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

the time I remembered his name. But Sergeant O'Keefe did mention ... Lieutenant Craft.... I don't think I wrote Lieutenant Craft specifically. But, I did write [the letter to the] Lieutenant because I knew it was a Lieutenant."].) In any event, I find that any factual dispute about this narrow issue is immaterial, since the crux of Defendants' factual assertion is clearly that Plaintiff did not write a letter to Defendant Craft requesting to be released from the S.H.U. until March 17, 2004, *if ever.*

Finally, with respect to the sixth factual assertion, Plaintiff appears to take issue with only part of the factual assertion in question, asserting that he was not transported back to *Wyoming Correctional Facility* but was "placed on a DOCS bus toward *Auburn Correctional Facility.*" (*Id.* at ¶ 22 [emphasis added].) For the sake of brevity, I will set aside the evidentiary insufficiency of the documents on the docket to which Plaintiff cites in support of partial denial. (*Id.*) Rather, I find that the limited fact that Plaintiff is denying is immaterial to Defendants' motion and thus can be disregarded by the Court.

As a result, pursuant to Local Rule 7.1(a)(3), the following five facts are undisputed for purposes of Defendants' motion: (1) from March 12, 2004, until March 17, 2004, Defendant Craft was not responsible for the conditions of the Ulster C.F. S.H.U. while Plaintiff was in that S.H.U.; (2) from March 12, 2004, until March 17, 2004, Defendant Craft had no interaction with Plaintiff while he was in the Ulster C.F. S.H.U.; (3) Plaintiff never spoke to Defendant Craft from March 12, 2004, through March 17, 2004; (4) Plaintiff did not write to Defendant Craft requesting to be released from the Ulster C.F. S.H.U. until March 17, 2004, if ever; (5) Defendant Craft never received Plaintiff's March 17, 2004, letter; and (6) on the same morning that Plaintiff wrote his March 17, 2004, letter, Plaintiff was in fact released from the Ulster C.F. S.H.U.

**\*17** Based on these undisputed facts, and based on the lack of record evidence establishing any involvement of Defendant Craft in the conditions of confinement that Plaintiff experienced in the Ulster C .F. S.H.U., I find that no rational fact-finder could conclude that Defendant Craft

was personally involved in the Eighth Amendment violation alleged by Plaintiff.[FN72] I make the same finding with regard to Plaintiff's Fourteenth Amendment due process claim because (even assuming Plaintiff possessed a right of procedural due process arising from his six-day confinement in S.H.U.) he was afforded all the process that was due from Defendant Craft under the circumstances in that (1) no record evidence exists that Plaintiff did not properly receive notice of the Administrative Segregation Recommendation,[FN73] and (2) Plaintiff was entitled to a hearing only within *14 days* of Defendant O'Keefe's signing of the Administrative Segregation Recommendation on March 12, 2004.[FN74] However, I have trouble making the same finding with regard to Plaintiff's First Amendment retaliation claim, because record evidence exists that Defendant Craft was the individual who signed the Administrative Segregation Recommendation (submitted by Defendant O'Keefe on March 12, 2004) authorizing Plaintiff's confinement in S.H.U. pending a hearing to be conducted within 14 days of the recommendation.[FN75]

FN72. I note that, as I stated in Part III.B.2. of this Report-Recommendation, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

FN73. (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, containing paragraph at bottom labeled, **"Notice to Inmate"**] [emphasis in original]; *cf.* Dkt. No. 43, Part 3, at 27-28, 45 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating that, before Plf. was brought to the Ulster C.F. S.H.U., Def. Craft orally informed Plf. to write to Def. Craft if he "wanted to get out of the box or not go in the box"].)

FN74. (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

2004, stating, in pertinent part, "A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V."]; Dkt. No. 43, Part 8, ¶ 3 [Craft Decl.].) *See also* 7 N.Y. Comp.Codes R. & Regs. § 301.4(a) ("This hearing [conducted pursuant to Part 254] shall be conducted with 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation recommendation made by the employee who ascertained the facts or circumstances.").

FN75. (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; *cf.* Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., asserting that Def. Craft "failed to ... see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status...."].)

For these reasons, I recommend, in the alternative, as follows: (1) that all of Plaintiff's claims against Defendant Goord be dismissed because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged; and (2) that only Plaintiff's Eighth and Fourteenth Amendment claims be dismissed against Defendant Craft because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged.

**E. Whether, in the Alternative, Plaintiff's Claims Against all Defendants Should Be Dismissed Because, Based on the Current Record, They Are Protected from Liability by the Doctrine of Qualified Immunity, as a Matter of Law**

Because I have already found that adequate grounds exist upon which to recommend the dismissal of Plaintiff's

claims, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against all Defendants should be dismissed because, based on the current record, Defendants are protected from liability by the doctrine of qualified immunity, as a matter of law. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) As a result, I do not analyze Defendants' argument other than to make one point.

In my Report-Recommendation of January 30, 2007, addressing Defendants' motion to dismiss for failure to state a claim, I stated, "I believe that a credible argument might be made by Defendants that the law [as to whether a DOCS-issued exemption from the one-inch beard rule was effective, or whether a court order was required] was not clearly established [on March 12, 2004], giving rise to a qualified immunity defense." (Dkt. No. 24, at 31-32 & nn. 84-84.) As explained in that Report-Recommendation, I made that statement based on the case of *Young v. Goord,* in which the U.S. District Court for the Eastern District of New York traced the "alternat[ing]" law between November 16, 1993, and February 5, 2001, with regard to whether a DOCS "exemption" or a "court order" was necessary to excuse an inmate from the effects of DOCS' one-inch beard rule. *Young v. Goord,* 01-CV-0626, 2005 WL 562756, at *2-6 (E.D.N.Y. March 10, 2005), *aff'd,* 192 F. App'x 31 (2d Cir. Aug 2, 2006) (unpublished decision cited only to show case's subsequent history). In their argument regarding qualified immunity, Defendants have cited no case after *Young,* suggesting that the law continued to alternate after February 5, 2001. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) FN76 As a result, I have no reason to believe that that point of law was not clearly established by March 12, 2004.

FN76. Indeed, *Young* stated that the DOCS Directive issued on February 5, 2001, "remain[s] in force" as of the date of the decision, which was March 10, 2005. *Young,* 2005 WL 562756, at *6.

**F. Whether, in the Alternative, Plaintiff's Action Should Be Dismissed Under Local Rule 41.2(b) Because of His Failure to Keep the Court Apprised of His Current Address**

**\*18** Defendants argue that, in the alternative,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

Plaintiff's action should be dismissed under Local Rule 41.2(b) because (1) he was released from DOCS' custody on November 13, 2007, (2) since November 13, 2007, and the date of Defendants' motion, January 23, 2008, Plaintiff had failed to notify the Court of his current address, and (3) this failure has caused the Court's mail to Plaintiff (specifically, the Court's receipt of Plaintiff's partial payment of the Court filing fee) to be returned as undeliverable on November 20, 2007. (Dkt. No. 43, Part 12, at 17-18 [Defs.' Mem. of Law]; Dkt. No. 43, Part 11, ¶ 26 [Defs.' Rule 7.1 Statement].) Defendants are correct in the above recitation of events. Indeed, an additional mailing from the Court to Plaintiff was returned as undeliverable on January 7, 2008, due to Plaintiff's failure to promptly notify the Court of his change in address upon release from DOCS. (Dkt.Nos.42.)

However, on January 17, 2008, Plaintiff resurfaced in the Bergan County Jail in Hackensack, New Jersey, and by letter notified the Court of his change in address. (Dkt. No. 45.) In his letter, Plaintiff explained that, immediately upon his release from DOCS, he was taken into custody by the Department of Homeland Security and "placed in [i]mmigration proceedings," wherein he was (allegedly) denied access to his legal work and materials necessary to write to the Court. (*Id.*) Plaintiff repeats these assertions in his sworn declaration in opposition to Defendants' motion. (Dkt. No. 48, Plf.'s Decl. in Opp., ¶¶ 2-4.) Defendants have submitted no reply to Plaintiff's response. In addition, I can find only minimal prejudice to the Court and Defendants due to Plaintiff's two-month delay, under the circumstances.

For these reasons, I find that Plaintiff's two-month failure to keep the Court notified of his current address is not an appropriate ground upon which to dismiss his Amended Complaint. Rather, Plaintiff's Amended Complaint should be dismissed for the reasons (and alternative reasons) discussed above in Parts III.A. through III.D. of this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 43) be *GRANTED.*

**A N Y   O B J E C T I O N S   t o   t h i s**

**Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.** [FN77]

> FN77. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; see also *Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

(Cite as: 2008 WL 3884369 (N.D.N.Y.))

863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.

Barnes v. Craft
Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Rudolph ROSSI, Plaintiff,
v.
Glenn GOORD, Commissioner of DOCS, et al.,
Defendants.
No. 9:00-CV-1521 (LEK/DEP).

Sept. 28, 2006.
Rudolph Rossi, Comstock, NY, pro se.

David L. Cochran, New York State Attorney General, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

*1 This matter comes before the Court following a Report-Recommendation filed on March 27, 2006, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 103). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Rudolph Rossi, which were filed on April 7, 2006. Objections (Dkt. No. 104).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein. FN1, FN2

FN1. The Court wishes to note that in Plaintiff's objections, citation is made to the case of Wolf v.

McDonald, 468 U.S. 539. See Objections (Dkt. No. 104) at ¶¶ 13-14, 16-17. However, despite the Court's researching, no case bearing that caption appears to exist in any of the State or Federal courts of the United States. The citation 468 U.S. at 539 (1984) corresponds to the case of Hudson v. Palmer, but that case and the relevant page pin cite do not appear to stand for the general proposition argued for by Plaintiff. However, the Court believes that Plaintiff intended to cite the case of Wolff v. McDonnell, 418 U.S. 539 (1974), which was also cited by Judge Peebles in the Report, and, thus, the Court has reviewed Plaintiff's objections in light of the belief that Plaintiff intended to cite McDonnell.

FN2. The Court has noted several citation errors, which do not otherwise impact in a material manner upon the Report-Recommendation. The correct citation for the case of Johnson v. Keane is No. 92 Civ. 4287, 1993 U.S. Dist. LEXIS 19292 (S.D.N.Y.Apr.30, 1993). See Report-Rec. (Dkt. No. 103) at 4. The Nepveu Decl. is Docket Number 97, not 96. See Report-Rec. (Dkt. No. 103) at 10. The correct citation for the case of Tellier v. Fields is 280 F.3d 69 (2d Cir.2000). See Report-Rec. (Dkt. No. 103) at 24. The correct citation for the case of Davidson v. Goord is No. 99-CV-555, 2000 WL 33174399 (W.D.N.Y. Sept. 27, 2000). See Report-Rec. (Dkt. No. 103) at 28 n. 16. The correct pin citation for the case of Rossi v. Portuondo on page 32 of the Report is 713 N.Y.S.2d at 298. See Report-Rec. (Dkt. No. 103) at 32. And, the correct short cite for the case of Chance v. Armstrong on page 48 of the Report is 143 F.3d at 701. See Report-Rec. (Dkt. No. 103) at 48.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 103) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

**ORDERED,** that defendants' Motion for partial summary judgment (Dkt. No. 97) dismissing portions of Plaintiff's claims is **GRANTED .** Therefore, **the following causes of action remain for trial: Plaintiff's claims of food tampering and insufficient nutritional intake, which involve only Defendants Lutz, Decker and Annetts;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

DAVID E. PEEBLES, Magistrate Judge.

*REPORT AND RECOMMENDATION*

Plaintiff Rudolph Rossi, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 claiming to have experienced various constitutional deprivations while confined within the Shawangunk Correctional Facility ("Shawangunk"). The claims raised in Plaintiff's complaint can be loosely grouped into three general categories, involving 1) placement on Tuberculosis ("TB") hold for 365 days in 1998, based upon his refusal to be tested for the disease; 2) seven disciplinary hearings conducted in late 1998 and early 1999, as well as the issuance of additional misbehavior reports which were not the subject of disciplinary proceedings; and 3) an alleged assault by corrections officers and the later confiscation of his medical boots allegedly utilized by him to kick a corrections worker. Plaintiff's complaint seeks recovery of compensatory and punitive damages.

Currently pending before the court is a motion by the defendants seeking the entry of partial summary judgment dismissing certain of Plaintiff's remaining claims on the merits.[FN1] For the reasons set forth below, I recommend that defendants' motion be granted.

FN1. As will be seen, certain of the claims contained in Plaintiff's complaint were previously dismissed by the court. *See* pp. 15-16, *post.*

I. *BACKGROUND*

Plaintiff is a New York State prison inmate entrusted to the custody of New York State Department of Correctional Services ("DOCS"). At the times relevant to his claims, plaintiff was incarcerated at Shawangunk. Plaintiff's complaint, which is both lengthy and comprehensive, asserts an amalgamation of claims addressing various conditions and occurrences falling into three broad categories.

A. *TB Testing and Medical Keeplock Confinement*

***2** One aspect of Plaintiff's complaint centers upon efforts by the DOCS to test him for TB. Plaintiff alleges that in 1997 defendant Patricia Buttersworth, a prison nurse, forcibly administered a TB test, over his objection. Complaint (Dkt. No. 1) ¶¶ 22-31. Rossi's refusal during the following year to submit to another TB test resulted in his confinement on TB hold in medical keeplock confinement for a period of one year, beginning on October 10, 1998. Complaint (Dkt. No. 1) ¶¶ 32-38.

The efforts of prison officials to test Rossi for TB were governed by DOCS Policy No. 1.18. *See* Nepveu Decl. (Dkt. No. 97) Exh. A. Under that policy, New York State prison inmates must be screened for the presence of TB reactivity upon entry into DOCS custody, and at least annually thereafter. *See id.,* at 4. The policy further provides for inmates refusing to submit to testing to be placed upon TB hold for one year, and thereafter released unrestricted into the general prison population if no signs or symptoms of TB develop and the inmate has had three negative chest x-rays. *Id.,* at 5. Inmates on medical hold are required to remain in their cells at all times except for one hour of recreation each day and three showers per week, and additionally are limited to only legal visits.[FN2] Nepveu Decl. (Dkt. No. 97) Exh. A, at 5.

FN2. The circumstances leading up to the DOCS' enactment of the policy for comprehensive testing and treatment of TB are ably recounted by Magistrate Judge Naomi Reice Buchwald in *Johnson v. Keane,* No. 92 Civ. 4287, 1993 U.S. Dist. LEXIS 19292 (S.D.N.Y. May 3, 1993).

On November 3, 1998, while Rossi remained on TB hold, DOCS officials became aware that he was being

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

taken from his cell for purposes of a scheduled dental appointment. Nepveu Decl. (Dkt. No. 97) Exh. N. After determining that the appointment was for routine teeth cleaning only, with no immediate need for care or treatment, L. Barringer, a nurse at the facility, cancelled the scheduled visit and ordered Rossi to be returned to his cell, believing her directive to be in accordance with the DOCS TB hold policy. *Id.; see also* Complaint (Dkt. No. 1) ¶¶ 60-65.

B. *Misbehavior Reports and Disciplinary Proceedings*

On October 14, 1998 plaintiff was issued an inmate misbehavior report alleging his refusal to obey a direct order, in violation of Inmate Disciplinary Rule 106.10. Nepveu Decl. (Dkt. No. 97) Exh. B. That misbehavior report, authored by Corrections Officer G. Warner, was based upon Plaintiff's failure to promptly comply with an order, given initially by Corrections Officer Warner and later reiterated by Sergeant Duffany, that he collect his belongings and move to another housing location within the same correctional facility. *Id.; see also* Complaint (Dkt. No. 1) ¶¶ 55-56. Following a disciplinary hearing conducted October 19, 1999 by Corrections Lieutenant John O'Rourke regarding the matter, plaintiff was found guilty of the disciplinary violations charged, resulting in a sanction of thirty days of keeplock confinement with a corresponding loss of package, commissary and telephone privileges.[FN3], [FN4] Nepveu Decl. (Dkt. No. 97) Exh. B; Complaint (Dkt. No. 1) ¶ 57. An appeal of that determination to facility Superintendent Leonard Portuondo was denied. [FN5] Complaint (Dkt. No. 1) ¶ 59.

FN3. Plaintiff's complaint also alleges that the hearing disposition resulted in the confiscation of monies from his prison account. Complaint (Dkt. No. 1) ¶ 58.

FN4. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and denying or limiting the prisoner's participation in normal prison activities. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir.1989); *Tinsley v. Greene*, No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,*

46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (citing *Camacho v. Keane,* No. 95 CIV. 0182, 1996 WL 204483, at *2 (S.D.N.Y. Apr. 25, 1996) and *Gayle v. Keane,* No. 94 CIV. 7583, 1998 WL 187862, at *4 (S.D.N.Y. Apr. 21, 1998)). Those conditions include confinement to the inmate's general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals. *Id.* The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

FN5. In their motion, defendants assert that the October 19, 1998 hearing result was later administratively reversed. *See* defendants' Memorandum (Dkt. No. 97) at 2, n. 3. No additional information is found in the record, however, regarding that reversal.

**\*3** Plaintiff was issued another misbehavior report on or about January 8, 1999, charging him with littering (Rule 118.25) and causing property damage or loss (Rule 116.10). Nepveu Decl. (Dkt. No. 97) Exh. C (Rossi Affidavit in Support of Order to Show Cause) ¶ 5. Those disciplinary charges stemmed from an incident during which plaintiff allegedly threw a food tray out of his cell and into the gallery. *Id.* A Tier II hearing was subsequently conducted on January 12, 1999 to address those allegations, apparently in Plaintiff's absence, at the conclusion of which he was found guilty of the violations charged, resulting in a disciplinary sanction which is not specified in the record.[FN6], [FN7] Complaint (Dkt. No. 1) ¶¶ 69-72. The hearing officer's findings and resulting penalty were affirmed on appeal to the facility superintendent, and in a subsequent proceeding commenced by the plaintiff under Article 78 of the New York Civil Practice Law and Rules ("CPLR"). Nepveu Decl. (Dkt. No. 97) Exh. C (Rossi Affidavit in Support of Order to Show Cause) ¶ 5;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

*id.* Exh. D (Answer to Order to Show Cause) ¶ 4; *id.* Exh. E; *Rossi v. Portuondo,* 275 A.D.2d 823, 713 N.Y.S.2d 97 (3d Dept.2000), *leave to appeal denied,* 96 N.Y.2d 703, 745 N.E.2d 1017, 722 N.Y.S.2d 795 (2001).

> **FN6.** The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U .S. 907, 119 S.Ct. 246 (1998).

> **FN7.** Plaintiff's complaint alleges that this hearing disposition also resulted in the confiscation of monies from his prison account. *See* Complaint (Dkt. No. 1) ¶ 70.

Plaintiff was issued another misbehavior report, authored by Corrections Officer L. Mazzella, on or about January 16, 1999, accusing him of assaulting a fellow inmate, in violation of Rule 100 .10. Nepveu Decl. (Dkt. No. 97) Exh. F. That charge resulted from an incident which occurred that day in a housing television viewing area. *See id.* A Tier III disciplinary hearing was conducted to address that misbehavior report, beginning on January 22, 1999, by the Shawangunk Deputy Superintendent of Programs, Jimmy Harris. Nepveu Decl. (Dkt. No. 97) Exh. G; *see also* Complaint (Dkt. No. 1) ¶¶ 78-80. At the close of that hearing plaintiff was found guilty, and a penalty of 120 days of disciplinary special housing unit ("SHU") confinement, with a corresponding loss of privileges, as well as a recommended four month loss of good time credits, was imposed. Nepveu Decl. (Dkt. No. 97) Exh. F. Those findings were later administratively reversed on June 1, 2000 by Donald Selsky, the DOCS Director of Special Housing/Inmate Discipline, based upon the failure of prison officials to properly document a requested witness's refusal to testify at the hearing. *Id.* Exh. H; *see also Rossi,* 275 A.D.2d at 823, 713 N.Y.S.2d at 97-98 .

On or about March 2, 1999 plaintiff was issued a misbehavior report by Corrections Officer Coran, in essence charging him with failure to return supplies provided for use in cleaning his cell. Complaint (Dkt. No. 1) ¶¶ 94-96. That misbehavior report appears to have grown out of a disagreement between plaintiff and Corrections Officer Coran over whether Rossi had been provided with clean water for purposes of carrying out the assigned task. *Id.* Following a disciplinary hearing conducted by Senior Corrections Counselor Robert Cunningham, plaintiff was found guilty of the charges set forth in that misbehavior report. *Id.* ¶ 97. Although the record is somewhat unclear as to the sanction imposed, it appears that once again plaintiff was fined, and monies were transferred from his prison account for the violation, and that plaintiff may also have suffered the loss of commissary, package and telephone privileges for thirty days. *Id.; see also* Nepveu Decl. (Dkt. No. 97) Exh. J (Plaintiff's Application for Order to Show Cause) ¶ 1. An internal, administrative appeal to Commissioner Goord from that determination was denied. Complaint (Dkt. No. 1) ¶ 98. Plaintiff's judicial challenge of that determination under Article 78 of the CPLR was similarly rejected. *Rossi v. Portuondo,* 277 A.D.2d 615, 615-16, 716 N.Y.S.2d 116, 117-18 (3d Dept.2000).

**\*4** Plaintiff was again administered an inmate misbehavior report on March 5, 1999, this one authored by Corrections Sergeant W. Lutz, charging him with refusal to obey a direct order (Rule 106.10), engaging in violent conduct (Rule 104.11) and disorderly conduct (Rule 104.13). Nepveu Decl. (Dkt. No. 97) Exh. I. The genesis of that misbehavior report was Plaintiff's refusal to cooperate with an extraction from his SHU cell for purposes of a routine cell search. *Id.; see also* Complaint (Dkt. No. 1) ¶ 100. At the conclusion of a hearing conducted by Deputy Superintendent Harris on March 16, 1999 to address those allegations, plaintiff was acquitted of engaging in violent conduct and creating a disturbance, but found guilty of refusal to obey a direct order. Nepveu Decl. (Dkt. No. 96) Exh. I. As a penalty, Deputy Superintendent Harris imposed thirty days of disciplinary keeplock confinement with a corresponding loss of package, commissary and telephone privileges and a surcharge from Plaintiff's inmate account in an unspecified

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

amount. Complaint (Dkt. No. 1) ¶ 102; Nepveu Decl. (Dkt. No. 96) Exh. I. Although the record does not firmly establish as much, it appears that plaintiff appealed the results of that disciplinary hearing internally, without success. *See* Nepveu Decl. (Dkt. No 97) Exh. J (Rossi Affidavit in Support of Order to Show Cause) ¶ 22. A judicial challenge to that determination brought by the petitioner under CPLR Article 78 resulted in confirmation of the hearing officer's determination.[FN8] *Rossi,* 277 A.D.2d at 615-16, 716 N.Y.S.2d at 117-18; *see also* Nepveu Decl. (Dkt. No. 97) Exhs. J-L.

> FN8. A brief submitted on behalf of Superintendent Portuondo in response to Plaintiff's Article 78 petition challenging that determination, among others, suggests that Rossi did not appeal the hearing officer's findings. *See* Nepveu Decl. (Dkt. No. 97) Exh. L, at 27.

On March 24, 1999 plaintiff was issued a misbehavior report accusing him of harassment (Rule 107.11). Complaint (Dkt. No. 1) ¶ 106; Nepveu Decl. (Dkt. No. 97) Exh. L, at 9. That report, authored by Corrections Officer McGuire, accused plaintiff of making inappropriate comments toward him. *Id.* A Tier II disciplinary hearing was conducted regarding those allegations, commencing on March 31, 1999, during which Rossi argued that the misbehavior report had been administered in retaliation for his having lodged complaints against Corrections Officer McGuire. Nepveu Decl. (Dkt. No. 97) Exh. L, at 10. On April 2, 1999, at the close of the hearing, plaintiff was found guilty of the charges set forth in that misbehavior report, and a sanction which included fifteen days of disciplinary keeplock confinement was imposed. *Id.,* at 12. That determination was affirmed both upon internal, administrative review, *see id.,* and an Article 78 challenge into the courts. *Rossi,* 277 A.D.2d at 615-16, 716 N.Y.S.2d at 117-18; *see also* Complaint (Dkt No. 1) ¶¶ 107-08.

Plaintiff was issued two separate misbehavior reports on April 2, 1999. Nepveu Decl. (Dkt. No. 97) Exh. L, at 12. In the first, Rossi was accused by Corrections Officer McGuire of assault on staff (Rule 100.11), refusal to obey a direct order (Rule 106.10) and harassment (Rule 107.11). *Id.* The second, also written by Corrections

Officer McGuire, charged Rossi with assault on staff (Rule 100.11) and interference with an employee (Rule 107.10). *Id.* A combined hearing to address those two misbehavior reports was conducted, beginning on April 13, 1999, with defendant Cunningham presiding. *Id.,* at 13-21. At the close of those proceedings the hearing officer found Rossi guilty of two counts of assault on staff, harassment, refusal to obey a direct order, and interference with an employee, and imposed a total of 730 days of SHU disciplinary confinement, with a corresponding loss of package, telephone and commissary privileges. *Id.,* at 21. That determination was upheld on administrative review, *see id.,* and following Rossi's Article 78 challenge into the courts. *Rossi,* 277 A.D.2d at 615-16, 716 N.Y.2d at 117-18.

**\*5** In addition to these disciplinary charges and resulting hearings, Plaintiff's complaint references two allegedly false misbehavior reports issued by Corrections Officer McGuire on unspecified dates, relating to his alleged failure to return cleaning supplies and flooding of his cell, asserting that both of those accusatory instruments were ultimately dismissed. Complaint (Dkt. No. 1) ¶ 85. Plaintiff's complaint also references a misbehavior report issued sometime after November 3, 1998, based upon Rossi's alleged refusal to provide a urine sample, and additionally another charge lodged on or about May 26, 1999, alleging Rossi's failure to return handcuffs to prison authorities.[FN9] Complaint (Dkt. No. 1) ¶¶ 67, 137.

> FN9. Plaintiff does not identify the author of those two reports, nor does he appear to be asserting any procedural due process claims relating to their issuance and any disciplinary hearings which may have followed.

### 3. *Miscellaneous Claims*

In addition to complaining of his keeplock confinement while on medical hold and the various disciplinary proceedings against him, Plaintiff's complaint asserts a series of claims addressing the conditions of his confinement at the relevant times. Those claims include those stemming from the denial of dental treatment on November 3, 1999, which was addressed above.[FN10] Complaint (Dkt. No. 1) ¶¶ 62-65. Plaintiff also alleges in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

part two of his complaint a claim which is more closely aligned with the various prison condition assertions included in part three, relating to an incident on April 2, 1999 when his food was allegedly tampered with, causing him to become ill and leading to his refusal to eat between April 5, 1999 and May 10, 1999. Complaint (Dkt. No. 1) ¶¶ 117, 130-33, 136.

> FN10. *See* p. 4, *ante.*

In part three of his complaint, plaintiff alleges that he was verbally abused and harassed by Corrections Officers Freer and Rankin in July of 1999, and ultimately assaulted by those officers, acting in concert with Corrections Sergeant Kobelt, who refused to intercede on his behalf. Complaint (Dkt. No. 1) ¶¶ 152-74. That incident led to the issuance by Corrections Officer Freer on July 4, 1999 of a misbehavior report accusing Rossi of assault on a staff member (Rule 100.11)-a charge which plaintiff maintains was fabricated in order to "cover-up" the officers' assault on him. Nepveu Decl. (Dkt. No. 97) Exh. P; Complaint (Dkt. No. 1) ¶ 164. A Tier I I I hearing was subsequently conducted, beginning on July 15, 1999 and continuing to July 29, 1999, by Corrections Captain K. Decker to address those charges. Nepveu Decl. (Dkt. No. 97) Exhs. P & Q. At the close of the hearing plaintiff was found guilty of the charge set forth in the misbehavior report and directed to serve six months of disciplinary SHU confinement. *Id.* Exh. P. On October 14, 1999, that determination was affirmed on appeal to Donald Selsky. *Id.* Exh. R; *see also* Complaint (Dkt. No. 1) ¶ 170.

In addition to complaining of the issuance of the false misbehavior report and the resulting disciplinary confinement, plaintiff also alleges that as a direct result of the July, 1999 incident his medical boots were confiscated, causing "significant pain to Plaintiff's feet, ankles and knees and a denial of medical treatment prescribed by a doctor." Complaint (Dkt. No. 1) ¶ 171. A grievance filed by the plaintiff seeking redress for the deprivation of his boots was denied, both at the facility level and by the Central Office Review Committee ("CORC"), based upon the lack of any showing of medical necessity and the fact that plaintiff was provided with adequate, substitute orthotics for his boots and sneakers. Nepveu Decl. (Dkt. No. 97) Exh. S.

## II. *PROCEDURAL HISTORY*

*\*6* Plaintiff commenced this action on October 5, 2000. Dkt. No. 1. Named as defendants in Plaintiff's complaint are Glenn Goord, Commissioner of the DOCS, as well as Shawangunk Superintendent Leonard Portuondo and several other corrections workers employed at the facility. Plaintiff's complaint alleges causes of action for violation of his First Amendment free religious exercise right, excessive use of force, denial of procedural due process, deliberate indifference to his medical needs, cruel and unusual punishment, and unlawful retaliation.

On October 24, 2002 plaintiff moved seeking the entry of summary judgment with respect to his TB testing claims. Dkt. Nos. 57-60. Defendants both opposed Plaintiff's motion and cross-moved for partial summary judgment with regard principally to the TB testing claims set forth in the first portion of Rossi's complaint. Dkt. Nos. 66-69. As a result of the issuance by me on October 24, 2003 of a report and recommendation, Dkt. No. 78, and its subsequent adoption by District Judge Lawrence E. Kahn on January 20, 2004, Dkt. No. 83, Plaintiff's motion for summary judgment was denied, and defendants' cross-motion for summary judgment was granted in part, leading to dismissal of portions of Plaintiff's TB hold claims. Those determinations left intact, however, the portion of Plaintiff's TB hold claim alleging deprivation of procedural due process based upon the 360 days spent by him on TB hold. *See id.* Included among the claims dismissed by the court were Plaintiff's excessive force cause of action stemming from the forcible administering of TB testing by Nurse Buttersworth, as well as companion tort claims, which were dismissed under N.Y. Correction Law § 24. Plaintiff's claim for compensatory damages on the causes of action set forth in the first portion of his complaint were also dismissed based upon his failure to plead and prove the existence of physical injury, as required under 42 U.S.C. § 1997e(e). Plaintiff's First Amendment free exercise claim, stemming from the forcible administration of TB testing and his medical keeplock confinement in 1998, was also dismissed based upon the preclusive effects of an earlier, unsuccessful state court challenge to those determinations, and on the basis of qualified immunity.[FN11] *See Rossi v. Portuondo, 277 A.D.2d 526, 714 N.Y.S.2d 816 (3d Dept.2000).*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

FN11. An earlier report and recommendation was issued by me on November 13, 2002, Dkt. No. 64, and adopted by District Judge Lawrence E. Kahn on December 18, 2002, Dkt. No. 71, denying a motion by the defendants seeking dismissal of Plaintiff's complaint based upon its length and degree of detail, pursuant to Rule 8 of the Federal Rules of Civil Procedure.

By motion filed on February 1, 2005, defendants now move for the entry of partial summary judgment dismissing portions of the remaining claims contained in Plaintiff's complaint. Dkt. No. 97. In their motion, *inter alia,* defendants seek dismissal of 1) Plaintiff's procedural due process claims, relating to the time spent by Rossi in TB testing isolation, based upon the fact that he was provided notice and an opportunity to be heard regarding his recourse, and additionally on the ground of qualified immunity; 2) Plaintiff's procedural due process claims related to various disciplinary proceedings referenced in his complaint, based upon Rossi's failure to show the deprivation of a constitutionally cognizable liberty interest and a due process deprivation associated with the denial in certain instances, as well as on the grounds of collateral estoppel and qualified immunity; 3) Plaintiff's medical indifference claims, based upon the lack of a showing of any serious medical need as relates to the deprivation of his medical boots; and 4) Plaintiff's claims against Commissioner Goord, based upon the lack of his personal involvement in the various constitutional violations alleged in Plaintiff's complaint. Dkt. No. 100. By opposition filed on April 11, 2005, plaintiff has since responded to that motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

*7 Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

B. *TB Hold Procedural Due Process Claims*

**\*8** Plaintiff's complaint alleges that as a result of his refusal to submit to purified protein derivative ("PPD") testing for TB in October of 1998 he was placed in medical keeplock for one year. Complaint (Dkt. No. 1) ¶¶ 32-41. Plaintiff contends that the restrictions placed upon him while in keeplock confinement represent sufficiently significant departures from those placed upon prison inmates generally as to result in the deprivation of a constitutionally cognizable liberty interest. Plaintiff maintains that the liberty interest deprivation was imposed without adequate safeguards, in contravention of his procedural due process right enjoyed under the Fourteenth Amendment.

In their motion defendants assume, for purposes of argument, that if the TB hold confinement represented the deprivation of a constitutionally significant liberty interest, but assert that the strictures of the Fourteenth Amendment were satisfied since plaintiff was given notice of the reasons for the confinement and an opportunity to be heard. Defendants further maintain that in any event, they are entitled to dismissal of this claim on the basis of qualified immunity, arguing that in 1998 the law surrounding the various legal implications of the DOCS TB testing policy was unsettled.

The concept of procedural due process under the Fourteenth Amendment is a flexible one, with its requirements being dependent upon the nature of the deprivation at issue and the process associated with it. In a prison setting, an inmate who is subject to the deprivation of a constitutionally significant liberty interest is entitled under the Fourteenth Amendment to notice and an opportunity to be heard. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965)).

Like the defendants, I will assume for the sake of argument that Plaintiff's medical keeplock confinement for a period of one year, with a corresponding loss of privileges, constituted the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's due process protections. [FN12] Plaintiff was therefore entitled to both notice and a meaningful opportunity to be heard with regard to that deprivation. *Sira,* 380 F.3d at 69.

> [FN12.] While some courts have analyzed procedural due process claims stemming from keeplock confinement under principles ordinarily applicable to disciplinary or administrative SHU confinement, *e.g., Delisser v. Goord,* No. 9:02-CV-0073, 2003 WL 133271, at \*7 (N.D.N.Y. Jan. 15, 2003), others have concluded that ordinary keeplock confinement conditions are not sufficiently atypical or significant hardships in relation to the ordinary incidents of prison life to trigger the protections of the Fourteenth Amendment. *See, e.g., Luis v. Coughlin,* 935 F.Supp. 218, 220-22 (W.D.N.Y.1996).

Under DOCS Policy No. 1.18, before being placed in keeplock confinement for refusing to be tested for TB, an inmate must "be carefully counseled about the importance of [the] test." Nepveu Decl. (Dkt. No. 97) Exh. A, at 4. The policy also requires that inmates on TB hold be offered testing "daily for one week, weekly for one month and monthly thereafter until the inmate accepts testing or prophylaxis" going on to provide that "[i]nmates can agree to testing/prophylaxis at any time." *Id.,* at 5. Accordingly, assuming the validity of DOCS Policy No. 1.18-a matter determined by the state courts in response to Plaintiff's challenge of the policy ( *Rossi v. Portuondo,* 277 A.D.2d 526, 714 N.Y.S.2d 816 (3d Dept.2000)-the requirements of due process were met, in that plaintiff had both notice of the reason for his keeplock confinement and the means of ending it. Under these circumstances, no reasonable factfinder could conclude that plaintiff was denied procedural due process in connection with its medical keeplock confinement. Accordingly, I recommend dismissal of Plaintiff's remaining claims associated with the TB testing.[FN13]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

FN13. In light of my recommendation on the merits, I have not addressed qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001); *Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003); *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)).

C. *Misbehavior Report and Disciplinary Hearing Claims*

**\*9** defendants' summary judgment motion seeks dismissal of the majority of Plaintiff's claims arising from the issuance of misbehavior reports and resulting disciplinary proceedings on several bases.

1. *Governing Legal Principles*

Before addressing the merits of Plaintiff's claims surrounding the various misbehavior reports and resulting disciplinary hearings, it is useful to discuss the legal principles associated with those claims, and against which they must be judged. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York State has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor (*see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)), the question of

whether a constitutionally significant deprivation is implicated in connection with one or more of Plaintiff's disciplinary hearings is dependent upon whether he suffered conditions rising to the level of an atypical and significant hardship under *Sandin.*

Atypicality in a *Sandin* inquiry is normally a question of law .FN14 *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.FN15 *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336. In the event a constitutionally significant deprivation is found to have occurred, the court's focus must then shift to whether, in connection with that deprivation, the plaintiff received the constitutionally mandated safeguards to which he was entitled.

FN14. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

FN15. While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin.* *Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin (see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

**\*10** The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the applicable requirements having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* an inmate facing the deprivation of a liberty interest as a result of disciplinary proceedings, while not deserving of "the full panoply of rights" due to a criminal defendant, must be afforded 1) advance written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a fair and impartial hearing officer; 4) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 5) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Sira,* 380 F.3d at 69 (citing *Wolff); Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In the event that these requirements are satisfied, and the resulting disposition is supported by "some evidence"-a standard which has been described as "extremely tolerant"-an inmate has been afforded due process. *Sira,* 380 F.3d at 69 (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 2774 (1985)).

*2. October 19, 1998 Hearing*

Plaintiff's claims surrounding the October 19, 1998 hearing and underlying misbehavior report, issued on October 14, 1998, are two-pronged. Plaintiff asserts that the misbehavior report was false, and additionally alleges a deprivation of procedural due process associated with the resulting hearing.

The first portion of Plaintiff's complaint regarding the October 19, 1998 hearing is easily dispensed with. It is

well-established that a prisoner has no constitutional right against the issuance of a false misbehavior report, provided that the requisite due process is provided with regard to that report. [FN16] *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)); *Franco v. Kelly,* 854 F.2d 584, 587-89 (2d Cir.1988).

FN16. A false misbehavior report issued in retaliation for a prisoner having engaged in protected activity, such as the commencement of litigation or the filing of grievances, can be independently actionable as unlawful retaliation under the First Amendment. *Davidson v. Goord,* No.99-CV-555, 2000 WL 33147399, at \*10-\*11 (W.D.N.Y. Sept. 27, 2000) (citing *Franco v. Kelly,* 854 F.2d 584, 587-89 (2d Cir.1988)). From his opposition papers, plaintiff appears to advance such a claim with regard to the October 19, 1998 hearing, asserting that issuance of the disciplinary charge was motivated by his questioning of an order given by prison authorities. The questioning by an inmate of a lawful order given by a corrections officer, however, does not constitute protected speech deserving of First Amendment protection. *See Rodriguez v. Phillips,* 66 F.3d 470, 478-79 (2d Cir.1995).

The remaining focus of Plaintiff's claims related to the October, 1998 hearing surround his contention that his due process rights were violated in connection with that proceeding. From the record, however, it appears that the penalty associated with that hearing and the resulting finding of guilt was limited to thirty days of keeplock confinement, with a corresponding loss of privileges. *See* Nepveu Decl. (Dkt. No. 97) Exh. B. Under settled due process jurisprudence, including *Sandin* and its progeny, a thirty day period of keeplock confinement does not constitute a liberty interest deprivation sufficient to trigger the Fourteenth Amendment's due process protections. *Moore v. Senkowski,* No. 93-CV-1052, 1996 WL 191988, at \*1-\*3 (N.D.N.Y. Apr. 15, 1996) (Pooler, J.) I therefore recommend that all claims associated with the October 19, 1998 hearing be dismissed as a matter of law.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

3. *Disciplinary Hearings Conducted On January 12, 1999, March 15, 1999, March 16, 1999, April 2, 1999 and April 20, 1999*

**\*11** Defendants next seek dismissal of Plaintiff's claims surrounding each of the five disciplinary hearings referenced above, arguing that they are precluded by collateral estoppel, based upon the unfavorable state court decisions issued in Rossi's Article 78 proceedings challenging those determinations.

The Second Circuit has provided useful guidance concerning the preclusive effects to be given to prior judicial determinations involving the same subject matter as is presented in the case under consideration. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280 (2d Cir.2002). In *Marvel,* the Second Circuit noted that state law governs the preclusive effect to be given to a state court determination. 310 F.3d at 286. The Full Faith and Credit Clause requires that a federal court give the same preclusive effect to a state judgment as would be ascribed by that state court. *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896 (1984) (citing *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415 (1980)). The court in *Marvel* went on to note, however, that "there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel." *Marvel,* 310 F.3d at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n. 14 (2d Cir.2001)).

As the Second Circuit explained in *Marvel,* claim preclusion-often referred to as res judicata-requires that a final judgment on the merits of an action be given preclusive effect, barring parties as well as those in privity with them from relitigating claims that were or could have been raised in the prior action. *Marvel,* 310 F.3d at 286-87; *see also Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 28 (2d Cir.1986) (citing, *inter alia, Migra),* *overruled on other grounds, Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768 (2d Cir.2002).

In this case it is clear, based upon well-established case authority, that the prior unfavorable Article 78 determinations did not foreclose the plaintiff from commencing this subsequent section 1983 action for damages, since damages are unavailable to compensate a

party in an Article 78 proceeding for civil rights violations. *Davidson v. Capuano,* 792 F.2d 275, 278-80 (2d Cir.1986). Accordingly, Plaintiff's claims for damages in this section 1983 action are not barred by the prior Article 78 proceeding, even assuming that all of the other requirements for claim preclusion can be met.

This finding, however, does not end the inquiry. Under the doctrine of issue preclusion, often referred to as collateral estoppel, a party that has had a full and fair opportunity to litigate an issue of fact or law may be precluded from relitigating the issue once it has been decided against the party or its privy. *Marvel,* 310 F.3d at 288-89. Defendants argue that collateral estoppel should serve to bar the plaintiff from relitigating the issues raised in his two Article 78 proceedings-that is, whether he was denied procedural due process during the course of the disputed disciplinary proceedings.

a. *January 12, 1999 Hearing*

**\*12** In his challenge to the January 12, 1999 hearing, plaintiff maintains that he was not permitted to call witnesses and to be present at the hearing. Complaint (Dkt. No. 1) ¶ 69. Those same claims were raised in his state court Article 78 challenge to that hearing determination, Nepveu Decl. (Dkt. No. 97) Exh. C (Rossi Affidavit in Support of Order to Show Cause) ¶¶ 5-8, and were rejected in a decision and order entered by Supreme Court Justice John G. Connor on January 2, 2000, *see id.* Exh. E, and upheld on appeal. *Rossi,* 275 A.D.2d at 824, 713 N.Y.S.2d at 98. On the issue of the Plaintiff's failure to appear at the hearing, the Appellate Division specifically made a finding that plaintiff "repeatedly refused attempts to have him leave his cell and would not sign a waiver form", thereby justifying the decision to hold the hearing in his absence. *Id.* As the petitioner in the Article 78 proceeding, plaintiff was presumably provided a full and fair opportunity in the state courts to litigate the issue of whether his procedural rights were violated as a result of that disciplinary hearing. Based upon the state courts' findings, I recommend that this court give preclusive effect to those findings and dismiss Plaintiff's due process claims associated with the January 12, 1999 hearing.

b. *March 15, 1999 Hearing*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

Plaintiff's claims surrounding the March 15, 1999 hearing center upon his contention that "despite evidence to the contrary, [he] was arbitrarily found guilty of the charges [set forth in the underlying misbehavior report]". Complaint (Dkt. No. 1) ¶ 97. In one of his Article 78 proceedings, plaintiff asserted lack of evidence as a basis for overturning the March 15, 1999 hearing determination. *See* Nepveu Decl. (Dkt. No. 97) Exh. K, at 1-2. Addressing that contention, the Third Department found "that the detailed misbehavior report and testimony regarding the incident from the correction officer who authored the report provide the necessary substantial evidence to support the determination[.]" *Rossi, 277 A.D.2d at 615, 716 N.Y.S.2d at 117.* Substantial evidence, in that context, constitutes "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact." *Bryant v. Coughlin, 77 N.Y.2d 642, 647, 572 N.E.2d 23, 25, 569 N.Y.S.2d 582, 584 (1991)).* Since this standard appears to be appreciably more demanding than the "some evidence" test applied under *Hill,* the Appellate Division's finding of substantial evidence is entitled to preclusive effect and demonstrates that the challenged hearing determination is supported by at least "some evidence" as constitutionally mandated. *Alicea v. Howell, 387 F.Supp.2d 227, 232-33 (W.D.N.Y.2005).*

c. *March 16, 1999 Hearing*

In the portion of his complaint addressing the March 16, 1999 disciplinary hearing, plaintiff argues that he was denied the ability to call two requested witnesses. Complaint (Dkt. No. 1) ¶ 101. From the brief submitted by plaintiff in support of his Article 78 challenge of that determination, it appears that his inability to call the requested witnesses resulted from their refusal to testify. Nepveu Decl. (Dkt. No. 97) Exh. K, at 2. There is an argument to be made that the precise issue now presented was not raised before and decided by the Third Department in connection with Plaintiff's Article 78 proceeding. Nonetheless, since Plaintiff's March 16, 1999 disciplinary hearing resulted in only thirty days of keeplock confinement, *see* Nepveu Decl. (Dkt. No. 97) Exh. I, at 1 & Exh. L, at 27, it did not implicate the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's due process requirements.[FN17]

*Moore,* 1996 WL 191988, at *1-*3.

FN17. It also appears, as defendants argue, that plaintiff failed to appeal that determination though prescribed, internal channels, and thus did not exhaust available administrative remedies before commencing this action. *Rosales v. Bennett, 297 F.Supp.2d 637, 639-40 (W.D.N.Y.2004).*

d. *April 2 and 20, 1999 Hearings*

*13 Plaintiff's claims regarding the two hearings conducted in April of 1999 are similarly unavailing, and subject to dismissal as a matter of law. As a result of a Tier II April 2, 1999 hearing conducted to address a March 24, 1999 misbehavior report, plaintiff received only fifteen days of keeplock confinement as a penalty. Nepveu Decl. (Dkt. No. 97) Exh. K, at 14-26. Accordingly, that hearing did not implicate a liberty interest sufficient to trigger the Fourteenth Amendment's due process provisions. *Dawkins v. Healy, No. 94 Civ. 6382, 1996 WL 145989, at *1-*3 (S.D.N.Y. Apr. 1, 1996), vacated on other grounds, 1996 WL 280737 (S.D.N.Y. May 28, 1996).* In any event, the claims raised by plaintiff concerning that hearing-that he was not permitted to present evidence of retaliation, *see* Complaint (Dkt. No. 1) ¶¶ 106-07-were presented to and rejected by the Appellate Division in connection with one of Plaintiff's two Article 78 proceedings. Nepveu Decl. (Dkt. No. 97) Exh. K, at 12-14; *Rossi, 277 A.D.2d at 616, 716 N.Y.S.2d at 118.*

The same holds true with regard to the April 20, 1999 Tier II hearing determination. In his complaint, plaintiff challenges that determination based upon his inability to attend, additionally alleging the receipt of fabricated testimony from prison officials and hearing officer bias associated with that disciplinary proceeding. Complaint (Dkt. No. 1) ¶¶ 120-26. These arguments were among a host of claims asserted by the plaintiff in his second Article 78 proceeding. Nepveu Decl. (Dkt. No. 97) Exh. J (Rossi Affidavit in Support of Order to Show Cause) ¶¶ 34-70; *see also id.* Exh. K (Petitioner's Brief), at 24. In response to those claims the Third Department found that no evidence of hearing officer bias, and concluded that the hearing had properly been held in Plaintiff's absence. *Rossi, 277 A.D.2d at 616, 716 N.Y.S.2d at 117-18.*

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

Plaintiff is therefore collaterally estopped from relitigating those claims in this forum.

4. *Disciplinary Hearing of January 26, 1999*

Defendants next challenge the portion of Plaintiff's complaint addressing a January 26, 1999 Tier I II hearing on charges of assaulting a fellow inmate, resulting in a finding of guilt and the imposition of a penalty which included 120 days of SHU disciplinary confinement. In support of his attack upon that proceeding, plaintiff alleges that the proceeding was "exaggerated to a tier II I offense for retaliatory reasons" and that fabricated evidence was presented at the hearing. Complaint (Dkt. No. 1) ¶ 79. The record does not disclose any deprivation of the procedural rights required before such a disciplinary penalty can be imposed, however, even assuming that a 120 day disciplinary confinement is sufficient to trigger the protections of the Fourteenth Amendment. The fact that prison officials exercised their judgment to treat the matter as a Tier III violation in and of itself does not implicate any constitutional deprivation, provided the decision was not motivated by retaliatory animus.[FN18]

> **FN18.** Plaintiff suggests that the elevation in seriousness of the disciplinary proceedings was motivated by retaliatory animus. Plaintiff does not, however, link that retaliation to any specific protected activity, nor does he offer any proof, in opposition to defendants' summary judgment motion, to support a nexus between his protected activity and a decision to treat the charge that he assaulted a fellow inmate as a Tier III offense. Moreover, as defendants note, the reviewing officer apparently responsible for determining the level offense was Corrections Lieutenant D'abrogio, who is not named as a defendant in this action. Any potential retaliation associated with that elevation is thus subject to dismissal as against the defendants in this action based upon the lack of their personal involvement. *Jackson v. Johnson,* 15 F.Supp.2d 341, 365-66 (S.D.N.Y.1998).

**\*14** Plaintiff's evidentiary claims arising from the January 29, 1999 determination are similarly lacking in support from the record.[FN19] Plaintiff's claim of fabricated

evidence appears to address an unusual incident report in which he was accused of utilizing a weapon. Complaint (Dkt. No. 1) ¶ 79; *see also* Nepveu Decl. (Dkt. No. 97) Exh. G, at 7. The record reflects, however, that the evidence relied upon by the hearing officer in finding plaintiff guilty of assaulting a fellow inmate by striking him in the face with his hand did not include the unusual incident report. *See id.* at Exh. F, at 3. Plaintiff also complains regarding alleged discrepancies in log books regarding whether he punched another inmate in the face. Nepveu Decl. (Dkt. No. 97) Exh. G, at 3-4. Plaintiff does not indicate, however, how this undermines the outcome of the hearing, particularly in light of his refusal to deny that he did in fact punch a fellow inmate. *See id* . Exh. G, at 14-15.

> **FN19.** The determination stemming from the January 26, 1999 Tier III hearing was administratively reversed, based upon the hearing officer's failure to properly document an inmate's refusal to testify at the hearing as requested by the plaintiff. Nepveu Decl. (Dkt. No. 97) Exh. H.

In further support of his due process challenge with regard to that hearing, plaintiff argues that the hearing officer improperly denied his request to take the depositions of Donald Selsky, the DOCS Director of Inmate Discipline/Special Housing; Anthony Antonucci, the DOCS General Counsel; a psychiatrist; and a witness who was not present during the incident. *See* Nepveu Decl. (Dkt. No. 97) Exh. F, at 14-15 & Exh. G, at 6-7, 18, 30. The request that the hearing officer require the production of each of those individuals as witnesses was properly denied, however, based upon his finding that they did not witness the relevant events, and consequently their testimony would be irrelevant to the charges at issue. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

Two other witnesses requested by the plaintiff, including the inmate he was charged with assaulting and another prisoner present during the incident, refused to testify at his hearing, and signed forms to that effect. Nepveu Decl. (Dkt. No. 97) Exh. F, at 12-13. Generally speaking, a hearing officer's determination not to call a witness to testify after his or her refusal to appear willingly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:06-cv-00401-FJS-DEP   Document 54   Filed 08/31/11   Page 216 of 413

Page 14

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

"will not constitute a violation of the prisoner's constitutional rights." *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993); *Shell v. Brzezniak,* 365 F.Supp.2d 362, 377 (W.D.N.Y.2005) (citing *Silva* ). In the absence of proof that the witness's refusal to testify was directly attributable to intimidation on the part of prison officials-a circumstance which is not supported or even suggested by the record in this case-the hearing officer's failure to compel the reluctant inmate to testify during this hearing did not violate Plaintiff's constitutional rights. *See Silva,* 992 F.2d at 22.

5. *July 29, 1999 Determination*

The last disciplinary proceeding challenged by the plaintiff is that which was completed on July 29, 1999, involving his alleged assault on staff. Complaint (Dkt. No. 1) ¶¶ 165-66, 178. Plaintiff maintains that the finding of guilt in connection with those charges was not supported by the evidence in the record. Complaint (Dkt. No. 1) ¶ 178.

**\*15** At the conclusion of the hearing on July 29, 1999, hearing officer Decker recited the evidence forming the basis for his finding of guilt, including the misbehavior report; the testimony of Corrections Officer Freer, who authored the report; photographs of Corrections Officer Freer, offered to corroborate that he had suffered injuries consistent with having been kicked in the ribs-one of the allegations against the plaintiff; and a nurse's testimony regarding the corrections officer's injuries. Nepveu Decl. (Dkt. No. 97) Exhs. P, at 4, 23 & Q, at 94-95. The hearing officer acknowledged that at the time of the incident staff at the facility's SHU failed to follow established escort procedures, and noted the difficulty in evaluating the case in light of the conflicting accounts offered by Rossi and the corrections officer involved. *Id.* The hearing officer ultimately concluded, however, that the evidence supported the charge of assault upon staff, adding that such conduct is unacceptable and should not be tolerated particularly in a maximum security SHU, but saw fit to mitigate the penalty in light of the failure of prison officials to follow proper procedure. *Id.* Having carefully reviewed the record regarding that hearing, I find that the hearing result was supported by some evidence.

6. *False Misbehavior Reports*

Plaintiff also complains of the issuance of two allegedly false misbehavior reports, authored by Corrections Officer McGuire, regarding cleaning supplies and the flooding of his cell. Complaint (Dkt. No. 1) ¶ 85. Plaintiff alleges that the disciplinary charges set forth in those reports, which were eventually dismissed, were false. To the extent that plaintiff asserts a claim based upon the fabrication of charges set forth in those misbehavior reports, such allegations do not rise to a level of constitutional significance. *Boddie,* 105 F.3d at 862; *Franco,* 854 F.2d at 587-89. And, since those misbehavior reports were ultimately dismissed and consequently did not result in the deprivation of any cognizable liberty interest, the allegations regarding their falsity do not support a constitutional claim. *Benton v. Keane,* 921 F.Supp. 1078, 1078-79 (S.D.N.Y.1996).

7. *Miscellaneous Misbehavior Reports*

In addition to the disciplinary charges referred to above, Plaintiff's complaint also mentions in passing other misbehavior reports, including one issued some time after November 3, 1998, based upon Rossi's alleged refusal to provide a urine sample, and another on May 26, 1999 for his refusal to surrender handcuffs. Complaint (Dkt. No. 1) ¶¶ 67, 137. Because plaintiff provides no further details, and does not make any specific allegations of constitutional violations resulting from the issuance of those misbehavior reports, I recommend dismissal of any claims associated with them. *Boddie,* 105 F.3d at 862.

D. *Retaliation*

Plaintiff's complaint alleges that the cancellation of a scheduled appointment for dental cleaning in November of 1998 was motivated by unlawful retaliation. Citing evidence in the record firmly establishing that the cancellation of the dental appointment was the result of Plaintiff's medical TB hold and established DOCS policy providing that routine medical and dental treatment is not provided to inmates under those circumstances, defendants assert that Plaintiff's retaliation claim is lacking in merit.

**\*16** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. Such claims must also be judged taking into account the reality that, as the Second Circuit has noted-and the complaint in this action illustrates-"claims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse," and are easily incanted but far more difficult to substantiate. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

In their motion, defendants assert that consistent with the DOCS TB policy in place at the time, and in order to avoid the possibility of transmission of undetected TB, plaintiff was required to remain in his cell except for recreation, showers, legal visits, and medical and dental care. Nepveu Decl. (Dkt. No. 97) Exh. A. It is true, as plaintiff argues, that the DOCS TB policy cited by the defendants does not specifically state that an inmate on TB medical hold may only receive emergency medical and dental care. *See id.; see also Ramos v. O'Connell,* 28 F.Supp.2d 796 (W.D.N.Y.1998) (noting that DOCS TB policy does not establish parameters governing medical care available to inmates on TB hold and therefore analyzing claim of denial of dental treatment to abscessed wisdom tooth under Eighth Amendment standards.) Accordingly, he argues, the decision to deny him routine dental care was "arbitrary". Plaintiff's mere disagreement

with a decision of this nature, however, does not alone support a showing of a constitutional retaliation violation. *Soto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at *1 (S.D.N.Y. June 4, 2003). A review of the documentation associated with the denial of dental care to the plaintiff reflects that it was a decision made out of concern that dental staff not be exposed to the possibility of TB infection for a non-emergency dental visit. Nepveu Decl. (Dkt. No. 97) Exhs. N, O. In the face of this, plaintiff has submitted no evidence of any pretext, nor does evidence in the record suggest that the decision was not motivated by legitimate penological concerns, but instead out of retaliatory animus. Accordingly, I recommend dismissal of Plaintiff's retaliation claims regarding the denial of dental treatment.

E. *Medical Indifference*

**\*17** Plaintiff's complaint asserts that his Eighth Amendment right to remain free from punishment that is cruel and unusual was violated when medical boots were taken from him following an assault on staff, which entailed his kicking of Corrections Officer Freer in the ribs. Complaint (Dkt. No. 1) ¶¶ 164-72. Plaintiff maintains that this deprivation represented defendants' deliberate indifference to his serious medical needs.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are "incompatible with the evolving standards of decency that mark the progress of a maturing society."[FN20] *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290 (1976) (citations and internal quotations omitted); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ).

> [FN20.] That amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const. amend. VIII.*

While the Eighth Amendment " 'does not mandate comfortable prisons' ", neither does not tolerate inhumane prison conditions; thus the conditions of an inmate's confinement, including medical care, are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

832, 114 S.Ct. 1970, 1976 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)). To succeed on a claim alleging that prison conditions, including but not limited to medical care, violate the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977 (citations and internal quotations omitted); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (also citing, *inter alia, Wilson* ).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "-since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted).

*\*18* Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

It is well established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). Diagnostic techniques and treatments are a "classic example of a matter for medical judgment", and medical staff is vested with broad discretion to determine what method of diagnosis and/or treatment to provide its patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

In their motion, defendants assert that plaintiff has failed to establish the existence of a serious medical need of constitutional proportions. Having carefully reviewed the record in the light of Plaintiff's position to the motion, I can find no evidence that plaintiff suffered from a foot problem producing or likely to produce "death, degeneration, or extreme pain". *Chatin v. Artuz,* No. 95 Civ. 7994, 1999 WL 587885, at *3 (S.D.N.Y. Aug. 4, 1999). I am also unable to conclude that defendants acted with deliberate indifference to any such need, since when Plaintiff's medical boots were taken away he was provided with substitute orthotics for his sneakers, with a physician noting that they were adequate to address Plaintiff's medical needs while incarcerated in the SHU, where he was not required to do any extended walking. *See* Nepveu Decl. (Dkt. No. 97) Exh. S, at 5. I therefore recommend dismissal of Plaintiff's deliberate indifference claim as a matter of law, based upon his failure to offer proof of either the existence of a constitutionally significant serious medical need or deliberate indifference on the part of any named defendant to such a need.

G. *Personal Involvement*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

The final element of defendants' motion seeks dismissal of Plaintiff's claims against Commissioner Goord, based upon lack of personal involvement. In support of that request defendants argue that the sole reference in Plaintiff's complaint to the Commissioner surrounds his alleged failure to answer letters sent to him by Rossi regarding the various matters addressed in his complaint. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 76, 105, 134.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*19** A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

It is true, as defendants argue, that the mere sending of unanswered letters to the Commissioner does not implicate his personal involvement in the constitutional violations detailed in those letters. *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989)). Plaintiff's complaint goes further, however, asserting that on at least one occasion Commissioner Goord affirmatively acted in denying a request made by him. *See* Complaint (Dkt. No. 1) ¶ 41. Such an allegation, if substantiated, could implicate the Commissioner in the particular violation referenced in the letter. *Walker v. Pataro,* No. 99Civ.4607, 2002 WL 664040, at \*12-\*14 (S.D.N.Y. Apr. 23, 2002). That letter, however, relates to Plaintiff's religious objections to his TB testing. Since that is an issue which no longer remains in the case, I recommend that defendants' motion for summary judgment dismissing Plaintiff's complaint with respect to Commissioner Goord be granted.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint challenges the issuance of several misbehavior reports and resulting disciplinary proceedings against him. Because those various proceedings either do not implicate the deprivation of a constitutionally significant liberty interest and/or plaintiff is barred by collateral estoppel from relitigating those claims, based upon his unsuccessful state court challenges to those proceedings, I recommend dismissal of Plaintiff's procedural due process claims.

Plaintiff has also asserted that his procedural process rights were violated when he was placed in medical keeplock confinement for one year for refusing to be tested for TB. Because that confinement was accompanied by notice of the governing DOCS policy and adequate opportunity for plaintiff to be heard, his due process rights were not infringed as a result of the TB hold.

Plaintiff's medical indifference claims related to the taking of his boots, following an incident involving his kicking of a corrections officer, does not implicate a serious medical need, nor does it stem from any deliberate indifference to such a medical need. I therefore recommend dismissal of that claim as well. I further recommend dismissal of all claims in this action against defendant Goord, based upon lack of personal involvement.

**\*20** Based upon the foregoing, I recommend

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)

(Cite as: 2006 WL 2811505 (N.D.N.Y.))

dismissal of all claims asserted by the plaintiff in his diverse and multi-faceted complaint with the exception of those related to his allegation that his food was tampered with and he was denied nutritionally adequate meals between April 5, 1999 and May 10, 1999, involving allegations made in paragraphs 117, 130-33 and 135 of Plaintiff's complaint.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for partial summary judgment dismissing portions of Plaintiff's claims be GRANTED. Based upon this recommendation, if accepted, the causes of action which will remain in this case for trial include Plaintiff's food tampering and insufficient nutritional intake claims, implicating only defendants Lutz, Decker and Annetts.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED, that the Clerk serve a copy of this report and recommendation on the plaintiff by regular mail and defendants' counsel via electronic means.

IT IS SO ORDERED.

N.D.N.Y.,2006.

Rossi v. Goord
Not Reported in F.Supp.2d, 2006 WL 2811505 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Prince PILGRIM, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional
Facility, Defendants.

Civ. No. 9:07-CV-1001 (GLS/RFT).

March 18, 2010.

Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendant.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Prince Pilgrim has filed this civil
rights action, pursuant to 42 U.S.C. § 1983 and the
Religious Land Use and Institutionalized Persons Act
("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.*, alleging that
Defendant Dale Artus, Superintendent of Clinton
Correctional Facility, violated his constitutional and
statutory rights to freely exercise his religious beliefs. Dkt.
No. 1, Compl. The crux of Plaintiff's religious expression
claim is that he was repeatedly punished for exercising his
sincerely held religious beliefs, which require him to wear
dreadlocks, because he is a member of the Nation of Islam
("NOI") and Department of Correctional Services'
("DOCS") policy allows only those of the Rastafarian faith
to wear dreadlocks. *See generally id.*

In addition, Plaintiff alleges that Artus failed to
protect him from unconstitutional retaliation, his due
process rights were violated during the course of several
disciplinary hearings, and the penalties imposed as a result
of his disciplinary convictions constituted "cruel and
unusual punishment" in violation of the Eighth
Amendment. *Id.*

Presently before the Court for a
Report-Recommendation is Defendant's Motion for
Summary Judgment. Dkt. No. 36. Since the filing of
Defendant's Motion, the Court has granted Plaintiff four
separate extensions of time to file a response in opposition
to the Motion. *See* Dkt. No. 46, Order, dated Aug. 20,
2009, at p. 1 (cataloguing prior extensions). The final
extension granted Plaintiff until September 4, 2009, to file
a response, and warned Plaintiff that *"failure to oppose
Defendant's Motion will result in this Court accepting
the facts set forth by Defendant as true." Id.* at p. 3
(emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)).
Despite this Court's leniency and warnings, Plaintiff's
Response [FN1] was not received until September 10, 2009,
six days after the deadline passed. Dkt. No. 47, Pl.'s Resp.
in Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure
to meet the extended deadline, because he is proceeding
*pro se,* we will nonetheless consider his Response and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Exhibits attached thereto in issuing a recommendation on Defendant's Motion.

> FN1. Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

For the reasons that follow, we recommend that Defendant's Motion be **granted** in part and **denied** in part.

### I. FACTS NOT IN DISPUTE

The following facts were derived mainly from the Defendant's Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional and statutory violations.

**\*2** Plaintiff was received into DOCS' custody on or about November 4, 1992. Dkt. No. 36-2, Def.'s 7.1 Statement, at ¶ 1. At all times relevant to the Complaint, and continuing until the present, Defendant Dale Artus has been the Superintendent of Clinton Correctional Facility ("Clinton"), where Plaintiff was confined from April 1, 2005 through February 5, 2009. *Id.* at ¶ 2. Plaintiff is currently incarcerated at Attica Correctional Facility. *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks. *Id.* at ¶ 18; Dkt. No. 47-1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14. DOCS' hair policy is based on DOCS Directive # 4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives. Dkt. No. 36-6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59. DOCS Directive # 4914 allows inmates to wear long hair [FN2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks. *Id.,* Ex. B, DOCS Directive # 4914(III)(B)(2)(a)-(d). However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.,* Ex. C, CORC Decision, dated May 8, 2003.

> FN2. DOCS Directive # 4914 defines "long" as "below shoulder length." Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2) (b).

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back. *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17-18. C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10). Def.'s 7.1 Statement at ¶ 19. At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock,[FN3] with loss of commissary, package and phone privileges. *Id.* at ¶ 20. During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue. *Id.* at ¶¶ 40-41. However, Plaintiff was allowed to call other witnesses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

including two C.O.'s and another inmate. *Id.* at ¶ 42. Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision. *Id.* at ¶ 21.

> FN3. Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek-Co,* 2009 WL 211371, at *4 n. 6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order and a prior hearing disposition. *Id.* at ¶¶ 22-23; Pl.'s Decl. at ¶ 21. A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181 .10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23-24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

**\*3** Also on February 20, 2007, Plaintiff filed a

grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43-44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46-47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35-36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36-37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining that DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles .... This issue has been addressed in numerous CORC decisions .... Based on DOCS established policy and CORC decisions, no compelling evidence has been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52. Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision. *Id.* at ¶ 53.

**\*4** Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences. *Id.* at ¶ 54; Compl. at ¶ 4. On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action. Def.'s 7.1 Statement at ¶ 56.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party

bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## B. Personal Involvement

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

**\*5** Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him. Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken against him. Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal." *Id.* at 145. Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf. The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

Artus.[FN4] *See* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A-U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

> FN4. Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007. As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth. *See generally,* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs. Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing. *See also* Compl. at ¶ 1 (stating that Plaintiff filed *"three appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus"* (emphasis added)).

**\*6** However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (quoting *Harnett v. Barr,* 538 F.Supp.2d 511, 524-25 (N.D.N.Y.2008)); *cf. Charles v. New York State Dep't of Corr. Servs.,* 2009 WL 890548, at \*6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official ***receives and acts on*** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis in original) (citation omitted)). Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v.*

*Wurzberger,* 2006 WL 1285627, at \*2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action. Artus Decl. at ¶ 13. The documentary record confirms that contention. Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings. *Id.,* Exs. B-D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007. In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5. Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[FN5] were all responded to by Artus's subordinate staff members. Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006; Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec. J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06 grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07 grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q-S, Interdep't Comm'ns, dated July 5, Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor T. Brousseau).

> FN5. Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007. Pl.'s Aff. at p. 5. The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point. Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007. Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

**\*7** Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception of his RLUIPA and First Amendment religious expression claims,[FN6] be **dismissed** for lack of personal involvement. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the referral of appeals down the chain of command does not create personal involvement on the part of the referee); *see also Brown v. Goord,* 2007 WL 607396, at * 10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved); *Cruz v. Edwards,* 1985 WL 467, at *4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

FN6. We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal involvement, we would still find all of his constitutional claims (again with

the notable exception of his First Amendment religious expression claim) to be without merit.

a. *Due Process*

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

b. *Retaliation*

**\*8** Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted retribution for grievances he filed and that Artus failed to protect him from such reprisals. Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)

(citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.*

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

**\*9** In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl ., Exs. B-E, Disciplinary Packets for MR's 1-4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a

valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

c. *Cruel and Unusual Punishment*

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods.[FN7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual punishment. *See Parker v. Peek-Co,* 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("It is well established ... that placement in keeplock confinement under the conditions normally associated with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (citing cases). Therefore, it is recommended that this claim

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

be **dismissed** as a matter of law.

> FN7. Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See* *Lewis v. Casey,* 518 U.S. 343, 353 (1996).

**C. RLUIPA and First Amendment Claims**

*1. Merits of Plaintiff's Claims*

**\*10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion." [FN8] *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). RLUIPA provides that

> FN8. RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment. "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord,* 2007 WL 4560597, at \*5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v.. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. 482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened. Plaintiff is a registered NOI member. The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible. Pl.'s Decl. at ¶ 43. As Plaintiff explains, his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

refusal to cut his hair is rooted in the spiritual understanding that he is *"one"* with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:

A. Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH. But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."

B. Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id.* at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs. Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S .C. § 2000cc-5(7)(A). Thus, the question of whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite. However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13. On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993. Dkt. No.

36-3, Pl.'s Dep. at p. 12. In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity. Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

**\*11** RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717-718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ). In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment. In *Amaker v. Goord,* 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice." 2007 WL 4560596, at *6; [FN9] *see also Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

FN9. The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.,* 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32-33; Dkt. No. 36-8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7-21; Leonard Decl. at ¶¶ 48-57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. *See Cutter v. Wilkinson,* 544 U.S. at 725 n. 13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive # 4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners. Plaintiff asserts that the least restrictive means of ensuring security is already provided in DOCS Directive # 4914(III)(B)(2)(e), which states that

**\*12** [a]n inmate may be subjected to a hair search when

there is reason to believe that contraband may be discovered by such a search. An inmate may be subjected to such search at any time that a pat frisk, strip search, or strip frisk is being conducted. Consistent with Directive # 4910, during a pat frisk, an inmate will be required to run fingers through [his] hair. During a strip search, an inmate may be subjected to an inspection of his or her hair. During a strip frisk, an inmate will run his or her hands through the hair.

*Id.*

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein." LeClaire Decl. at ¶ 18. LeClaire further argues that if an inmate need only declare a personally held religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no ability to restrict the number of inmates wearing dreadlocks. *Id.* at ¶ 19. The Court does not overlook the weight of these arguments nor the deference courts must accord prison officials when analyzing their policies. However, we question the assumption that permitting dreadlocks to be worn by inmates whose sincerely held religious beliefs require them would open the proverbial floodgates. Under DOCS' current policy, any nefariously motivated inmate need only register himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence presented to the Court that such policy has resulted in a substantial increase in the Rastafarian/dreadlock-wearing inmate population. Leonard Decl. at ¶ 63; *see also* Artus Decl., Ex. D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July 1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC Decision, dated Feb. 9, 2005 (ruling that "staff have correctly directed the grievant to remove his dreadlocks, or change

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See Amaker v. Goord et al.,* 2007 WL 4560595.

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (citations omitted).

**\*13** The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOC S' policy substantially burdens his religious beliefs. *See Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006).[FN10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id.* at 89-91 (citations omitted).

FN10. In *Salahuddin,* the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 n. 5 (2d Cir.2006). *See also Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

DOCS has a compelling and legitimate penological interest in maintaining prison security. The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest. The other remaining three factors, however, weigh against Defendant. On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks. As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks. For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles. Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged. *See Benjamin v. Coughlin,* 905 F.2d 571, 576-77 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990) (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have "more than a de minimis effect on valid penological interests"); *see also Francis v. Keane,* 888 F.Supp. 568, 577 (S.D.N.Y.1995) (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord,* 2007 WL 4560595.

### 2. *Personal Involvement*

**\*14** Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims.[FN11] *See Joseph v. Fischer,* 2009 WL 3321011, at \*18 (S.D.N.Y. Oct. 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* 2009 WL 3199520, at \*9 (N.D.N.Y. Sept. 30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at \*2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at \*3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* 2008 WL 4185945, at \*3 (W.D.Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law,"

42 U.S.C. § 2000cc-5(4)(A). Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

FN11. The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates. Artus Decl. at ¶ 13. Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging. *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive # 4914 and relevant CORC determinations, which have the effect of Directives). Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims.[FN12] *See Zuk v. Gonzalez,* 2007 WL 2163186, at \*2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte,* in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker,* 2006 WL 5893295, at \*7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim

Page 15

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

brought by a *pro se* plaintiff); *Ciancio v. Gorski,* 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999) (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

FN12. Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility. Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility."). However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

### 3. *Monetary Damages under RLUIPA*

**\*15** Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation. Def.'s Mem. of Law at p. 29. RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it. *See Bock v. Gold,* 2008 WL 345890, at *5-7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord,* 571 F.Supp.2d 477, 506-08 (S.D.N.Y.2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities.FN13 Looking to the Eleventh Amendment's protection of the states' sovereign immunity,

courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord,* 571 F.Supp.2d at 509 (" 'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.' "(quoting *Lane v. Pena,* 518 U.S. 187, 192 (1996)); *see also Bock v. Gold,* 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.,* 579 F.Supp.2d 249, 258-63 (D.Conn.2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution.FN14 *See Pugh v. Goord,* 571 F.Supp.2d at 506-07; *Vega v. Lantz,* 2009 WL 3157586, at *4 (D.Conn. Sept. 25, 2009) (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328 (5th Cir.2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz,* 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F.Supp.2d at 506-07 (citing *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the canon of constitutional avoidance FN15 in concluding that RLUIPA does not permit such causes of action. *See Bock v. Gold,* 2008 WL 345890, at *6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**FN13.** Research has not revealed any district court in this Circuit that has concluded otherwise.

**FN14.** Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 329 n. 34 (5th Cir.2009); *Smith v. Allen,* 502 F.3d 1255, 1274 n. 9 (11th Cir.2007). We agree with those courts that because "there is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See Sossamon v. Lone Star State of Texas,* 560 F.3d at 329 n. 34.

**FN15.** "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold,* 2008 WL 345890, at *6.

**\*16** Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities. *See Pugh v. Goord,* 571 F.Supp.2d at 507 (citing cases); *see also Sweeper v. Taylor,* 2009 WL 815911, at *9 (N.D.N .Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA). Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed.** However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

### D. Qualified Immunity

Defendant asserts the affirmative defense of qualified immunity. Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted).

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g., Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ( "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities ... and it protects only against claims for damages, not against claims for equitable relief."); *see also Rodriguez v. Phillips,* 66 F.3d 470, 481 (2d Cir.1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

**\*17** Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin,* 905 F.2d at 576-77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See Redd v. Wright,* 597 F.3d 532, 2010 WL 774304, at *4 (2d Cir.2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity" for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See Rodriguez v. Phillips,* 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See Farid v. Smith,* 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report-Recommendation; and it is further

**RECOMMENDED,** that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED,** that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

**\*18 RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

it is further

**RECOMMENDED,** that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED,** that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.

Pilgrim v. Artus

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Rodney JOSEPH, Plaintiff,
v.
Brian FISCHER, Commissioner of N.Y.S.D.O.C.S., Jane Doe (a.k.a.Ms. Calero), Commissioner's Hearing Officer, Luis R. Marshall, Superintendent of Sing Sing Corr. Fac., William A. Lee, Deputy Superintendent of Security, Keith Dubray, Acting Director of Special Housing Unit, John Doe (a.k.a.MR. N. Ingenito), Correctional Lieutenant, Jane Doe (a.k.a.MS. C. Cooper), Correctional Officer, John Doe (a.k.a. MR. A Orrico), Correctional Sergeant, James Conway, Superintendent of Attica Corr. Fac., Defendants.
No. 08 Civ. 2824(PKC)(AJP).

Oct. 8, 2009.
*MEMORANDUM AND ORDER*

[P. KEVIN CASTEL](), District Judge.

**\*1** Plaintiff Rodney Joseph brings this action *pro se* under [42 U.S.C. § 1983]() and the Religious Land Use and Institutionalized Person Act ("RLUIPA"), codified at [42 U.S.C. § 2000cc *et seq.*,]() seeking damages for violations of his rights under the United States Constitution and under RLUIPA, and other relief. Defendants move under [Rule 56, Fed.R.Civ.P.](), for summary judgment in their favor on all of plaintiff's claims. Construing plaintiff's pleadings generously, plaintiff, an inmate, asserts principally the following claims: (1) a misbehavior report was issued to him in retaliation for the actions of the NAACP and prior complaints he made; (2) plaintiff was denied due process of law at a hearing on the charges contained in the misbehavior report; and (3) certain religious materials were unlawfully confiscated from him. Plaintiff asserts other claims which are discussed in the course of this

memorandum. Also, he asserts that various defendants had different roles with respect to the claims, including supervisory personnel who failed to act or correct the actions of others. For the reasons explained below, defendants' motion is granted.

BACKGROUND

I. *Facts*

In considering the motion, the Court accepts non-movant Joseph's version of the facts, as set forth in his verified complaint, dated February 1, 2008, (the "Complaint"), the exhibits submitted by Joseph in opposition to defendants' motion ("Plaintiff's Exh. ___"), and any facts proffered by defendants which Joseph does not dispute.[FN1] The Court draws all reasonable inferences in favor of plaintiff.

> FN1. "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under [Rule 56(e) (1)]()." *[Colon v. Coughlin,]()* [58 F.3d 865, 872 (2d Cir.1995).]() [Rule 56(e)]() requires that affidavits "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

Plaintiff is an inmate currently incarcerated by the New York State Department of Correctional Services ("DOCS") at the Attica Correctional Facility ("Attica"). (Inmate Transfer History attached as Exhibit M to the Declaration of Neil Shevlin (the "Shevlin Decl.") at RJ 369.) On or about February 23, 2007, while plaintiff was an inmate at Sing Sing Correctional Facility ("Sing Sing"), plaintiff filed grievance number SS-42482-07 (the "Grievance") with the Inmate Grievance Resolution Committee ("IGRC"). (Grievance No. SS-42482-07 attached as Exhibit D to Shevlin Decl. at RJ 384-85.) In the Grievance, Joseph claimed that on February 18, 2007, Corrections Officer Carrabello, a non-party, denied him "access to the gym, with the NAACP Organization's fund-raiser." (*Id.* at 384) Joseph claimed that this was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

done in retaliation for prior complaints he had filed. (*Id.*) Joseph's Grievance described ongoing retaliation from corrections officers, primarily relating to restrictions placed by officers on the NAACP's efforts to sell greeting cards. (*Id.*) The Grievance also alleged that on February 12, 2007, Corrections Officer Carrabello conducted a pat frisk of plaintiff and told plaintiff: "You and your friends better watch what the fuck you say in your complaints, because you ain't see[n] assaults and attacks yet." (*Id.; see also* Plaintiff's Exh. A, Affidavit of Rodney Joseph, dated February 13, 2007.) None of the defendants in this case were mentioned in the Grievance.

### A. The Misbehavior Report

  **\*2** On March 10, 2007, at approximately 7:30 a.m., defendant Lt. Neil Ingenito ordered defendant Corrections Officer Carmen Cooper to bring plaintiff to the Housing Block A Sergeant's office so that Ingenito could interview plaintiff about the Grievance. (Declaration of Neil Ingenito (the "Ingemto Deck") ¶ 3; Declaration of Carmen Cooper (the "Cooper Deck") ¶ 4; Plaintiff Statements [sic] Pursuant to Local Rule 56.1(b) ("Plaintiff's 56.1 Statement") ¶ 13.) When plaintiff was brought to the sergeant's office, he was frisked, either by Cooper or by Corrections Officer Bonano, a non-party. (*Compare* Cooper Decl. ¶ 5 (stating that Bonano conducted the pat frisk), *with* Memorandum from Cooper contained in the Misbehavior Report Packed attached as Exhibit E to the Shevlin Decl. at RJ 625 ("I pat frisked [Rodney Joseph] prior to an interview with Lt. N. Ingenito").) During this pat frisk the officers found Joseph's wallet, which Cooper then searched. (Cooper Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 15-16.) Cooper found a note in Joseph's wallet (the "Note") which she read and handed to defendant Sgt. Alfonso Orrico. (Cooper Decl. ¶ 5; Plaintiff's 56.1 Statement ¶¶ 15-16; *see also* Declaration of Alfonso Orrico (the "Orrico Deck") ¶ 4; Plaintiff's 56.1 Statement ¶ 16.) Orrico then handed the Note to Lt. Ingenito, who was interviewing plaintiff. (Orrico Decl. ¶ 5; Ingenito Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 17.)

  Plaintiff admitted to Ingenito that he possessed the Note, but the parties dispute whether plaintiff told Ingenito who sent the Note. (Ingenito Decl. ¶ 5; Plaintiff's 56.1 Statement" ¶ 17.) It is undisputed, however, that the Note stated, in part:

This is a reminder of what I would like for you to do for me.

(1) Give these two packs to Divine G.

(2) Give these 15 stamps to Divine G and tell him they go to the guy in Marcassi's (sp?) office who sold me the black socks in the locker.

(3) Look in the file cabinet, in the card book that is upside down, find the card in the front and read the note.

  (Shevlin Decl. Exh. E at RJ 509.) The Note was signed by someone named "Shakim." (*Id.*)

  Plaintiff then provided defendant Ingenito with the combinations to the several locked filed cabinets located in Sing Sing's NAACP office. (Ingenito Decl. ¶ 6; Complaint § V.) At approximately 8:15 a.m., Ingenito and several other corrections personnel searched the NAACP office. (Ingenito Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 20.) That search yielded 19 categories of material the officers considered contraband or items that posed a security threat, all of which were confiscated. (Ingenito Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 20.) The confiscated items included 1136 postage stamps (worth approximately $440), an atlas containing at least one map of New York State and a used color ink cartridge. (Ingenito Decl. ¶ 8; Complaint § V.)

  At approximately the same time the search was conducted, plaintiff was attending an event in Sing Sing's chapel. (Complaint § V.) Ingenito ordered Orrico to go to the chapel and escort plaintiff to his cell block. (Ingenito Decl. ¶ 10; Orrico Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 24.) En route from the chapel back to plaintiff's cell block, Orrico told plaintiff that contraband was found in the NAACP office and Orrico asked plaintiff if he wanted to make a statement about the contraband. (Orrico Decl. ¶ 7; Complaint § V.) Plaintiff declined. (Orrico Decl. ¶ 7; Complaint § V.) Upon reaching plaintiff's cell block, Orrico searched plaintiff's net bag and found an undated letter from the plaintiff to the American Rehabilitation Ministries (the "Letter"). (Orrico Decl. ¶ 8; Plaintiff's 56.1

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

Statement ¶ 25.)

**\*3** The Letter stated:

I am writing to find out more on purchasing a card order from your Ministry. Presently, the Moorish Science Temple of America is an established religious group here in Sing Sing Correctional Facility. We look for many ways to assist the prison population in any way that we can.

At present, we do not have the (cash) funds to purchase the cards to give population. So we would like to know if you would allow us to send stamps in place of a check, or if it is possible that somebody from the outside can send the check for us.

(Shevlin Decl. Exh. E at RJ 142.) The Letter was signed "Min. R. Joseph." (*Id.*)

Orrico then issued to plaintiff an Inmate Misbehavior Report, dated March 10, 2007 (the "Misbehavior Report"). (Shevlin Decl. Exh. E at RJ 506-07.) The Misbehavior Report charged plaintiff with four rules violations: (1) 103.20-unauthorized solicitation to a business; (2) 113.15-unauthorized exchange; (3)113.16-excessive stamps and unauthorized valuable property; and (4) 114.10-smuggling or soliciting others to smuggle. (*Id.*) The Misbehavior Report was signed by Orrico and endorsed by Cooper as an employee-witness. (*Id.*)

That same day, March 10, 2007, pending further investigation, plaintiff was placed on keeplock. Defendants claim that plaintiff was in keeplock for 72 hours, and was released on March 13, 2007. (Ingenito Decl. ¶ 16; Orrico Decl. ¶ 14; Keeplock Pending Investigation Log attached as Exhibit J to Shevlin Decl. at RJ 649.) Plaintiff claims that he was placed in keeplock for six days and was not released until March 16, 2007. (Transcript of Tier III Hearing, dated April 1, 3, 10 and 11, 2007, attached as Exhibit F to the Shevlin Decl. (the "Hearing Tr.") at RJ 176.) I assume the truth of plaintiff's assertion for the purposes of this motion.

B. *Plaintiff's Disciplinary Hearing*

Between March 30 and April 11, 2007, defendant Hearing Officer Ana Calero conducted a Tier III Hearing in connection with the Misbehavior Report. (Declaration of Ana Calero (the "Calero Decl.") ¶ 3; Plaintiff's 56.1 Statement ¶ 32.) At the beginning of the hearing, Calero informed the plaintiff that he would be able to call witnesses and "present any relevant oral or written evidence." (Calero Decl. ¶ 5; Hearing Tr. at RJ 175-76; Plaintiff's 56.1 Statement ¶ 33.) Calero also asked plaintiff for a list of witnesses he would like to call during the hearing. (Hearing Tr. at RJ 177.) Plaintiff identified three DOCS employees, Orrico, Cooper and Ingenito, each of whom he was permitted to call. (*Id.* at RJ 177-78.) Plaintiff also identified several additional individuals; Rev. Samboni, and inmates Murry, Torres, Merchinson, Whitfield and Stuart. (*Id.* at RJ 178, 183-85.) He was permitted to call Rev. Samboni. (*Id.* at RJ 253-74.) <sup>FN2</sup> Calero reviewed the allegations made against plaintiff as set forth in the Misbehavior Report and read into the record the Note, the Letter and a memorandum from Ingenito listing the items taken from the NAACP office. (Calero Decl. ¶¶ 7-8; Hearing Tr. at RJ 186-91.)

> FN2. The reasons for excluding the testimony of witnesses and, indeed, all other claims of an inability to present evidence or cross-examine witnesses will be discussed in the Court's analysis of the due process claim.

**\*4** At the hearing, Calero questioned plaintiff about the charges against him and allowed him to tell his version of the events before calling any witnesses. (Hearing Tr. at RJ 191-219; Plaintiff's 56.1 Statement ¶ 37.) Plaintiff admitted that the Note was in his wallet (Hearing Tr. at RJ 188), that the Letter to the American Rehabilitation Ministries was his and bore his signature (*Id.* at RJ 192), and that he knew about most of the items confiscated from the NAACP office before the office was searched, including the atlas containing at least one map of New York, the used color ink cartridge, and that there were a number of stamps in the NAACP office. (*Id.* at RJ 205-12.)

Calero then called as witnesses the DOCS employees requested by plaintiff and called Rev. Samboni. (*Id.* RJ 220-51, 253-74, 291-315, 341-50). In addition, Calero

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

called as witnesses an Imam working at Sing Sing (*id.* at RJ 275-87), and Mr. Folsom, the NAACP staff advisor (*Id.* 335-41.) Plaintiff was allowed to question the witnesses, however, Calero did not allow plaintiff to ask some questions which she believed were immaterial or irrelevant. (Calero Decl. ¶ 12.) During the hearing, Officer Calero reviewed the documents plaintiff sought to introduce. Plaintiff was allowed to submit some documents in his defense (Hearing Tr. at RJ 328-31), but Officer Calero did not permit plaintiff to submit others (*e.g., id* at RJ 213-15, 288-89).

At the conclusion of plaintiff's Tier III hearing, Calero found him guilty of all four violations and sentenced him to six months in a Special Housing Unit ("SHU"), with two months suspended. (*Id.* at RJ 357.) Officer Calero also sentenced plaintiff to loss of packages, loss of phone privileges and loss of commissary privileges for six months, with two months suspended. (*Id.* at RJ 357-58.)

It is DOCS' practice that inmates who receive an SHU sentence of 90 days or more are transferred from Sing Sing to the SHU at Upstate Correctional Facility ("Upstate SHU"). (Declaration of William Lee (the "Lee Decl.") ¶ 7; Plaintiff's Rule 56.1 Statement ¶ 46.) Plaintiff entered the Upstate SHU on or about April 11, 2007, and was scheduled to be released on August 11, 2007. (Declaration of Keith Dubray (the "Dubray Decl.") ¶ 7; Inmate Disciplinary History, attached as Exhibit K to the Shevlin Decl. at RJ 1-2). Because of good behavior, plaintiff's SHU incarceration was reduced by 19 days. (Dubray Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 48.) Plaintiff's privileges were restored and he was released on or about July 23, 2007. (Dubray Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 48.) Plaintiff was confined to SHU and had his privileges revoked for 104 days (inclusive of July 23, 2007).

C. *Plaintiff's Appeals*

Defendant Luis Marshall is the Superintendent of Sing Sing and has held that position since January 5, 2007. (Declaration of Luis Marshall (the "Marshall Decl.") ¶ 2.) Plaintiff sent two letters to defendant Marshall, on March 13 and April 4, 2007. (Letter dated March 13, 2007, attached in Exhibit I to the Shevlin Decl. at RJ 97-99; Letter dated April 4, 2007, attached in Exhibit L to the

Shevlin Decl. at RJ 100-01.) Plaintiff also claims that he sent defendant Marshall another letter on April 15, 2007, but neither party has attached a copy of that letter. (Complaint § VII(F)(2)(c).) Plaintiff's March 13, 2007 letter asked Marshall to "intervene so that [plaintiff] may receive a fair and impartial hearing." (Shevlin Decl. Exh. I at RJ 97.) In that letter, plaintiff also stated that:

**\*5** This misbehavior report derived from an interview that I had with Lt. Ingenito on March 10, 2007, whereas a chain of events transpired when I told him that I will write another complaint because memo's [sic] are still not being honored and harassment is continuing by said officers. I guess he did not like me telling him this, since it was my third interview on this one complaint (understandable).

(*Id.*) On April 3, 2007, Marshall responded, "it is noted that you have a Tier III report pending, therefore, your defense should be presented to the hearing officer for consideration. Any evidence or statements in your defense must be turned in at your hearing or submitted" during any subsequent appeal. (Letter dated April 3, 2007, attached in Exhibit I to the Shevlin Decl.)

In the April 4, 2007 letter, plaintiff claimed that he was not receiving a fair and impartial hearing on the Misbehavior Report. (Letter dated April 4, 2007, attached in Exhibit L to the Shevlin Decl. at RJ 100.) Plaintiff then asked that the Misbehavior Report be dismissed "on the grounds that it was rooted in retaliation and written on assumptions not facts." (*Id.*) Plaintiff also stated that "[i]t is because of the grievance complaint that I filed, I am being punished and this is not only wrong, but Unconstitutional. The very fact that Lt. Ingenito re-interviewed me (a 3rd time) in regards to my harassment grievance ... [makes] the retaliatory nature of this entire proceeding ... obvious." (*Id.* at RJ 100-01.)

In response to this letter, defendant William Lee, the Deputy Superintendent for Security at Sing Sing, reviewed the documents generated as part of plaintiff's hearing. (Lee Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 57.) Lee determined that the hearing was conducted properly, refused to reverse the hearing officer's decision and informed the plaintiff that he could appeal the decision. (Lee Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 57.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

Defendant Fischer was Superintendent of Sing Sing from May 4, 2000, through January 1, 2007. (Declaration of Brian Fischer (the "Fischer Decl.") ¶ 2.) On November 28, 2006, the NAACP organization at Sing Sing sent Fischer a letter stating that certain corrections personnel (none of whom are defendants here) had prevented plaintiff and other members of the NAACP from selling greeting cards. (Plaintiff's Exh. K, November 28, 2006 Letter to Brian Fischer.) The letter did not state that this was done in retaliation for anything. (*Id.*) In a second letter to Fischer, which is undated but must have been sent after plaintiff was transferred to Attica, plaintiff complained that he was told the only job assignment he would receive while at Attica was one working the "lawns & grounds or porter." (Plaintiff's Exh. J, Undated Letter to Brian Fischer.) That letter also stated that Program Committee Chairman Roach had "taken it upon himself to give [plaintiff] additional disposition charges without due process." (*Id.*) Fischer never responded to this second letter. (Fischer Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 53.)

**\*6** Fischer is now Commissioner of DOCS, a position he has held since January 2, 2007. (Fischer Decl. ¶ 2.) As Commissioner, Fischer is responsible for reviewing inmate appeals from disciplinary hearings. (Fischer Decl. ¶ 6; Plaintiff's 56.1 Statement ¶ 52.) As was his routine practice, Fischer did not review plaintiff's appeal. (Fischer Decl. ¶ 2; Plaintiff's 56.1 Statement ¶ 52.) He delegated this responsibility to defendant Keith Dubray, the Acting Director of DOCS' Special Housing/Inmate Disciplinary Program. (Fischer Decl. ¶ 2; Plaintiff's 56.1 Statement ¶ 52.)

On June 20, 2007, Acting Director Dubray affirmed Officer Calero's determination. (Appeal Packet attached as Exhibit H to Shevlin Decl. at RJ 3.) In deciding to affirm Officer Calero's determination, Dubray reviewed: (1) Officer Calero's summary of the evidence and her analysis of the case; (2) the Misbehavior Report; (3) the Note found in plaintiff's wallet; (4) the Letter from plaintiff to the American Rehabilitation Ministries; (5) Lt. Ingenito's March 10, 2007 memorandum setting forth the items confiscated from the NAACP office; and (6) the Witness Interview Notice on which Officer Calero listed the witnesses she did not allow plaintiff to call and her reasons

for denying his request. (Dubray Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 47.) Dubray did not listen to the audio tapes of plaintiff s hearing. (Dubray Decl. ¶ 6; Plaintiff's 56.1 Statement ¶ 47.)

D. *Plaintiff's Grievances at Attica*

Upon his completion of time in upstate SHU, plaintiff was transferred to Attica. After plaintiff was transferred to Attica, certain materials were confiscated from him and he was issued a second misbehavior report (the "Second Misbehavior Report") for possessing certain of these materials related to the religious group Nations of Gods and Earths. (Complaint § V; Second Misbehavior Report attached as Exhibit V to the Shevlin Decl. at RJ 700.) The Complaint does not provide details but merely states that at Attica, on or about "August 2, 2007 when the plaintiff was given his property, all of the plaintiff's Religious Material (including his Holy Quran) was confiscated from him, Religious tapes were disposed and a misbehavior report was issued, denying him his Right to Freedom of Religion." (Complaint § IV; *see also* Complaint § V stating that plaintiff "had his Holy Quran along with all of his religious material, tapes and headwear confiscated from him. He was also given another misbehavior report for having said religious material.")

The Second Misbehavior Report was issued to plaintiff on or about August 2, 2007. (Complaint § IV; Shevlin Decl. Exh. V at RJ 700.) At the conclusion of plaintiff's hearing on the Second Misbehavior Report he received a sentence of 30 days confinement, the entirety of which was suspended. (Transcript of Tier II Hearing, dated August 8, 2007, attached as Exhibit W to the Shevlin Decl. at 9:5-8; Plaintiff's 56.1 Statement ¶ 85.)

**\*7** On or about August 17, 2007, plaintiff filed grievance number A-52355-07, in which he alleged that after he arrived in Attica and received his personal property, plaintiff was told that he could not have his religious cassette tapes because he did not have a "radio," (presumably, meaning a tape player). (Grievance No. A-52355-07, attached as Exhibit R to the Shevlin Decl. at RJ 445.) Plaintiff was required to send his tapes to his home. (*Id.*) This grievance was appealed to the Superintendant of Attica, defendant James Conway, who denied the grievance. (Declaration of James Conway (the

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

"Conway Decl.") ¶ 14; Plaintiff's Rule 56.1 Statement ¶ 68.) Plaintiff appealed this decision to the Central Office Review Committee (the "CORC"), the final level of administrative appeal for an inmates grievance, which upheld Conway's determination. (Shevlin Decl. Exh. R at RJ 437.)

On August 17, 2007, plaintiff filed grievance number A-52360-07 in which he stated that on August 15, 2007, he appeared before Attica's Program Committee and was told that he would not be given any "positive job assignments such as clerk, Teacher's Aide etc.," but that he would be allowed to work on the lawns or placed on the waiting list to work as a porter. (Grievance No. A-52360-07, attached as Exhibit O to the Sheviin Decl. at RJ 455.) According to this grievance, plaintiff was denied the job of his choosing because of the first Misbehavior Report. (*Id.*) This grievance was denied by the IGRC. (*Id.* at RJ 453) On August 28, 2007, based on an investigation by Superintendent Conway's staff, Conway affirmed the IGRC's decision. (Conway Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 61.) On August 29, 2007, plaintiff appealed Conway's decision to the CORC, which affirmed the decision. (Conway Decl. ¶ 7; Plaintiff's 56.1 Statement ¶ 61.)

Plaintiff filed three grievances at Attica concerning his religious headwear. Two of these grievances, grievance number A-52987-08, dated January 7, 2008, and a resubmitted grievance also numbered A-52987-08, but dated February 6, 2008, allege that upon his arrival at Attica, plaintiff's religious headwear was placed with his art supplies, and he was told he had to send them home. (Grievance Nos. A-52987-08 attached in Exhibit T to the Sheviin Decl. at RJ 465-66.) The denials of these grievances were affirmed by CORC on April 23, 2008. (Sheviin Decl. Exh. T at RJ 456; Plaintiff's 56.1 Statement ¶ 77.)

In a third grievance filed by plaintiff-grievance number A-52357-07-plaintiff complained that he "was informed by Correctional Staff that one of my religious head wear could not be worn." (Grievance No. A-52357-07 attached as Exhibit S to Sheviin Decl. at RJ 436.) That grievance does not state that plaintiff's headwear was confiscated. (*Id.*) Its denial was affirmed by

CORC on October 17, 2007. (Shevlin Decl. Exh. S at RJ 427; Plaintiff's 56.1 Statement ¶ 72.)

II. *Procedural History*

**\*8** Plaintiff filed the Complaint, *pro se,* on March 31, 2008. (Docket No. 2.) Defendants filed their answer on August 18, 2008, and they filed an amended answer on August 22, 2008. (Docket Nos. 20, 22.) On September 5, 2008, plaintiff filed an amended complaint, in which he amended this action's caption, but did not change any of the substantive allegations. (Docket No. 25.)[FN3] That same day, plaintiff also filed an unverified "opposition" to defendants' answer. (Docket No. 24.)

> FN3. Because the Complaint and the amended complaint are substantively identical, the Court need not address whether the amendment was valid under Rule 15(a), Fed.R.Civ.P. The Court's discussion below applies to both pleadings.

On December 1, 2008, defendants filed a memorandum of law in support of their motion for summary judgment ("Defendants' Motion") with accompanying materials, and their notice to pro se litigant who opposes summary judgment pursuant to Local Rule 56.2. (Docket Nos. 32-35.) Plaintiff filed an opposition to defendants' motion for summary judgment with accompanying exhibits and a Local Rule 56.1 Statement on January 16, 2009. Defendants filed their reply on February 20, 2009. (Docket No. 38.)

DISCUSSION

I. *Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

exists." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* If the movant meets this burden, by asserting facts demonstrating that the non-movant's claim cannot be sustained, the non-movant must "set out specific facts showing a genuine issue for trial," and cannot rest on mere allegations or denials of the facts asserted by the movant. Rule 56(e)(2), Fed.R.Civ.P. This requires only "a limited burden of production," but, nevertheless, the non-movant "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (citing *Aslanidis v. United States Lines. Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal quotation marks and citations omitted). The Court must read a pro se party's submissions liberally, especially when a defendant moves for summary judgment on a pro se plaintiff's claims. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment").

II. *Retaliation Claim Against Defendants Ingenito, Orrico and Cooper*

**\*9** The Complaint may fairly be construed as asserting a claim under 42 U.S.C. § 1983, against Lt. Ingenito, Sgt. Orrico and Corrections Officer Cooper for issuing the Misbehavior Report in retaliation for earlier complaints made by the NAACP and the February 23, 2007 Grievance filed by plaintiff. To prevail on a retaliation claim under section 1983, a plaintiff bears the initial burden of showing, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the

adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003).

Once the plaintiff has satisfied his initial burden, the burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. *Id.* The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (per curiam).

The Second Circuit has cautioned that, because prisoner retaliation claims can be easily fabricated, courts should "examine prisoners' claims of retaliation with skepticism and particular care ." *Colon,* 58 F.3d at 872. The plaintiff must provide something more than "non-conclusory allegations." *Bennett,* 343 F.3d at 137.

Plaintiff has satisfied the first necessary element of his claim because the act of filing a grievance is constitutionally protected petitioning activity. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983"). Defendants concede this. (Defendants' Motion at 4.)

Plaintiff has provided sufficient evidence which, if believed, would demonstrate that retaliation was a motivating factor in the issuance of the Misbehavior Report. Plaintiff submitted an affidavit to which he swore on February 13, 2007, a few weeks before he received the Misbehavior Report, (Plaintiff's Exh. A.) In that affidavit, plaintiff claimed that two corrections officers, who are not defendants in this action, threatened him and told him to watch what he was saying in his complaints. (*Id.* ¶ 3.) Also, in January 2007, plaintiff complained about retaliation against the NAACP for the complaints it had filed. (Shevlin Decl. Exh. H at RJ 55).

In addition, when analyzing whether plaintiff has demonstrated that his protected conduct was a substantial or motivating factor the prison officers' actions, the Court may consider the "temporal proximity" of the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

retaliatory misbehavior report to the grievance plaintiff filed. *Gayle,* 313 F.3d at 683 ("We have held that the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation."). Plaintiff filed several grievances beginning in 2006, including one on February 23, 2007 (dated February 18, 2007). (Shevlin Decl. Exh. D at RJ 384.) Plaintiff was issued the Misbehavior Report less than three weeks later, on March 10, 2007. (Shevlin Decl, Exh. E at RJ 506-07.) Finally, it is undisputed that plaintiff was the only member of the NAACP who was charged with the contraband found in that office. (Ingenito Decl. ¶ 15; Plaintiff's 56.1 Statement ¶ 13.) This evidence is sufficient, at this stage, to satisfy plaintiff's initial burden.

**\*10** Summary judgment may be granted to defendants Ingenito, Cooper and Orrico only if they demonstrate that plaintiff would have received the same punishment regardless of any retaliatory motive. *See Gayle,* 313 F.3d at 682. The Misbehavior Report charged that plaintiff possessed a letter in which the author requested "another individual to give 'two packs' of cigarettes to a third individual as well as '15 stamps' to the same 3rd individual as payment to a fourth individual as payment for socks." (Misbehavior Report at RJ 506.) It is undisputed that plaintiff possessed this Note (Ingenito Decl. ¶ 5; Plaintiff's 56.1 Statement ¶ 17; Hearing Tr. at RJ 188), and that the Note stated, in part: "This is a reminder of what I would like for you to do for me. (1) Give these two packs to Divine G. (2) Give these 15 stamps to Divine G and tell him they go to the guy in Marcassi's (sp?) office who sold me the black socks in the locker." (Shevlin Deck Exh. E at RJ 509.)

The Misbehavior Report further charges that plaintiff possessed a letter "soliciting cards from a vendor in exchange for postage stamps." (Misbehavior Report at RJ 506.) It is undisputed that plaintiff possessed the Letter, signed by him and addressed to the American Rehabilitation Ministries, which stated: "I am writing to find out more on purchasing a card order from your Ministry." (Shevlin Deck Exh. E at RJ 142; Hearing Tr. at RJ 192.) The letter also stated: "At present, we do not have the (cash) funds to purchase the cards to give population. So we would like to know if you would allow us to send stamps in place of a check, or if it is possible

that somebody from the outside can send the check for us." (Shevlin Decl. Exh. E at RJ 142.)

The final charge in the Misbehavior Report is that during a search of the "NAACP office, of which Joseph is an official" numerous items of contraband were found. (Misbehavior Report at RJ 506.) It is undisputed that prior to the search of the NAACP office, plaintiff was aware of the following items, all of which were confiscated because they were contraband or posed a potential security threat: video tapes; computers disks; two computers; blank copy tickets; blank picture tickets; a newspaper article pertaining to Sing Sing; a copy of the yellow pages; black ink cartridges; a used color ink cartridge; a memorandum from plaintiff to the Ossining chapter of the NAACP; an atlas containing a map of New York state; and the NAACP's supply of stamps (although plaintiff was not aware of the precise number of stamps). (Plaintiff's 56.1 Statement ¶¶ 20, 37; Hearing Tr. at RJ 205-12; Ingenito Decl. ¶ 7.)

The Misbehavior Report concludes; "The presence of the contraband items in the NAACP office and the letters indicating Joseph's intended use of the stamps establishes his conspiracy to participate in an unauthorized exchange, posses [s] unauthorized valuables, and solicit[ ] goods from an unauthorized source via an unauthorized method of payment." (Misbehavior Report at RJ 506-07.) As stated above, plaintiff admitted to possessing the Letter, the Note and that he was aware of contraband in the NAACP office. Defendants have satisfied their burden of proving that plaintiff committed the prohibited conduct charged in the Misbehavior Report and, therefore, have satisfied their burden of demonstrating that plaintiff would have received the same punishment regardless of any retaliatory motive. In view of this undisputed evidence, no reasonable jury could find in plaintiff's favor on this claim. Therefore, the Court grants summary judgment in favor of defendants Ingenito, Cooper and Orrico on the retaliation claim asserted against them.

### III. *Denial of Due Process Rights*

#### A. *Hearing Officer Calero*

**\*11** Plaintiff claims that Hearing Officer Calero

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

deprived him of his due process rights during his hearing on the Misbehavior Report. (Complaint §§ III ¶ 7, IV, V and VI.) To establish the claim, plaintiff must show: ' "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (quoting *Giano v. Selsky,* 37 F.Supp.2d 162, 167 (N.D.N.Y.1999)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life ....' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1985)) (alteration in original). In determining whether a particular confinement imposes an atypical or significant hardship, the Court must consider both the duration of confinement and the conditions of confinement. *Id.*

Plaintiff was confined for 104 days. (Dubray Decl. ¶ 7.) "Where the plaintiff was confined for an intermediate duration-between 101 and 305 days-'development of a detailed record' of the conditions is required" to determine if the conditions were atypical or a significant hardship. *Palmer,* 364 F.3d 64-65. Neither plaintiff nor defendants provided the Court with information sufficient to develop a detailed record of plaintiff's SHU conditions. "In the absence of a detailed record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short-less than the 30 days that the *Sandin* plaintiff spent in SHU-and there was no indication that the plaintiff endured unusual SHU conditions." *Id.* at 65-66. Because neither party has provided this Court with information sufficient to assess the conditions of confinement, the Court will draw the inference in favor of non-movant plaintiff, and assume that plaintiff's conditions were atypical or a significant hardship. Therefore, plaintiff possessed a liberty interest in not being confined in SHU and defendant Calero is entitled to summary judgment only if she can demonstrate that she did not use an insufficient process to deprive plaintiff of his liberty interest.

"The due process protections afforded a prison inmate do not equate to 'the full panoply of rights' due to a

defendant in a criminal prosecution." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (quoting *Wolf v. McDonnell,* 418 U.S. 539, 556 (1974)). "The only process due an inmate is that minimal process guaranteed by the Constitution, as outlined in" *Wolf. Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004) (emphasis omitted). In a hearing, those minimal due process guarantees are; (1) advance written notice of the charges against the prisoner; (2) a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence the hearing officer relied upon. *Sira,* 380 F.3d at 69.

**\*12** Plaintiff's hearing took place over several days between March 30, 2007 and April 11, 2007. (Calero Decl. ¶ 3; Plaintiff's 56.1 Statement ¶ 32.) There is no claim that plaintiff did not receive prior written notice of the charges against him or a written statement of the facts underlying the hearing's disposition. (Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 29.) Plaintiff alleges, however, that he did not have a reasonable opportunity to call witnesses and introduce documentary evidence and that officer Calero was not fair and impartial. (Complaint §§ III, ¶ 7, IV, V and VI.) Reading plaintiff's Complaint liberally, it also may be read to challenge the sufficiency of the evidence Officer Calero relied upon in reaching her determination. (*Id.*)

1. *Sufficiency of Evidence*

"[J]udicial review of the written findings required by due process is limited to determining whether the disposition is supported by" some reasonable evidence. *Sira,* 380 F.3d at 69. As stated above, plaintiff admitted to the factual predicates for all the violations he was charged with. (Hearing Tr. at RJ 188, 192, 205-12.) In addition, plaintiff's own witness, Rev. Samboni, one of the three chaplains who oversaw all religious groups at Sing Sing, testified that: (1) all inquiries about purchasing greeting cards had to go through the "Dep of Programs;" (2) the senior chaplains in Sing Sing make the purchase orders; and (3) Rev. Samboni would not have approved the Letter if it had been presented to him. (Hearing Tr. at RJ 266-68.) The Sing Sing Imam, who supervised plaintiff's religious group, the Moorish Science Temple of America,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

agreed that solicitations had to be approved by the "Dep of Programs" and that he would not have approved the Letter. (Hearing Tr. at RJ 278-79.) In addition, Sgt. Orrico testified that inmates are not permitted to barter stamps for goods. (Hearing Tr. at RJ 314-15.) The testimony of the witnesses, along with plaintiff's admissions, satisfy the requirement that the written determination be supported by some reasonable evidence.

2. *Right to Call Witnesses*

Plaintiff also challenges the failure to call certain witnesses who he requested be called. A hearing officer may refuse to allow a prisoner to call a witness or introduce documentary evidence if that witness or evidence would be irrelevant or unnecessary. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). "The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingslev v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991).

Plaintiff asked to call nine witnesses. (Hearing Tr. at RJ 177-78, 183-85.) He was permitted to call four: Lt. Ingenito, Reverend Samboni, Sgt. Orrico and Corrections Officer Cooper. (Hearing Tr. RJ 220-51, 253-74, 291-315, 341-350). In addition, Officer Calero called two witnesses on her own initiative, the facility Imam, (*id.* at RJ 220-49, 275-87), and the NAACP staff advisor, Mr. Folsom (*id.* at 220-49, 335-41). Plaintiff was allowed to question all of these witnesses.[FN4]

> FN4. To the extent that the Complaint asserts that plaintiff's due process rights were violated because Officer Calero prevented plaintiff from asking the witnesses certain questions because they were irrelevant or unnecessary, those allegations fail to state a claim. *Kalwasinski,* 201 F.3d at 109 ("Nor does an inmate have a constitutional right of confrontation.").

**\*13** Defendant Calero did not allow plaintiff to call as witnesses inmates Murry, Torres, Merchinson, Whitfield and Stuart on the grounds that their testimony would have been irrelevant. (Hearing Tr. at RJ 356; Shevlin Decl. Exh. H at RJ 31-32.) Plaintiff stated that he wanted to call inmates Murry, Torres and Merchinson because Murry "was locked up for similar things" on the same day

plaintiff was confined, and because all three would have been able to testify about the distribution of the greeting cards plaintiff was alleged to have solicited. (Hearing Tr. at RJ 183-86.) Plaintiff was charged with a violation of rule 103.20, 7 N.Y.C.R.R. § 270.2(4)(ii), which provides, "[a]n inmate shall not request or solicit goods or services from any business or any person other than an immediate family member without the consent and approval of the facility superintendent or designee." He was charged with violating this rule because he had a letter, "signed by [him], soliciting cards from a vendor in exchange for postage stamps." (Misbehavior Report at RJ 506). Because rule 103.20 prohibits solicitation, and not the actual purchase of goods or services, Officer Calero had a rational basis for excluding witnesses Murry, Torres and Merchinson, whose testimony would have been limited to how plaintiff would have paid for the cards. *Scott v. Kelly,* 962 F.2d 145, 147 n. 2 (2d Cir.1992) ("We must defer to the judgment of prison officials in balancing prisoners' rights against penological interests, absent a showing of abuse of discretion.").

Plaintiff also asked to call inmates Whitfield and Stuart because they were members of the NAACP's Executive Board and because they worked in the NAACP office. (Hearing Tr. at RJ 185-86.) In the Complaint, plaintiff alleges that inmates Whitfield and Stuart would have testified as to what the NAACP was allowed to possess. (Complaint § V.) He did not give this reason to officer Calero during the hearing.

Plaintiff was charged with a violation of rule 113.16, 7 N.Y.C.R.R. § 270.2(14)(vi), which provides that "[a]n inmate shall not be in possession of stamps in excess of $22.50 in value, money, credit card, credit card numbers, check or unauthorized valuable or property." The basis for this charge was that he was an official of the NAACP and the excess stamps and unauthorized items were found in the NAACP's office. (Misbehavior Report at RJ 506.) At his hearing, plaintiff testified that he and the four other NAACP Executive Board members would drop off two or three stamps in a communal box after every time each went to the commissary. (Hearing Tr. at RJ 207-08.) In addition, plaintiff testified that other members of the NAACP also would drop off stamps in the communal box. (*Id.*) Finally, plaintiff testified that he was aware of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

blank copy tickets in the NAACP office, which are the equivalent of money within the facility. (*Id.* at RJ 206-07, 211; Ingenito Decl. ¶ 9; Plaintiff's 56.1 Statement ¶ 22.) Given these admissions, it was not an abuse of discretion for Officer Calero to determine that inmates Whitfield's and Stuart's testimony would have been irrelevant or unnecessary. In addition, it was unnecessary to call these witnesses to testify about what the NAACP was allowed to possess because Officer Calero allowed plaintiff to provide that testimony. (Hearing Tr. at RJ 212.)

### 3. *Documentary Evidence*

**\*14** Plaintiff also alleges that he was denied the right to present certain documentary evidence at the hearing. Officer Calero excluded certain documents because they were not relevant to the charges against plaintiff. (Hearing Tr. at RJ 213-15, 288-90.) From the transcript, and the documents attached to the Appeal Report (Shevlin Decl. Exh. H), it appears that these documents related to defendant's retaliation defense. (*Id.*) Indeed, plaintiff makes this clear in his 56.1 Statement in which he claims that all of the documents he wished to introduce would "show a pattern of retaliation against the plaintiff due to the fact that the plaintiff's name is included on all of them." (Plaintiff's 56.1 Statement ¶ 43.) Because plaintiff did not claim at the time of the hearing, (nor does he claim now) that these documents addressed the actual charges against him, it was not an abuse of discretion for Officer Calero to exclude them,

### 4. *Right to Impartial Hearing Officer*

The only allegation contained in the complaint directly addressing Calero's impartiality is that she "denied plaintiff a fair and impartial hearing," and "took it upon herself to deny the plaintiff's Constitutional Rights to Due Process." (Complaint § III, ¶ 7.) This conclusory allegation is insufficient to show that Calero was not impartial. *See Gill v. Mooney,* 824 F.2d 192, 194-95 (2d Cir.1987) ("recognizing the possibilities for abuse in claims of this sort, we have insisted on a higher level of detail in pleading them and have held that a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone") (quotation marks and citation omitted).

Based on the foregoing, defendant Calero is entitled

to summary judgment in her favor.

### IV. *Lee, Dubray, Fischer and Marshall*

A defendant must be personally involved in a constitutional deprivation to be liable under section 1983. The Supreme Court's recent decision in *Iqbal v. Ashcroft,* addressed this requirement. 129 S.Ct. 1937 (2009). In *Iqbal,* the Supreme Court examined a *Bivens* claim against two high-ranking federal government officials. *Id.* at 1942.[FN5] According to the Court, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. The Court specifically rejected the respondent's argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," because that "conception of 'supervisory liability' is inconsistent with [respondent's] accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents." *Id.* at 1949. In fact, "[i]n a § 1983 suit or a *Bivens* action-where masters do not answer for the torts of their servants-the term 'supervisory liability' is a misnomer." *Id.* Accordingly, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* Thus, under *Iqbal,* a defendant can be liable under section 1983 only if that defendant took an action that deprived the plaintiff of his or her constitutional rights. A defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right.[FN6]

FN5. The Court noted that "[i]n the limited settings where *Bivens* does apply, the implied cause of action is the 'federal analog to suits brought against state officials under [section] 1983 .' " *Id.* at 1948 (quoting *Hartman v. Moore,* 547 U.S. 250, 254 (2006)).

FN6. See *Bellamy v. Mount Vernon Hospital,* No. 07 Civ. 180I(SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (Scheindlin, J.) ("*Iqbal*'s 'active conduct' standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation.... [A] supervisor is only

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."); *Spear v. Hugles,* No. 08 Civ. 4026(SAS), 2009 WL 2176725 (S.D.N.Y. July 20, 2009); *see also Young v. State of New York Office of Mental Retardation and Developmental Disabilities,* 649 F.Supp.2d 282, 2009 WL 2749783 (S.D.N.Y. Aug. 27, 2009) (Kaplan, J.) ("Precisely what remains of the Second Circuit [personal involvement] rule in light of *Iqbal* is not entirely clear.").

A. *Lee*

**\*15** Plaintiff alleges that defendant Lee "reviewed the Discretionary Review Letter that was submitted to the Superintendent and failed to take corrective measures." (Complaint § III, ¶ 4.) The "Discretionary Review Letter" appears to be a letter dated April 4, 2007, that plaintiff sent to Superintendent Marshall, in which plaintiff stated that he was not receiving a fair and impartial hearing regarding the Misbehavior Report. (Lee Decl. ¶ 3.) Specifically, plaintiff asked that the Misbehavior Report be dismissed "on the grounds that it was rooted in retaliation and written on assumptions not facts." (Shevlin Decl. Exh. L at RJ 100 .) Plaintiff also stated that "[i]t is because of the grievance complaint that I filed, I am being punished and this is not only wrong, but Unconstitutional. The very fact that Lt. Ingenito re-interviewed me (a 3rd time) in regards to my harassment grievance ... [makes] the retaliatory nature of this entire proceeding ... obvious." (*Id.* at RJ 100-01.)

Although the letter was addressed to defendant Marshall, Lee responded. In preparing his response, defendant Lee reviewed the documents generated as part of the hearing and determined that the hearing was conducted properly. (Lee Decl. ¶ 5.) He responded to plaintiff's letter on April 17, 2007. (April 17, 2007 Memorandum attached in Exhibit L to the Shevlin Decl.) In that response, defendant Lee refused to reverse Hearing Officer Calero's decision, and informed the plaintiff that he could appeal the decision. (Lee Decl. ¶ 5.)

Lee cannot be held liable under a retaliation theory

for failing to reverse Hearing Officer Calero's determination, even though there was some evidence that the Misbehavior Report was written in retaliation for plaintiff's earlier complaints. Under *Iqbal,* a government official is only liable under section 1983 if that official's "own individual actions ... violated the Constitution." *Iqbal,* 129 S.Ct. at 1948. Plaintiff's claim, based on Lee's "failure to take corrective measures," is precisely the type of claim *Iqbal* eliminated. *Id.* at 1948-49. And Lee's independent conduct of reviewing a grievance determination does not make him liable for the alleged improper conduct that underlies that grievance. Finally, because plaintiff's hearing satisfied the requirements of due process of law, Lee cannot be held liable under section 1983 for deprivation of due process.

B. *Dubray*

The only basis of liability asserted by plaintiff against Dubray is that "he review[ed] the Appeal of the plaintiff and failed to take corrective measures, he Affirmed [sic] the Appeal." (Complaint §§ III, ¶ 5, V.) Construing the Complaint liberally, this allegation may be read as asserting a claim that Dubray violated plaintiff's due process rights by affirming Officer Calero's decision. But, because there was no due process violation in plaintiff's disciplinary hearing, defendant Dubray cannot be held liable for failing to correct a non-existent violation. In addition, as with defendant Lee, Dubray cannot be held liable for affirming Officer Calero's determination even if there was some evidence the Misbehavior Report was written in retaliation for plaintiff's complaints. This is not the type of action *Iqbal* requires. Therefore, defendant Dubray is entitled to summary judgment.

C. *Fischer*

**\*16** Plaintiff alleges that defendant Fischer is liable under section 1983 because: (1) he oversees DOCS; (2) Fischer "was the (former) Superintendent of Sing Sing" at the time plaintiff filed complaints against personnel at Sing Sing; and (3) "[h]e had knowledge of all activities [taking] place but failed to intervene to correct the errors." (Complaint § III, ¶ 2.) None of these allegations states that Fischer ever took any action that deprived plaintiff of his rights. The first two allegations are insufficient because they amount to no more than an allegation that Fischer was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

in a position of control at Sing Sing or in the DOCS system. Liability for a section 1983 claim cannot be based on a theory of *respondeat superior. Iqbal,* 129 S.Ct. at 1948. Plaintiff's third allegation that Fischer "failed to intervene to correct the errors," is the type of claim, based on the defendant's failure to act, that cannot stand in light of *Iqbal. Id.* at 1948-49. Therefore, defendant Fischer is entitled to summary judgment.

D. *Marshall*

Plaintiff alleges that Superintendent Marshall "had full knowledge of all that was [taking] place through letters that were submitted to him by the plaintiff. He had a full opportunity to go over all of the evidence and take the correct actions that should [have] been deemed appropriate, but failed to do so." (Complaint § III, ¶ 3.) This allegation, like the one made against defendant Fischer, is insufficient under *Iqbal,* because it is based on Marshall's alleged failure to act, not on his actions. *Iqbal,* 129 S.Ct. at 1948-49.

A review of the record, however, reveals that Superintendent Marshall did respond to plaintiff's letter, dated March 13, 2007. In that letter plaintiff asked Marshall to "intervene so that [plaintiff] may receive a fair and impartial hearing." (Shevlin Decl. Exh. I at RJ 97.) Plaintiff also stated that:

This misbehavior report derived from an interview that I had with Lt. Ingenito on March 10, 2007, whereas a chain of events transpired when I told him that I will write another complaint because memo's [sic] are still not being honored and harassment is continuing by said officers. I guess he did not like me telling him this, since it was my third interview on this one complaint (understandable).

(*Id.*) Marshall responded by informing plaintiff that because he had a disciplinary hearing pending, his defense should be presented to the hearing officer. (April 3, 2007 Memorandum attached in Exhibit I to the Shevlin Decl.) This response, which is an action on Marshall's part, did not deprive plaintiff of any constitutional rights. Defendant Marshall, therefore, is entitled to summary judgment.

V. *Defendant Conway*

The Complaint alleges that defendant Conway "over[saw] Attica Correctional Facility and is aware of the plaintiff being denied programs and religious material as a showing of retaliation for receiving the misbehavior report of April 11, 2007." (Complaint § III, ¶ 10.) The Court assumes that plaintiff's allegation actually refers to the March 10, 2007 Misbehavior Report, as there is no evidence of an April 11, 2007 misbehavior report. Defendant Conway is the only defendant named in this action who worked at Attica during the relevant time period. (Conway Decl. ¶ 2.) Therefore, to the extent that certain of plaintiff's claims are based on actions taken at Attica, the Court has construed those claims as being asserted against defendant Conway.

**\*17** The Complaint alleges that at Attica, "all of the plaintiff's Religious Material (including his Holy Quran) was confiscated from him, Religious tapes were disposed and a misbehavior report was issued, denying him his Right to Freedom of Religion." (Complaint § IV.) The Complaint also alleges that at Attica, "plaintiff has been denied specific [job] programing [sic] (he was told that he could never get a job as long as he's in Attica Correctional Facility)." (Complaint § V.) Taking these allegations in a light most favorable to plaintiff, the Complaint can fairly be read to assert three claims against Conway: (1) retaliation for plaintiff's exercise of his First Amendment right to petition the government, in violation of section 1983; (2) violation of section 1983 by depriving plaintiff of his rights under the Free Exercise Clause of the First Amendment; and (3) violation of plaintiff's rights under RLUIPA.[FN7]

> FN7. Plaintiff's Complaint and other submissions do no cite RLUIPA, but I am obligated to consider the Complaint as raising the strongest argument it suggests. *Bennett,* 343 F.3d at 137.

A. *Section 1983 Claims for Retaliation and Deprivation of Free Exercise Rights*

There is no allegation or evidence that defendant Conway took any action with respect to plaintiff, other than on several occasions affirming the IGRC's denial of plaintiff's grievances. (Conway Decl. ¶¶ 3, 11, 14, 18, 22, 27, 30; Deposition of Rodney Joseph, dated September

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

10, 2008, attached as Exhibit C to the Shevlin Decl. ("Plaintiff's Dep.") at 95:21-96:9 (testifying that a draft officer confiscated his religious materials); *id.* at 105:4-9 (testifying that Sgt. Cochran issued the Second Misbehavior Report to plaintiff); *id.* at 109:20-110:14 (testifying that Mr. Roach of the Program Committee told plaintiff he would not receive a job program at Attica).) Plaintiff has not come forward with any evidence that defendant Conway had the requisite personal involvement in any of the actions that took place at Attica to support his section 1983 claim. In addition, plaintiff's claim arising from the alleged denial of the work program of his choice is conclusory and insufficient to state a claim. *See, e.g., Gill,* 824 F.2d at 194-95 (affirming dismissal of a prisoner's retaliation claim based on allegations that his work assignments were changed).

**B.** *RLUIPA Claims*

Plaintiff alleges that at Attica, "all of the plaintiff's Religious Material (including his Holy Quran) was confiscated from him, Religious tapes were disposed and a misbehavior report was issued, denying him his Right to Freedom of Religion." (Complaint § IV.) This allegation may fairly be read to assert claims against defendant Conway for violations of plaintiff's rights under RLUIPA. RLUIPA authorizes a private right of action and plaintiff's RLUIPA claim is separate from his section 1983 free exercise claim. 42 U.S.C. § 2000cc-2(a) ("A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.")

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person" residing in certain correctional facilities "unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA's definition of "government" includes any "State, county, municipality, or other governmental entity created under the authority of a State," "any branch, department, agency, instrumentality, or official" thereof, and "any other person acting under color of State law." 42 U.S.C. § 2000cc-5(4)(A).

**\*18** Neither the Supreme Court nor the Second Circuit, have explicitly concluded whether, like section 1983, a defendant's personal involvement in the alleged "substantial burden" on the plaintiff's exercise of religion is a prerequisite to a RLUIPA claim. In *Salahuddin v. Goord,* however, the Second Circuit implicitly recognized this requirement. 467 F.3d 263, 279 (2d Cir.2006). In *Salahuddin.* the Second Circuit vacated in part the district court's grant of summary judgment in favor of several defendants on plaintiff's RLUIPA and religious freedom section 1983 claims. That court stated:

> Along with defendant Stanton, Salahuddin identifies defendants Herbert, Goord, Wright, and Eagan as responsible for this alleged violation by virtue of their denial of Salahuddin's grievance. Leaving the personal involvement of these defendants to the district court for analysis in the first instance, we vacate the judgment as to Stanton, Herbert, Goord, Wright, and Eagan on this claim.

*Id.* (internal citation omitted). Thus, at least in dictum, the Second Circuit has suggested that for an individual defendant to be liable, the individual must have "personal involvement" in the alleged wrongdoing.

Several district courts outside of the Second Circuit have concluded that personal involvement is a prerequisite under RLUIPA. *See Greenberg v. Hill,* No. 2:07-CV-1076, 2009 WL 890521, at \*3 (S.D.Ohio Mar. 31, 2009) ("In order to establish liability under RLUIPA (and Section 1983), a plaintiff must prove, among other things, the personal involvement of each defendant in the alleged violation."); *Alderson v. Burnett,* No. 1:07-CV-1003, 2008 WL 4185945, at \*3 (W.D.Mich. Sept. 8, 2008) ("While municipal entities can be held vicariously liable under RLUIPA, as to individual defendants, the plaintiff must demonstrate that the defendant was personally involved."); *Copenhaver v. Burnett,* No. 07-CV-14376, 2008 WL 2741807, at \*3 (E.D.Mich. July 11, 2008) ("under the RLUIPA plaintiff must show that the named defendants personally imposed a substantial burden on his free exercise of religion").

*Salahuddin* recognizes that a defendant may be liable under RLUIPA for affirming the denial of a plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)

(Cite as: 2009 WL 3321011 (S.D.N.Y.))

grievance. 467 F.3d at 279. But, *Salahuddin* was decided before *Iqbal.* Under *Iqbal,* a government official's act of affirming the denial of a grievance that alleges the deprivation of a constitutional right, without more, is insufficient to establish that the defendant was personally involved in depriving plaintiff of that right. Although *Iqbal* addressed *Bivens* claims (and, by analogy, section 1983 claims as well), there is no reason why its reasoning should not apply with equal force to RLUIPA claims.

Based on the foregoing, I conclude that personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA. I also conclude that an official's denial of a grievance alleging a constitutional deprivation, without more, does not amount to personal involvement in the deprivation of that right. Plaintiff's allegations about defendant Conway, which are limited to alleging that Conway affirmed several of the IGRC's denials of his grievances, do not satisfy RLUIPA's personal involvement requirement. Therefore, defendant Conway is entitled to summary judgment on plaintiff's RLUIPA claims.

**\*19** Because defendants are entitled to summary judgment in their favor on all of plaintiff's claims, I need not address defendants' arguments regarding administrative exhaustion, qualified immunity and Eleventh Amendment immunity. To the extent that plaintiff's request that he not be subject to "retaliation in the near future for filing this claim," may be construed as a request for injunctive relief, any such threat is speculative and at this time merely hypothetical. *See O'Shea v. Littleton,* 414 U.S. 488, 494-96 (1974). To the extent that plaintiff's request that he be "transferred back to Sing Sing Correctional Facility and given back his job assignment," can be considered a request for an injunction, this request relates to his retaliation claims for which I have granted defendants summary judgment. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) ("The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly toward the party requesting the preliminary relief").

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted and the action is dismissed. The Clerk is directed to enter judgment for the defendants.

SO ORDERED.

S.D.N.Y.,2009.

Joseph v. Fischer
Not Reported in F.Supp.2d, 2009 WL 3321011 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Derrick HAMILTON, Plaintiff,
v.
J.T. SMITH, Superintendent, Shawangunk Correctional
Facility; J. Maly, Deputy Superintendent of Security;
William M. Gonzalez, Deputy Counsel; M. Genovese,
Medical Doctor; M. Skies, Registered Nurse; Donald
Selsky, Director of Special Housing; D. Parisi, Mail
Room Clerk; F. Chiapperino, Counselor; and Elaine
Davis, Steward, Attica Correctional Facility,
Defendants.
No. 9:06-CV-0805 (GTS/DRH).

Sept. 30, 2009.
West KeySummary**Federal Civil Procedure 170A**
⚷   **2491.5**

170A Federal Civil Procedure

170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
A genuine issue of material fact as to whether prison
officials intentionally interfered with a prisoner's ability to
receive mail addressed to him precluded summary
judgment in favor of the officials. The prisoner alleged
that the officials violated his First Amendment rights when
they confiscated mail addressed to him, including an
affidavit from a former inmate. The prisoner was placed
on mail watch and some of his mail was intercepted
because it allegedly did not comply with facility protocol,
but the officials failed to offer any explanation as to why
the documents were never returned to the sender. U.S.C.A.
Const.Amend. 1.

Derrick Hamilton, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts-Ryba, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.
    *1 Currently pending before the Court, in this *pro se*
prisoner civil rights action filed by Derrick Hamilton
("Plaintiff") against nine employees of the New York State
Department of Correctional Services ("Defendants")
pursuant to 42 U.S.C. § 1983, are the following: (1)
Defendants' motion for summary judgment (Dkt. No. 51);
(2) United States Magistrate Judge David R. Homer's
Report-Recommendation recommending that Defendants'
motion be granted in part and denied in part (Dkt. No. 60);
(3) Plaintiff's Objections to the Report-Recommendation
(Dkt. No. 67); and (4) Defendants' Objections to the
Report-Recommendation (Dkt. No. 66). For the reasons
set forth below, the Report-Recommendation is accepted
and adopted as modified, and Defendants' motion is
granted in part and denied in part.

**I. RELEVANT BACKGROUND**

    On June 28, 2006, Plaintiff filed his Complaint
asserting claims against the following seven (7) employees
of Department of Correctional Services ("DOCS"): (1)
J.T. Smith, the Superintendent of Shawangunk
Correctional Facility (hereinafter, "Shawangunk C.F.");
(2) J. Maly, a Deputy Superintendent of Security of
Shawangunk C.F.; (3) William M. Gonzalez, Deputy
Counsel of DOCS; (4) M. Genovese, a medical doctor at
Shawangunk C.F.; (5), M. Skies, a registered nurse at
Shawangunk C.F.; (6) Donald Selsky, Director of Special
Housing of DOCS; and (7) D. Parisi, a mailroom clerk at
Shawangunk C.F. (Dkt. No. 1.)
    On December 8, 2006, Plaintiff filed an Amended
Complaint, naming two additional Defendants to the
action: (1) F. Chiapperino, a corrections counselor at
Shawangunk C.F.; and Elaine Davis, a steward at Attica
Correctional Facility ("Attica C.F."). (Dkt. No. 17.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

Generally, in his Amended Complaint, Plaintiff alleges that Defendants (1) violated his religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), (2) violated his right to medical confidentiality under the Health Insurance Portability and Accountability Act ("HIPAA"), and (3) violated his civil rights under the First, Eighth and Fourteenth Amendments, including his right to be free from mail tampering, deliberate indifference to his serious medical needs, and inadequate prison conditions. (Dkt. No. 17.)

On July 31, 2008, Defendants filed a motion for summary judgment seeking dismissal of all claims against them, arguing that (1) Plaintiff failed to establish claims under RLUIPA, HIPAA, and the First, Eighth and Fourteenth Amendments, (2) Plaintiff failed to allege personal involvement against several Defendants, and (3) Defendants are entitled to qualified immunity. (Dkt. No. 51.)

On October 20, 2008, Plaintiff submitted his response to Defendants' motion, repeating the allegations made in his Amended Complaint. (Dkt. No. 58.)

On January 13, 2009, Magistrate Judge Homer issued a Report-Recommendation that recommended that Defendants' motion for summary judgment be denied as to the following claims: (1) Plaintiff's First Amendment Claim against Defendant Smith regarding the provision of meals which complied with both his health needs and his religious tenets; (2) Plaintiff's First Amendment Claim against Defendants Smith and Maly regarding mail tampering; and (3) Plaintiff's Fourteenth Amendment Claim against Defendants Maly and Selsky regarding the due process violation that occurred during Plaintiff's disciplinary rehearing where Plaintiff was precluded from calling certain witnesses. Magistrate Judge Homer further recommended that all remaining claims be dismissed and that all claims as to Defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino and Davis be dismissed for lack of personal involvement. (Dkt. No. 60.) [FN1] Familiarity with the grounds of Magistrate Judge Homer's Report-Recommendation is assumed in this Decision and Order.

FN1. It should be noted that Defendant Davis

was recommended for dismissal in the ordering paragraph of the Report-Recommendation. (*See* Dkt. No. 60, at 48.) However, in reviewing Defendant Davis's involvement in events surrounding the disciplinary proceeding, Magistrate Judge Homer determined that Defendant Davis was directly involved in the disciplinary hearing, which forms the basis for Plaintiff's due process claim. (*Id.* at 45.) Thus, it appears that Defendant Davis was mistakenly included in the ordering paragraph recommending dismissal. (*Id.* at 46-47 [stating that qualified immunity would not extend to those Defendants who were involved in the events forming the basis for Plaintiff's Fourteenth Amendment claim].) As a result, the Court has included Defendant Davis in its analysis with respect to Plaintiff's Fourteenth Amendment claim.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

**\*2** When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See* Brown v. Peters, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See* Batista v. Walker, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

FN2. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN3. *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion for Summary Judgment**

Magistrate Judge Homer correctly recites the legal standard governing a motion for summary judgment. (Dkt. No. 60, at 16-17.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS OF CLAIMS RECOMMENDED FOR TRIAL**

**A. Plaintiff's Claim Regarding His Meals**

In his Amended Complaint, Plaintiff alleges that

Defendant Smith, who is the Superintendent at Shawangunk C.F., failed to provide Plaintiff with meal options that accommodate both his therapeutic dietary needs as well as his religious tenets. (Dkt. No. 17, at 11.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because he found that there was a genuine issue of material fact as to whether there was a legitimate penological interest for Shawangunk C.F.'s failure to provide Plaintiff with meals that accommodate both his religious and dietary needs. (Dkt. No. 60.)

In their objections, Defendants make the following four arguments: (1) "[w]hile Plaintiff claims that he requires low-sodium and low-cholesterol food, he presents absolutely no evidence aside from his speculation that the nutritional makeup of the Kosher meal (also known as a "Cold Alternative Diet" or "CAD") exceeds the sodium or cholesterol content plaintiff is recommended"; (2) "in coming to its conclusion, the Report ignored the fact that the CAD is provided to inmates who request it, due to religious reasons, through ministerial services staff and that Defendant Smith lacks control over the diet"; (3) "[w]hile the Report cites to the fact that the meals are provided to Shawangunk by outside providers, it [errs] by first agreeing that the Department of Correctional Services ('DOCS') lacks the ability to provide inmates with meals that are kosher and low in sodium and then incredibly finds Defendant Smith liable for this lack and for not creating an acceptable alternative"; and (4) "since there was no diet meeting Plaintiff's request available and Defendant Smith did not have any personal involvement in preparing or providing special diets, the claims must be dismissed as to Defendant Smith for lack of personal involvement." (Dkt. No. 66.)

**\*3** As an initial matter, the Court finds the first argument unpersuasive. In his declaration in opposition to Defendants' motion for summary judgment, Plaintiff swears that Defendant Genovese informed him that the CAD was high in sodium, and that he therefore had to change his diet. (Dkt. No. 58, Part 1, at ¶¶ 10-11.)

In addition, the Court finds the fourth argument unpersuasive. According to his declaration, Defendant Smith is the Superintendent at Shawangunk C.F. (Dkt. No.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

58, Part 3, at 10.) In this capacity, he is responsible for "all aspects of facility operations." (*Id* .) Based on this general characterization, the Court finds that there is a genuine issue of material fact as to whether Defendant Smith was responsible for implementing the facility's meal menus. Accordingly, the claims against Defendant Smith should not be dismissed for lack of personal involvement.

The Court analyzes Defendants' remaining two arguments as follows.

**1. Defendant's Argument Regarding Plaintiff's Claim Arising Under the First Amendment's Free Exercise Clause**

"The right of prison inmates to exercise their religious beliefs ... is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04-CV-0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007) (Peebles, MJ) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 [1987] ) (other citation omitted). "A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is one of reasonableness, taking into account whether the particular act affecting the constitutional right is reasonably related to legitimate penological interests." *Guiffere,* 2007 WL 3046703, at *4 (internal quotation marks and citations omitted)

"Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals." *Id.* (citations omitted). Accordingly, "[c]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Id.* (citation omitted). Having said that, because of the demands of prison officials to operate prison facilities in a certain manner, "[a] free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate

penological interests on the other hand." *Id.* (citation omitted).

**\*4** When examining a plaintiff's free exercise claim, a court must undergo a three-part, burden shifting framework. *Id.* at *5 (citation omitted). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs." *Id.* (citations omitted). "Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Id.* (citations omitted). "In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)." *Id.* (citations omitted).

"Under *Turner,* the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective." *Id.* (internal quotation marks and citation omitted). "The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question." *Id.* (citations omitted). "Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* (internal quotation marks and citation omitted). "Decisions rendered since *Turner* have clarified that when applying this test, a court should examine the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Id.* (internal quotation marks and citations omitted).

In their motion, Defendants suggest that, because Plaintiff converted to Judaism only to "learn about the religion" and because Plaintiff no longer practices Judaism, his beliefs were not serious. (Dkt. No. 51, Part 6, at 14.) While the facts suggested by Defendants may be true, the Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004). As a result, the Court finds that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

Plaintiff has satisfied his burden in the first part of the above-described, burden-shifting inquiry.

In response, Defendants argue that officials have a legitimate penological interest in carrying out their responsibility for the daily preparation of meals for all inmates within their control. (Dkt. No. 51, Part 6, at 14.) Defendants further argue that "[i]t is a not a reasonable demand that prison officials supply every inmate with their personal diet request for every meal." (*Id.*) As a result, the Court finds that Defendants have satisfied their burden in the second part of the above-described, burden-shifting inquiry.

Because Defendants have articulated a justification for failing to provide Plaintiff with a diet that conforms to both his religious and therapeutic needs, the focus shifts back to Plaintiff to establish, through a weighing of the *Turner* factors, that "the policy is not reasonably related to legitimate penological interests ." *Guiffre,* 2007 WL 3046703, at *6. "Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment." *Id.* Having said that, a court must also bear in mind that, "[w]hile all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities." *Furnace v. Arceo,* 06-CV-4609, 2008 WL 618907, at *7 (N.D.Cal. Mar.3, 2008) (citing *Beard v. Banks,* 126 S.Ct. 2572, 2578 [2006] ). Therefore, "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Banks,* 126 S.Ct. at 2578.

**\*5** As described above, the first *Turner* factor is whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective. *Turner,* 482 U.S. at 89-90. Defendants argue, as did the defendants in *Arceo,* that two legitimate penological interests prevent them from providing [P]laintiff with a ... diet [that satisfies both his religious and therapeutic needs]: budgetary and administrative concerns. *Arceo,* 06-CV-4609, 2008 WL 618907, at *8. Furthermore, as did the defendants in *Arceo, "[i]n* support of their argument,

Defendants have presented [a] declaration [ ] attesting to the fact that all meals provided to inmates at [Shawangunk C.F.] are based on standardized menus generated by the [state]; this plan includes the [Shawangunk C.F.] alternative-entree meals that are provided to inmates who for religious reasons choose not to eat meat [or choose to eat only Kosher products]." <u>FN4</u>

> <u>FN4.</u> In particular, Defendant Smith states, in his declaration, that Plaintiff was offered the CAD after he submitted a form to change his religious affiliation to Judaism. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-33 [Decl. of Joseph T. Smith].) Defendant Smith further states that the CAD is a diet that exists on a "state wide menu" which is "supplied to Shawangunk C.F. from the Oneida Correctional Facility Food Processing Plant, or other approved, outside vendors." (*Id.* at ¶ 34.) Finally, Defendant Smith states that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium]." (*Id.* at ¶ 32, 35.)

Under the circumstances, this Court finds, as did the district court in *Arceo* that, "[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Arceo,* 2008 WL 618907, at *8 (citing *Shakur v. Schriro,* 514 F.3d 878, 886 [9th Cir.2008] ). For example, it is clear that a diet that complies with Plaintiff's therapeutic and religious needs cannot be prepared from any of the food menus available to Plaintiff. (Dkt. No. 53, Part 3, at 14, ¶¶ 32, 35 Decl. of Joseph T. Smith, testifying that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium].") "[C]onsequently, the Court finds a common-sense connection exists between [D]efendants' policy of not providing [P]laintiff with a [specialized food menu] and their legitimate budgetary and administrative concerns." *Arceo,* 2008 WL 618907, at *8. In addition, "[P]laintiff has not presented evidence that refutes the connection [.]" *Id.* As a result, the Court finds that the first *Turner* factor weighs in favor of Defendants.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 89-90. Here, there is no record evidence that indicates that there were not alternative means for Plaintiff to exercise his right to religious freedom. According to his own testimony, Plaintiff was given a Kosher diet that complied with the faiths of his religion. (Dkt. No. 51, Part 5, at 102-104.) In addition, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7-10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].) Finally, Plaintiff has failed to offer any evidence that would suggest that Defendants prevented him from studying, praying, wearing whatever clothing he desired, or attending ceremonies and rituals.[FN5] As a result, the Court finds that the second *Turner* factor weighs in favor of Defendants.

> FN5. *See Arceo,* 2008 WL 618907, at *8 (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon"); *see also O'Lone,* 482 U.S. at 351-52 ("The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is 'virtually unlimited except during working hours,' and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer.").

**\*6** The third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." *Turner,* 482 U.S. at 91. Defendants argue that providing Plaintiff with diet that conforms to both his therapeutic and religious needs will significantly impact both prison resources and prison officials, and that institutional budgetary concerns weigh in favor of maintaining the system in its current fashion. (Dkt. No. 51, Part 6, at 14.) Granted, Defendants have not offered any evidence that specifically describes the budgetary costs associated with adding new food options to prison menus, or other practical obstacles associated with providing a low-sodium CAD. (*See generally* Dkt. No. 51.) *Cf. Arceo,* 2008 WL 618907, at *9 (where defendants provided declarations showing that meal preparation at the facility "is a systematized process that involves many different departments and individuals.").

Having said that, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the special equipment and training required to prepare the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-35 [Decl. of Joseph T. Smith].) Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD. Moreover, Defendants have argued that this accommodation-providing Plaintiff with a meal option outside of the state-wide menu-could have "a significant 'ripple effect' on fellow inmates," *Turner,* 482 U.S. at 90, in that such an accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs. (Dkt. No. 51, Part 6, at 14.) Based on this potential "ripple effect," the Court finds that it must be "deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90. Moreover, Plaintiff has failed to offer any evidence that Defendants' position is unreasonable.[FN6] As a result, the Court finds that the third *Turner* factor weighs in favor of Defendants.

> FN6. "The prisoner-plaintiff bears the burden of proving that the disputed regulation is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

unreasonable." *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995).

The fourth *Turner* factor requires the Court to consider the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests. "The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Arceo,* 2008 WL 618907, at *9 (citing *O'Lone,* 482 U.S. at 350 [1987] ) (other citation omitted). Here, Plaintiff has not put forth a ready alternative to Defendants' religious-diet policy that would accommodate his right to a religious diet at a *de minimis* cost to Defendants' legitimate administrative and budgetary concerns. As a result, the Court finds that the fourth *Turner* factor weighs in favor of Defendants.

**\*7** In sum, after considering each factor of the *Turner* test,[FN7] the Court finds that it was not unreasonable for Defendant Smith to follow a state-wide meal menu, which did not happen to satisfy both Plaintiff's dietary and therapeutic needs, given the legitimate penological concern of maintaining order. The Court makes this finding cognizant of the fact that "deference must be accorded prison authorities' views with respect to matters of professional judgment," *Beard v. Banks,* 548 U.S. 521, 126 S.Ct. 2572, 2574, 165 L.Ed.2d 697 (2006), understanding that "matters of professional judgment" include selecting inmate meal menus, given the budgetary expense and potential disorder associated with this task.[FN8]

FN7. It bears noting that the four *Turner* factors must be looked at as a whole when "determining the reasonableness of the regulation at issue." *Turner,* 482 U.S. at 89.

FN8. *See Kahane v. Carlson,* 527 F.2d 492, 496 (2d Cir.1975) (requiring, under the First Amendment, DOCS to provide "a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws, without otherwise mandating specific items of diet"); *cf. Andreola v. Glass,* 04-CV-0282, 2008 WL 2937574, at *1 (E.D.Wisc. July 23, 2008) (expressing doubt as to whether plaintiff's claim

that the Wisconsin Department of Corrections failed to "provide him with a kosher diet low in cholesterol and salt, pursuant to his doctor's orders regarding his cardiac health," established a cognizable claim under the First Amendment.

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's claim under the First Amendment's Free Exercise Clause.

**2. Defendant's Argument Regarding Plaintiff's Claim Arising Under RLUIPA**

"Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b)." *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002). "RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce." *Broaddus,* 200 F.Supp.2d at 297 (citations omitted). "[A claim arising under] RLUIPA is an independent cause of action, with a slightly different standard and must be treated separately from the First Amendment claim." *Keesh v. Smith,* 04-CV-0779, 2007 WL 2815641, at *11 (N.D.N.Y. Sept.25, 2007) (Mordue, J.) (citation omitted).

"Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion *and the state bears the burden of persuasion on all other elements.*" *Broaddus,* 200 F.Supp.2d at 297 (citation omitted; emphasis added). Stated another way, "RLUIPA imposes a more exacting standard on prison officials [than does the First Amendment], requiring that any substantial burden on an inmate's exercise of religion be warranted by a compelling governmental interest, and be the least restrictive means of accomplishing that interest." *Keesh,* 2007 WL 2815641, at *11 (internal quotation marks and citations omitted). "By its terms, RLUIPA is to be construed to broadly favor protection of religious exercise." *Broaddus,* 200 F.Supp.2d at 297 (citing 42 U.S.C. § 2000cc-3 [g] ).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

The Supreme Court has defined substantial burden as "[w]here the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employ. Sec. Div.,* 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Here, there is no question that forcing an inmate to choose between his therapeutic needs and his religious dietary needs creates a substantial burden on Plaintiff's ability to exercise his religion. Therefore, the Court must determine whether Defendants have demonstrated that (1) the substantial burden on Plaintiff's exercise of religion was warranted by a compelling governmental interest, and (2) following the state-wide menu option was the least restrictive means of accomplishing that interest.

**\*8** As the Supreme Court recently explained in its discussion of RLUIPA, " '[c]ontext matters' in the application of th[e compelling interest] standard." *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (quoting *Grutter v. Bollinger,* 539 U.S. 306, 327 [2003] ). In other words, RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter,* 544 U.S. at 723. In addition, when reviewing a claim under RLUIPA, a court must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (quoting Joint Statement 16699 [quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900] ).

Here, the Court notes that Defendants Smith and Genovese have adduced some-albeit little-evidence in an effort to specifically establish that (1) the substantial burden on Plaintiff's exercise of religion was warranted by a *compelling governmental interest* (e.g., in controlling costs and/or maintaining order) at Shawangunk C.F., and (2) adhering to the state-wide menu option was the *least restrictive means* of accomplishing the above-referenced compelling governmental interest.[FN9] A review of the declarations of Defendants Smith and Genovese reveals

why they adduced little such evidence: they argue, in pertinent part, that they lacked personal involvement in the RLUIPA violation alleged. (*See, e.g.,* Dkt. No. 51, Part 6, at 24 [Defs.' Memo. of Law].)

FN9. For example, with regard to the first referenced element, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the specialized nature of the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-35 [Decl. of Joseph T. Smith].) Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD. Moreover, with regard to the second referenced element, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7-10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].)

Furthermore, they have adduced record evidence in support of that argument. More specifically, Defendant Smith, the highest-ranking official at Shawangunk C.F., swears that "[t]he [CAD] menus are not created at Shawangunk. Thus, I have no personal control over the contents of the [CAD] meals." (Dkt. No. 53, Part 3, at 14, ¶ 34 [Decl. of Joseph T. Smith].) Similarly, Defendant Genovese, a Clinical Physician at Shawangunk C.F., swears as follows:

As a Clinical Physician 2, I do not prescribe religious diets due to the fact that such diets are not prescribed by health care workers at DOCS. To receive a religious

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

diet, inmates are required to complete paper work that is processed by the Ministerial Services, not the medical department. Therefore, I have never prescribed a religious diet to any inmate due to the fact that religious diets are not based on medical benefits or health criteria.... In this case ..., plaintiff was placed on a therapeutic diet on June 12, 2006. Plaintiff's diet was a 'Controlled A' which contains enhanced fiber, is low in fat, cholesterol, and sodium.... As a[C]linical [P]hysician 2, I am responsible solely for the prescription of therapeutic diets. No part of my job duties require, or allows, me to actually provide the diets as they are distributed by another department.... To the extent that plaintiff claims I violated his right to practice his religion, I reiterate that I at no time had [the] ability to prescribe religious diets.

**\*9** (Dkt. No. 68, Part 3, ¶¶ 6, 11, 14, 15 [Decl. of Maryann Genovese].) It should be noted that Defendant Genovese's testimony is consistent with four administrative decisions denying two of Plaintiff's grievances on the subject, which explain that, pursuant to DOCS Directive 4311, "Inmate requests for religious foods/diets[ ] shall not be prescribed by the health care provider." (Dkt. No. 58, Part 2, at 22, 24-26.) Finally, it should be noted that Plaintiff has failed to adduce any admissible record evidence controverting the record evidence adduced by Defendants Smith and Genovese.

After carefully reviewing the undisputed facts in the record, and the relevant case law, the Court agrees with Defendants Smith and Genovese: they lacked personal involvement in the RLUIPA violation alleged in this action, because (as the superintendent and a physician at Shawangunk C.F.) they lacked the authority to deviate from DOCS' state-wide Kosher menu in order to design, and prepare for Plaintiff, a new Kosher menu that was low in sodium.[FN10] *See Johnson v. Sisto,* 07-CV-1826, 2009 WL 2868724, at \*6 (E.D.Cal. Sept.2, 2009) ("Plaintiff has presented no evidence disputing the defendants' averments that they [are not liable under RLUIPA because they] do not create the menus and cannot order substitutions of [Rastafarian religious] menu items, nor has he named as defendants those in [the California Department of Corrections] responsible for establishing the system-wide religious diet plans."); *Acoolla v. Angelone,*

01-CV-1008, 2006 WL 938731, at \*13 (W.D.Va. Apr.10, 2006) ("Because the record indicates that decisions about [Virginia Department of Corrections] religious diets are centralized, ... it is clear that officers at individual prisons have no authority to provide [plaintiff] the relief he seeks [under RLUIPA].").[FN11]

[FN10.] Although Magistrate Judge Homer based his recommendation that Plaintiff's claims against Defendant Genovese be dismissed on this ground, Plaintiff failed to specifically challenge that recommendation in his Objections. (*Compare* Dkt. No. 60 at 43-44 *with* Dkt. No. 67.) As a result, this recommendation is subject only to clear-error review. *See, supra,* Part II.A. of this Decision and Order. However, the Court notes that this recommendation would survive even a *de novo* review, for the reasons stated above.

[FN11.] *Cf. Agrawal v. Keim,* 06-CV-0945, 2009 WL 309990, at \*2 (S.D.Ill. Feb.9, 2009) (dismissing prisoner's RLUIPA claim that a prison chaplain did not provide him with a Hindu vegetarian diet that contained dairy products, because "there is no evidence that [chaplain] was personally involved in the diet decisions"); *Williams v. Miller,* 04-CV-0342, 2007 WL 2893641, at \*8 (S.D.Ill. Sept.28, 2007) (dismissing prisoner's First Amendment claim that a prison chaplain did not provide him with a Kosher diet, because "[the chaplain] does not make policy for [the Illinois Department of Corrections], ..., and does not have any role in setting or modifying an inmate's diet"); *Ghashiyah v. Wisconsin Dept. of Corr.,* 01-CV-0010, 2007 WL 2822005, at \*12-13 & n. 16 (E.D.Wis. Sept.27, 2007) (dismissing prisoner's RLUIPA claim alleging that he was not provided with a halal meal free of contact with pork, because "it is undisputed that [none of the defendants] had any personal involvement with the food service policies at issue in [Oshkosh Correctional Institution] and [Racine Correctional Institution]"), *aff'd,* 278 F. App'x 654 (7th Cir.2008).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

The Court finds that the Second Circuit's recent decision in *Jova v. Smith,* No. 08-2816, 2009 WL 3068100 (2d Cir. Sept.28, 2009), is distinguishable for two reasons: (1) in addition to suing Joseph T. Smith, the plaintiffs in that case sued the DOCS Commissioner, Deputy Commissioner for Program Services, and Director of Ministerial & Family Services; and (2) neither the district court nor the Second Circuit in that case addressed the issue of whether Joseph T. Smith had the authority to design, and prepare for the plaintiffs, a new religious menu (especially one that fulfilled the plaintiffs' therapeutic dietary needs). *See Jova,* 2009 WL 3068100; *Keesh v. Smith,* 04-CV-0779, 2007 WL 2815641 (N.D.N.Y. Sept.25, 2007).

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's RLUIPA claim.

**B. Plaintiff's First Amendment Claim Regarding Mail Tampering**

In his Amended Complaint, Plaintiff alleges that Defendants Smith and Maly confiscated legal and non-legal mail addressed to Plaintiff in violation of his First Amendment rights. (Dkt. No. 17.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly intentionally interfered with Plaintiff's ability to receive mail addressed to him (specifically, mail sent from Nicole Esters enclosing an affidavit from a former inmate, Mr. "D. Mathis"),[FN12] and whether Defendant Smith was negligent in his supervision of Defendant Maly and the procedures followed with respect to prison mail. (Dkt. No. 60.)

> FN12. In his affidavit, Mr. Mathis claims his DOCS identification number was 93-A-6702. (Dkt. No. 58, Part 4, at 50.) According to DOCS' on-line "Inmate Lookup" Service, that DOCS identification number belongs to an inmate named Daniere N. Mathis.

**\*10** In their objections, Defendants argue that "[t]he Report relies on conclusory allegations made by the plaintiff in finding that defendant Maly received an affidavit that was addressed to the plaintiff and failed to forward the affidavit to the plaintiff or mail it back to the sender." (Dkt. No. 66.) Defendants further argue that "the record is void of any proof whatsoever that such an affidavit existed or was ever in the possession of defendant Maly." (*Id.*) In addition, Defendants argue that "plaintiff fails to offer proof that the [Mathis] affidavit was packaged in a way that met the criteria of the Inmate Correspondence Program as set forth in DOCS directives." (*Id.*) With regard to Defendant Smith, Defendants argue that "[P]laintiff had no personal knowledge that defendant Smith allowed defendant Maly to confiscate his mail[, and] Plaintiff cannot establish that an investigation did not take place regarding his mail." (*Id.*)

According to Plaintiff, in December 2005, Nicole Saunders sent Plaintiff legal documents by Federal Express. (Dkt. No. 17, at ¶ 34.) Because the documents, which never reached Plaintiff, were assigned a tracking number, Saunders was able to determine that the documents reached Shawangunk C.F. (*Id.*) According to Plaintiff, Saunders contacted the facility, and was notified by the mail room that Defendant Maly was in possession of the documents, and that, if the documents did not comply with facility protocol, they would be sent back to her with a letter. (*Id.* at ¶ 35.) However, neither Saunders nor Plaintiff ever received the documents or a letter. (*Id.*)

It does not seem disputed that Plaintiff, along with certain other inmates, had been placed on mail watch at around the time that Saunders attempted to send these documents. However, even assuming that Plaintiff's mail was properly intercepted because it did not comply with facility protocol (which would have justified the non-delivery of the documents to Plaintiff), Defendants have failed to offer any explanation as to why the documents were never returned to the sender.

Moreover, in addition to this incident, Plaintiff's Amended Complaint (which is verified pursuant to 28 U.S.C. § 1746, and thus has the force and effect of an affidavit for purposes of a motion for summary judgment)[FN13] identifies at least three other incidents in a seven-month period, prior to when Plaintiff was allegedly on mail watch, in which mail was sent to Plaintiff, but was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

neither received by Plaintiff or returned to the sender. (Dkt. No. 17, at 7-9; *see also* Dkt. No. 60, at 11-12.) One of the documents that Plaintiff never received (and that was never returned to sender) was Nicole Esters' first mailing of the Mathis affidavit on June 21, 2005, in which Mathis stated that his urine sample was switched with Plaintiff's urine sample, resulting in Plaintiff's positive drug test. (Dkt. No. 17, at 7; *see also* Dkt. No. 60, at 11-12.)[FN14]

> FN13. (Dkt. No. 17, at 37.) See *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

> FN14. It appears that Plaintiff received Nicole Esters' *second* mailing of that affidavit, in early July 2005. (*Compare* Dkt. No. 17, ¶¶ 30-31 [Plf.'s Am. Compl., alleging that Defendant Maly stole the affidavit [sent in July of 2005] and refused to provide it to Hamilton] *with* Dkt. No. 58, Part 4, at 49-51 [Plf.'s response papers, attaching letter from Plaintiff to Selsky dated 7/6/05, enclosing affidavit in question].)

**\*11** Under the circumstances, the Court finds that there is at least a genuine issue of material fact as to whether (1) Defendant Maly tampered with Plaintiff's mail, and (2) Plaintiff suffered any harm as a result of the alleged tampering. *Brown v. Kepiec,* 06-CV-1126, 2009 WL 818959, at \*4 (N.D.N.Y. Mar.25, 2009) (Suddaby, J.) ("To prevail on a First Amendment access-to-courts claim based on interference with legal mail under § 1983, a prisoner must make a showing that a prison official's deliberate and malicious interference caused an actual injury, such as the dismissal of a non-frivolous legal claim."); *cf. Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

The Court makes this finding with some reservation given that Plaintiff's appeal of the decision to place him in SHU was decided by Defendant Selsky *before* the two dates on which Nicole Esters attempted to mail the Mathis affidavit to Plaintiff (so that Plaintiff could submit that affidavit to Selsky for consideration).[FN15] It is conceivable to the Court that such an anachronism might destroy the causal connection necessary for Plaintiff to succeed on a mail-tampering claim under the First Amendment. However, Defendants have not established that, if Plaintiff had received the Mathis affidavit during the few days after Nicole Esters mailed it on June 21, 2005, and had immediately sent it to Defendant Selsky for reconsideration of his decision of June 13, 2005, that decision would have remained the same.[FN16] As a result, the Court finds that this claim survives judgment as a matter of law, on the current record.

> FN15. The first time that Nicole Esters attempted to mail Plaintiff the affidavit in question was on or about June 21, 2005. (Dkt. No. 58, Part 3, at 2.) However, Plaintiff's appeal of the April 2005 decision to place him in SHU was modified by Defendant Selsky more than a week before that attempted mailing-on June 13, 2005. (Dkt. No. 17, at ¶ 26 [Plf.'s Verified Amended Complaint, asserting fact]; Dkt. No. 58, Part 4, at 49 [Plf.'s response papers, attaching contemporaneous letter from Plaintiff referencing date of decision].)

> FN16. *See, e.g., Dawes v. Coughlin,* 83 N.Y.2d 597, 612 N.Y.S.2d 337, 337-38, 634 N.E.2d 938 (N.Y.1994) (describing procedural history of case in which Donald Selsky granted the plaintiff "supplementary appeal," which served as a motion for reconsideration, and explaining that "[n]o provision exists ... concerning reconsideration of the Commissioner's decisions. Notwithstanding the absence of explicit statutory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

or regulatory authority permitting respondent to reconsider an apparently final prior determination, we conclude that respondent acted properly in this case.... In the absence of statutory or regulatory guidance, respondent is entitled to exercise some discretion in fashioning appropriate remedies ....") [citations omitted]; *cf. Miller v. Selsky,* 111 F.3d 7, 8 (2d Cir.1997) (describing procedural history of case in which Donald Selsky *sua sponte* reversed his prior ruling, apparently based on argument raised by the plaintiff in an Article 78 proceeding challenging Selsky's decision).

With regard to Defendant Smith, it is true that "[he] cannot be liable solely because he held a position of authority over other defendants." *Douglas v. Smith,* 05-CV-1000, 2008 WL 434605, at * 15 (N.D.N.Y. Feb.14, 2008) (Homer, MJ). However, liability may be imputed to Defendant Smith where his supervision amounts to gross negligence. *Murray v. Pataki,* 03-CV-1263, 2007 WL 956941, at *4 (N.D.N.Y. Mar.29, 2007) (Kahn, J.) ("[I]f a prisoner claims that a supervisory official failed to train or supervise subordinates because of gross negligence, supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates gross or deliberate indifference by failing to act.") (internal quotation marks and citations omitted).

Here, Plaintiff alleges in his verified Amended Complaint that "[i]n July 2005, Hamilton complained to J.T. Smith about the unconstitutional theft of mail being implemented at Shawangunk." (Dkt. No. 17, at ¶ 31.) "Smith refused to correct the policy being instituted by J. Maly and allowed the theft of mail to continue." (*Id.*) This sworn allegation (which, again, has the force and effect of a statement in an affidavit) creates a genuine issue of material fact as to whether Defendant had notice of Defendant Maly's alleged behavior. In addition, because Plaintiff swears that some of the mail tampering occurred after he made Defendant Smith aware of the problem (*see* Dkt. No. 17, at ¶ 31-35), there is genuine issue of material fact as to whether Defendant Smith was grossly negligent in his supervision of Defendant Maly.

**\*12** For all of these reasons, Defendants' motion for summary judgment on this claim is denied.

**C. Plaintiff's Fourteenth Amendment Claim of Violation of Due Process**

In his Amended Complaint, Plaintiff alleges that Defendants Maly, Selsky and Davis violated his due process rights by precluding him from calling certain witnesses during Plaintiff's disciplinary rehearing, which resulted in Plaintiff being sentenced to twelve months in the Special Housing Unit ("SHU"). (Dkt. No. 17.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly violated Plaintiff's Fourteenth Amendment due process rights at his disciplinary hearing by refusing to call former inmate named Mathis (who Plaintiff claims possessed exculpatory evidence) and a substance abuse program representative (who Plaintiff claims could have provided mitigating evidence).[FN17] (Dkt. No. 60, at 9-11, 36-38.)

> FN17. The Witness Interview Notice, filled out by Defendant Maly, indicates that Plaintiff sought to call Counselor Williams, Counselor Bosland, and/or "someone from OMH." (Dkt. No. 68, Part 2, at 9.)

In their Objections to the Report-Recommendation, Defendants argue that Magistrate Judge Homer erred in his conclusion because (1) the record is clear that Defendant Maly attempted to contact Mathis, but was unsuccessful in locating him, and (2) Defendant Maly refused to allow other witnesses to testify at the second hearing only after interviewing these witnesses and determining that they lacked direct knowledge of the alleged incident. (Dkt. No. 66.)

On January 12, 2005, Plaintiff was selected for a random drug test. (Dkt. No. 58, Part 3, at 33.) Two separate urinalysis tests were positive for cannabinoids. (*Id.*) As a result, Plaintiff was reported for a violation of Rule 113.24. (*Id.*) On January 31, 2005, Defendant Davis conducted a superintendent's hearing at Attica C.F. and found Plaintiff guilty. (Dkt. No. 68, Part 7.) Plaintiff appealed this determination, and a rehearing was scheduled for April 12, 2005, at Shawangunk C.F. (Dkt.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

No. 58, Part 3, at 33.)

At his rehearing, Plaintiff requested that the hearing officer, Defendant Maly, allow him to call a former inmate (Mathis), who was recently released from prison, who could offer exculpatory evidence about Plaintiff's positive drug test. (Dkt. No. 51, at 96-98, 121-23 [Hamilton Dep. Tr.].) Defendant Maly interviewed some of the witnesses that Plaintiff requested, and found them to have no direct knowledge of the incident. (Dkt. No. 58, Part 3, at 10.) As a result, Defendant Maly determined that these witnesses were irrelevant, and accordingly denied Plaintiff's request to call them. (*Id.*) Defendant Maly also attempted to contact Mathis, but was unsuccessful in locating him. After interviewing the witnesses that he deemed irrelevant and attempting to contact Mathis to no avail, Defendant Maly proceeded with the hearing in Plaintiff's absence. (Dkt. No. 58, Part 3, at 34.) [FN18]

> [FN18.] Plaintiff refused to attend his hearing because he alleges that it was perfunctory. (Dkt. No. 58, Part 4, at 30-38.)

The Supreme Court has held that "an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). However, the Court also held that "the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff,* 418 U.S. at 566. Furthermore, the Court in *Wolff* explained that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators ... [w]e must balance the inmates's interest [in avoiding the loss of a right or benefit] against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.; see also Scott v. Kelly,* 962 F.2d 145, 147 (2d Cir.1992) (request for witnesses "can be denied on the basis of irrelevance or lack of necessity").

**\*13** "Emphasizing the caution courts should exercise before challenging disciplinary hearings, the Supreme Court instructs, '[p]rison officials must have the necessary discretion to keep a prison disciplinary hearing within reasonable limits and ... to limit access to other inmates to collect statements or to compile other documentary evidence.' " *Dixon v. Goord,* 224 F.Supp.2d 739, 745-46 (S.D.N.Y.2002) (citing *Wolff,* 418 U.S. at 566). "Deference to prison administrators may mean upholding a denial of a request even in situations where the 'denied witness might have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." *Dixon,* 224 F.Supp.2d at 746 (citing *Afrika v. Selsky,* 750 F.Supp. 595, 601 [S.D.N.Y.1990] ).

As an initial matter, the Court finds that Defendant Davis, who worked at Attica C.F. during the time in question, had no personal involvement in the disciplinary proceedings held in April 2005 at Shawangunk C.F., which give rise to Plaintiff's Fourteenth Amendment due process claims. As a result, Plaintiff's Fourteenth Amendment due process claim against Defendant Davis should be dismissed.

With regard to Defendant Maly, it is undisputed that he attempted to contact Mathis, using the telephone number provided to him by Plaintiff. (Dkt. No. 58, Part 3, at 13.) When Defendant Maly called that telephone number, "the local phone company responded that this number was disconnected." (*Id.*) In addition, Defendant Maly interviewed the witnesses that Plaintiff sought to call, and determined during these interviews that their testimony was irrelevant to the issue of whether Plaintiff tested positive for cannabinoids.

Even assuming that Mathis may have provided exculpatory testimony, it cannot be said that failure to call him (and the other requested witness) amounts to a violation of Plaintiff's due process rights given that Defendant Maly made efforts to contact Plaintiff's witnesses, and provided Plaintiff with an explanation (through the Witness Interview Notice Form) as to why they would not be testifying at his hearing.[FN19] The Court notes that, as previously stated, courts should exercise caution before challenging disciplinary hearings, and prison officials must have the necessary discretion to keep

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

a prison disciplinary hearing within reasonable limits. *Dixon,* 224 F.Supp.2d at 746. Here, the Court finds that such discretion is properly exercised in giving some deference to the hearing officer's judgment as to (1) what constitutes relevant testimony, and (2) what constitutes a reasonable period of time in which to conduct a disciplinary hearing. *Id.; Wolff,* 418 U.S. at 566.

> FN19. The Supreme Court has held that prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify but that they may do so either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a 'liberty' interest is challenged because of that claimed defect in the hearing. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). "In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.' " *Ponte v. Real,* 471 U.S. at 497. "Explaining the decision at the hearing will of course not immunize prison officials from a subsequent court challenge to their decision, but so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals,' " the explanation should meet the due process requirements as outlined in *Wolff. Id* .

For these reasons, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's Fourteenth Amendment due process claims.

## IV. ANALYSIS OF REMAINING CLAIMS

The only Objections offered by Plaintiff to Magistrate Judge Homer's Report-Recommendation regarding the claims not discussed above in Part III of this Decision and Order are simply reiterations of Plaintiff's previous arguments of his claims regarding a denial of mental health treatment by Defendant Skies, contaminated drinking water and poor ventilation in the prison facility, and wrongful placement in CSU. (*See* Dkt. No. 67).

**\*14** After carefully reviewing all of the papers in this

action, including Magistrate Judge Homer's Report-Recommendation and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Homer's Report-Recommendation regarding the claims not discussed above in Part III of this Decision and Order is correct in all respects. Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the remainder of the Report-Recommendation for the reasons stated therein.

**ACCORDINGLY,** it is

**ORDERED** that United States Magistrate Judge David R. Homer's Report-Recommendation (Dkt. No. 60) is *ACCEPTED* and *ADOPTED* **as modified** by this Decision and Order; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is *DENIED* with respect to Plaintiff's First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is *GRANTED* as to all other claims and Defendants; and it is further

**ORDERED** that Plaintiff's claims against Defendants Gonzalez, Genovese, Parisi, Selsky, Davis, and Chiapperino are *DISMISSED* in their entirety.

N.D.N.Y.,2009.

Hamilton v. Smith
Slip Copy, 2009 WL 3199520 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2940069 (S.D.Ohio)

(Cite as: 2009 WL 2940069 (S.D.Ohio))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. Ohio,
Eastern Division.
Phillip Douglas JACOBS, et al., Plaintiffs,
v.
Ted STRICKLAND, et al., Defendants.
No. 2:08-cv-680.

Sept. 9, 2009.
Phillip Douglas Jacobs, Marion, OH, pro se.

Ahlus Sunnah Wal Jama'Ah, pro se.

Turaee Manley, pro se.

Thomas Lidge, pro se.

Jerry Jones, pro se.

Thomas Amir, pro se.

Devon Lyles, pro se.

Mary Anne Reese, Attorney General of Ohio, Cincinnati, OH, for Defendants.

### OPINION AND ORDER

GEORGE C. SMITH, District Judge.

**\*1** This matter is before the Court on Plaintiff's Motion to Alter or Amend this Court' August 11, 2009 Opinion and Order granting the defendants' motion to dismiss. Plaintiff Phillip D. Jacobs, a state prisoner, filed this action against various state officials for alleged violations of his rights under the Religious Land Use and Institutionalized Persons Act and the United States Constitution. Defendants Governor Ted Strickland, the Ohio Department of Rehabilitation and Correction, ODRC Director Terry Collins, ODRC Deputy Director Toni

Brooks, ODRC Regional Director Khelleh Konteh, ODRC Regional Director Ernie Moore, and ODRC Employee Records Manager Nancy Patete-Hetterscheidt filed a motion to dismiss the Complaint for failure to state a claim upon which relief can be granted. On June 10, 2009, the Magistrate Judge recommended that the motion to dismissed be granted. Plaintiff objected to the Report and Recommendation. This Court overruled Plaintiff's objections, adopted the Report and Recommendation and granted Defendants' motion. For the following reasons, the Court **DENIES** Plaintiff's Motion to Alter or Amend.

### I. STANDARD OF REVIEW

A motion to alter or amend pursuant to Fed.R.Civ.P. 59(e) is designed only to "correct manifest errors of law or fact or to present newly discovered evidence." *Phelps v. Hamilton,* 122 F.3d 1309, 1324 (10th Cir.1997); *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Accordingly, a Rule 59(e) motion may be made for one of only three reasons: (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or to prevent manifest injustice. *See Berridge v. Heiser,* 993 F.Supp. 1136, 1146-47 (S.D.Ohio 1997) (citing *Firestone v. Firestone,* 76 F.3d 1205 (D.C.Cir.1996)).

A motion for reconsideration or to alter or amend is not a vehicle to reargue the case or to present evidence which should have been raised in connection with an earlier motion. *See Database America v. Bellsouth Advertising & Pub. Corp.,* 825 F.Supp. 1216, 1219-20 (D.N.J.1993); 11 Charles Alan Wright, Arthur Miller and Mary Kay Kane, *Federal Practice and Procedure,* § 2810.1 (2d ed. 1995) (Motions to alter or amend judgment cannot be used to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment."). "A party seeking reconsideration must show more than a disagreement with the court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.' " *Database,* 825 F.Supp. at 1220.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2940069 (S.D.Ohio)

(Cite as: 2009 WL 2940069 (S.D.Ohio))

## II. DISCUSSION

Plaintiff asserts four arguments in support of his Motion to Alter or Amend: (1) that the Court ignored the fact that he had standing as a Sunni Muslim to assert claims on his own behalf; (2) that the Court's requirement that he demonstrate personal involvement by the individual defendants to establish liability under RLUIPA is incompatible with the actual requirements of that statute; (3) that he was not required to plead detailed facts in support of his allegations of personal involvement; and (4) that whether the individual defendants actually created the food service policy or allowed it to continue is a question of fact that cannot be decided at this stage of the proceedings.

### A. Standing

**\*2** Mr. Jacobs apparently does not take issue with this Court's determination that, as a *pro se* with no legal training, he may not assert class-based claims on behalf of other Sunni Muslim prisoners. Rather, he contends that the August 11, 2009 Opinion and Order found that he lacked standing, as a Sunni Muslim, to assert his own individual claims. The Court made no such finding. Plaintiff's claims for injunctive relief were dismissed on mootness grounds because he was no longer incarcerated at NCCI. His claims for damages against ODRC were dismissed as barred by the 11th Amendment and his damage claims against the individual defendants were dismissed because he failed to allege that the individual defendants had any direct personal involvement in the alleged discriminatory practices. No claims, other than the class-based claims were dismissed for lack of standing. With respect to these claims, it is well-settled in this Circuit that a pro se prisoner such as Mr. Jacobs may not serve as a representative of the class of Sunni Muslims incarcerated at NCCI and other state correctional facilities. *See Palasty v. Hawk,* 15 Fed.App'x 197, 200 (6th Cir.2001).

### B. Personal Involvement Under RLUIPA

As noted in the Magistrate Judge's Report and Recommendation, at least one district judge in the Southern District of Ohio has specifically held that a plaintiff fails to state a claim for damages against individual defendants under RLUIPA unless he pleads the personal involvement of those defendants in the alleged

discriminatory conduct. *See Greenberg v. Hill,* No. 2:07-CV-1076, 2009 WL 890521 at \*3 (S.D.Ohio Mar. 31, 2009) (Sargus, J.). Such a requirement clearly applies to actions brought under 42 U.S.C. § 1983. *See Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984). Mr. Jacobs does not point to any specific language in the RLUIPA, or cite to any caselaw construing that statute, for which a different result should obtain in this case. Consequently, the Court cannot find that requiring Mr. Jacobs to show the personal involvement of each defendant in order to establish individual liability under RLUIPA is a clear error of law.

### C. Pleading Personal Involvement

Plaintiff's contention that he is not required to plead detailed facts to support his allegations of personal involvement by each individual defendant is belied by two recent Supreme Court decisions. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While the pleading standard contained in Fed.R.Civ.P. 8 does not require "detailed factual allegation," it demands something more than a naked assertion that a defendant caused harm. *Twombly,* 550 U.S. at 555. A complaint that offers only "labels and conclusions" or a formulaic accounting of the elements of a claim is insufficient. *Id.* To survive a motion to dismiss, a complaint must comprise enough facts to state an entitlement to relief that is plausible on its face. *Id.* at 570.

**\*3** In this case, none of the named defendants are even employed at NCCI, where the alleged discriminatory conduct took place. The complaint alleges that the individual defendants planned and promulgated official policies and practices which led to the arbitrary and capricious actions of prison officials at NCCI and other state correctional facilities. Mr. Jacobs, however, fails to identify a single policy or practice that was planned or promulgated by these defendants and which led to the discriminatory practices of which he complains. His allegations are merely conclusory and, as such, need not be accepted as true. *Id.* at 554-555; *Ashcroft,* 129 S.Ct. at 1951. Absent factual allegations connecting the actions of these defendants with Plaintiff's claims of invidious discrimination, the Complaint fails to state a claim for relief against defendants Strickland, Collins, Brooks,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2940069 (S.D.Ohio)

(Cite as: 2009 WL 2940069 (S.D.Ohio))

Konteh, Moore, and Patete-Hetterscheidt that is plausible on its face.

**D. Question of Fact**

Contrary to Plaintiff's supposition, the Court did not decide the question of whether the individual defendants actually created the food service policy by which Mr. Jacobs was allegedly denied Halal meals. Had Mr. Jacobs sufficiently pled the existence of such a policy promulgated by the individual defendants or detailed their personal involvement in the denial of Halal meals to him, the Complaint might have survived a motion to dismiss. Because he did not satisfy these pleading requirements, the Court did not clearly err in granting the defendants' motion to dismiss.

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff' Motion to Alter or Amend (# 29).

**IT IS SO ORDERED.**

S.D.Ohio,2009.

Jacobs v. Strickland
Slip Copy, 2009 WL 2940069 (S.D.Ohio)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. Ohio,
Eastern Division.
Steven M. GREENBERG, Plaintiff,
v.
Judy HILL, et al., Defendants.
Civil Action No. 2:07-CV-1076.

March 31, 2009.
West KeySummary**Prisons 310** ☞ **154**

310 Prisons

310II Prisoners and Inmates
310II(B) Care, Custody, Confinement, and Control
310k151 Religious Practices and Materials
310k154 k. Diet and Meals. Most Cited
Cases

Even if a Jewish inmate was denied a full Seder meal
on two occasions, the inmate failed to establish that the
denial was a substantial burden on the inmate's exercise of
religious freedom, and thus, the Religious Land Use and
Institutionalized Persons Act was not violated. The
incident was isolated. The inmate had received the meals
for the previous three years and prison officials made
efforts to rectify the situation by providing all remaining
required meals to the inmate that year. 42 U.S.C.A. §
2000cc-1(a).

Steven M. Greenberg, Blacklick, OH, pro se.

Mary Anne Reese, Attorney General Of Ohio, Cincinnati,
OH, for Defendants.

**OPINION AND ORDER**

EDMUND A. SARGUS, JR., District Judge.

**\*1** Plaintiff, formerly incarcerated at the Ross
Correctional Institution ("RCI"), brings this action under
42 U.S.C. § 1983, alleging that, on two nights during

Passover 2007, he (and other Jewish inmates) were denied
the Seder kosher meal required by their religion, in
violation of the First and Fourteenth Amendments to the
United States ConstitutionPlaintiff also asserts that
defendants violated the Religious Land Use and
Institutionalized Persons Act ("RLUIPA"), 2000cc-1, *et
seq*. On February 12, 2009, the United States Magistrate
Judge issued a *Report and Recommendation*
recommending that defendants' motion for summary
judgment be granted and that plaintiff's motion for
summary judgment be denied. Doc. No. 43.[FN1] This matter
is now before the Court on plaintiff's objections to that
*Report and Recommendation*, which the Court will
consider *de novo*. 2a U.S.C. § 636(b).

> **FN1.** The United States Magistrate Judge also
> recommended that defendants' motion to strike
> plaintiff's cross-motion for summary judgment be
> denied. Doc. No. 43. No party objected to this
> recommendation.

**I. FACTUAL BACKGROUND**

The Court will briefly summarize the undisputed facts
from the *Report and Recommendation*. Plaintiff is an
Orthodox Jew and observes Passover, which
commemorates the exodus of the Jewish people from
Egyptian slavery. The Passover Seder meal, served during
the first two nights of Passover, is an important part of the
religious holiday.

On or about March 2, 2007, approximately one month
before Passover, defendant Sims, RCI's Religious Services
Administrator, circulated a memorandum regarding the
Passover celebration to all chaplains, wardens, deputy
wardens of special services and food service managers,
including defendant Judy Hill, RCI's Food Service
Manager. In this memorandum, defendant Sims identified
the dates of Passover in 2007 and explained:

> Jewish inmates, who desire to observe Passover, shall
> be afforded the opportunity to participate in the
> "kosher" meal of Passover (breakfast, lunch, and
> dinner); and the Seder meal.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

### PASSOVER MEALS

The eight (8) Passover meals (April 2-10, 2007) should include a "kosher" breakfast, lunch and dinner.

### SEDER

Traditional Jewish laws require Jews to participate in the Seder meal. The first Seder meal is the first night of Passover and the second Seder meal is the second night of Passover (April 2 and 3, 2007).

A Seder plate which consists of a shank bone, horseradish, egg, romaine lettuce, and onion is used. Four cups of wine (grape juice) is drunk and Matzo is eaten. These items could be found at any kosher food store. At the meal a Haggadah is read.

The required ceremonial foods for the Seder are:

1. Matzah

2. Kosher grape juice

3. Parsley (or celery)

4. One hard boiled or roasted egg

5. Salt water

6. Horseradish

7. Charosat (mixture of kosher grape juice, scraped apple & nuts)

8. Roasted shank bone (a chicken neck may be substituted)

Exhibit A-1, attached to *Declaration of Judy Hill* ("*Hill Decl.*"), attached to *Defendants' Motion for Summary Judgment,* Doc. No. 26. Thus, according to the memorandum, Jewish inmates were entitled to the Seder plate, containing various ceremonial foods, on the first two nights of Passover, as well as to kosher meals throughout Passover.

**\*2** Prior to April 2 and 3, 2007, the first two nights of Passover, Jewish inmates were instructed to go to the prison chapel to receive their Passover Seder meals. The parties do not dispute that the Seder plate, Matzah and grape juice were delivered to the chapel on April 2 and 3, 2007. *See Verified Complaint,* ¶ 15; *Hill Decl.* ¶ 5. It is also undisputed that the kosher meals, which plaintiff identifies as the "Seder Meal," were not delivered to the chapel on those two evenings. *Verified Complaint,* ¶ 15; *Hill Decl.* ¶ 6.

Further, plaintiff does not dispute that (1) other than these two meals, all of the other meals (breakfast, lunch and dinner) were provided to plaintiff and the other Jewish inmates during the eight days of Passover, April 2-10, 2007, and (2) during Passover 2008, the ceremonial Seder plate and kosher meals were provided at the same time to the Jewish inmate participants in the prison chapel. *Hill Decl.* ¶¶ 7, 9.[FN2]

> [FN2.] Similarly, plaintiff received, without incident, the Seder meals for the preceding three Passover celebrations in 2004, 2005 and 2006. *Verified Complaint,* ¶ 22.

The *Report and Recommendation,* Doc. No. 43, noted the defendants' position that the failure to provide Jewish inmates the full kosher Seder meal on two nights in April 2007 was an "unintentional oversight resulting from inadvertent miscommunication." *Hill Decl.,* ¶¶ 8-9. The *Report and Recommendation* also noted plaintiff's disagreement with that position and plaintiff's contention that the defendants purposely deprived him and other Jewish inmates of the full Seder Passover meal on those nights. *Report and Recommendation,* p. 13. The *Report and Recommendation* went on to conclude, however, t hat even accepting plaintiff's allegations as true, plaintiff did not establish that the deprivation suffered by him amounted to a "substantial burden" on his religious practices for purposed of RLUIPA:

By plaintiff's own admission, he received the full Passover Seder meals for the three years prior to Passover 2007. *Verified Complaint,* ¶ 22. After the two Passover Seder meals were not delivered to plaintiff in the chapel during Passover 2007, defendants took steps to remedy the situation by providing 22 of 24 Passover meals to plaintiff that year. *Hill Decl.,* ¶ 7. Defendants also ensured that plaintiff and other Jewish inmate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

participants received all the appropriate meals the following year during Passover 2008. *Id.* at ¶ 9. Therefore, the uncontroverted evidence establishes that plaintiff missed two partial Passover Seder meals over the course of five years. Under these circumstances, the failure to provide two meals in several years is an isolated omission that does not qualify as a "substantial burden" for purposes of RLUIPA.

*Report and Recommendation,* pp. 13-14.[FN3]

> [FN3.] Plaintiff's objection relating to the reference to "partial Passover Seder Meal" is discussed *infra.*

## II. REQUESTED RELIEF

As an initial matter, the Court notes that plaintiff seeks declaratory and injunctive relief in addition to monetary damages against defendants, who are sued in their individual capacities.[FN4] *Verified Complaint,* ¶¶ 2-9. Defendants argue that plaintiff's request for injunctive relief is without merit because he has been released from prison. *Defendants' Memorandum in Opposition to Plaintiff's Objections to the Magistrate Judge's Report and Recommendation,* Doc. No. 49, pp. 10-12 (*"Opposition to Plai ntiff's Objections"* ). Plaintiff has filed a change of address, notifying the Court that his new address is in Blacklick, Ohio. Doc. No. 42. Therefore, the Court concludes that plaintiff's request for injunctive and declaratory relief is now moot because he is no longer incarcerated at RCI. *See, e.g., Dellis v. Corr. Corp. of Am., 257 F.3d 508, 510 n. 1 (6th Cir.2001); Kensu v. Haigh, 87 F.3d 172, 175 (6th Cir.1996).* However, plaintiff may proceed with his request for monetary relief.[FN5]

> [FN4.] As discussed in the *Report and Recommendation,* it is unsettled whether RLUIPA creates a private cause of action against defendants in their individual capacities. Several courts, including sister courts in the Sixth Circuit, have concluded that RLUIPA does not permit individual capacity claims. *See, e.g., Smith v. Allen, 502 F.3d 1255, 1274-75 (11th Cir.2007); Pugh v. Goord, 571 F.Supp.2d 477, 507 (S.D.N.Y.2008); Sisney v. Reis ch, 533 F.Supp.2d 952, 967 (D.S.D.2008); Garrison v.*

*Dutcher,* No. 1:07-CV-642, 2008 U.S. Dist. LEXIS 90504, at *12-13 (W.D.Mich. Sept. 30, 2008); *Horacek v. Burnett,* No. 07-11865, 2008 U.S. Dist. LEXIS 80477, at *2 (E.D.Mich. Sept.30, 2008). However, other courts, including a district court in the Sixth Circuit, have permitted individual capacity claims pursued under RLUIPA. *See Shakur v. Schriro,* 514 F.3d 878 (9th Cir.2008); *Williams v. Bitner,* 455 F.3d 186, 194 (3d Cir.2006); *Farnsworth v. Baxter,* No. 03-2950, 2007 U.S. Dist. LEXIS 72209, at *6 (W.D.Tenn. Sept. 26, 2007). For purposes of summary judgment only, however, the Court will assume that plaintiff may proceed on these claims.

> [FN5.] Defendants contend that, assuming arguendo that plaintiff is entitled to damages, he is entitled only to nominal damages because he "has failed to meet the threshold requirement [under the Prison Litigation Reform Act ("PLRA") ] of showing any physical injury." *Opposition to Plaintiff's Objections,* pp. 10-11. However, the United States Court of Appeals for the Sixth Circuit has not definitively determined whether the PLRA precludes the recovery of damages. In an unpublished opinion, the Sixth Circuit suggested that the PLRA does not preclude punitive damages. *See Miller v. Bock,* No. 02-1964, 55 Fed. Appx. 310, 312 (6th Cir. Jan.28, 2003). Accordingly, the Court assumes, without deciding, that the PLRA does not preclude plaintiff's request for damages.
>
> Defendants also argue that damages are unavailable under RLUIPA. *Opposition to Plaintiff's Objections,* pp. 11-12. The Sixth Circuit has not definitively ruled on this issue and, as defendants note, the courts are divided. However, for purposes of summary judgment, the Court will assume, without deciding, that money damages are available against the defendants.

## III. ALLEGED DISCOVERY ABUSES

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

**\*3** In his first objection, plaintiff complains that abuse in the discovery process prejudiced him. *Plaintiff's Objections to the Magistrate's Report and Recommendations,* Doc. No. 47 (*"Plaintiff's Objections"* ). Specifically, plaintiff complains that the Magistrate Judge improperly denied his two motions to compel and three motions for sanctions.[FN6]

> **FN6.** To the extent that plaintiff complains about inferences raised in his *Civil Complaint Verified,* Doc. No. 4 (*"Verified Complaint"* ), that objection is addressed *infra.*

In addition to being untimely, plaintiff's objection in this regard is without merit. It was an earlier order of the Court, Order, Doc. No. 38, rather than the *Report and Recommendation,* that addressed these discovery motions. That *Order* advised plaintiff that "if plaintiff believes that he requires certain, specified, discovery in order to make substantive response to the motion for summary judgment, he shall expressly articulate, in his memorandum contra the motion for summary judgment, the particular discovery that he needs." *Id.* In his memorandum *contra,* which also served as his motion for summary judgment, plaintiff did not identify any specific discovery necessary to fully respond to defendants' motion for summary judgment, Doc. No. 26 (*"Defendants' Motion for Summary Judgment"* ). *Plaintiff's Memorandum Contra the Motion for Summary Judgment of Defendants; and Plaintiff's Consolidated Cross Motion for Summary Judgment,* Doc. No. 39 (*"Plaintiff's Motion for Summary Judgment"* ). Similarly, *Plaintiff's Objections* fail to specify what discovery that was denied him was essential to his case or to his response to *Defendants' Motion for Summary Judgment.*

Here, despite the Court's invitation in the *Order,* plaintiff has identified no specific discovery necessary to make substantive response to *Defendants' Motion for Summary Judgment.* Accordingly, the Court agrees with the Order, Doc. No. 38, that denied plaintiff's five discovery motions. *Cf., Lanier v. Bryant,* 332 F.3d 999, 1006 (6th Cir.2003) ("Nebulous assertions that more discovery time would have produced evidence to defeat summary judgment will be unavailing. [Plaintiff] has failed to indicate what information he could have gained through discovery to identify a material issue of fact[.]")

(internal citations omitted); *Lewis v. ACB Business Services, Inc.,* 135 F.3d 389, 402 (6th Cir.1998) (stating that the trial court has broad discretion to determine the proper scope of discovery).

## IV. RLUIPA

Plaintiff alleges that defendants violated his rights under RLUIPA and the First and Fourteenth Amendments. *Verified Complaint,* ¶ 25. RLUIPA prohibits the government from imposing a "substantial burden" on an inmate's religious exercise unless the government establishes that the burden furthers a "compelling governmental interest" through the "least restrictive means [.]" 42 U.S.C. § 2000cc-1(a).

In order to establish liability under RLUIPA (and Section 1983), a plaintiff must prove, among other things, the personal involvement of each defendant in the alleged violation. *See, e.g.,* 42 U.S.C. §§ 2000cc-1(a), 2000cc-5(4)(A)(iii); *Monell v. Dep't of Soc. Servs. of the City of* New York, 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Copeland v. Machulis,* 57 F.3d 476, 481 (6th Cir.1995) (*per curiam* ); *Copenhaver v. Burnett,* No. 07-CV-14376, 2008 U.S. Dist. LEXIS 53040, at \*7 (E.D.Mich. July 11, 2008); *Kitchen-Bey v. Hoskins,* No. 2:06-cv-251, 2008 U.S. Dist. LEXIS 17544, at \*2 (W.D.Mich. Mar. 7, 2008).

## A. ALLEGATIONS CONTAINED IN THE *VERIFIED COMPLAINT*

**\*4** In his objections, plaintiff complains that "essential factual allegations" in his *Verified Complaint* were not considered even though the Court previously stated that "defendants appear to concede the factual allegations made by plaintiff in the *Verified Complaint* [.]" *Plaintiff's Objections* (quoting Order, Doc. No. 38).

It is well-settled that a court may consider only admissible evidence in ruling on a motion for summary judgment. *See, e.g., Wiley v. United States,* 20 F.3d 222, 225-26 (6th Cir.1994). Therefore, while statements in a verified complaint may have the same effect as an affidavit for summary judgment purposes, *see, e.g., Williams v. Browman,* 981 F.2d 901, 905 (6th Cir.1992), those statements must be based on personal knowledge. *See, e.g., Weberg v. Franks,* 229 F.3d 514, 526 n. 13 (6th Cir.2000); Fed.R.Civ.P. 56(e). Accordingly, the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

cannot consider hearsay evidence even if such evidence appears in a verified complaint. *Id.; Carter v.Univ. of Toledo,* 349 F.3d 269, 274 (6th Cir.2003).

Similarly, speculative and conclusory allegations, even if made within a verified complaint, are insufficient to withstand a motion for summary judgment. *See, e.g., Hamilton v. Roberts, No. 97-1696, 1998 U.S.App. LEXIS 22653, at *17-18 (6th Cir. Sept. 10, 1998); Emmons v. McLaughlin,* 874 F.2d 351, 354-55 (6th Cir.1989) (finding that vague and conclusory allegations in an affidavit were insufficient to withstand summary judgment); *Bryant v. Kentucky,* 490 F.2d 1273 (6th Cir.1974) (stating that conclusory allegations, without more, are not enough to survive summary judgment). In addition, vague statements cannot overcome a motion for summary judgment. *See, e.g., Stalbosky v. Belew,* 205 F.3d 890, 895 (6th Cir.2000); *Emmons,* 874 F.2d at 354-55.

Finally, the Court notes that summary judgment is appropriate only when the record reflects a genuine issue of material fact. Fed.R.Civ.P. 56(c). "Material" facts are those facts that affect the outcome of the dispute under the applicable law. *See, e.g., Anderson v. Liberty L obby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 702 (6th Cir.2008) ("Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment.") (quoting *Anderson,* 477 U.S. at 248). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

In light of the above, the Magistrate Judge was free to disregard statements contained within the *Verified Complaint* that are conclusory, vague, hearsay or that relate to immaterial facts under applicable law.

**B.  Plaintiff's  Allegations  Against  Individual Defendants**

**1. Defendants Sims and Djaleta**

**\*5** After reviewing the allegations contained in the *Verified Complaint,* the Court concludes that plaintiff has failed to show that defendants Sims and Djaleta were personally involved in the failure to provide plaintiff a Seder meal on April 2 and 3, 2007. First, plaintiff offers only conclusory and vague allegations and immaterial facts and speculation regarding the knowledge possessed by and the state of mind of defendant Sims, "head of all religious services in Ohio within the ODRC [Ohio Department of Rehabilitation and Correction]." *Verified Complaint,* ¶¶ 9, 19. Similarly, plaintiff provides only conclusory statements and immaterial facts regarding defendant Djaleta, "chaplain at RCI[.]" *Id.* at ¶¶ 7, 17-18. As discussed *supra,* conclusory statements and non-material facts are insufficient to overcome summary judgment. Finally, to the extent that plaintiff recounts conversations with defendant Djaleta, those conversations relate to the alleged involvement of other defendants, not that of defendant Djaleta. *Id.* at ¶ 17.

**2. Defendant Upchurch**

Plaintiff also cannot demonstrate that defendant Upchurch, "Deputy Warden of Special Services at RCI," was personally involved in the failure to provide two Seder kosher meals in 2007. *Id.* at ¶¶ 8, 20. Other than vague and conclusory statements and nonmaterial facts, plaintiff asserts that he spoke with defendant Upchurch "[l]ater" in the month after the events at issue in this case. *Id.* However, this conversation related to allegations against another defendant, Judy Hill, not to any failure on the part of defendant Upchurch to provide one kosher meal on two occasions during Passover in 2007. *Id.* at ¶ 20.

**3. Defendants Ward and Depue**

According to the *Verified Complaint,* defendants Ward and Depue, food coordinators, told plaintiff that defendant Judy Hill, "Direct Supervisor of kitchen staff at [RCI]," and Chris Hill, "Food Coordinator Supervisor at [RCI]," instructed staff "not to deliver kosher Passover Seder Meals" on April 2 and 3, 2007. *Id.* at ¶¶ 4, 5, 12, 13, 14, 16.[FN7] Accordingly, based on the record before the Court, defendants Ward and Depue were following the orders of their superiors, defendants Judy and Chris Hill. There is no evidence that defendants Ward and Depue controlled the delivery of kosher meals in April 2007 or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

otherwise intentionally participated in or caused the failure to deliver the two meals about which plaintiff complains. Therefore, plaintiff has failed to establish that defendants Ward and Depue were personally responsible for the failure to provide kosher meals on two occasions. *Cf. Van Wy he v. Reisch,* 536 F Supp.2d 1110, 1125 (D.S.D.2008) (granting summary judgment on RLUIPA claim to subordinates who obeyed violative policies adopted by their superiors).

> FN7. Because defendants have not otherwise argued that this statement is inadmissible, the Court presumes that it may be considered as the admission of a party opponent. Fed.R.Evid. 801(d)(2)(A) (providing that a statement is not hearsay when "[t]he statement is offered against a party and is (A) the party's own statement in either an individual or representative capacity[.]").

**4. Defendants Whitt, Judy Hill and Chris Hill**

For purposes of summary judgment, the Court will presume that plaintiff sufficiently demonstrated that defendant Whitt was personally involved in the failure to provide a Passover Seder kosher meal on April 2, 2007. *Verified Complaint,* ¶ 17. Similarly, the Court will accept plaintiff's allegations that defendants Judy Hill and Chris Hill were personally and intentionally involved in the failure to deliver Passover Seder kosher meals on April 2 and 3, 2007. *Id.* at ¶¶ 13, 16, 17, 19, 20.[FN8]

> FN8. In this respect, the Court notes that, contrary to plaintiff's objection, the *Report and Recommendation* also accepted as true plaintiff's allegations that "the evidence demonstrates that defendants purposely deprived him and other Jewish inmates of the full Passover Seder meal on those [two][n]ights." *Report and Recommendation,* pp. 13-14.

**C. Liability under RLUIPA**

**1. Standard**

**\*6** However, plaintiff must establish more than personal involvement in order to prevail on his RLUIPA claim. He must demonstrate that defendants Whitt, Judy Hill and Chris Hill substantially burdened his religious

exercise. 42 U.S.C. § 2000cc-1(a). As discussed in the *Report and Recommendation,* the parties do not dispute that Passover observances, including the mandate to observe kosher, constitute "religious exercise" under RLUIPA.

Instead, in his objections, plaintiff complains that the wrong standard was applied to his RLUIPA claim. *Plaintiff's Claims,* pp. 7-8. Specifically, plaintiff complains that the four factors articulated by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987, were not considered. *Id.* (citing *Whitney v. Brown,* 882 F.2d 1068 (6th Cir.1989)).[FN9] This Court disagrees that the wrong standard was applied to plaintiff's RLUIPA claim. RLUIPA specifically provides that the religious exercise of an inmate shall not be *substantially burdened* unless the imposition of that burden furthers "a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a) (emphasis added). Accordingly, under the plain language of the statute, the Court must first determine whether or not a "substantial burden" has been imposed before considering whether or not that substantial burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. *Id. See also Living Water Church of God v. Charter Twp. Meridian,* Nos. 05-2309 and 06-1210, 258 Fed. Appx. 729 (6th Cir. Dec.10, 2007) (stating that, when analyzing a RLUIPA claim in the zoning context, "[t]he first question" is whether a substantial burden was imposed); *Dunlap v. Losey,* No. 01-2586, 40 F. App'x 41, 43 (6th Cir. May 15, 2002) ("RLUIPA ... requires the complainant to show that his religious exercise was substan tially burdened."). Plaintiff therefore bears the initial burden of establishing that he suffered a "substantial burden" in his religious practice. 42 U.S.C. § 2000cc-2(b). Only if plaintiff establishes this initial predicate does the burden shift to defendants to prove that the substantial burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b); *Koger v. Bryan,* 523 F.3d 789, 796 (7th Cir.2008).

> FN9. In Turner,
>
> The Court set out a four-factor standard to test

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

the validity of a challenged prison regulation. First, courts are to determine if there is a "valid rational connection" between the challenged regulation and the asserted governmental interest. Second, are there "alternative means of exercising the right that remain open to ... inmates" if the regulation is upheld? Third, will accommodation of the asserted right have an undue impact on guards, other inmates, and prison resources generally? And fourth, is there an alternative to the challenged regulation that fully accommodates the prisoner's rights at *de minimis* costs to valid penological interests?

> *Whitney,* 882 F.2d at 1072 (quoting *Turner,* 107 S.Ct. at 2262) (internal citations omitted).

Although not specifically defined by RLUIPA or the United States Supreme Court, the Sixth Circuit has stated (in the context of a RLUIPA zoning case) that a "substantial burden" places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water,* 258 Fed. Appx. at 734. However, isolated or sporadic government action or omission is *de minimis* and does not constitute a "substantial burden." *Dunlap,* 40 Fed. Appx. at *43. *See also Furnace v. Sullivan,* No. C 07-4441, 2008 U.S. Dist. LEXIS 93464, at *9-10 (N.D.Cal. Nov. 10, 2008); *Talbert v. Jabe,* No. 7:07-cv00450, 2007 U.S. Dist. LEXIS 82962, at *60 (W.D.Va. Nov. 8, 2007); *Thompson v. Quarterman,* No. V-01-01, 2007 U.S. Dist. LEXIS 73207, at *6 (S.D.Tex. Sept. 30, 2007); *Welch v. Talmadge,* No. 05-CV-07387, 2006 U.S. Dist. LEXIS 70387, at *22-23 (E.D.Pa. Sept. 8, 2006). Finally, negligence is not actionable under RLUIPA. *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006).

## 2. Discussion

**\*7** In his objections, plaintiff complains that the *Report and Recommendation* inaccurately referred to the delivery of the grape juice, Matzah and a Seder plate on April 2 and 3, 2007, as "partial" Passover Seder Meals. Plaintiff argues that the Seder plate, containing "a couple of edible symbolic items," is not part of the Seder meal.

*Plaintiff's Objections,* pp. 7-8. Plaintiff contends that, because he was denied the "full meal" or "Seder Meal" on the first two nights of Passover, he suffered a substantial burden. *Id.*

Even accepting plaintiff's contention that he was denied a "full" "Seder Meal" on two occasions in 2007, the Court agrees with the *Report and Recommendation* that plaintiff has failed to establish a "substantial burden" under RLUIPA. Plaintiff contends that, unlike the plaintiff in *Dunlap,*[FN10] there was no alternative to the Seder meal and he was unable to fulfill his religious obligation on the first two nights of Passover in 2007.[FN11] However, plaintiff's deprivation was an isolated occurrence. Plaintiff admits that he received all Passover Seder meals throughout the three years prior to Passover 2007. *Verified Complaint,* ¶ 22. In 2007, after the failure to deliver the two meals about which plaintiff complains, plaintiff does not deny that defendants made efforts to rectify the situation by providing all remaining required meals to plaintiff that year. *Hill Decl.,* ¶ 7. Similarly, plaintiff does not dispute that he and other Jewish inmate participants received the proper meals during Passover 2008. *Id.* at ¶ 9. Therefore, the Court agrees with the *Report and Recommendation* that the undisputed evidence establishes that plaintiff was not provided two Seder meals on two evenings over the course of five years.

> **FN10.** Plaintiff Dunlap was denied the use of his hardcover Bibles. *Dunlap,* 40 Fed. Appx. 41, at *43. During the month that these were taken from him, Dunlap did not show that he pursued the opportunity to obtain a softcover Bible. *Id.* The Sixth Circuit concluded that "the temporary deprivation of his hardcover Bibles, which Dunlap might have remedied more quickly, while making the practice of his religion somewhat more difficult, did not coerce him into action contrary to his beliefs, and did not state a claim under the RLUIPA." *Id.*

> **FN11.** Plaintiff also argues that *Peterson v. Price,* No. 5:06cv106, 2007 U.S. Dist. LEXIS 75737 (N.D.W.V. Sept. 28, 2007) supports his position. *Plaintiff's Objection,* p. 11. Plaintiff's reliance on this case is misplaced. *Peterson* held that the plaintiff did not have a cause of action

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 890521 (S.D.Ohio)

(Cite as: 2009 WL 890521 (S.D.Ohio))

under RLUIPA. *Peterson,* 2007 U.S. Dist. LEXIS at *13. In addition, to the extent that plaintiff attempts to rely on this case to buttress his First Amendment claims, those claims are deficient for the reasons discussed *infra.*

Moreover, as discussed *supra,* it is undisputed that the Seder plate, Matzah and grape juice were delivered to the chapel on April 2 and 3, 2007. There is no evidence that plaintiff was deprived of these integral symbolic items nor was he prevented from engaging in the Passover readings and re-enactment rituals on April 2 and 3, 2007.

Under these circumstances, the Court agrees with the *Report and Recommendation* that missing two Seder kosher meals over the course of several years is an isolated occurrence that does not qualify as a "substantial burden" for purposes of RLUIPA. *See, e.g., Hysell v. Pliler,* No. S-04-0355, 2008 U.S. Dist. LEXIS 2721, at *25 (E.D.Cal. Jan. 14, 2008) (dismissing First Amendment and RLUIPA claims where, *inter alia,* error acknowledged and efforts were taken to rectify the situation); *Furnace,* 2008 U.S. Dist. LEXIS 93464, at *9-10; *Talbert,* 2007 U.S. Dist. LEXIS 82962, at *60; *Thompson,* 2007 U.S. Dist. LEXIS 73207, at *6; *Welch,* 2006 U.S. Dist. LEXIS 70387, at *22-23. *Cf. Lovelace, 472 F.3d at 195-96* (denying summary judgment on RLUIPA claim where, *inter alia,* a defendant failed to correct error that prevented the plaintiff, a follower of Islam, from attending prayers and receiving special meals during the remainder of Ramadan, a total of 24 days). Because plaintiff has not met his initial burden of establishing a "substantial burden" on his religious exercise, the Court need not determine whether that substantial burden was the least restrictive means of furthering a compelling government interest. Plaintiff's claims under RLUIPA must fail. 42 U.S.C. S 2000cc-1(a).

**V. Free Exercise**

**\*8** In his final objection, plaintiff complains that the *Report and Recommendation* erroneously concluded that the First Amendment claim must fail. *Plaintiff's Objections,* pp. 11-13. This Court disagrees. Isolated incidents do not rise to the level of constitutional violations. *See, e.g., Rapier v. Harris, 172 F.3d 999, 1006 n. 4 (7th Cir.1999)* (concluding that "the unavailability of

a non-pork tray for [plaintiff] at 3 meals out of 810 does not constitute more than a *de minimis* burden on [plaintiff's] free exercise of religion"); *White v. Glantz,* No. 93-4189, 1993 U.S.App. LEXIS 4189 (10th Cir. Feb. 25, 1993); *Joseph v. Arpaio,* No. CV 06-1944, 2008 U.S. Dist. LEXIS 6227, at *6 (D.Ariz. Jan. 28, 2008); *Joseph v. Ware,* No. 07-1297, 2007 U.S. Dist. LEXIS 87459, at *5-6 (W.D.La. Oct. 22, 2007).

Additionally, "RLUIPA applies a stricter standard on prison officials than that which applies to § 1983 claims for First Amendment Free Exercise violations[.]" *Kretchmar v. Beard,* No. 05-6108, 2006 U.S. Dist. LEXIS 49530, at *17 (E.D.Pa. July 18, 2006). *See also Gladson v. Iowa Dep't of Corr., 551 F.3d 825, *15-16 (8th Cir.2009); Smith, 502 F.3d at 1264 n. 5; Charles v. Frank, No. 04-1674, 101 Fed. Appx. 634, at *635 (7th Cir. June 3, 2004); Sanders,* 484 F.Supp.2d at 1037. It follows, then, that because plaintiff cannot establish a violation of RLUIPA, he cannot establish a violation of his rights under the Constitution.

Under these circumstances, the objections to the *Report and Recommendation* are **DENIED.** The *Report and Recommendation* is **ADOPTED** and **AFFIRMED.** Plaintiff's motion for summary judgment, Doc. No. 39, is **DENIED** and defendants' motion for summary judgment, Doc. No. 26, is **GRANTED.**

The Clerk shall enter **FINAL JUDGMENT** for defendants in this action.

S.D.Ohio,2009.

Greenberg v. Hill
Slip Copy, 2009 WL 890521 (S.D.Ohio)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4185945 (W.D.Mich.)

(Cite as: 2008 WL 4185945 (W.D.Mich.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

W.D. Michigan,
Southern Division.
Demetrius ALDERSON, Plaintiff,
v.
Dave BURNETT, Defendant.
No. 1:07-CV-1003.

Sept. 8, 2008.

Demetrius Alderson, Coldwater, MI, pro se.

Christine M. Campbell, MI Dept Attorney General (Corrections), Lansing, MI, for Defendant.

### *JUDGMENT*

RICHARD ALAN ENSLEN, Senior District Judge.

**\*1** This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. On June 13, 2008, United States Magistrate Judge Ellen S. Carmody issued a Report and Recommendation (Report) to grant Defendant's motion for summary judgment because Plaintiff had failed to demonstrate that Defendant was personally involved in the actions of which Plaintiff complains. The matter presently is before the Court on Plaintiff's objections to the Report.

This Court reviews *de novo* those portions of a Report to which objections are made. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The Court may accept, reject or modify any or all of the Magistrate Judge's findings or recommendations. *Id.*

Plaintiff makes a variety of objections, only one of which requires discussion. Plaintiff argues that the Magistrate Judge erred in granting summary judgment to Defendant before allowing Plaintiff to engage in discovery. Plaintiff principally argues what he previously argued in his response to Defendant's motion for summary judgment: that he should have been allowed to discover

whether Defendant, although not officially responsible for the placement of publications on the Restricted Publication List, gave input to the Deputy Director of the Correctional Facilities Administration ("CFA") who made that decision. The Magistrate Judge rejected the argument, reasoning that, because Plaintiff had conceded that Defendant lacked the authority to place books on the Restricted Publication List, further discovery could not demonstrate that Defendant was responsible for the constitutional deprivation alleged by Plaintiff. The Court agrees with the Magistrate Judge's analysis.

In the second part of his objection to the lack of discovery, Plaintiff argues for the first time that he should have been permitted discovery that would have revealed the name of the Deputy Director of the CFA. Plaintiff claims that such discovery would have allowed him to amend his complaint to add a new defendant.

Plaintiff's suggestion that he would like to amend his complaint comes too late. As the Sixth Circuit has explained,

[w]hile the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.,* permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate.

*Murr v. United States,* 200 F.3d 895, 902 n. 1 (6th Cir.2000) (citing, *inter alia, United States v. Waters,* 158 F.3d 933, 936 (6th Cir.1998); *see also Williams v. Allegan County Sheriff Dep't,* No. 1:07-cv-1052, 2008 WL 1701649, at *2 (W.D.Mich. Apr.9, 2008). Defendant's motion to dismiss was filed on January 11, 2008, together with a motion to stay discovery. In his combined response to the motion for summary judgment and the motion to stay discovery, Plaintiff did not indicate an intent either to discover the name of the Deputy Director of the CFA or to amend his complaint. After the Magistrate Judge granted the stay on February 22, 2008, Plaintiff made no attempt to appeal the decision, to seek an exception to the stay or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185945 (W.D.Mich.)

(Cite as: 2008 WL 4185945 (W.D.Mich.))

to amend the complaint. Only after the Report was issued on July 14, 2008 did Plaintiff make the instant passing reference to the possibility of amendment. Plaintiff's belated objection therefore will be denied.

**\*2** The Court has also reviewed *de novo* Plaintiff's remaining objections and finds no error in the reasoning of the Magistrate Judge. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Objections (Dkt. No. 24) are **DENIED,** the Report and Recommendation (Dkt. No. 23) is **ADOPTED,** Defendant Dave Burnett's Motion for Summary Judgment (Dkt. No. 15) is **GRANTED,** and the action is **DISMISSED WITH PREJUDICE.**

### *REPORT AND RECOMMENDATION*

ELLEN S. CARMODY, United States Magistrate Judge.

This matter is before the Court on *Defendant's Motion for Summary Judgment.* (Dkt.# 15). Pursuant to 28 U.S.C. § 636(b)(1) (B), the Court recommends that Defendant's motion be **granted** and Plaintiff's action **dismissed.**

### *BACKGROUND*

The following allegations are contained in Plaintiff's complaint. Plaintiff is a member of the Nation of Islam. He asserts that the following books are "essential" to the practice of his religion: (1) How to Eat to Live; and (2) Our Saviour has Arrived. Plaintiff is unable to obtain these two books, however, because they have been placed on the Michigan Department of Corrections' "Restricted List." How to Eat to Live was placed on the Restricted List in January 2005 and Our Saviour has Arrived was placed on the Restricted List in September 2000.

Prison officials placed these books on the Restricted List because they allegedly "advocate racial supremacy" and are "likely to promote group disruption." Plaintiff asserts that Defendant Burnett has "allowed these books to be placed on the Restricted List." Plaintiff asserts that his inability to purchase these books violates his First Amendment right to freely practice his religion and also violates the Religious Land Use and Institutionalized Persons Act (RLUIPA). Defendant Burnett now moves for summary judgment.

### *STANDARD*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints,* 398 F.3d 751, 761 (6th Cir.2005); *see also, Amini v. Oberlin College,* 440 F.3d 350, 357 (6th Cir.2006) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo,* 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini,* 440 F.3d at 357 (citing *Anderson,* 477 U.S. at 247-48; *Celotex Corp. v. Catrett,* 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini,* 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside,* 396 F.3d 730, 734-35 (6th Cir.2005) (quoting *Anderson,* 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.,* 434 F.3d 810, 813-14 (6th Cir.2006) (citations omitted).

**\*3** Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185945 (W.D.Mich.)

(Cite as: 2008 WL 4185945 (W.D.Mich.))

*Holdings Corp., Inc.,* 379 F.3d 348, 353 (6th Cir.2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Daniels,* 396 F.3d at 735.

### ANALYSIS

Liability in a § 1983 action cannot be based upon a theory of respondeat superior or vicarious liability, as Plaintiff must instead allege personal involvement by a particular defendant. *See* Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir.1999) (liability is not to be found in passive behavior or an alleged failure to act, rather liability must be based upon "active unconstitutional behavior"); *Salehpour v. University of Tennessee,* 159 F.3d 199, 206-07 (6th Cir.1998); *Street v. Corrections Corp. of America,* 102 F.3d 810, 817-18 (6th Cir.1996). While municipal entities can be held vicariously liable under RLUIPA, *see* Layman Lessons, Inc. v. City of Millersville, 2008 WL 686399 at *20 (M.D.Tenn., Mar.7, 2008), as to individual defendants, the plaintiff must demonstrate that the defendant was personally involved in the conduct giving rise to the claim. *See, e.g., Van Wyhe v. Reisch,* 536 F.Supp.2d 1110, 1125-26 (D.S.D.2008) (granting summary judgment to several RLUIPA defendants on the ground that there existed no evidence that they were involved in the actions giving rise to the RLUIPA claim).

Pursuant to Michigan Department of Corrections' Policy Directives, in effect as of the dates relevant in this matter, the determination whether to place an item on the Restricted Publications List was made by the Deputy Director of the Correctional Facilities Administration (CFA). *See* Mich. Dep't of Corr. Policy Directive 05.03.118 ¶¶ MM-PP (effective July 19, 1999); Mich. Dep't of Corr. Policy Directive 05.03.118 ¶¶ PP-RR (effective Dec. 19, 2003).

Defendant Burnett has submitted an affidavit in this

matter. (Dkt. # 16, Burnett Affidavit). Burnett asserts that he has never served as the Deputy Director of the CFA. According to Defendant Burnett he presently serves as a Special Activities Coordinator for the CFA. Burnett has served in this capacity since February 1995. Defendant Burnett asserts that he has "never taken action to have a book placed on the Restricted Publications List," as such decisions are made "at the facility level." Burnett further asserts that he has "never been assigned responsibilities for placing any publications on the Restricted Publications List." *Id* . Thus, Defendant Burnett asserts that he is entitled to summary judgment on the grounds that he was not personally involved in the decision to place the books in question on the Restricted Publications List.

*4 Plaintiff does not challenge Defendant Burnett's assertion (consistent with the aforementioned Policy Directives) that decisions whether to place an item on the Restricted Publications List are made by the Deputy Director of the CFA. Plaintiff likewise does not challenge Defendant Burnett's assertion that he has never taken part in a determination whether to place an item on the Restricted Publications List. Plaintiff nonetheless requests that the Court deny Defendant's motion for summary judgment on the grounds that Plaintiff must first be given the opportunity to engage in discovery for the purpose of demonstrating that "the deputy director deferred to defendant in the area of religious matters." Plaintiff also seeks to establish through discovery that the Deputy Director's decisions were influenced by Defendant Burnett.

The Court fails to discern the relevance or need for such discovery. Even assuming that Plaintiff could establish that the Deputy Director of the CFA "deferred to" or was "influenced by" Defendant Burnett, such would not establish that Defendant Burnett made the decision to place the books in question on the Restricted Publications List. Absent evidence of such, Defendant Burnett cannot be held liable in this matter. In sum, Plaintiff has failed to submit evidence calling into question Defendant Burnett's claim that he was not involved in the events which give rise to this action. Furthermore, Plaintiff's request for discovery is insufficient to thwart Defendant Burnett's motion for summary judgment, as the discovery Plaintiff seeks would not entitle him to relief.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4185945 (W.D.Mich.)

(Cite as: 2008 WL 4185945 (W.D.Mich.))

### CONCLUSION

For the reasons articulated herein, the Court recommends that *Defendant's Motion for Summary Judgment,* (dkt.# 15), be **granted** and Plaintiff's action **dismissed.**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

W.D.Mich.,2008.

Alderson v. Burnett
Not Reported in F.Supp.2d, 2008 WL 4185945 (W.D.Mich.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

---

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Tyheem KEESH; Jesus Jova, Plaintiffs,
v.
Joseph T. SMITH; Evan Gorelick, et al., Defendants.
No. 9:04–CV–779 (NAM/ATB).

Feb. 2, 2011.
Tyheem Keesh, pro se.

Jesus Jova, pro se.

Richard Lombardo, Asst. Attorney General for Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.
**\*1** This matter has been referred to me for Report–Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).[FN1]
FN1. The case was originally referred to the Honorable Gustave J. Di Bianco and was assigned to me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 154).

### I. *RELEVANT FACTS*

The facts in this case involve plaintiffs' desire to practice their chosen religion. Plaintiff Keesh wrote a letter to defendants Goord and Smith on October 14, 2003, advising them of his desire to practice the "Tulukeesh" religion. (Dkt. No. 126 at 3) (citing Amended Complaint (AC) at ¶ 1 and Ex. 1. (Dkt. No. 26)). Plaintiff Keesh's letter also sought to establish Tulukeesh as an authorized religion within the Department of Correctional Services (DOCS). *Id.* (citing Ex. 1). According to plaintiff Keesh, "Tulukeesh" is the "Religion of Zee Keesh (The

Creator)," and plaintiff identified himself as the "Savior and Teacher" of Tulukeesh. *Id.* at 4 (citing Ex. 1 at pp. 1, 3). Plaintiff Keesh also stated that he is the "Leader and Founder" of Tulukeesh. *Id.* (citing Mans Aff. Ex. 19, Keesh Aff. ¶ 3).

The letter further outlined many of the required practices and observances of Tulukeesh. *Id.* (citing AC, Ex. 1). These practices included adherence to specific dietary laws, observation of holy days and fast days, possession of religious items and literature, hygiene requirements, exercise, and health requirements. *Id.* (citing Ex. 1 at pp. 1–6). The dietary laws included eating a vegan diet, without soybeans, prepared only by another follower of Tulukeesh. *Id.* (citing Ex. 1at pp. 1–2). Additionally, certain foods had to be eaten on certain days of the week. *Id.* (citing Ex. 1 at p. 2). Plaintiff Keesh carefully described which foods were to be eaten on which days. *Id.* (citing Ex. 1 at p. 2).

Although not relevant to this report, the Tulukeesh adherents are required to have a prayer rug and mat; a head crown; a flag; a library of at least seventy books; and be professionally trained in martial arts. *Id.* at 4 (citing Ex. 1 at 4–5). Tulukeesh followers were also required to have access to both a radio and a cassette player. *Id.* The Tulukeesh holy days included the birthdays of plaintiff Keesh; Dr. Martin Luther King; Bob Marley; and Judy Keesh (plaintiff's mother). *Id.* (citing Ex. 1 at 3). The Holy Book of Tulukeesh was written by plaintiff Keesh and is entitled the "Holy Blackness." *Id.* at 5 (citing Def.s' Ex. G).

Defendant Smith responded to plaintiff's letter, by Memorandum dated October 17, 2007, stating that although DOCS took no position in acknowledging any religion within the inmate population, DOCS supported the " 'concept of religious liberty.' " *Id.* at 5 (citing AC, Ex. 2). Defendant Smith stated that plaintiff Keesh could practice his [FN2] religion in the privacy of his own cell, " 'within the parameters established by current facility operational procedures.' " *Id.* Plaintiff was also told that, prior to any further action by DOCS, it would be helpful to have the Holy Blackness reviewed by the Coordinating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

Chaplain, Imam Rashid. *Id.*

> FN2. Defendant Smith also pointed out that, at the time, plaintiff Keesh's religion was listed in DOCS records as "Nation of Islam" (NOI). (Dkt. No. 126 at 5).

**\*2** In a letter dated November 3, 2003, defendant Nuttal told plaintiff Keesh that if he wished to change his religious registration, he would have to make that request through the Coordinating Chaplain. *Id.* at 7 (citing Ex. 6). Plaintiff Keesh later applied to change his religious affiliation, but because DOCS did not formally recognize Tulukeesh, in mid-November of 2003, plaintiff Keesh's registration was changed from NOI to " 'other' " according to DOCS records. *Id.* at 7 (citing Ex. 10). Plaintiff Keesh was denied the ability to have "congregate" services because the DOCS regulations required the involvement of an "outside" member of the clergy, together with an approved inmate acting as a facilitator. *Id.* at 6–7 (citing Ex. 4). In response to a grievance, plaintiff was told that he was free to encourage an outside "clergyperson" to contact the Coordinating Chaplain and apply to become a registered religious volunteer, pursuant to DOCS Directive No. 4202(C). *Id.* at 8. Plaintiff Jova also complained to DOCS officials that he was being denied the right to practice Tulukeesh. *Id.* at 9 (citing Ex. 18).

Chief Judge Mordue's opinion describes the letters written, and grievances filed, by plaintiffs, challenging the alleged violations of their rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLIUPA), 42 U.S.C. § 2000cc *et seq. Id.* at 7–9, 16–17. Plaintiff's cells were searched, and they were charged with various disciplinary offenses, based upon their attempts to practice their religion as they saw fit. *Id.* at 11–15. Plaintiff Keesh had the Holy Blackness published by an outside publisher and was disciplined for having done so. *Id.* at 14. On September 23, 2004, the Facility Media Review Committee decided that certain pages of the Holy Blackness should be removed because they might "incite disobedience." *Id.* at 17 (citing Ex. 72–73). Ultimately, defendant Nuttal advised plaintiff Keesh that the Holy Blackness would be kept in the facility Chaplain's

possession, but that plaintiff would have reasonable access to his book upon request. *Id.* at 18 (citing Ex. 75).

Plaintiff Keesh brought an Article 78 Proceeding in New York State Supreme Court in June of 2004, a month before bringing this action. In the Article 78 papers, he raised both constitutional claims under the First Amendment, as well as claims under RLIUPA.[FN3] In that case, plaintiff challenged the denial of a grievance "seeking special accommodations to practice 'Tulukeesh,' a religion which he created." *See Allah v. Goord,* 26 A.D.3d 608, 810 N.Y.S.2d 235 (3d Dep't 2006). Plaintiff's claims were denied on the merits, both by Justice E. Michael Kavanaugh and on appeal to the Appellate Division, Third Department. *Id.* The Appellate Division held that the respondent had carefully considered plaintiff's requests for a special dietary menu, observance of "self-created" religious holidays, and opportunities for congregate services. *Id.* at 609. The New York State courts found that the partial denial of plaintiff's grievance was neither arbitrary, nor capricious, and that the response was " 'consistent with and served to further institutional objectives of confinement, order and safety.' " [FN4] *Id.*

> FN3. Although defendants argued that plaintiffs' claims should be barred by collateral estoppel, Chief Judge Mordue correctly found that neither Judge Kavenaugh, nor the Appellate Division mentioned the constitution, RLIUPA, or their respective standards in their decisions. (Dkt. No. 166 at 20). Judge Mordue found that plaintiff Keesh's RLIUPA claims were not "necessarily decided" in the state court, and it was questionable whether plaintiff's constitutional claims were "necessarily decided" in the state courts, thus, preventing the application of collateral estoppel. *Id.* at 21–22.

> FN4. Plaintiff Keesh later brought a petition under Article 78, challenging the result of a disciplinary report that charged him with solicitation regarding the printing of the Holy Blackness. *See Keesh v. Goord,* 26 A.D.2d 560, 807 N.Y.S.2d 733 (3d Dep't 2006). The Appellate Division ruled that because the actual correspondence with the publishing company

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

was not in the record, there was insufficient evidence to sustain the disciplinary determination. *Id.* at 561. The determination was, therefore, reversed. *Id.*

## II. PROCEDURAL HISTORY

*3 Plaintiffs filed this action on July 6, 2004 and amended their complaint on March 10, 2005. (Dkt.Nos.1, 26). The amended complaint raised claims based on the First and Fourteenth Amendments; RLUIPA; New York State Regulations; and Department of Correctional Services (DOCS) Directives. (Am. Compl.; Dkt. No. 26). The basis of plaintiffs' allegations was that defendants violated their rights to freely practice their chosen religion, Tulukeesh. On September 26, 2007, Chief Judge Mordue granted defendants' motion for summary judgment and dismissed the action in its entirety .[FN5] (Dkt. No. 126).

> FN5. At the same time, Chief Judge Mordue denied plaintiffs' cross-motion for summary judgment. (Dkt. No. 126 at 51).

Plaintiffs appealed the dismissal to the Second Circuit Court of Appeals, and on September 28, 2009,[FN6] the Second Circuit affirmed in part and vacated and remanded in part. (Dkt. No. 153). The Second Circuit affirmed the dismissal of all of plaintiffs' claims except plaintiffs' RLUIPA claim *only* with respect to their religiously-mandated diet. In vacating and remanding that single issue to the District Court, the Second Circuit stated that:

> FN6. The mandate was issued November 30, 2009 and filed with this court on December 10, 2009. (Dkt. No. 153).

Although the record indicates that the Defendants were perfectly capable of providing a vegetarian entree on most days of the week, and may in fact have provided vegan entrees on occasion, there is no indication that the Defendants discussed, let alone demonstrated why they cannot provide an entirely vegetarian menu to inmates who request it. We therefore conclude that the Defendants did not demonstrate that the religious/meatless alternative menu was the least restrictive means of furthering their compelling

administrative interests.

*Jova v. Smith*, 582 F.3d 410, 417 (2d Cir.2009). The remand was very limited, and the court further stated that:

the case is remanded for consideration of whether there is a less restrictive substitute (including, but not limited to, an entirely vegetarian diet) for the current religious alternative menu .[ ]

*Id.* (footnote omitted). The Second Circuit also left it to the District Court to consider any issues of qualified immunity because, although defendants had raised it, the district court did not consider its potential application. [FN7] *Id.* at 418 n. 4. The dismissal of all plaintiffs' other claims was affirmed. *Id.* at 418.

> FN7. Discussion of qualified immunity was not necessary because the District Court found no constitutional or statutory violation upon which to base the determination of qualified immunity.

On April 16, 2010, Chief Judge Mordue issued an order, in accordance with the Second Circuit's remand, affording the parties leave to file renewed motions for summary judgment, addressing the remaining RLUIPA claim and qualified immunity. (Dkt. No. 155). On July 23, 2010, both plaintiffs and defendants filed their renewed motions for summary judgment. (Dkt.Nos.167, 168). Defendants argue that the Religious Alternative Menu (RAM) is the least restrictive alternative to giving plaintiffs the specific foods they request for their religiously mandated diet and to affording a completely "vegetarian" diet to those inmates who request it. Defendants also argue that RLUIPA does not allow for monetary damages against them in their official capacities, they were not personally involved in their individual capacities, and in any event they would be entitled to qualified immunity.

*4 Plaintiffs argue that summary judgment should be granted in their favor because DOCS can easily provide them with the diet they request with "no administrative burden." (Dkt. No. 167–2 at 21). Both plaintiffs and defendants have responded to each other's motions for summary judgment. (Dkt.Nos.185, 188). Defendants filed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

a reply, and each plaintiff filed a reply. [FN8] (Dkt.Nos.190, 191, 192).

> FN8. On January 18, 2011, plaintiffs filed a "Motion to Vacate Order on Motion for Summary Judgment," seeking to have Chief Judge Mordue "vacate" his September 25, 2007 judgment based upon what plaintiffs perceive to be a fraud perpetrated upon the court by defendants. (Dkt. No. 193–94). The court would point out that plaintiffs have already made one motion to vacate Chief Judge Mordue's Order. (Dkt. No. 130). This motion, filed October 9, 2007, also claimed mistake of facts and fraud by defendants. *Id.* The motion was denied on May 29, 2008. (Dkt. No. 138). Plaintiffs have now advanced a different reason that they claim defendants misled the court. This new reason relates to congregate services. (Dkt. No. 193). This new allegation has no bearing on the issue upon which the Second Circuit's remand was based, thus, this court will continue to address the dietary claim and allow Chief Judge Mordue to address plaintiffs' most recent motion to vacate.

For the following reasons, this court agrees with defendants and finds that the RAM is the least restrictive alternative, and that defendants did not violate RLUIPA in refusing to give plaintiffs the specific menus they requested. Further, this court finds that defendants were not personally involved in denying plaintiff's menu choices, and that in any event, they would be entitled to qualified immunity with respect to damages in their individual capacities. Because the court finds that defendants did not violate RLUIPA, the court need not decide the issue of whether plaintiffs would be entitled to damages against defendants in their official capacities That issue is currently pending before the Supreme Court.[FN9] *See Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted,* ––– U.S. ––––, 130 S.Ct. 3319 (U.S. May 24, 2010).

> FN9. In *Hall v. Epke,* No. 09–4492, 2010 WL 3996211 at *3 (2d Cir. Oct. 13, 2010), the Second Circuit reserved decision on a RLUIPA

claim, pending the resolution of the question of whether an individual may sue a state or state official in his official capacity for money damages under RLUIPA. Plaintiff in *Hall* was seeking only money damages, whereas the plaintiffs in this case are seeking both injunctive and monetary relief.

### III. *SUMMARY JUDGMENT*

#### A. Legal Standard

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56 [FN10]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

> FN10. Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c) (1)(A). Where the nonmovant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the nonmovant's claims or (2)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

identifying those portions of the nonmovant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 323); FED. R. CIV. P. 56(c)(1). The second method requires the movant to identify evidentiary insufficiency, not merely to deny the opponent's pleadings. *Id.*

**\*5** If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

## IV. RLUIPA

### A. Legal Standard

RUILPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiffs bear the burden of showing that their religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b). The

burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the **least restrictive** means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

### B. Application

As stated by Chief Judge Mordue in his order, for purposes of their original motion, the defendants conceded that plaintiffs were engaging in a "religious exercise" and that the defendants' conduct substantially burdened that exercise. (Dkt. No. 126 at 37). The Second Circuit held that "the district court properly found that the Defendants' interests were compelling." *Jova v. Smith,* 582 F.3d at 416. The relevant issue now, only with respect to plaintiffs' dietary requirements, is whether defendants' response to plaintiffs' request for a particular diet is the least restrictive method for achieving their compelling state interests. *Id.* at 417.

In support of their motion for summary judgment, defendants have submitted the declaration of Elizabeth Culkin, the Assistant Director of Nutritional Services for DOCS. (Dkt. No. 168–1; Culkin Decl. ¶ 1). Ms. Culkin has a Bachelor of Science Degree in food and nutrition and is a Registered Dietitian with the American Dietetic Association. (Culkin Decl. ¶¶ 2, 4). She began working for DOCS in 1984 as an Associate Nutritionist, and in 1985, she was promoted to her current position of Assistant Director of the Office of Nutritional Services. (Culkin Decl. ¶¶ 5–6). As the Assistant Director, Ms. Culkin is responsible for providing "guidance and direction" with respect to DOCS's nutrition policies and procedures. (Culkin Decl. ¶ 7).

**\*6** The Office of Nutritional Services is under the supervision of the DOCS Deputy Commissioner of Administration. (Culkin Decl. ¶ 8). Ms. Culkin's office is responsible for providing "all food services" to DOCS inmates and for the development and implementation of both the "general confinement menu" and the "religious alternative menu" (RAM). *Id.* Ms. Culkin states that there are approximately 63 "general confinement correctional facilities" within DOCS, which house approximately

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

55,000 inmates." (Culkin Decl. ¶ 9). "General confinement correctional facilities" are "all correctional facilities maintained by DOCS with the exception of shock facilities and camps." *Id.* n. 1. Each general confinement facility serves the inmates breakfast, lunch, and dinner as set forth in a "state-wide menu," prepared by Ms. Culkin's office ("the general confinement menu"). (Culkin Decl. ¶ 10). Absent an emergency, an individual facility does not have the authority to change or deviate from the general confinement menu without the approval of the Office of Nutritional Services. (Culkin Decl. ¶ 11).

In her declaration, Ms. Culkin states that in developing the menus for DOCS facilities, the Office of Nutritional Services tries to provide the inmates with a variety of nutritious and palatable meals at a reasonable cost to the taxpayers. (Culkin Decl. ¶ 12). Each meal in the general confinement menu contains an entree; side dishes, including potatoes, rice, cooked vegetables, and salad; and a beverage. (Culkin Decl. ¶ 13). Lunch and dinner also include dessert. *Id.* The meals are served to the general population inmates by mess hall workers under the supervision of civilian cooks and security staff. (Culkin Decl. ¶ 14). Inmates in general population get their meals by picking up a tray and proceeding through a mess hall line, while inmates who are in disciplinary housing, either in a special housing unit or on keeplock, get their meals delivered to their cells by inmate porters or security staff. (Culkin Decl. ¶¶ 14–15).

The RAM was instituted after the Office of Nutritional Services began to consider "how best to accommodate as many of the dietary preferences of the inmate population as possible." (Culkin Decl. ¶ 16). Ms. Culkin states that the main issues that were considered were inmates who (1) claimed to have food allergies; (2) those who had religious objections to eating certain foods; and (3) were vegetarians. *Id.* The inmate population contains vegetarians "of varying degrees." (Culkin Decl. ¶ 17). Ms. Culkin states that

Many inmates do not eat red meat or pork, but do eat fish and poultry. Some inmates are true vegetarians, who do not eat any animal flesh or eggs. A very small minority of inmates are vegans, who do not consume either animal flesh or any animal products, such as eggs,

dairy products, *honey,* or lard.

(Culkin Decl. ¶ 17) (emphasis added).

Ms. Culkin then states that in order to consume sufficient amounts of protein to maintain health, vegetarians usually substitute eggs; cheese; and legumes, such as peas, beans, lentils, and soy for meat. (Culkin Decl. ¶ 18). Because vegans do not eat dairy products, including eggs and cheese, they rely upon legumes such as peas, beans, lentils, and soy for protein. *Id.* Soy products, the "most popular" substitutes for meat include entrees and side dishes made from soy, such as soy patties, casseroles, and soy milk. *Id.*

*7 In 1993, the Office of Nutritional Services determined that the best way to meet the varying dietary preferences of the inmate population was to add a nutritionally adequate alternative entree to the general confinement menu for every meal that contains a meat entree. (Culkin Decl. ¶ 19). This alternative entree is referred to as the RAM. *Id.* Ms. Culkin explains that the RAM is not a separate "menu," but merely an alternative entree added to the general confinement menu. *Id.* n. 3. DOCS began testing the RAM in 1994, and it has been in use in all the general confinement facilities since 1996. *Id.* The RAM was designed, not only for those with religious objections to eating certain foods, but also those who have food allergies and those who are vegetarians. *Id.* Inmates may choose this alternative entree without stating any reason, religious or otherwise, for doing so. *Id.* Absent an emergency, the facility administration has no authority to deviate from the RAM without prior approval of Ms. Culkin's office. *Id.*

Ms. Culkin has submitted for the court's review, a copy of the weekly general confinement menus for the period from September 29, 2003 to the present. (Defs.' Ex. O). The lunch and dinner alternative entree is listed with an asterisk. (Culkin Decl. ¶ 20). No alternative entree is listed for breakfast because breakfast does not include a meat entree. *Id.* In order to implement the RAM, each facility was required to determine how many alternative entrees would be required each day and to store, prepare, and serve the alternative entree. (Culkin Decl. ¶ 21). Service of the alternative entree requires additional

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

supervision by civilian and security staff to ensure that each inmate receives only one entree (alternative or regular). *Id.*

General confinement facilities that contain a "main mess-hall" will permit general population inmates to choose either the regular or the alternative entree at a serving line. (Culkin Decl. ¶ 22). Other facilities, such as Shawangunk, have "satellite feeding areas" in each housing unit. *Id.* Those facilities require inmates to submit a request to be placed on a list of inmates who wish to receive the alternative entree. *Id.* Inmates who are in SHU or in keeplock also must submit a request for an alternative entree. *Id.*

A review of Exhibit O in conjunction with Ms. Culkin's declaration shows that for each lunch or dinner that includes a meat entree, an alternative entree is available. (Culkin Decl. ¶ 23). When the lunch or dinner does not include a meat entree, no alternative is available because the entree is already meatless. *Id.* These entrees, served on the average twice per week, include pizza, stuffed shells, macaroni and cheese, ravioli, and lasagna. *Id.* Ms. Culkin points out that in a seven-day cycle, inmates are served 21 meals, and of these 21 meals, nine of the main entrees (seven breakfasts and two lunches/dinners) are meatless. (Culkin Decl. ¶ 24).

**\*8** For the remaining twelve meals, an alternative is offered (the RAM). (Culkin Decl. ¶ 26). Ms. Culkin states that of these twelve remaining meals, approximately ten are meatless. *Id.* The meatless alternatives, however, are generally soy products, such as meatless chili; sloppy joe, and casseroles containing beans; eggs; or cheese. *Id.* Ms. Culkin states that because most vegetarians do consume eggs and other dairy products, it was determined that eggs and cheese would be included in the alternative entrees, particularly because they are an excellent source of protein. *Id.* However, Ms. Culkin states that of the ten meatless alternative entrees that appear during a weekly cycle, on average, seven do not contain eggs or dairy products. (Culkin Decl. ¶ 26 n .5). The other two entrees are either fish or chicken patties. (Culkin Decl. ¶ 26). Of the 21 meals fed to inmates in one week, 19 meals include a meatless (vegetarian) entree. (Culkin Decl. ¶ 27).

Ms. Culkin states specifically that in developing and implementing the RAM menu, DOCS did consider making every alternative entree meatless, but determined not to do so because the purpose of the alternative entree program was to accommodate vegetarians, inmates who have religious objections to eating certain foods, and inmates who have food allergies. (Culkin Decl. ¶ 28). Ms. Culkin states that to fully accommodate the dietary preferences of each of the approximately 55,000 inmates in DOCS would pose an unreasonable financial burden on the taxpayers in New York and an impossible administrative burden on DOCS. *Id.*

Ms. Culkin states that the Office of Nutritional Services has determined that the best way to strike a balance between the needs of all the inmates who are not fully accommodated by the general confinement menu, is to provide as many meatless entrees as possible while still providing inmates who choose not to eat the main entree for different reasons with two alternatives in a seven-day cycle. (Culkin Decl. ¶ 29). The Office of Nutritional Services also considered the possibility of providing a second alternative meatless entree for those two days per week, but DOCS determined that it would not be administratively or financially feasible to do so. (Culkin Decl. ¶ 30). Serving three entrees during a particular meal would make the determination of how many alternative entrees would be required, as well as the preparation and service of those entrees, more time consuming, labor intensive, and expensive. (Culkin Decl. ¶ 31).

In support of her statement, Ms. Culkin states that serving lines are only equipped with five compartments for hot foods, and adding an entree would require additional serving equipment. (Culkin Decl. ¶ 32). The service of a second alternative would also require additional inmate cooks and servers, which would, in turn, require additional civilian and security staff to supervise the inmates.[FN11] (Culkin Decl. ¶ 33). Additionally, inmates in disciplinary housing or keeplock would have to be accommodated as well, and DOCS would have to implement a time-consuming and labor-intensive procedure for those inmates to select the particular entree prior to each meal. (Culkin Decl. ¶ 34).

FN11. Defendants have also submitted the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

declaration of Robert C. Schattinger, the DOCS Director of Nutritional Services, and Ms. Culkin's superior. (Dkt. No. 190–1). Director Schattinger's declaration was submitted in response to plaintiffs' attempt to discredit Ms. Culkin's statements about the administrative burdens that would be imposed upon DOCS, if it were to attempt to provide a completely vegetarian menu. (Schattinger Decl.). His responsibilities as Director require him to visit kitchens and mess halls throughout the state. (Schattinger Decl. ¶ 2). Plaintiffs attempt to tell DOCS that they should simply use pans that are less wide to fit the additional required food, that additional servers would not be required, and that to Mr. Jova's knowledge, meat items cost more than fruits and vegetables. (*See* Schattinger Decl. ¶¶ 5–10, 15–16 citing Keesh Aff. ¶¶ 14, 16 (Dkt. No. 185–2 at pp. 1–7) and Jova Aff. ¶ 9 (Dkt. No. 185–2 at pp. 8–11). Plaintiffs' assertions are unsupported by personal knowledge.

**\*9** Ms. Culkin noted that these additional costs would be only for a completely *vegetarian* option that would involve only two additional meals per week, while providing what plaintiffs ask for, a completely *vegan* menu would pose a significantly greater financial and administrative burden on DOCS than simply providing a completely "vegetarian" menu. (Culkin Decl. ¶ 34 n. 6). This would involve identifying all vegan inmates, creating a separate vegan menu, purchasing and preparing entrees, side dishes, beverages, and desserts containing no animal products, together with devising a means to serve these individuals.[FN12] *Id.*

> FN12. In addition, Mr. Keesh's problem with soybeans restricts defendants' possibilities even further.

Ms. Culkin also states that, considering that only *two meals per week* have an alternative entree that contains meat, "an inmate who consumes just the meatless side dishes, together with dessert and a beverage would receive enough food to satisfy that inmate and would receive "a nutritionally adequate diet." (Culkin Decl. ¶ 36). Ms.

Culkin also points out that both the general confinement menu and the RAM offer foods that are on plaintiffs' religious diet, albeit, not necessarily served at the same time as required by plaintiffs. (Culkin Decl. ¶¶ 37–41). Ms. Culkin counted 45 different items listed on plaintiff Keesh's menu (AC, Ex. 1). (Culkin Decl. ¶ 39). Ms. Culkin states that 28 of those 45 items are either served by DOCS as an entree, side dish, or dessert or are ingredients contained in dishes offered by DOCS to its inmates. (Culkin Decl. ¶ 40). Additionally, most of the remaining foods on plaintiff Keesh's list have very similar counterparts on the DOCS menu. (Culkin Decl. ¶ 41). Thus, if as the Second Circuit states, plaintiffs really had any degree of "flexibility" in their requested diet, they would be able to be accommodated by the existing RAM.

Ms. Culkin also pointed out that plaintiffs have been able to purchase additional foods from the Shawangunk commissary. (Culkin Decl. ¶ 42 & Ex. P). Many of the foods that are not available in the mess hall are available through commissary purchases. (Culkin Decl. ¶¶ 43–44). Plaintiffs have taken advantage of the ability to purchase additional items from the commissary. Ms. Culkin has submitted the commissary records for 2005, and 2007 through 2010, illustrating the plaintiffs' purchases. (Culkin Decl. ¶¶ 45–46) (citing Exs. Q & R). Ms. Culkin has also pointed out that both plaintiffs have taken advantage of the commissary purchase to buy items that are clearly not vegan. (Culkin Decl. ¶ 46 n. 9). These foods include "Chunky Monkey" ice cream; shrimp soup; roast beef; corned beef; cream cheese; and chicken to name only a few. *Id.* (citing Ex. R at pp. 3–6; 8–9; 15, 17–19; 25; 27–33; 35; 42; 52;57–59; 61; 64; 76; 86–89; 105; 118; and 120).

The Culkin Declaration shows that DOCS did consider affording inmates a "completely" vegetarian diet, but decided against it, not only in order to accommodate, the needs of other inmates, but to avoid the administrative and financial burdens. The Second Circuit states that plaintiffs might be willing to "compromise as a result of further accommodation by the Defendants." 582 F.3d at 417 n. 3. Although one of plaintiff Keesh's statements could be read as an attempt to compromise,[FN13] the rest of plaintiffs' papers make it quite clear that they are not interested in compromising. In fact, in their current papers,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

plaintiffs seem to argue that DOCS should serve everyone the Keesh diet because it is less expensive and healthier. (Dkt. No. 191, ¶ 15).

> FN13. In paragraph 6 of plaintiff Keesh's declaration, he states that
>
>> 6. If DOCS sought to cut down any perceived burden in providing a vegan diet (what Culkin claims to be an additional meal) all DOCS have to do is eliminate the animal meal and provide an entirely vegetarian menu that everyone can eat, not just the animal eaters, which would be the logical thing to do.
>
>> It first appears as though plaintiffs would be satisfied if DOCS replaced the two meals per week where the RAM alternative was meat with a vegetarian dish that "everyone" could eat. However, again, there seems to be a confusion regarding what is vegetarian, and plaintiffs' demand that the meals be vegan.

**\*10** 15. Upon information and belief, it is not against any religious tenet for any of the DOCS prisoners to eat a vegan diet, therefore, if DOCS was to provide one structured vegan diet, it would be less burdensome for DOCS.

Plaintiff Keesh also states that
... it is imperative that the Court order defendants (and DOCS to provide Tulukeesh adherents with a Keesh diet and that responsible people be assigned to handle the food for this diet. Because from my experience, DOCS put many inmates in charge of the food who are criminal minded and not mindful of others, causing them to cross contaminate the food, using utensils on vegetables, etc., that was [sic] used on animal products.

*Id.* ¶ 20. Although plaintiffs argue that providing the Tulukeesh diet would not require extra staff, clearly if the inmates selected to serve food are unacceptable to plaintiff, it is unclear who DOCS would have performing those tasks. It is quite clear that plaintiff Keesh is not even willing to eat the vegetarian options because they are made with "animal flesh" or "animal

milk." (Dkt. No. 191, ¶ 12). Apparently, however, Mr. Keesh has no problem eating honey, which is not technically vegan. (Dkt. No. 26, Ex. 1 at 2) (stating that honey is one of the foods required in the Tulukeesh diet on Mondays and Wednesdays).

Plaintiff Keesh's argument actually weighs in favor of the defendants' position. Plaintiff Keesh clearly implies that the current menu would have to be completely revamped in order to accommodate plaintiffs because they cannot eat the vegetarian options that DOCS currently provides because they are made with animal flesh or cheese (or soybeans).[FN14] In arguing that DOCS should respect his religion and accusing defendants of all sorts of deception, Mr. Keesh seems to forget that there are other inmates in DOCS who might not want to eat what plaintiff Keesh eats, regardless of whether it is "better" for them or not. Plaintiff Keesh appears to care only about his religion or his needs, but forgets that DOCS must attempt to balance its accommodation of plaintiffs' needs with the needs of the other 55,000 inmates in New York State. DOCS cannot be expected to remake its entire food service system for plaintiffs Keesh and Jova.

> FN14. Plaintiffs compare the alleged costs of "animal items" versus "non-animal" items and allege that the non-animal items cost less. (Dkt. No. 191, ¶¶ 16–17; Dkt. No. 192, ¶ 9). Plaintiff Jova states that "[t]he cost savings of serving meatless diets, in institutions, go way beyond meal expenses." (Dkt. No. 192, ¶ 9). Plaintiff Jova also states that there are environmental costs to serving meat-based diets. *Id.* ¶¶ 20–25.

Mr. Jova goes to great lengths to tell the court how detrimental meat is to one's health, and he also advocates that DOCS should feed all DOCS inmates a vegetarian or vegan diet. (Dkt. No. 192, ¶¶ 9–26). This is clearly not what the Second Circuit intended with its remand. This is not a debate over whether DOCS should replace its meals with completely vegan or vegetarian meals, but whether providing additional vegan or vegetarian meals to plaintiffs is the least restrictive alternative under RLUIPA. Additionally, notwithstanding that there are foods in the commissary that comply with the Tulukeesh diet,[FN15] when Mr. Keesh and Mr. Jova purchase extra food from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

the commissary, they purchases things such as toaster pastries; duplex creme cookies; strawberry short cakes; jelly beans; lemon creme cookies; honey roasted peanuts; "Chunky Monkey," (a flavor of ice cream); or shrimp soup.[FN16]

> FN15. (Defs.' Ex. P, Commissary Buy Sheet).

> FN16. (*See e.g.* Defs.' Ex. Q at pp. 3–4, 18 (Mr. Keesh); Defs.'s Ex. R at pp. 3–6, 8–9, 15, 17–19, 25 (Mr. Jova)).

**\*11** On one day, Mr. Jova purchased Pepsi Cola; Grape Soda; mayonnaise; Baby Ruth candy bars; several bags of nacho chips; cheese nip crackers; ice cream; Tang; and a bag of mints. (Defs.' Ex. R at p. 13). On another day, he purchased three cans of Tuna in oil; several bags of nacho chips; iced oatmeal cookies; macaroni and cheese; and fruit punch drink mix. *Id.* at 15. If plaintiff Jova is complaining about being overweight, it is not necessarily the DOCS menu that is making him so.

This court finds that defendants have shown that their religious alternative entree is the least restrictive means of furthering their compelling administrative interests. There is no less restrictive means because defendants have shown that it is financially and administratively impossible to offer a completely vegetarian or vegan meal, particularly considering the problem created by plaintiff's unwavering demand for a completely vegan diet (without soybeans). Therefore, plaintiffs' claims for both injunctive and monetary relief may be dismissed.

**V. *PERSONAL INVOLVEMENT***

**A. Legal Standard**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). It has been held that personal involvement is also a prerequisite for a valid RLUIPA claim. *See Pilgrim v. Artus,* 9:07–CV–1001, 2010 WL 3724883 at \*14 (N.D.N.Y. March 18, 2010) (Report–Recommendation) (citing *inter alia Joseph v. Fischer,* 08 Civ. 2824, 2009

WL 3321011, at \*18 (S.D.N.Y. Oct. 8, 2009); *Hamilton v. Smith,* 9:06–CV–805, 2009 WL 3199520, at \*9 (N.D.N.Y. Sept. 30, 2009)).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* ___ U.S. ___, 129 S.Ct. 1937 (U.S.2009).

**B. Application**

Because this court has found no RLUIPA violation, this discussion is not necessary to the court's recommendation, but has been included as an alternative basis for the dismissal of any claim for damages. Defendants allege that none of them were personally involved in plaintiffs' dietary issue. According to Ms. Culkin, absent an emergency, "the administration at each facility has no authority to deviate from the religious alternative menu without the prior approval of the Office of Nutritional Services. (Culkin Decl. ¶ 19). If none of the defendants had the authority to change the existing menu or to provide a separate menu as plaintiffs requested, they could not be liable for damages, regardless of their position in the facility hierarchy. A review of the existing defendants shows that none of them worked for the Office of Nutritional Services, and none of them would have the professional knowledge or the authority to determine whether plaintiffs' requested menu was nutritionally adequate to provide to plaintiffs or to any other inmate.[FN17]

> FN17. Defendant Pataki was the Governor of New York during the period in question. Clearly

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

the Governor would have no personal involvement in the food served in DOCS facilities. Defendant Smith was the Superintendent of Shawangunk Correctional Facility and was not involved in determining what food to serve inmates. Defendant Goord was the Commissioner of DOCS and was not involved in determining what food to serve inmates, nor is he alleged to have been involved with plaintiffs' dietary requests, other than as the recipient of various letters of complaint written by plaintiffs. (AC ¶¶ 18, 26, 29, 49, 52, 53, 58, 60, 61, 63, 83, 84, 127). Defendants Wright, Bunce, Cutler, Selsky and Ewanciw were only named in connection with plaintiff's retaliation claim, and thus, were not involved in their dietary requests. Deputy Superintendent Gorelick lacked the authority to deviate from DOCS dietary policy. Neither defendants Nuttal, the Deputy Commissioner for Program Services, nor Mark Leonard, the Director of Ministerial and Family Services worked for the Office of Nutritional Services and would not have had the authority to change the menus for plaintiffs.

*12 Because none of the defendants had the authority to change the menu policy or the menus themselves, none of the defendants were personally involved in any violation. See Hamilton v. Smith, 9:06–CV–805, 2009 WL 3199520, *9 (case dismissed against doctor who had no authority to change DOCS procedures for prescribing special inmate diets); Hatfield v. Goord, No. 04–CV–159, 2007 WL 700961 at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing for lack of personal involvement because the Superintendent did not create the policy nor was there any allegation that he had the power to create or terminate the policy). Therefore, the RLUIPA claim could be dismissed as against the individual defendants, in the alternative, based upon a lack of personal involvement.

## VI. QUALIFIED IMMUNITY

### A. Legal Standard

Qualified immunity protects government officials performing discretionary functions in the course of their employment where "their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir.2001) (internal quotation marks omitted).

In determining whether qualified immunity applies, the court may first consider whether the facts alleged show that the defendants' conduct violated a constitutional or statutory right. Saucier v. Katz, 533 U.S. 194, 201(2001), modified by Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). If the court finds that no constitutional or statutory right would have been violated if the allegations were established, there is no necessity for further inquiry concerning qualified immunity. Saucier, 533 U.S. at 201.

The defense of qualified immunity protects only individual defendants, not governmental entities and applies only to damage claims, not to claims for equitable relief. Rodriguez v. City of New York, 72 F.2d 1051, 1065 (2d Cir.1995) (citing Allen v. Coughlin, 64 F.3d 77, 81 (2d Cir.1995); Giacalone v. Abrams, 850 F.2d 79, 84 (2d Cir.1988)). Finally, in determining the right at issue, the Supreme Court has expressly "cautioned against" framing the right too broadly, and in Redd v. Wright, the Second Circuit stated that it has "interposed a 'reasonable specificity' requirement" on the constitutional or statutory right for qualified immunity purposes. Redd v. Wright, 597 F.3d 532, 536 (2d Cir.2010) (citing Wilson v. Lane, 526 U.S. 603, 615 (1999); Dean v.. Blumenthal, 577 F.3d 60, 67–68 (2d Cir.2009)).

### B. Application

*13 The Second Circuit dismissed the constitutional claims in this case, and because this court has found that defendants did not violate RLUIPA, and were not responsible for the dietary policy in any event, the court need not address the issue of qualified immunity.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

However, assuming that damages would have been available under RLUIPA against defendants in their "individual capacities,"[FN18] the court notes that defendants would have been entitled to assert qualified immunity as a defense to any individual damage claims.

> FN18. In *Hall v. Epke,* 2010 WL 3996211, *3 (2d Cir. Oct. 13, 2010),* the Second Circuit reserved on the issue of whether damages would be available under RLUIPA against the state defendants in either their individual or official capacities, pending the Supreme Court's decision in *Sossamon v. Texas, supra.*

Even assuming that a violation of RLUIPA could be established, this court cannot find that reasonable corrections personnel in 2003 would have known such a right would be violated with respect to plaintiffs' dietary demands. The court must keep in mind the letter and the demands that were sent to defendants Goord and Smith on October 14, 2003. (Dkt. No. 26–1; AC Ex. 1 at 1–7). At that time, plaintiff Keesh was demanding that, among other requirements, the Tulukeesh adherents were to be served certain foods on certain days, were to have "separate eating equipment," and were to "only [eat] food that [was] prepared by Keesh adherent(s)." *Id.* at 2.

The Keesh adherents were to eat "seven servings of fruit a day" unless it was a fast day, and were required to eat ***"fresh navy beans"*** at least four times per week. *Id.* The letter specifically stated that "we have fixed diets that are to be eaten on certain days which are listed in our Holy Book ...." *Id.* Although the court notes that plaintiff Keesh's most recent submission in support of his "Motion to Vacate" that will be decided by Chief Judge Mordue, indicates that "the menu is not restricted to these exact foods," there is no such concession in the letter that the defendants received on October 14, 2003. [FN19] *Compare* AC, Ex. 1 at 1–3 (referring to "fixed diets'), *with* Dkt. No. 194 at 9).[FN20] The October 13, 2003 letter also stated that the plaintiffs should receive their meals "all at one time at about 12p.m. which can be consumed throughout the day as we choose."

> FN19. The court also notes that plaintiffs attempted to assert this willingness to "compromise" in their first motion to vacate.

(Dkt. No. 130 at 12–13–CM/ECF pages; pp.8–9—plaintiffs' page numbering).

> FN20. Page 9 refers to the page assigned within Dkt. No. 194 by the CM/ECF system. Plaintiffs have numbered this page 7 of their submission.

Regardless of the existence of RLUIPA, this court is aware of no case that would have indicated to a reasonable corrections officials that offering plaintiffs the Religious Alternative menu instead of giving them the exact foods requested on their diet would have violated that statute. Whether plaintiffs decided later that it was in their best interests to allege that they would have compromised,[FN21] that is not what was before defendants at the time that they made their decisions. Thus, defendants would have been entitled to qualified immunity from any damage claim that would have been available under RLUIPA.

> FN21. As stated above, although plaintiffs continue to allege that they are willing to accept other foods, their papers make it clear that their idea of compromise is quite different than that envisioned by the Second Circuit's decision.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 168) be **GRANTED,** and plaintiffs' RLUIPA claim, the only remaining claim, be **DISMISSED IN ITS ENTIRETY,** and it is

**\*14 RECOMMENDED,** that plaintiffs' motion for summary judgment (Dkt. No. 167) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1135931 (N.D.N.Y.)

(Cite as: 2011 WL 1135931 (N.D.N.Y.))

N.D.N.Y.,2011.

Keesh v. Smith
Slip Copy, 2011 WL 1135931 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 837117 (W.D.N.Y.)
(Cite as: 2007 WL 837117 (W.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Anthony FOX, Plaintiff,
v.
Thomas POOLE, et al., Defendants.
**No. 06CV148.**

March 15, 2007.

Anthony Fox, Gouvenor, NY, pro se.

Ann C. Williams, New York State Attorney General's
Office, Buffalo, NY, for Defendants.

**Order**

Honorable HUGH B. SCOTT, United States Magistrate
Judge.

**\*1** Before the Court is plaintiff's motion to compel
defendants answer his interrogatories, answer requests for
admissions, and produce sought documents (Docket No.
28 FN1). On August 25, 2006, the parties consented to
proceed before the undersigned as Magistrate Judge
(Docket No. 17). After scheduling a status conference (for
April 17, 2007, at 10 am, Docket No. 26), the Court issued
a briefing schedule for this motion, with responses due by
February 21, 2007, and replies due by February 28, 2007,
and the motion deemed submitted (without oral argument)
on February 28, 2007 (Docket No. 30).

FN1. In support of this motion, plaintiff filed his
notice of motion, the motion (including legal
citations), Docket No. 28. In opposition,
defendants filed their attorney's declaration,
citing discovery filed separately, Docket No. 31.

**BACKGROUND**

On March 13, 2006, plaintiff, an inmate in New York
State custody proceeding *pro se,* sued the superintendent
of his former facility, Five Points Correctional Facility, the
director of Health Services for the Department of
Correctional Services ("DOCS"), the Five Points
Correctional Facility health services director, treating
personnel at that facility, the DOCS grievance director,
and the State of New York, alleging violations of his
constitutional rights for placing him in medical isolation
in September and October 2005 (Docket No. 1, Compl.).
While in that isolation, plaintiff alleges being deprived
medical and dental care (*id.* at 6). He also claims that
defendants violated the Americans with Disabilities Act
(*id.* at 6-7) and discriminated against him despite being an
alleged federally funded facility, in violation of 29 U.S.C.
§ 794(a) (*id.* at 10). This Court granted plaintiff's motion
(Docket No. 2) to proceed *in forma pauperis* without
dismissing any claims or parties (Docket No. 3).

In May, June, and October 2006, defendants separately
answered (Docket Nos. 5-7, 11-13, 20). Apparently, while
various defendants were answering, plaintiff made his
Interrogatories and other discovery requests (*see* Docket
No. 27, dated June 6, 2006, *filed* Jan. 24, 2007). In
plaintiff's first motion to dismiss affirmative defenses on
June 12, 2006, he also cross-moved to compel discovery

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 837117 (W.D.N.Y.)
(Cite as: 2007 WL 837117 (W.D.N.Y.))

(Docket No. 8, at 2), which this Court rejected as being premature (Docket No. 18, Order at 3). The Court denied plaintiff's motions (Docket Nos. 8, 22) to dismiss certain asserted affirmative defenses (Docket Nos. 18, 25). On August 31, 2006, the Court issued a Scheduling Order (Docket No. 19) which called for initial Rule 26(a) disclosures by October 30, 2006, motions to compel discovery due by January 29, 2007, and discovery to be completed by February 28, 2007. Following New York State's Answer, defendants filed their Rule 26 initial disclosure (Docket No. 21), *see* W.D.N.Y. Loc. Civ. R. 7.1(a)(1) (all discovery in *pro se* cases are to be filed with the Court).

Plaintiff filed his June 2006 Interrogatories on January 24, 2007 (Docket No. 27), which included Requests for Admissions and Requests for Documents. These Interrogatories did not have filed with them any proof of service, *see* Fed.R.Civ.P. 5(d) (papers required to be filed with certificate of service), but merely included plaintiff's indication that a copy of the document was sent to defense counsel (Docket No. 27, at page 9). Plaintiff then filed his present motion to compel on the same day (Docket No. 28), filing with this motion and a copy of his discovery requests a certificate of service (Docket No. 29). Plaintiff claims in his motion that he served his Interrogatories and other Requests on defense counsel on September 5, 2005 [FN2] (Docket No. 28, Pl. Motion ¶ 5), and argues that defendants refused to respond to the Interrogatories and other Requests on October 31, 2006, with defendants' initial disclosures (*id.* ¶ 6).

FN2. Plaintiff probably means "2006," since September 5, 2005, was before plaintiff was placed in medical isolation, Docket No. 1, Compl., at 6 (in medical isolation from September 22, 2005); *see* Docket No. 31, Defs. Atty. Decl. ¶ 2, or commenced this action, *see* Docket No. 1, Compl. dated Mar. 13, 2006.

*2 Defendants contend that plaintiff had not served the Interrogatories, Requests for Admissions or Requests for Documents (Docket No. 31, Defs. Atty. Decl. ¶ 4) and thus his motion to compel should be denied (*id.* ¶ 5). They claim that in their initial disclosure they responded to plaintiff's otherwise unserved discovery requests (*id.* ¶¶ 7, 11-13). Defendants submitted an authorization form for plaintiff to sign to obtain his medical records but plaintiff sent them back his own signed form. Defense counsel submitted plaintiff's form to the Department of Correctional Services to release plaintiff's medical and mental health records. Once defendants obtain those documents (either on plaintiff's executed authorization or on a reissued defense authorization), defense counsel intends to produce them to plaintiff. (*Id.* ¶¶ 8-10.) Defendants, however, do not indicate how plaintiff's interrogatories are responded to by the discovery already produced within defendants' initial disclosure nor do defendants state whether they intend to answer these interrogatories.

Plaintiff did not submit a reply.

## DISCUSSION

In addition to the potential sanctions for failing to disclose, Fed.R.Civ.P. 37(a)(4)(A), there are consequences for not responding to a properly served Interrogatory or Request for Admission. Any ground for an objection to an Interrogatory not stated within 30 days after service of them is waived, Fed.R.Civ.P. 33(b)(3). A matter is deemed admitted unless the parties served with the Request for Admission serves a written answer or objection within 30 days, Fed.R.Civ.P. 36(a).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 837117 (W.D.N.Y.)
(Cite as: 2007 WL 837117 (W.D.N.Y.))

As for his motion to compel discovery, plaintiff needs to first serve his discovery demands before he can move to compel their answer. Plaintiff's Interrogatories and other Requests, if served when dated on June 6, 2006, predates the Answers by some of the defendants (in fact summonses for other defendants had not yet been returned, *see* Docket Nos. 14, 15, 16), and this Court's Scheduling Order (*see* Docket No. 19). Under Rule 26(d) discovery usually begins after the parties have conducted a discovery planning conference under Rule 26(f). But this timing requirement does not apply to proceedings exempt from the initial disclosure requirement by Rule 26, as here "an action brought without counsel by a person in the custody of the United States, a state, or a state subdivision," Fed.R.Civ.P. 26(a)(1)(E)(iii), (d). Thus, plaintiff's Interrogatories, Request for Admission, and Request for Production technically were timely but only for those defendants who had appeared by filing their Answers as of June 6, 2006 (*cf.* Docket Nos. 5-7, Ans. of Defs. Macomber, Poole, Gregoire). These Interrogatories and Requests for Admissions were directed at all defendants, even those who had not yet appeared when the Requests and Interrogatories were dated (*e.g.,* Docket No. 27, Interrog. No. 14, directed to defendant Wright; cf. Docket No. 13, Wright Ans., dated June 15, 2006). Further, plaintiff sought these disclosures, in part, under Rule 26(a) as initial disclosures, which were not applicable to him as an inmate proceeding *pro se* prior to this Court's Scheduling Order (Docket No. 19, Order of Aug. 31, 2006) calling for initial disclosures, *see* Fed.R.Civ.P. 26(a)(1)(E)(iii).

**\*3** Plaintiff claims in his motion that he served this discovery on September 5, 2006 (*see* Docket No. 28, Pl. Motion ¶ 5), which would have been after all defendants answered and the entry of the Scheduling Order. But plaintiff did not file proof of service of those discovery requests and defendants deny receiving those requests.

Defendants indicated that they would have responded to those demands had they been properly served (Docket No. 31, Defs. Atty. Decl. ¶¶ 7-13), relying upon the initial disclosure served and filed in this case (Docket No. 21).

Also, plaintiff did not certify his good faith efforts in attempting to confer with defense counsel to resolve this discovery dispute prior to filing this motion, *see* Fed.R.Civ.P. 37(a)(2)(A). While plaintiff's incarceration may have restricted his means to confer, the rule does not exempt inmate plaintiffs from this requirement, or at least indicating either attempts at conferring or the barriers that prevented such a conference. Had plaintiff attempted this, he may have learned from defense counsel that she did not receive the requests at issue, obviating the need for this motion.

Regardless of the date of the Interrogatories and Requests or of their service and absent proof of their service, plaintiff's motion to compel is **denied** as to the document demands. Defendants have shown that their initial disclosure produced the documents sought by plaintiff in his demand. Defendants, however, have not shown that plaintiff's Interrogatories or Request for Admissions have been responded to within the disclosure already made by them. Given that through the electronic filing of these Interrogatories and Request for Admissions defendants now have received these interrogatories (*see* Docket No. 27, Notice of Electronic Filing) and giving the incarcerated, *pro se* plaintiff every benefit, defendants should respond to them and avoid the consequences of waiver of objections or formal admissions of matters asserted in plaintiff's Request for Admissions. Thus, plaintiff's motion to compel is **granted in part** (in compelling answers to the Interrogatories and respond formally to the Requests for Admissions) **and denied in part (as to the other Requests).** Defendants have thirty (30) days from entry of this Order to respond to these discovery demands.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 837117 (W.D.N.Y.)
(Cite as: 2007 WL 837117 (W.D.N.Y.))

As a result, the discovery deadline (Docket No. 19) is extended to **June 9, 2007;** dispositive motions will be due on or before **August 10, 2007;** if no motions are filed, pretrial statements will be due by **October 15, 2007.**

### CONCLUSION

For the reasons stated above, plaintiff's motion to compel (Docket No. 28) is **granted, in part (compelling defendants to answer plaintiff's Interrogatories and Requests for Admissions), denied in part.** Defendants have thirty (30) days from entry of this Order to respond to these discovery demands. The Scheduling Order (Docket No. 19) in this action is amended as follows: the discovery deadline (Docket No. 19) is extended to **June 9, 2007;** dispositive motions will be due on or before **August 10, 2007;** if no motions are filed, pretrial statements will be due by **October 15, 2007.**

**\*4** So Ordered.

W.D.N.Y.,2007.
Fox v. Poole
Not Reported in F.Supp.2d, 2007 WL 837117 (W.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 4609379 (N.D.N.Y.)

(Cite as: 2010 WL 4609379 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Douglas R. McCARROLL, Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, Harley G. Lappin,
Deborah G. Schult, Dawn Marini, A. Lester, Robert S.
Mueller, III, Defendants.
No. 9:08-CV-1343 (DNH/GHL).

Sept. 30, 2010.
Douglas R. McCarroll, c/o Law Offices of Bruce
Corrigan, Jr., Westport, CT, pro se.

Hon. Richard S. Hartunian, United States Attorney for the
Northern District of New York, Syracuse Office, Charles
E. Roberts, Esq., of Counsel, Syracuse, NY, for
Defendants Lappin, Schult, Marini, Lester, and the Bureau
of Prisons.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to *Bivens v. Six Unknown Named
Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971,
has been referred to me for Report and Recommendation
by the Honorable David N. Hurd, United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). Plaintiff Douglas R. McCarroll alleges that
Defendants violated his constitutional and statutory rights
by taking a sample of his blood, rather than his hair or
saliva, for inclusion in a national DNA database. (Dkt. No.
1.) Defendants Harley G. Lappin, Deborah G. Schult,
Dawn Marini, A. Lester, and the Federal Bureau of
Prisons moved to dismiss the complaint for failure to state
a claim pursuant to Federal Rule of Civil Procedure
12(b)(6). (Dkt.Nos.14.) In a Report-Recommendation
issued on March 2, 2010 ("March Report"), I
recommended that Defendants' motion be granted in part

and denied in part. (Dkt. No. 27.) Defendants objected to
the March Report. (Dkt. Nos. 28 and 29.) Judge Hurd
remanded the matter to me for reconsideration of the
motion to dismiss in conjunction with *Redd v. Wright,* 597
F.3d 532 (2d Cir.2010), a Second Circuit decision issued
a week after the March Report. (Dkt. No. 31.)

Having carefully reviewed the matter in light of
Defendants' objections and the Second Circuit's opinion in
*Redd,* I recommend that the Court dismiss the complaint
in its entirety.

### I. FACTUAL AND PROCEDURAL SUMMARY

The facts associated with this action and the standards
to be applied when reviewing a motion to dismiss are set
forth in detail in the March Report and will not be restated
herein.

### II. SUMMARY OF THE FINDINGS SET FORTH IN
THE MARCH REPORT

In the March Report, I recommended that (1) any
*Bivens* claims against the Bureau of Prisons or the
Defendants in their official capacities be dismissed *sua
sponte;* (2) Plaintiff's request for injunctive relief be
dismissed as moot; (3) any claim by Plaintiff that the DNA
Act violates the Fourth Amendment be dismissed for
failure to state a claim; (4) Defendants' motion to dismiss
Plaintiff's *Bivens* free exercise claim be denied; (5)
Plaintiff's RLUIPA claim be dismissed *sua sponte* because
Plaintiff is a federal prisoner; (6) Plaintiff's RFRA claim
should survive *sua sponte* review; (7) Defendant Lappin
be dismissed for lack of personal involvement; (8)
Defendants' motion to dismiss the claims against
Defendants Schult, Marini, and Lester for lack of personal
involvement be denied; and (9) Defendant Mueller be
ordered to show cause why he should not be charged with
any expenses incurred in making service on him. (Dkt. No.
27.) I assume the reader's familiarity with the March
Report and will not restate the legal analysis therein
except to the extent that it is relevant to Defendants'
objections.

### III. DEFENDANTS' OBJECTIONS TO THE
MARCH REPORT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4609379 (N.D.N.Y.)

(Cite as: 2010 WL 4609379 (N.D.N.Y.))

**A. Failure to Acknowledge that the FBI's Policy of Blood-Only DNA Collection Serves Legitimate Penological Interests That Justify Any Minimal Intrusion on Plaintiff's Free Exercise Rights.**

**\*2** In the March Report, I discussed at length Defendants' failure to reference, much less analyze, the major Supreme Court and Second Circuit precedents setting forth the proper standard to apply to free exercise claims by prisoners. (Dkt. No. 27 at 5-6, 10-19.) Under this standard, the prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." _Salahuddin v. Goord,_ 467 F.3d 263, 274-75 (2d Cir.2006) (citing _Ford v. McGinnis,_ 352 F.3d 582, 591 (2d Cir.2003)). If the prisoner does so, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." _Salahuddin,_ 467 F.3d at 275 (punctuation omitted). "[T]he burden remains with the prisoner to show that these articulated concerns were irrational." _Id._ (punctuation omitted). In the March Report I found, and Defendants do not now dispute, that Plaintiff met his threshold burden. (Dkt. No. 27 at 15-17.) I then noted that:

> Defendants have not met [their] relatively limited burden. Defendants argue, and Plaintiff concedes, that the DNA Act itself serves an important government interest. (Defs.' Br. at 12-13; Compl. ¶ 26.) However, the policy at issue in this case is not the DNA Act itself, despite Defendants' repeated attempts to characterize Plaintiff's claim in that manner. Rather, the policy at issue here is the policy of requiring a _blood_ sample rather than one of the other types of samples authorized by the DNA Act. Defendants have not asserted any reason at all for the need to collect blood rather than one of the other types of samples authorized by the DNA Act. The only references in the record to the reasons for the policy are in attachments to the complaint, which state that the "FBI determined for the purposes of accuracy, efficiency, and compliance with the [A]ct it will analyze only blood samples." (Compl. Exs. A-1 and A-2.) Defendants have not even mentioned this assertion, much less made even a minimal attempt to characterize it as an explanation of a legitimate penological interest.

(Dkt. No. 27 at 18-19.)

Defendants now object to the March Report on the basis that "the lower court failed to acknowledge that the FBI's policy of blood-only DNA collection serves legitimate penological interests that justify any minimal intrusion on Plaintiff's free exercise rights." (Dkt. No. 28 at 2-3.) Defendants acknowledge that "the motion to dismiss did not expressly reference" the attachments to the complaint, but argue that the documents "clearly satisf[y] the Defendants' burden ..." _Id._ at 8-9. Specifically, they argue that

> saliva and hair are not "obvious, easy alternatives" ... Use of either of these alternatives would result in reduced accuracy in the DNA collection process as well as reduced efficiency, as such an accommodation would subsequently be extended to any inmate with a religious objection to blood tests.

**\*3** _Id._ at 10. It is noteworthy that Defendants offer no justification for having failed to previously make this argument or to even reference the major legal precedents.

Defendants' objection is not persuasive for two reasons. First, the District Court, on _de novo_ review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.[FN1] Defendants' argument regarding the alleged legitimate penological interest for requiring blood tests could, without doubt, have been presented to the undersigned in the first instance.

> FN1. _See, e.g., Paddington Partners v. Bouchard,_ 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") (internal quotation marks and citations omitted); _Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,_ 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4609379 (N.D.N.Y.)

(Cite as: 2010 WL 4609379 (N.D.N.Y.))

additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) (citation omitted); *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") (citations omitted); *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") (citations omitted); *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") (citation omitted).

Second, Defendants' argument relies on facts (e.g., that saliva and hair samples are, in fact, less efficient and accurate than blood samples and that saliva and hair samples, despite being explicitly authorized by the Act, are not obvious, easy alternatives) that do not appear on the face of the complaint. As another judge in this District has observed, in the religion context the legitimate penological interest inquiry "is particularly fact-lad [ ]en and often ill-suited for resolution on [a] motion for summary judgment, let alone a motion to dismiss." *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP),

2009 U.S. Dist. LEXIS 125893, at *26, 2009 WL 6066799, at *7 (N.D.N.Y. Dec. 31, 2009). Therefore, I recommend that the Court overrule Defendants' objection that the March Report erred by its "failure to acknowledge that the FBI's policy of blood-only DNA collection serves legitimate penological interests that justify any minimal intrusion on plaintiff's free exercise rights."

**B. Failure to Apply Current Supervisory Liability Law.**

In the March Report, I found that Plaintiff had alleged facts plausibly suggesting that Defendants Schult, Marini, and Lester were personally involved in the alleged constitutional violations. (Dkt. No. 27 at 21-24.) Defendants object to this portion of the March Report, arguing that "the lower court failed to apply current supervisory liability law." [FN2] (Dkt. No. 28 at 6.)

> FN2. I note that Defendants, in their memorandum of law in support of the motion to dismiss, their reply, or their sur-sur-reply, did not cite any of the cases on which they now rely. (Dkt. Nos. 14, 21, and 23.) Nor, again, do they offer any justification to the Court for not having done so.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under' " *Bivens. Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a *Bivens* cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally

Slip Copy, 2010 WL 4609379 (N.D.N.Y.)

(Cite as: 2010 WL 4609379 (N.D.N.Y.))

involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*4** In *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal* 's effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543-44 (S.D.N.Y.2009) (collecting cases). However, under a more nuanced view, *Iqbal* does not necessarily negate *Colon:*

These decisions may overstate *Iqbal* 's impact on supervisory liability. *Iqbal* involved alleged intentional discrimination. The Supreme Court specifically held that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." Where the alleged constitutional violation involved "invidious discrimination in contravention of the First [FN3] and Fifth Amendments," *Iqbal* held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether he is a subordinate or a supervisor. It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v.*

*Coughlin* may still apply.

FN3. The case that the Supreme Court cited for the proposition that a free exercise claim requires a showing of discriminatory intent was *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993), which did not involve a prisoner. That case therefore applied the *Smith* test rather than the *O'Lone/Turner* "legitimate penological interest" test. For a more complete discussion of these two tests and their implications in this case, see the March Report.

*Sash,* 674 F.Supp.2d at 544 (citations omitted). Here, Plaintiff's constitutional claim does not require a showing of discriminatory intent. Rather, as discussed above, it requires a showing that the blood-only policy is not reasonably related to legitimate penological interests. Therefore, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply and I recommend that the Court overrule Defendants' objections based upon the Court's purported failure to apply current supervisory liability law.

**C. Failure to Address Defendants' Qualified Immunity Arguments**

In their memorandum of law in support of the motion to dismiss, Defendants argued that they are entitled to qualified immunity because:

[T]he law in this area is clear: "All the federal circuits that have considered the question have upheld the state and federal DNA indexing laws, as have the overwhelming majority of district courts and state courts." Challenges to such laws have been rejected under a host of constitutional provisions. Further, inmates have a reduced expectation of privacy, the intrusion of a blood test is "minimal," and such tests are "commonplace." Finally, the government has a compelling and indeed "monumental" interest in collecting DNA from inmates. As noted by Judge Sharpe and adopted by this Court, the "person having the sample taken does not have the option to dictate the type of sample taken."

**\*5** (Dkt. No. 14-1 at 12-13, citations omitted.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4609379 (N.D.N.Y.)

(Cite as: 2010 WL 4609379 (N.D.N.Y.))

I did not address Defendants' qualified immunity argument in the March Report because it simply reiterated Defendants' substantive arguments, which I had already rejected. Defendants' qualified immunity argument, like Defendants' argument on the merits of Plaintiff's claims, relied almost entirely on Fourth Amendment precedent and assumed that Plaintiff was challenging the constitutionality of the DNA Act as a whole. As I explained in the March Report, this was a mischaracterization of Plaintiff's claim, which is a religious challenge to the Bureau of Prisons policy of collecting blood samples rather than saliva or hair samples.

Only now, in their objections to the March Report, do Defendants argue that "the right Plaintiff asserts, the right to be free from giving a blood sample on religious grounds, is not 'clearly established.'" (Dkt. No. 28 at 4.) In support of this argument, Defendants now cite purportedly analogous Northern District of New York cases from 2007 and 2009. *Id.* I note, once again, that Defendants have offered no justification to the Court for their failure to previously cite these cases. These cases could, certainly, have been presented to the undersigned in the first instance and, therefore, should not properly be considered for the first time on *de novo* review of the March Report.

In supplemental objections to the March Report, Defendants cite *Redd v. Wright,* 597 F.3d 532 (2d Cir.2010), a case decided after the March Report was issued. In *Redd,* a prisoner challenged the New York Department of Correctional Service's policy of placing prisoners who refused to take tuberculosis blood tests in keeplock confinement. Redd refused the blood test on religious grounds but offered to submit to saliva testing instead. He was placed in keeplock for thirteen months.

Redd filed suit in federal court, asserting that prison officials violated his First Amendment rights. The district court agreed that the defendants had violated Redd's First Amendment rights. However, the district court granted the defendants' motion for summary judgment on qualified immunity grounds because neither the Second Circuit nor the Supreme Court had held that application of the tuberculosis policy to religious objectors violated the First Amendment.

On appeal, Redd argued that the defendants were not entitled to qualified immunity because the right not to be subjected to punishment or more burdensome confinement as a consequence of religious beliefs was clearly established. The Second Circuit rejected Redd's argument, noting that "the Supreme Court has expressly cautioned against framing the constitutional right at too broad a level of generality" and thus characterizing the right at stake as the "right under the First Amendment ... to a religious exemption from the ... Policy." Finding that the right, as narrowly defined, had not been clearly established or "foreshadowed" by any Second Circuit or Supreme Court ruling, the Second Circuit affirmed the district court's ruling that the defendants were entitled to qualified immunity.

**\*6** Here, in his response to Defendants' objections, Plaintiff urges the Court to define the right at stake in this action broadly, as "the freedom of religion under the First Amendment." (Dkt. No. 32 at 2.) However, as the Second Circuit noted in *Redd,* the constitutional right at stake must be defined narrowly. Therefore, the right at stake in this action is a prisoner's right to submit the saliva or hair sample authorized by the Act rather than blood if submitting a blood sample would violate the prisoner's religious beliefs. That right has not been clearly established or foreshadowed by any Second Circuit or Supreme Court ruling. Therefore, Defendants are entitled to qualified immunity and I therefore recommend that the Court grant their motion to dismiss on those grounds.

### D. Defendant Mueller

Defendant Mueller refused service of the complaint. In the March Report, I recommended that Defendant Mueller be ordered, pursuant to Federal Rule of Civil Procedure 4(d)(2), to show good cause why he should not be charged with any expenses incurred in making service upon him. (Dkt. No. 27 at 24-26.) Defendants object to this portion of the March Report. (Dkt. No. 28 at 11-14.) Plaintiff states that he "has no objection to [D]efendant Mueller not being charged with expenses." (Dkt. No. 32 at 12.) In light of my recommendation that the complaint be dismissed on mootness and qualified immunity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4609379 (N.D.N.Y.)

(Cite as: 2010 WL 4609379 (N.D.N.Y.))

grounds, I recommend that the Court *sua sponte* dismiss the claims against Defendant Mueller.

**IV. CONCLUSION**

In conclusion, I recommend that the Court (1) dismiss Plaintiff's request for injunctive relief as moot, as discussed in the March Report on page eight; and (2) dismiss Plaintiff's damages claims against all defendants on qualified immunity grounds.

**ACCORDINGLY,** it is

**RECOMMENDED** that the Court dismiss this action in it its entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

McCarroll v. Federal Bureau of Prisons
Slip Copy, 2010 WL 4609379 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn Correctional Facility; Donald Selsky, Assistant Deputy Commissioner, Director of Special Housing/Disciplinary Program; Anthony Graceffo, Chief Medical Officer, Auburn Correctional Facility; Glenn S. Goord; Hans Walker; Gary Hodges; D.W. Seitz; Terry Halcott; Christine Coyne Nancy O'Connor; Ann Driscoll; John McClellen; John Rourke, Captain, Security Services at Auburn Correctional Facility; Koors, Head Pharmacist at Auburn Correctional Facility; Robrt Mitchell, Correctional Counselor at Auburn Correctional Facility; and Androsko, Registered Nurse, Auburn Correctional Facility, Defendants.
No. 9:01-CV-1039.

Sept. 24, 2008.
Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, David L. Fruchter, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Samuel Cabassa, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated June 30, 2008, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' second motion for summary judgment (Docket No. 81) be granted in part and denied in part. Objections to the Report Recommendation have been filed by the parties.

Based upon a de novo review of the portions of the Report-Recommendation to which the parties have

objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to the extent that it asserts:

(a) Any Fourteenth Amendment procedural due process claim whatsoever;

(b) A First Amendment access to courts claim against defendant Hans Walker;

(c) A First Amendment retaliation claim against defendant Hans Walker;

2. Defendants' second motion for summary judgment is otherwise DENIED, so that, surviving that motion, is:

(a) Plaintiffs First Amendment access-to-courts claim against defendants D.W. Seitz and Craig Gummerson asserted in the Fourth Amended Complaint's Fifth Cause of Action; and

(b) Plaintiffs First Amendment retaliation claim against defendants D.W. Seitz and Craig Gummerson also asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) [FN1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN3]

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN4] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN5] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN6]

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff].");  *see also Matsushita Elec.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[FN9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[FN10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN11] Finally, even though an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

FN7. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS

21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements

by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.FN13 In one of those actions, he was awarded $1,000 following a jury trial.FN14 (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.FN15

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County,

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

*4 Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second,

Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

> FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

> FN18. *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

*5 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) FN20 Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) [FN21]

FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held

prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf.* Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

*6  8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

FN22. I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (See Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false. [FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983. [FN24] The reason that I set these facts aside is that I can find no record evidence that there was any

connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

FN23. See Ciaprazi v. Goord, 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; Hodges v. Jones, 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. See Doe v. Conn. Dept. of Child & Youth Servs., 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). See Rivera v. Wohlrab, 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; Lopez v. Reynolds, 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. See Farinaro v. Coughlin, 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) [FN25]

> FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

**\*7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) [FN26]

> FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin*, 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential

informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [FN27]

FN27. *See Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for action, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

**8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6 [23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful

actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

> FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

> FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant

hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

> FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

FN33. *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to

possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-andsignificant-hardship analysis.) FN34

FN34. *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998. FN35 For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

**\*12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and

his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) FN36 The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [FN37]

> FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

> FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

**\*13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[I]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered an "independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin's* atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal

books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. [FN39]

FN39. *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts

claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

**\*15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [FN40]

> FN40. I note that, even if I were to so find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

> FN41. "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act. [FN45]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN42. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds,* Lewis v. Casey, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [v. Connor, 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also* Acre v. Miles, 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46. *Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

**\*18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin [v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints*

*or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre,* 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47. *Accord, Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. FN48 The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (Id. at ¶ 6[14].)

FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

*19 Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. See Arline v. City of Jacksonville, 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for two-and-a-half-hours after plaintiff had been acquitted at

criminal trial was unreasonable for purposes of Fourth Amendment); Lara v. Sheahan, 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to nine hours and fifteen minutes in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); Lewis v. O'Grady, 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for eleven hours after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments).FN49 In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning more than three weeks before the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN49. Cf. Brass v. County of Los Angeles, 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

> FN50. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

> FN51. See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

*20 Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (See, e.g., Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998). [FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional accessto-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52. *See Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state

court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54. N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. *See Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

**\*21** In order to convert the claim raised in this

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of*] his successful Article 78 [petition] ....." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6[13]" through "6[15]" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [FN56]

> FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the

case for complaints filed by plaintiffs who are *not* proceeding *pro se. See* Albert v. Carovano, 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord,* Wynder v. McMahon, 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), Northrup v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997).

> FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) ("*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See* Williams v. Manternach, 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

> FN58. *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

> FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to

Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

> FN60. To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's

First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

> FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground .[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning]."] [internal quotation marks omitted]. A s   e x p l a i n e d   e a r l i e r   i n   t h i s Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.

(Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be ***GRANTED*** in part and ***DENIED*** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be ***DISMISSED*** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be ***DISMISSED*** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment accessto-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise** ***DENIED*** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)

(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24   ANY   OBJECTIONS   to   this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN65]

FN65. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at \*18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default

argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.

Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Deirdre MacNAMARA, et al., Plaintiffs,
v.
CITY OF NEW YORK, et al., Defendants.
No. 04 Civ. 9216(RJS)(JCF).

May 19, 2011.

**Background:** Group of arrestees during protests held in connection with national political convention in New York City brought putative class action against city, its mayor, and its police department and various police officials, alleging violations of First, Fourth, Sixth, and Fourteenth Amendments, and parallel state constitution provisions arising from their arrests. Arrestees moved to certify three classes, one of which comprised eight subclasses.

**Holdings:** The District Court, Richard J. Sullivan, J., held that:

(1) arrestees lacked standing to bring claims for declaratory and injunctive relief;

(2) named plaintiffs arrested while observing protest activity had standing to assert First Amendment claim on behalf of mass arrest subclass, whereas named plaintiff arrested while rollerblading for recreation and exercise did not, and First Amendment claims asserted by her subclass failed for lack of adequate class representative;

(3) while first and third mass arrest subclasses failed predominance requirement for maintainability, other mass arrest subclasses met all requirements for certification with respect to constitutional claims;

(4) court would decline to grant class certification with respect to supervisory liability, respondeat superior, and pendent state law claims on behalf of mass arrest subclasses, and all proposed classes;

(5) excessive detention class otherwise met all requirements for certification; and

(6) conditions of confinement class otherwise met all requirements for certification.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **161.1**

**170A** Federal Civil Procedure

   **170AII** Parties
     **170AII(D)** Class Actions
      **170AII(D)1** In General
        **170Ak161.1** k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

If numerosity, commonality, typicality, and adequacy prerequisites are satisfied, proposed class must also qualify under at least one of the categories for maintainability before it may be certified as class action. Fed.Rules Civ.Proc.Rule 23(a, b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🔑 **172**

**170A** Federal Civil Procedure

   **170AII** Parties
     **170AII(D)** Class Actions
      **170AII(D)2** Proceedings
        **170Ak172** k. Evidence; Pleadings and Supplementary Material. Most Cited Cases

Each of the certification requirements of class action rule must be satisfied by a preponderance of the evidence, and burden to prove each element is on party seeking certification. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑 **161.1**

**170A** Federal Civil Procedure

   **170AII** Parties
     **170AII(D)** Class Actions
      **170AII(D)1** In General

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

In order to certify class, court must resolve factual disputes relevant to each requirement and find that whatever underlying facts are relevant to particular requirement of class action rule have been established. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⌐ 174**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak174 k. Consideration of Merits. Most Cited Cases

Although requirements for class certification may overlap with merits issues, district judge ruling on certification motion should not assess any aspect of the merits unrelated to a requirement of class action rule. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⌐ 162**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak162 k. Discretion of Court. Most Cited Cases

**Federal Civil Procedure 170A ⌐ 173**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak173 k. Hearing and Determination; Decertification; Effect. Most Cited Cases

District court is afforded broad discretion in class certification questions due to fact that district court is often in best position to assess propriety of class action and has ability to alter or modify class, create subclasses, and decertify class whenever warranted. Fed.Rules

Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⌐ 163**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases

**Federal Civil Procedure 170A ⌐ 164**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of Class; Typicality. Most Cited Cases

**Federal Civil Procedure 170A ⌐ 165**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Proposed class must satisfy four prerequisites in order to qualify for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⌐ 163**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases

Certification prerequisite that proposed class is so numerous that joinder of each member is "impracticable"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

does not mean impossible; rather, impracticability exists where individual adjudication would take an extended period of time and joinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[8]** Federal Civil Procedure 170A ⬤⟶ 163

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases

Courts will generally find that "numerosity" requirement for class certification is satisfied when class comprises 40 or more members and not satisfied when class comprises 21 or fewer, and in deciding numerosity, particularly in gray area between those parameters, courts must consider factors other than class size; additional factors include (1) judicial economy of avoiding multiple suits, (2) geographic dispersion of proposed class members, (3) financial resources of proposed class members, (4) ability of proposed class members to file individual suits, and (5) requests for prospective injunctive relief which would involve future class members. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[9]** Federal Civil Procedure 170A ⬤⟶ 165

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

"Commonality" requirement for class certification does not mean that all issues must be identical as to each member, but requires that plaintiffs identify some unifying thread among members' claims that warrants class treatment; single common issue of law may be sufficient to satisfy commonality requirement where common question is at core of cause of action alleged. Fed.Rules

Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[10]** Federal Civil Procedure 170A ⬤⟶ 164

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak164 k. Representation of Class; Typicality. Most Cited Cases

"Typicality" prong of class action rule requires that each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[11]** Federal Civil Procedure 170A ⬤⟶ 164

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak164 k. Representation of Class; Typicality. Most Cited Cases

Plaintiffs' claims are "typical" of class claims where plaintiffs and class members' injuries derive from unitary course of conduct by single system. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[12]** Federal Civil Procedure 170A ⬤⟶ 164

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak164 k. Representation of Class; Typicality. Most Cited Cases

Typicality criterion for class certification does not require that factual predicate of each claim be identical to that of all class members; when it is alleged that same unlawful conduct was directed at or affected both named plaintiff and class sought to be represented, typicality requirement is usually met irrespective of minor variations in fact patterns underlying individual claims. Fed.Rules

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[13]** **Federal Civil Procedure 170A** 🗝 **164**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak164 k. Representation of Class;
Typicality. Most Cited Cases
**Federal Civil Procedure 170A** 🗝 **165**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak165 k. Common Interest in Subject
Matter, Questions and Relief; Damages Issues. Most Cited
Cases
 Commonality and typicality requirements for class
certification often tend to merge into one another, so that
similar considerations animate the analysis of both;
although court will consider the two requirements
separately, both inquiries serve as guideposts for class
certification inquiry. Fed.Rules Civ.Proc.Rule 23(a)(2, 3),
28 U.S.C.A.

**[14]** **Federal Civil Procedure 170A** 🗝 **164**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak164 k. Representation of Class;
Typicality. Most Cited Cases
 In order for class representative to meet "adequacy"
requirement for class certification, class members must not
have interests that are antagonistic to one another and
class counsel must be qualified, experienced, and able to
conduct litigation. Fed.Rules Civ.Proc.Rule 23(a), 28
U.S.C.A.

**[15]** **Federal Civil Procedure 170A** 🗝 **164**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak164 k. Representation of Class;
Typicality. Most Cited Cases
 Adequacy inquiry serves to uncover conflicts of
interest between named parties and class they seek to
represent; however, in order to defeat motion for class
certification, conflict must be fundamental. Fed.Rules
Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[16]** **Declaratory Judgment 118A** 🗝 **305**

118A Declaratory Judgment

 118AIII Proceedings
  118AIII(C) Parties
   118Ak305 k. Representative or Class Actions.
Most Cited Cases
**Federal Civil Procedure 170A** 🗝 **165**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak165 k. Common Interest in Subject
Matter, Questions and Relief; Damages Issues. Most Cited
Cases
 Class action maintainable on ground that party
opposing class has acted or refused to act on grounds that
apply generally to class is intended for cases where broad,
classwide injunctive or declaratory relief is necessary to
redress groupwide injury; it does not extend to cases in
which appropriate final relief relates exclusively or
predominantly to money damages. Fed.Rules
Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[17]** **Declaratory Judgment 118A** 🗝 **305**

118A Declaratory Judgment

 118AIII Proceedings
  118AIII(C) Parties
   118Ak305 k. Representative or Class Actions.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Most Cited Cases
**Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Second Circuit has adopted ad hoc approach to evaluating predominant type of final relief sought in proposed class action under which district court should, at minimum, determine that (1) reasonable plaintiffs would bring suit to obtain injunctive or declaratory relief sought even in absence of possible monetary recovery and (2) injunctive or declaratory relief sought would be both reasonably necessary and appropriate were plaintiffs to succeed on the merits; insignificant or sham requests for injunctive relief should not provide cover for certification of claims that are brought essentially for monetary recovery. Fed.Rules Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[18] Federal Civil Procedure 170A** ☞ **177.1**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)2 Proceedings
        170Ak177 Notice and Communications
         170Ak177.1 k. In General. Most Cited Cases

To alert class members to their right to opt out, class action rule requires the best notice that is practicable under the circumstances. Fed.Rules Civ.Proc.Rule 23(c)(2)(B), 28 U.S.C.A.

**[19] Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Inquiry into whether common questions predominate over any questions affecting only individual class members tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation; "predominance" requirement is met if plaintiff can establish that issues in class action that are subject to generalized proof, and thus applicable to class as whole, predominate over those issues that are subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[20] Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Although predominance inquiry at maintainability stage of class certification is more demanding than commonality inquiry at prior stage, mere existence of individualized defenses does not preclude finding of predominance; as long as sufficient constellation of common issues binds class members together, variations in sources and application of defense will not automatically foreclose class certification on this basis. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.

**[21] Federal Civil Procedure 170A** ☞ **161.2**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak161.2 k. Superiority, Manageability, and Need in General. Most Cited Cases

"Superiority" analysis for maintaining class action requires courts to consider four nonexclusive factors: (1) interest of class members in controlling litigation of separate actions, (2) extent and nature of any litigation concerning controversy already begun by or against class

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

members, (3) desirability or undesirability of concentrating litigation of claims in particular forum, and (4) likely difficulties in managing class action. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[22] Federal Civil Procedure 170A** ☞ **103.2**

170A Federal Civil Procedure

    170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
          170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
    Whether plaintiff has standing is threshold question in every federal case, determining power of court to entertain suit.

**[23] Federal Civil Procedure 170A** ☞ **103.2**

170A Federal Civil Procedure

    170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
          170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
    To satisfy constitutional standing requirements, plaintiff must allege, inter alia, that he has suffered an injury in fact which is (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[24] Federal Civil Procedure 170A** ☞ **103.7**

170A Federal Civil Procedure

    170AII Parties
      170AII(A) In General
        170Ak103.7 k. Class Actions. Most Cited Cases

**Federal Civil Procedure 170A** ☞ **164**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions

      170AII(D)1 In General
        170Ak164 k. Representation of Class; Typicality. Most Cited Cases
    Actual injury requirement for standing is no less applicable to class action than to other suits; accordingly, if none of named plaintiffs purporting to represent class establishes the requisite injury, none may seek class action relief. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[25] Injunction 212** ☞ **114(2)**

212 Injunction

    212III Actions for Injunctions
      212k114 Parties
        212k114(2) k. Complainants. Most Cited Cases
    In order to meet constitutional minimum of standing to seek injunctive relief, plaintiff must carry burden of establishing that he has sustained or is immediately in danger of sustaining some direct injury as result of challenged official conduct and in so doing cannot rely on past injury to satisfy injury requirement but must show likelihood that he will be injured in the future; accordingly, plaintiff seeking injunctive relief must demonstrate both likelihood of future harm and existence of official policy or its equivalent.

**[26] Declaratory Judgment 118A** ☞ **305**

118A Declaratory Judgment

    118AIII Proceedings
      118AIII(C) Parties
        118Ak305 k. Representative or Class Actions. Most Cited Cases

**Federal Civil Procedure 170A** ☞ **186.10**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)3 Particular Classes Represented
          170Ak186.10 k. Prisoners and Inmates. Most Cited Cases
    Arrestees during protests held in connection with national political convention in New York City who were seeking to maintain class action on ground that injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

or declaratory relief was appropriate respecting class as whole failed to demonstrate likelihood of future harm and therefore lacked standing to seek injunctive relief; conclusory allegations that arrest and detention policies were ongoing and that several class representatives "plan to attend demonstrations in New York in the future" were insufficient. Fed.Rules Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[27]** Constitutional Law 92 ⬥ 1490

92 Constitutional Law

   92XVIII Freedom of Speech, Expression, and Press
      92XVIII(A) In General
         92XVIII(A)1 In General
            92k1490 k. In General. Most Cited Cases

**Constitutional Law 92 ⬥ 1502**

92 Constitutional Law

   92XVIII Freedom of Speech, Expression, and Press
      92XVIII(A) In General
         92XVIII(A)1 In General
            92k1502 k. Receipt of Information or Ideas; Listeners' Rights. Most Cited Cases

   First Amendment protects and promotes interests of audience, which have primary interest in having information readily available to it, as well as speaker. U.S.C.A. Const.Amend. 1.

**[28]** Constitutional Law 92 ⬥ 859

92 Constitutional Law

   92VI Enforcement of Constitutional Provisions
      92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
         92VI(A)9 Freedom of Speech, Expression, and Press
            92k858 Criminal Law
            92k859 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ⬥ 186.10**

170A Federal Civil Procedure

   170AII Parties

      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak186.10 k. Prisoners and Inmates. Most Cited Cases

   In proposed class action by persons arrested during protests held in connection with national political convention in New York City, named plaintiffs who were arrested while observing protest activity at national political convention had standing to assert First Amendment free speech claim on behalf of mass arrest subclass, whereas named plaintiff who was arrested while rollerblading for recreation and exercise did not. U.S.C.A. Const.Amend. 1.

**[29]** Federal Civil Procedure 170A ⬥ 163

170A Federal Civil Procedure

   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases

**Federal Civil Procedure 170A ⬥ 180**

170A Federal Civil Procedure

   170AII Parties
      170AII(D) Class Actions
         170AII(D)2 Proceedings
            170Ak180 k. Options; Withdrawal. Most Cited Cases

   Under class action rule, individuals are considered class members until they opt out of suit, and mere possibility that members of potential class may choose to opt out in the future is not enough to preclude finding of numerosity. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[30]** Federal Civil Procedure 170A ⬥ 186.10

170A Federal Civil Procedure

   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak186.10 k. Prisoners and Inmates.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Most Cited Cases

Existence of parallel actions by prospective subclass members did not defeat finding of numerosity at class certification stage in action by persons who were subject to mass arrest during protests held in connection with national political convention in New York City; in addition to raw number of plaintiffs included in each subclass the class members appeared to be geographically dispersed, and fact that some individuals within subclasses possessed the inclination and resources to pursue their own claims should not deprive those without such resources of opportunity to pursue action. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

[31] Federal Civil Procedure 170A ⬤⬤⬤ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Mass arrest subclasses satisfied commonality prerequisite for certification, as numerous legal and factual issues united claims of the putative class members; these included whether, at time, date, and location of each subclass, defendants conducted mass arrests without individualized probable cause, whether defendants issued audible dispersal orders followed by reasonable opportunities to disperse, and whether defendants acted pursuant to unlawful policy or practice of indiscriminate mass arrest. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

[32] Federal Civil Procedure 170A ⬤⬤⬤ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Typicality prerequisite for certification was satisfied by mass arrest subclass members; because each of them was arrested at particular time, date and location in

connection with real or perceived protest activity at national political convention, subclass injuries derived from unitary course of conduct, and because each of them alleged defendants employed unlawful policy or practice of indiscriminate mass arrest, subclass claims relied on similar legal arguments to prove liability, and status of various class members as protestors, observers or bystanders did not render their claims atypical given that the same unlawful conduct was directed at or affected both named plaintiff and class sought to be represented. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

[33] Constitutional Law 92 ⬤⬤⬤ 859

92 Constitutional Law

    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)9 Freedom of Speech, Expression, and Press
                92k858 Criminal Law
                    92k859 k. In General. Most Cited Cases
Federal Civil Procedure 170A ⬤⬤⬤ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Named plaintiff who was arrested during protests held in connection with national political convention in New York City while she was rollerblading for recreation and exercise lacked standing to assert First Amendment free speech claims on behalf of mass arrest subclass, and those claims failed for lack of adequate class representative. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

[34] Federal Civil Procedure 170A ⬤⬤⬤ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Proposed class counsel representing mass arrestees during protests held in connection with national political convention in New York City were qualified, experienced, and able to conduct litigation, and to extent named plaintiffs would also fairly and adequately represent the putative class members, adequacy prerequisite for subclass certification was satisfied. Fed.Rules Civ.Proc.Rule 23(a)(4), (g)(1), 28 U.S.C.A.

**[35] Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Predominance criterion for maintaining class action is more stringent and far more demanding than commonality prerequisite for certification, and to satisfy former plaintiff must establish not only existence of common questions, but predominance of such questions over other issues that are subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.

**[36] Federal Civil Procedure 170A** ☞ **161.1**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

District courts should take full advantage of provision allowing action to be brought or maintained as class action with respect to particular issues to certify separate issues in order to reduce range of disputed issues in complex litigation and achieve judicial efficiencies. Fed.Rules Civ.Proc.Rule 23(c)(4), 28 U.S.C.A.

**[37] Federal Civil Procedure 170A** ☞ **186.10**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

First and third subclasses of persons who were subject to mass arrest during protests held in connection with national political convention in New York City failed to satisfy predominance requirement for maintaining class action, as group arrests did not occur at their locations; there were no police barricades, assigned arresting officers, or incident commanders making group arrest decisions, and instead available facts indicated those arrests were conducted by officers exercising individual discretion rather than following mass arrest orders, and individualized probable cause inquiries would dictate course of litigation with respect to those subclasses. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[38] False Imprisonment 168** ☞ **13**

168 False Imprisonment

168I Civil Liability
168I(A) Acts Constituting False Imprisonment and Liability Therefor
168k9 Defenses
168k13 k. Probable Cause. Most Cited Cases

Probable cause is complete defense to individual false arrest claim.

**[39] Federal Civil Procedure 170A** ☞ **186.10**

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Fact that probable cause defense might arise and may affect different class members differently did not compel finding that individual issues predominated over common ones for purposes of determining maintainability of class action on behalf of mass arrest subclasses, nor did fact of conviction or guilty plea by subset of arrestees. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[40]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Despite predominance of common issues with respect to their constitutional claims, district court would decline to grant certification with respect to supervisory liability, respondeat superior, and pendent state law claims on behalf of mass arrest subclasses. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[41]** Civil Rights 78 ⚷ 1355

78 Civil Rights

78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General.
Most Cited Cases

Supervisor may not be held liable under § 1983 simply because one or more of his subordinates committed a constitutional tort; rather, plaintiff must establish affirmative causal link between supervisor's inaction and his injury. 42 U.S.C.A. § 1983.

**[42]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented

170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Class action was superior method of adjudicating constitutional claims on behalf of subclasses of persons who were subject to mass arrest during protests held in connection with national political convention in New York City. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[43]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Numerosity prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; of approximately 1,800 arrestees processed pursuant to Mass Arrest Processing Plan (MAPP), 1,480 were charged with more than violations and only 102 of those were not detained, leaving nearly 1400 class members. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[44]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Commonality prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; that class claimed common questions of whether defendants detained convention arrestees for unreasonable periods of time, whether such detention violated First, Fourth, or Fourteenth Amendments, and whether it resulted from municipal policy or practice. U.S.C.A. Const.Amends. 1, 4, 14;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[45]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Typicality prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; all members of "Excessive Detention" class were processed pursuant to Mass Arrest Processing Plan (MAPP), and as result claims arose from the same course of events and depended on the same legal arguments to prove liability. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[46]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Adequacy prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; because named plaintiffs were detained alongside prospective class members, they clearly possessed the same interest and suffered the same injury, and plaintiffs' counsel would supply full adequate legal representation. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[47]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

    170AII Parties

170AII(D) Class Actions
    170AII(D)3 Particular Classes Represented
        170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Predominance requirement for maintainability was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; because excessive detention claims all arose out of design and implementation of Mass Arrest Processing Plan (MAPP), common questions and legal theories predominated, and defendants' argument that variance in arrestees' detention times was fatal to predominance inquiry applied only to Fourth Amendment claim, not claims under First and Fourteenth Amendments. U.S.C.A. Const.Amends. 1, 4, 14; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[48]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Superiority requirement for maintainability was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; existence of parallel suits filed by significant minority of arrestees indicated some interest in controlling prosecution of separate actions, given related status of all the actions, the inevitable concentration of the litigation in the Southern District of New York remained neutral factor in superiority analysis, and there was little difficulty in managing "Excessive Detention Class" on issue of liability, since individualized inquiries would primarily relate to damages calculations. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[49]** Federal Civil Procedure 170A ⚷ 186.10

170A Federal Civil Procedure

    170AII Parties

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Numerosity prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; out of approximately 1,800 arrestees, all but 102 were allegedly handcuffed with plastic flex cuffs and detained at one location. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[50]** Federal Civil Procedure 170A ⟬⟭ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Commonality prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; arrestees' detention at one location subjected them to host of common conditions, including prolonged handcuffing, inadequate seating and sanitary facilities, and exposure to various chemicals. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[51]** Federal Civil Procedure 170A ⟬⟭ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Typicality prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; all class members

were handcuffed with plastic flex cuffs and detained at one location. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[52]** Federal Civil Procedure 170A ⟬⟭ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Adequacy prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; because all class members were detained under substantially common conditions at the same location, named plaintiffs suffered the same injury as absent class members, and class counsel was qualified, experienced, and able to conduct litigation. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[53]** Federal Civil Procedure 170A ⟬⟭ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Predominance requirement for maintainability was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; while details of individual detention experiences may have varied, overall conditions at location where they were detained were sufficiently similar to warrant class adjudication. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[54]** Federal Civil Procedure 170A ⟬⟭ 186.10

170A Federal Civil Procedure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Superiority requirement for maintainability was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; certifying as to liability would permit hundreds of conditions claims to be resolved in single proceeding. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Jonathan C. Moore and Clare Rivka Norins, Beldock Levine & Hoffman LLP, New York, NY, for Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City of New York, and Curt Peter Beck, Jeffrey Anthony Dougherty, Peter Gerard Farrell, Tonya Jenerette, and Raju Sundaran, Assistant Corporation Counsel of the City of New York, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

**\*1** Plaintiffs are a group of 24 individuals who were arrested by the New York City Police Department (the "NYPD") in connection with a series of protests held during the 2004 Republican National Convention (the "RNC"), Plaintiffs bring this putative class action against Defendants the City of New York (the "City") and numerous New York City officials and police officers, alleging violations of their rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as various state law claims. Specifically, Plaintiffs contend that Defendants subjected them to indiscriminate mass arrests without individualized probable cause, unreasonably prolonged detention, and cruel and inhumane confinement conditions.

Before the Court is Plaintiffs' motion to certify three classes, one of which comprises eight subclasses, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. For the reasons that follow, Plaintiffs' motion for class certification is granted in part and denied in part.

I. BACKGROUND[FN1]

This action is part of a larger group of cases relating to mass protests that occurred immediately prior to and during the RNC, which was held at Madison Square Garden from August 30, 2004 to September 2, 2004. These cases have been assigned to this Court as related and consolidated for discovery purposes. Because the Court presumes the parties' familiarity with the facts and procedural history of this action, the Court will briefly recite only those facts necessary to the resolution of the instant motion.

A. Parties

Plaintiffs bring this action individually and on behalf of approximately 1,800 individuals who were arrested immediately prior to or during the RNC. (SAC ¶ 1.) The proposed Mass Arrest Subclasses include all persons arrested during the Class Period at eight specified locations, dates, and times. (Id. ¶ 52(a).) The proposed Excessive Detention Class includes all persons arrested during the Class Period who were processed pursuant to the RNC Mass Arrest Processing Plan ("MAPP") and detained at Pier 57. (Id. ¶ 52(b).) The proposed Conditions of Confinement Class includes all persons arrested during the Class Period who were handcuffed with plastic flex cuffs and detained at Pier 57. (Id. ¶ 52(c).)

Defendants include the City; Mayor Michael Bloomberg; NYPD Commissioner Raymond Kelly; Assistant Chief Terence Monahan; Inspector Thomas Galati ("Galati"); and various named and unnamed New York City officials and police officers (collectively, "Defendants").

B. Facts

Months before the scheduled start of the RNC, Defendants were aware that numerous political demonstrations were planned to coincide with the Convention. (Id. ¶ 63.) In anticipation of the expected volume of protest activity, the City began to prepare for any arrests and prosecutions that might follow the RNC demonstrations. (Id. ¶ 65.) Plaintiffs allege that the contingency plans and arrest procedures developed by the NYPD were designed to discourage political protest and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

slow down the processing of individuals arrested during the RNC in order to maximize the amount of time the arrestees would be held in detention. (*Id.* ¶ 67.)

### 1. Mass Arrests

**\*2** During the RNC, Defendants allegedly employed an indiscriminate mass arrest policy to arrest large groups of people who were engaging in protected First Amendment activity, observing such activity, or simply passing by at the time of the arrests. (*Id.* ¶ 72.) The alleged policy involved, *inter alia,* the use of mesh netting or lines of police officers to corral large groups of protestors or perceived protestors; failure to distinguish bystanders, media personnel, and legal observers from the corralled groups prior to effecting arrests; failure to give dispersal orders that were audible to prospective arrestees; and failure to provide a reasonable opportunity to disperse. (*Id.* ¶ 73.) Plaintiffs allege that they were subjected to the mass arrest policy at the following locations:

### a. Mass Arrest Subclass One

On August 27, 2004, on Seventh Avenue between 34th and 35th Streets, between 6:30 p.m. and 9:30 p.m., the NYPD arrested individuals who were or were perceived to be participating in a monthly bike event known as "Critical Mass." (*Id.* ¶¶ 52(a), 74(A).) To effectuate these arrests, Defendants used mesh nets and lines of police officers on foot or on scooters to trap and arrest groups of cyclists. (*Id.* ¶ 74(A).) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Michael Binder, a cyclist who was arrested at the intersection of Seventh Avenue and 35th Street. (*Id.* ¶¶ 116–17.) While stopped at a red light, Binder observed NYPD officers arresting a number of cyclists and pulled out his camera to take a photograph of the intersection. (*Id.* ¶¶ 117–18.) As soon as Binder had taken the photograph, Defendants removed him from his bicycle, forced him to the ground, and handcuffed him. (*Id.* ¶ 119.) Binder was thereafter detained for approximately 16–20 hours. (*Id.* ¶ 116.)

### b. Mass Arrest Subclass Two

On August 27, 2004, on 35th Street between Tenth Avenue and Dyer Avenue, between 8:00 p.m. and 11:00

p.m., the NYPD arrested individuals who were or were perceived to be participating in the Critical Mass bike event. (*Id.* ¶¶ 52(a), 74(A).) Defendants allegedly effectuated the arrests at this site by trapping cyclists between two lines of police officers. (*Id.* ¶ 74(B).) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Elizabeth Fleischman, a Critical Mass cyclist who was arrested on 35th Street between Tenth Avenue and Dyer Avenue. (*Id.* ¶¶ 141–42.) After directing Fleischman and other cyclists onto 35th Street, NYPD officers barricaded the entrances and exits at both 10th Avenue and Dyer Avenue, thereby preventing the Critical Mass cyclists from leaving the scene. (*Id.* ¶ 143.) Fleischman was arrested, handcuffed, and transported to the detention facility at Pier 57, where she was detained for approximately 20 hours. (*Id.* ¶¶ 141, 143.)

### c. Mass Arrest Subclass Three

**\*3** On August 27, 2004, on Second Avenue between 9th and 10th Streets, between 8:00 p.m. and 11:00 p.m., the NYPD arrested individuals who were or were perceived to be participating in the Critical Mass bike event. (*Id.* ¶¶ 52(a), 74(A).) Plaintiffs allege that the arrestees at the Second Avenue site were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Randall Steketee, who was arrested near the intersection of Second Avenue and 10th Street while riding his bike home from a play. (*Id.* ¶¶ 74(C), 195.) Steketee rode to the intersection of Second Avenue and 9th Street to observe the crowd, but found his path blocked by a row of police officers when he attempted to leave. (*Id.* ¶ 196.) Although Steketee explained that he was not participating in any protest or demonstration, he was arrested, handcuffed, and transported to Pier 57, where he was detained for approximately 33 hours. (*Id.* ¶¶ 195–97, 199.)

### d. Mass Arrest Subclass Four

On August 29, 2004, on 37th Street between Seventh Avenue and Broadway, between 12:00 p.m. and 3:00 p.m., the NYPD arrested individuals who were riding bikes,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

rollerblading, or walking in the vicinity. (*Id.* ¶¶ 52(a), 74(E).) Once again, Plaintiffs allege that NYPD officers used mesh nets and police lines to surround the arrestees and failed to provide a meaningful opportunity to disperse prior to making the arrests. (*Id.* ¶ 74(E).)

Among those arrested was Plaintiff Carolyne Ali–Khan, who was arrested near the intersection of 37th Street and Broadway while she was rollerblading in the area. (*Id.* ¶¶ 100–01.) Ali–Khan and a group of cyclists were penned in by NYPD officers, ordered onto the sidewalk, and placed under arrest. (*Id.* ¶¶ 101–02.) Ali–Khan was then handcuffed and transported to Pier 57, where she was detained for approximately 28–29 hours. (*Id.* ¶¶ 100, 102–03.)

### e. Mass Arrest Subclass Five

On August 31, 2004, on Fulton Street between Church Street and Broadway, between 4:00 p.m. and 7:00 p.m., the NYPD arrested more than 200 individuals who were or were perceived to be participating in a march organized by the War Resisters League (the "WRL"). (*Id.* ¶¶ 52(a), 74(F).) Following negotiations between the demonstrators and various NYPD officers, Inspector Galati announced that the march would be permitted so long as participants did not block traffic and obeyed traffic signals at all intersections. (*Id.* ¶ 74(F).) The march had proceeded for less than a block when NYPD officers halted the demonstration, surrounded more than 200 people with mesh nets, and placed them under arrest. (*Id.*) Plaintiffs allege that the arrestees were not given reasonably audible dispersal orders or a meaningful opportunity to disperse. (*Id.*)

Among those arrested were Plaintiffs Simon Harak, Diana Raimondi, and William Steyert, Jr., who had attended a vigil at the World Trade Center site before joining the WRL march. (*Id.* ¶¶ 74(F), 156–58, 186–87, 201–02.) Harak was thereafter detained for approximately 20–25 hours (*id.* ¶ 156), Raimondi for approximately 50–52 hours (*id.* ¶ 186), and Steyert for approximately 16–17 hours (*id.* ¶ 201).

### f. Mass Arrest Subclass Six

**\*4** On August 31, 2004, on 16th Street between Union Square East and Irving Place, between 7:00 p.m.

and 10:00 p.m., the NYPD arrested individuals who were participating in, observing, or standing in the vicinity of a march that began in Union Square Park. (*Id.* ¶¶ 52(a), 74(G).) At the direction of NYPD officers, the demonstrators turned east onto 16th Street, where they were barricaded by a line of police officers who refused to allow them to exit. (*Id.* ¶ 74(G).) Everyone trapped on that block of 16th Street—including protestors, observers, and bystanders—was placed under arrest. (*Id.*) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.*)

Among those arrested were Plaintiffs Erika Biddle, Sonia Chandra, Emily Friedman, Deepa Majmudar, Celine Malanum, and Danielle Walsh. (*Id.*) Biddle was thereafter detained for approximately 50–52 hours (*id.* ¶ 110); Chandra for approximately 35–40 hours (*id.* ¶ 123); Friedman for approximately 45–50 hours (*id.* ¶ 146); Majmudar for approximately 45–50 hours (*id.* ¶ 177); Malanum for approximately 35–40 hours (*id.* ¶ 182); and Walsh for approximately 48 hours (*id.* ¶ 218).

### g. Mass Arrest Subclass Seven

On August 31, 2004, on 17th Street between Fifth Avenue and Broadway, between 8:00 p.m. and 10:00 p.m., the NYPD arrested a group of individuals that included both protestors en route to the "Free Speech Zone" at Madison Square Garden and bystanders who happened to be in the vicinity.[FN2] (*Id.* ¶¶ 52(a), 74(H).) At the direction of NYPD officers, these individuals turned west onto 17th Street, where they were stopped by a police line in full riot gear and told they could go no further. (*Id.* ¶¶ 74(H), 171.) After complying with orders to form a line and then move to the sidewalk, they were surrounded by police officers and arrested. (*Id.* ¶ 74(H).) Plaintiffs allege that the arrestees were neither ordered to disperse nor advised that they were in violation of any New York law or ordinance. (*Id.*)

Among those arrested were Plaintiff Deirdre MacNamara, who was in the area after browsing at the Barnes & Noble bookstore in Union Square (*id.* ¶¶ 170–71), and Plaintiff Rebecca Stoneback, who had traveled to New York City from her home in Asbury, New Jersey to participate in the RNC demonstrations (*id.* ¶¶ 205–06). Both MacNamara and Stoneback were handcuffed, transported to Pier 57, and detained for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

approximately 45–50 hours. (*Id.* ¶¶ 170–75, 205–08.)

### h. Mass Arrest Subclass Eight

On August 31, 2004, on 35th Street between Fifth and Sixth Avenues, between 7:00 p.m. and 10:00 p.m., the NYPD arrested individuals who were participating in, observing, or standing in the vicinity of a march proceeding west on 35th Street. (*Id.* ¶¶ 52(a), 74(J).) As these individuals traveled along 35th Street, they were stopped by a police line and told they could go no further. (*Id.* ¶ 74(J).) When they turned around to leave, they were blocked by another line of police officers on scooters and then arrested. (*Id.*) Plaintiffs allege that the arrestees were given no dispersal order and no meaningful opportunity to disperse. (*Id.*)

**\*5** Among those arrested were Plaintiff Jason Barrus, an RNC protestor (*id.* ¶¶ 105–06); Plaintiff Shahrzad Ghahremani–Ghadjar, a 15–year–old on her way to a movie theater (*id.* ¶¶ 151–52); and Plaintiff William Hobbs, a real estate agent on his way home from work (*id.* ¶¶ 165–66). Barrus was thereafter detained for 46 hours (*id.* ¶ 105), Ghahremani–Ghadjar for approximately four hours (*id.* ¶ 151), and Hobbs for approximately 36 hours (*id.* ¶ 165).

### 2. Excessive Detention

Plaintiffs further allege that Defendants implemented policies and practices designed to detain the RNC arrestees for unnecessary and prolonged periods of time in order to prevent them from participating in further demonstration or protest activity during the RNC. (*Id.* ¶ 91.) The alleged policies included, *inter alia,* (1) a "no summons" policy requiring custodial arrest for all RNC arrestees, no matter how minor the infraction (*id.*); (2) a blanket fingerprinting policy for RNC arrestees, despite the fact that the "overwhelming majority" were detained only on minor violations for which fingerprinting is not typically required (*id.* ¶¶ 91, 93); [FN3] (3) the use of a post-arrest staging facility without fingerprinting equipment (*id.* ¶¶ 91–92); and (4) the practice of requiring completed criminal background checks from both the New York State Division of Criminal Justice Services and the Federal Bureau of Investigation prior to arraignment (*id.* ¶ 91). Plaintiffs allege that these and similar procedures

unnecessarily and unreasonably extended the period of time the RNC arrestees spent in custody. (*Id.*)

### 3. Conditions of Confinement

Finally, Plaintiffs allege that Defendants implemented policies and practices designed to detain RNC arrestees in cruel and inhumane conditions both at the arrest sites and at Pier 57. (*Id.* ¶¶ 76–77.) During the mass arrests described above, Plaintiffs were handcuffed with plastic flex cuffs and remained in handcuffs for hours thereafter as they awaited transport to Pier 57. (*Id.* ¶ 89.) In some cases, the arrestees remained in handcuffs even after they arrived at the detention facility. (*Id.*) Numerous Plaintiffs allege that the excessively tight and prolonged handcuffing caused extreme pain, discomfort, numbness, bruising, and discoloration. (*See, e.g., id.* ¶¶ 103, 108, 113, 125, 130.)

Plaintiffs were then transported to the "Post Arrest Staging Site" at Pier 57, an empty storage facility on the west side of Manhattan that had previously been used to house City buses. (*Id.* ¶ 77.) Defendants had entered an agreement to use Pier 57 as a detention center during the RNC on July 28, 2004—a month before the start of the Convention. (*Id.* ¶ 78.) Although recent environmental reports on the facility had identified the presence of asbestos, the prevalence of oily waste on the concrete floors, and code deficiencies with the electrical, plumbing, and fire protection systems, Defendants failed to undertake an environmental review of the premises or obtain a certificate of occupancy. (*Id.* ¶¶ 77–78.) Instead, Defendants prepared Pier 57 for use as a detention facility by constructing holding cells using chain-link fence topped with razor wire. (*Id.* ¶ 79.)

**\*6** Upon arrival at Pier 57, Plaintiffs were searched, their property was confiscated, and they were placed in the makeshift holding cells. (*Id.* ¶ 80.) Because there were not enough benches in each cell, many arrestees were forced to sit in the "oily filth" on the floor, and in some cases developed rashes and blisters as a result. (*Id.* ¶ 82.) Due to the poor air quality, many arrestees developed stinging eyes and coughs or breathing difficulties. (*Id.*) Because the restroom facilities at Pier 57 were "grossly inadequate," arrestees were also required to wait in line for many hours to use the portable lavatories put in place for the RNC. (*Id.* ¶ 85.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

In addition to their complaints about the physical conditions at Pier 57, Plaintiffs claim that Defendants denied or ignored their requests for medical attention and access to medication (*id.* ¶ 82); access to telephones (*id.* ¶ 84); and access to attorneys (*id.* ¶ 86). Plaintiffs further allege that Defendants harassed, humiliated, embarrassed, and, in one instance, sexually harassed the RNC arrestees. (*Id.* ¶¶ 87–88, 184.)

### C. Procedural History

Plaintiffs commenced this action by filing a Complaint in the Southern District of New York on November 22, 2004. By Order filed September 21, 2005, this action was consolidated with 43 other cases—involving approximately 226 named plaintiffs—related to RNC protest and arrest activity. The consolidated cases were referred to the Honorable James C. Francis, Magistrate Judge, for discovery purposes. Plaintiffs filed an Amended Complaint on July 15, 2005, an initial motion for class certification on January 31, 2007,[FN4] and a further motion to amend on August 27, 2007. The case was reassigned to my docket on October 2, 2007.

Judge Francis granted partial leave to amend by Order dated January 23, 2008, and Plaintiffs filed a Second Amended Complaint (the "SAC") on January 29, 2008. The SAC primarily alleges violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, but also includes facial and as-applied challenges to New York City Administrative Code § 10–110 and New York Penal Law § 240.20(5)–(6), as well as supervisory liability, *respondeat superior,* and pendent state law claims. The parties filed supplemental briefs tailoring the outstanding class certification motion to the SAC. The supplemental briefs were fully submitted on March 7, 2008.[FN5]

By Order dated March 16, 2010, the Court denied the motion for class certification without prejudice to renewal in light of the petition for a writ of mandamus then pending before the Second Circuit regarding the disclosure of confidential NYPD intelligence documents prepared for the RNC.[FN6] Plaintiffs thereafter renewed their motion, and the Court held oral argument on May 21, 2010. By letter dated May 3, 2011, counsel in two related RNC cases

indicated that fact discovery in all consolidated RNC cases would conclude within the next several weeks. By endorsement dated May 9, 2011, Judge Francis ordered the parties in all consolidated RNC cases to appear for a discovery conference on May 26, 2011.

### II. LEGAL STANDARDS

**\*7** [1] Rule 23 of the Federal Rules of Civil Procedure governs class certification. In order to proceed as a class action, the proposed class must meet the following Rule 23(a) prerequisites:

(1) [T]he class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 98–99 (2d Cir.2007). If the Rule 23(a) criteria are satisfied, the proposed class must also qualify under at least one of the categories provided in Rule 23(b) before it may be certified as a class action. *See Cordes,* 502 F.3d at 104. In this case, Plaintiffs seek certification under Rules 23(b)(2) and 23(b)(3). (Pls.' Mem. 1.)

[2][3][4][5] Each of the Rule 23 requirements must be satisfied by a preponderance of the evidence, *see Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008), and the burden to prove each element is on the party seeking certification, *see Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In order to certify a class, the Court must "resolve [ ] factual disputes relevant to each Rule 23 requirement" and find that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 41 (2d Cir.2006). Although Rule 23 requirements may overlap with merits issues, "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id.* Moreover, the district court is afforded broad discretion in class certification questions due to the fact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

that "the district court is often in the best position to assess the propriety of the class [action] and has the ability ... to alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.,* 262 F.3d 134, 139 (2d Cir.2001).

### A. Rule 23(a) Requirements

[6] As previously noted, a proposed class must satisfy the following four prerequisites in order to qualify for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed.R.Civ.P. 23(a); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 504 F.3d 229, 244 (2d Cir.2007).

#### 1. Numerosity

[7] Under the first prong of Rule 23(a), a plaintiff must establish that the proposed class is "so numerous that joinder of each member is impracticable." Fed.R.Civ.P. 23(a). "Impracticable does not mean impossible." *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). Rather, "[i]mpracticability exists where individual adjudication would take an extended period of time," *Savino v. Computer Credit, Inc.,* 173 F.R.D. 346, 351 (E.D.N.Y.1997), and "[j]oinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible," *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992).

**\*8** [8] Courts will generally find that the numerosity requirement is satisfied when a class comprises 40 or more members, *see* *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995), and not satisfied when the class comprises 21 or fewer, *see* *Ansari v. N.Y. Univ.,* 179 F.R.D. 112, 114 (S.D.N.Y.1998). In deciding numerosity, particularly in the "gray area" between these parameters, courts must consider factors other than class size. *See id.* Those additional factors include (1) the judicial economy of avoiding multiple suits; (2) the geographic dispersion of the proposed class members; (3) the financial resources of the proposed class members; (4) the ability of the proposed class members to file individual suits; and (5) requests for prospective injunctive relief which would involve future class members. *See* *Robidoux,* 987 F.2d at 936.

#### 2. Commonality

[9] "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Cent. States,* 504 F.3d at 245 (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997)). "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 156 (S.D.N.Y.2008) (Lynch, J.) (quotation marks and alterations omitted). "A single common issue of law may be sufficient to satisfy the commonality requirement" where the common question is "at the core of the cause of action alleged." *Friedman–Katz v. Lindt & Sprungli (USA), Inc.,* 270 F.R.D. 150, 155 (S.D.N.Y.2010) (internal citations and quotation marks omitted).

#### 3. Typicality

[10][11][12] The typicality prong of Rule 23(a) requires that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir.2009) (quoting *Robidoux,* 987 F.2d at 936). A plaintiff's claims are typical of the class claims "where the plaintiff's and the class members' 'injuries derive from a unitary course of conduct by a single system.' " *Spicer v. Pier Sixty LLC,* 269 F.R.D. 321, 337 (S.D.N.Y.2010) (quoting *Marisol A., 126 F.3d at 377).* However, "[t]he typicality criterion does *not* require that the factual predicate of each claim be identical to that of all class members." *Shakhnes ex rel. Shakhnes v. Eggleston,* 740 F.Supp.2d 602, 625 (S.D.N.Y.2010) (internal citations and quotation marks omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux,* 987 F.2d at 936–37.

[13] "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate [the] analysis' of both." *Brown v. Kelly,* 609 F.3d 467, 475 (2d Cir.2010) (quoting *Marisol*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

*A.,* 126 F.3d at 376); *see Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Although the Court will consider the two requirements separately, both inquiries "serve as guideposts" for the class certification inquiry. *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

### 4. Adequacy

**\*9** [14][15] Finally, Rule 23(a) requires class representatives who "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In order for a class representative to meet the adequacy requirement, "the class members must not have interests that are antagonistic to one another," *Brown,* 609 F.3d at 479 (internal citation and quotation marks omitted), and class counsel must be "qualified, experienced, and able to conduct the litigation," *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir.2000). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. "In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings,* 574 F.3d at 35 (internal quotation marks and citation omitted).

### B. Rule 23(b)(2) Requirements

[16] Under Rule 23(b)(2), plaintiffs seeking class certification must also show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). Thus, "[t]he (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro–North Commuter RR Co.,* 267 F.3d 147, 162 (2d Cir.2001). Although "the text of Rule 23(b)(2) is silent as to what extent—if at all—monetary relief may also be sought," *id.,* the advisory committee's note indicates that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages," Fed.R.Civ.P. 23(b)(2) advisory committee's note (1966).

[17] In *Robinson v. Metro–North Commuter Railroad*

*Company,* the Second Circuit adopted an ad hoc approach to evaluating predominance for purposes of Rule 23(b)(2). Under the *Robinson* balancing test, the district court should, at a minimum, determine that (1) reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought even in the absence of possible monetary recovery; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. 267 F.3d at 164. "Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." *Id.*

### C. Rule 23(b)(3) Requirements

[18] Under Rule 23(b)(3), class certification is appropriate if common questions "predominate over any questions affecting only individual members" and if class resolution "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). To alert class members to their right to "opt out," Rule 23 also requires "the best notice that is practicable under the circumstances." Fed.R.Civ.P. 23(c)(2)(B); *see Amchem,* 521 U.S. at 617, 117 S.Ct. 2231.

### 1. Predominance

**\*10** [19][20] "As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Brown,* 609 F.3d at 476 (quoting *In re Nassau County Strip Search Cases,* 461 F.3d 219, 225 (2d Cir.2006)). "The predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *Cordes,* 502 F.3d 91, 107–08 (internal citation, quotation marks and alterations omitted). Although predominance "is a more demanding criterion than the commonality inquiry under Rule 23(a)," *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002), the mere existence of individualized defenses does not preclude a finding of predominance, *see Brown,* 609 F.3d at 485. "As long as a sufficient constellation of common issues binds class members

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* at 483 (internal citations and quotation marks omitted).

2. Superiority

[21] "For Rule 23(b)(3) certification to be proper, a class action also must be the most 'fair and efficient' method of resolving this case." *In re Nassau,* 461 F.3d at 230 (citing Fed.R.Civ.P. 23(b)(3)). The superiority analysis requires courts to consider four nonexclusive factors: (1) the interest of the class members in controlling the litigation of separate actions; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed.R.Civ.P. 23(b)(3).

D. Rule 23(g) Requirements

Rule 23(g) further provides that "a court that certifies a class must also appoint class counsel." Fed.R.Civ.P. 23(g)(1). In doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1)(B).

III. DISCUSSION

Plaintiffs seek to certify eight Mass Arrest Subclasses, an Excessive Detention Class, and a Conditions of Confinement Class, each comprised of individuals who were arrested and detained by Defendants prior to or during the RNC.[FN7] In what follows, the Court considers each proposed class in the context of the certification requirements imposed by Rule 23.

A. Standing

*11 [22] As a preliminary matter, Defendants contend that Plaintiffs lack standing to maintain a class action for

(1) injunctive or declaratory relief under Rule 23(b)(2), and (2) First Amendment retaliation claims. Because whether a plaintiff has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit," *In re Gucci,* 126 F.3d 380, 387–88 (2d Cir.1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)), the Court will examine these standing challenges at the outset.

[23][24] To satisfy constitutional standing requirements, a plaintiff must allege, *inter alia,* that he has suffered an "injury in fact" which is (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The actual injury requirement is no less applicable to a class action than to other suits. "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal citations and quotation marks omitted). Accordingly, if none of the named plaintiffs purporting to represent a class establishes the requisite injury, none may seek class action relief. *See O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

1. Declaratory and Injunctive Relief

[25] Under the aegis of Rule 23(b)(2), Plaintiffs seek both a declaratory judgment that the alleged policies, practices, and customs are unconstitutional and a permanent injunction against their continued implementation. (SAC ¶ 5.) "In order to meet the constitutional minimum of standing to seek injunctive relief, [a plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' " *Shain v. Ellison,* 356 F.3d 211, 215 (2d Cir.2004) (quoting *City of L.A. v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). In doing so, he "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he ... will be injured in the future." *Deshawn E. by Charlotte E.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

*v. Safir,* 156 F.3d 340, 344 (2d Cir.1998). Accordingly, "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain,* 356 F.3d at 216.

[26] Here, Plaintiffs contend that a likelihood of future harm exists because the alleged arrest and detention policies are ongoing, and because several class representatives "plan to attend demonstrations in New York in the future." (Pls.' Reply 37–38.) To support their assertion of likely future harm, Plaintiffs cite the depositions of RNC arrestees who have indeterminate future plans to participate in New York City protests (*see* Decl. of Clare Norins, July 23, 2007 ("Norins Decl."), Ex. 25, Steyert Tr. at 528:18–529:4) or do not plan "to avoid protest in New York City" (*id.* at Ex. 10, Fleischman Tr. at 367:21–25; *id.* at Ex. 24, Raimondi Tr. at 540:2–9).

*12 Such conclusory allegations are insufficient to establish the likelihood of a future encounter with the NYPD likely to result in unconstitutional arrests and detentions. That some Plaintiffs *may* participate in future demonstrations of unspecified date, duration, or scope does not translate into a "real and immediate threat of future injury." *Shain,* 356 F.3d at 215; *see Lyons,* 461 U.S. at 111, 103 S.Ct. 1660 ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen....") The chain of inferences required to find a sufficient threat of future injury on these facts is "simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Shain,* 356 F.3d at 216. Accordingly, the Court finds that Plaintiffs have failed to demonstrate a likelihood of future harm and therefore lack standing to seek injunctive relief. Because certification under Rule 23(b)(2) is appropriate only where injunctive or declaratory relief applies to the class as a whole, the Court denies the motion for class certification pursuant to Rule 23(b)(2).

### 2. First Amendment Claims

Defendants also challenge the First Amendment standing of RNC arrestees who were not engaged in protest activity at the time of their arrests. Specifically, Defendants note that Plaintiff Steketee of Subclass Three, Plaintiff Ali–Khan of Subclass Four, and Plaintiff

Malanum of Subclass Six all testified they were not involved in the demonstrations and were merely passing through the Subclass locations immediately prior to their arrests. (Defs.' Opp'n at 35.) Because these Plaintiffs "were not engaged in First Amendment activity," Defendants conclude that "they do not have standing to claim that [D]efendants acted in response to their exercise of First Amendment activity." (*Id.*)

[27][28] What Defendants fail to consider are the First Amendment rights of the audience, which "has a primary interest i[n] having information readily available to it." *Loper v. N.Y. City Police Dep't,* 802 F.Supp. 1029, 1042 (S.D.N.Y.1992). Because the First Amendment "protects and promotes" the interests of the audience as well as the speaker, *id.,* Plaintiffs who were present as observers of a political protest fall within the ambit of constitutional protection. In this case, Plaintiffs Steketee and Malanum were arrested while observing RNC protest activity (SAC ¶¶ 196, 183), while Plaintiff Ali–Khan was arrested while rollerblading for recreation and exercise (*id.* ¶ 101). Accordingly, the Court finds that Plaintiffs Steketee and Malanum have standing as audience members to pursue a First Amendment claim, but that Plaintiff Ali–Khan lacks standing to pursue a First Amendment claim on behalf of Subclass Four because she suffered no cognizable First Amendment injury.[FN8]

### B. Mass Arrest Subclasses

With these threshold matters resolved, the Court now proceeds to examine the Mass Arrest Subclasses, beginning with the Rule 23(a) prerequisites to certification.

#### 1. Rule 23(a) Analysis

##### a. Numerosity

*13 As previously noted, the numerosity analysis begins with the presumption that a class comprising 40 or more members is generally sufficient. *See Consol. Rail Corp.,* 47 F.3d at 483 (noting that "numerosity is presumed at a level of 40 members"). Based on RNC arrest records produced during discovery (Pls.' Mem. 27), Plaintiffs here contend that each Mass Arrest Subclass comprises at least 40 putative class members (*id.* at 5–11).[FN9]

[29] Defendants do not dispute the total number of RNC arrests, but instead challenge the numerosity of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Mass Arrest Subclasses based on the number of prospective class members who have filed suits on their own behalf. (Defs.' Opp'n 32.) Defendants argue that when each subclass is discounted by the number of class members who are named plaintiffs in other RNC actions, several subclasses drop below the presumptive threshold and no subclass is so numerous that joinder is impracticable. (Oral Arg. Tr., May 21, 2010 ("Tr."), at 56:20–57:25.) But Defendants supply no authority for the proposition that the existence of parallel actions should automatically reduce the number of prospective class members for purposes of the class certification inquiry. See In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 305 (S.D.N.Y.2003) (holding that "although scores of Individual Actions have been filed, the presence of those actions does not militate against class certification"). Under Rule 23, individuals are considered class members until they opt out of the suit, see Cuzco v. Orion Builders, Inc., 477 F.Supp.2d 628, 632 n. 2 (S.D.N.Y.2007), and "the mere possibility that members of a potential class may choose to opt out in the future is not enough to preclude a finding of numerosity," ( Gortat v. Capala Bros., Inc., No. 07 Civ. 3629 (ILG), 2010 WL 1423018, at *3 (E.D.N.Y. Apr. 9, 2010)). See Sunrise Toyota, Ltd. v. Toyota Motor Co., 55 F.R.D. 519, 533 (S.D.N.Y.1972). Accordingly, the Court adopts the subclass calculations derived from the RNC arrest records and the corresponding presumption that numerosity is satisfied.

Because a determination of practicability does not hinge on "mere numbers," Defendants also appeal to the Robidoux numerosity factors. Robidoux, 987 F.2d at 936. With respect to the first factor, they argue that the prevalence of parallel individual suits undermines the judicial economy of a class resolution. (Defs.' Opp'n 32.) As an initial matter, the Court notes that the case law on parallel claims by potential class members is not uniform. Some courts have identified the absence of individual claims as a factor weighing against class certification, see Novella v. Westchester County, 443 F.Supp.2d 540, 546 (S.D.N.Y.2006) (finding the fact that "no individual member of the prospective class has filed or threatened to file his own action" to constitute a factor weighing "against class certification"), while others have reached the opposite result, see Primavera Familienstiftung v. Askin, 178 F.R.D. 405, 410 (S.D.N.Y.1998) (finding the

"multiplicity of actions" already filed to constitute a factor weighing against class certification). Here, Defendants clearly ascribe to the latter view, arguing that "Plaintiffs have submitted 'no evidence that permitting this suit to go forward as a class action is necessary to avoid a multiplicity of redundant lawsuits.' " (Defs.' Opp'n 32 (citing Ansari, 179 F.R.D. at 115).)

**\*14** [30] The Court is unpersuaded that the existence of parallel actions by prospective class members defeats a finding of numerosity in this case. In addition to the raw number of plaintiffs included in each subclass, the class members appear to be geographically dispersed. According to the NYPD, 65 percent of the RNC arrestees were out-of-state residents. (Norins Decl., Ex. 51.) Cf. Koss v. Wackenhut Corp., No. 03 Civ. 7679 (SCR), 2009 WL 928087, at *5 (S.D.N.Y. Mar. 30, 2009) (finding that dispersion "across seven New York counties and three states" supported a finding of numerosity). And the fact that some individuals within the Mass Arrest Subclasses possess the inclination and resources to pursue their own claims should not deprive those without such resources of the opportunity to pursue this action. See In re WorldCom, 219 F.R.D. at 306 ("Individual investors, small entities, and the many large investors who have not filed individual actions should not be deprived of their opportunity to pursue this [class] action simply because some larger litigants with greater financial resources are presently pursuing parallel actions.").

Although the remaining Robidoux factors are sparsely briefed, Plaintiffs have shown that the Mass Arrest Subclasses are sufficiently numerous to make joinder impracticable. Based on the numerosity presumption accorded to each Subclass, the geographic dispersion of class members, and the fact that separate actions or a multitude of joinder actions "would substantially increase the burden on the parties and courts," Cromer Fin. Ltd. v. Berger, 205 F.R.D. 113, 121 (S.D.N.Y.2001), the Court finds that the numerosity requirement is satisfied. Of course, in the event that a significant number of class members decide to opt out of the Mass Arrest Subclasses, the Court may alter, amend, or decertify those classes pursuant to Rule 23(c)(1)(C). See Fed.R.Civ.P. 23(c)(1)(C).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

### b. Commonality

[31] The Mass Arrest Subclasses also satisfy the commonality requirement, as numerous legal and factual issues unite the claims of the putative class members. *See Damassia,* 250 F.R.D. at 156. Plaintiffs characterize the class allegations as "replete with interwoven questions of law and fact," including: (1) whether, at the time, date, and location of each Subclass, Defendants conducted mass arrests without individualized probable cause; (2) whether Defendants issued audible dispersal orders followed by reasonable opportunities to disperse; and (3) whether Defendants acted pursuant to an unlawful policy or practice of indiscriminate mass arrest. (Pls.' Mem. 28–30.) In response, Defendants simply recite the standards for class relief and assert that "each of Plaintiffs' proposed classes fail to meet Rule 23(a) commonality and typicality requirements." (Defs.' Opp'n 34.)

The Court is persuaded that the grievances of the Mass Arrest Subclass members "share a common question of law or of fact," *Robinson,* 267 F.3d at 155, due to the alleged policy or practice of indiscriminate mass arrest. Whether Plaintiffs will ultimately carry the burden of demonstrating such a policy or practice is, of course, beyond the scope of the Rule 23 inquiry. But because the common question of the alleged policy or practice is "at the core of the cause of action," *Friedman–Katz,* 270 F.R.D. at 155, the Court finds that the commonality requirement is met with respect to each Mass Arrest Subclass.

### c. Typicality

*15 [32] For reasons that merge with the commonality analysis, *see Brown,* 609 F.3d at 475, the typicality requirement is also satisfied. Because each Subclass member was arrested at a particular time, date, and location in connection with real or perceived RNC protest activity, the Subclass injuries derive from a "unitary course of conduct." *Spicer,* 269 F.R.D. at 337 (quoting *Marisol A.,* 126 F.3d at 377). Because each Subclass member alleges that Defendants employed an unlawful policy or practice of indiscriminate mass arrest, the Subclass claims rely on "similar legal arguments to prove ... liability." *In re Flag Telecom Holdings,* 574 F.3d at 35 (quoting *Robidoux,* 987 F.2d at 936).

The Court further notes that the status of various class members as protestors, observers, or bystanders does not render their claims atypical where, as here, "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Robidoux,* 987 F.2d at 936–37. Accordingly, the Court concludes that typicality is met for the Mass Arrest Subclasses "irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 937.

### d. Adequacy

[33] Finally, the Rule 23(a) adequacy prong requires the Mass Arrest Subclass representatives to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). As previously stated, Plaintiff Ali–Khan experienced no cognizable First Amendment injury and therefore lacks standing to assert a First Amendment claim on behalf of Subclass Four. *See supra* Part III.A.2. Although framed as a standing challenge (Defs.' Opp'n 34–35), the absence of First Amendment injury also carries implications for the adequacy of Subclass Four. Because an adequate class representative must "suffer the same injury as the class members," *Amchem,* 521 U.S. at 625–26, 117 S.Ct. 2231, and the named Subclass Four representative lacks standing to bring a First Amendment claim, the Court finds that the First Amendment claims asserted by Subclass Four fail for lack of an adequate class representative.

The remaining Mass Arrest Subclasses suffer no such deficiency. Defendants have not identified interests of the named Plaintiffs that are antagonistic to those of the Subclass members. *See Baffa,* 222 F.3d at 60. Similarly, there is no dispute that if the named Plaintiffs prevail, the putative class members will also benefit, since all were subject to the same allegedly unconstitutional course of conduct. *See Hirschfeld v. Stone,* 193 F.R.D. 175, 183 (S.D.N.Y.2000). Thus, it is clear that no "fundamental" conflict of interest impairs the representation of the remaining Mass Arrest Subclasses by the named Plaintiffs. *In re Flag Telecom Holdings,* 574 F.3d at 35.

[34] The named Plaintiffs are, in turn, represented by attorneys from Beldock, Levine & Hoffman LLP.[FN10] Under Rule 23(g)(1), which governs adequacy of class counsel, the Court must consider "the work counsel has

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

done in identifying or investigating potential claims in the action, ... counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, ... counsel's knowledge of the applicable law, and ... the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g). In this case, Plaintiffs contend that proposed class counsel is well-acquainted with the relevant facts, having represented Plaintiffs in this action since 2004. (Pls.' Mem. 35.) Plaintiffs further contend that the firms at issue bring a wealth of collective experience in complex federal litigation and a stated commitment to continued and vigorous pursuit of this litigation. (*Id.*) Defendants do not dispute these assertions. Accordingly, the Court finds that the proposed class counsel is "qualified, experienced, and able to conduct the litigation." *Baffa,* 222 F.3d at 60.

**\*16** Because the named Plaintiffs and the proposed class counsel will fairly and adequately represent the putative class members, the Court concludes that with the exception of the First Amendment claims brought by Subclass Four, the Mass Arrest Subclasses satisfy the adequacy requirement.

2. Rule 23(b)(3) Analysis

After completing the Rule 23(a) inquiry and declining to certify under Rule 23(b)(2), the Court now proceeds to analyze the remaining Mass Arrest Subclasses under the rubric of Rule 23(b)(3).

a. Predominance

[35][36] It is well established that the predominance criterion of Rule 23(b)(3) is "more stringent" and "far more demanding" than the commonality requirement of Rule 23(a). *Amchem,* 521 U.S. at 609, 623–24, 117 S.Ct. 2231. To satisfy Rule 23(b)(3) class certification requirements, a plaintiff must establish not only the existence of common questions, but the predominance of such questions over other issues that are subject only to individualized proof. *See Cordes,* 502 F.3d at 107–08. In conducting the predominance inquiry, the Court is also mindful that pursuant to Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues...." Fed.R.Civ.P. 23(c)(4). District courts should "take full advantage of this provision to certify

separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson,* 267 F.3d at 167 (internal citation, quotation marks, and alterations omitted).

i. Constitutional Claims

Plaintiffs argue that common questions regarding the alleged unconstitutional policy or practice of conducting indiscriminate mass arrests during the RNC "can only be answered with reference to the over[all] police conduct at each mass arrest site, and not by examining any one arrest in isolation." (Pls.' Mem. 37.) Plaintiffs further contend that the common questions at issue are subject to generalized proof because the police officers who made the arrest decisions made no individualized determinations of probable cause. (*Id.* at 37–38.)

Defendants counter that individual issues "overwhelm" the Mass Arrest Subclasses because probable cause inquiries will be necessary to determine liability. (Defs.' Opp'n 40.) Since the existence of probable cause is a complete defense to an action for false arrest, *see Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (internal citation and quotation marks omitted), Defendants argue that litigation of the Mass Arrest Subclasses will splinter into "mini-trials" regarding the facts and circumstances of individual arrest decisions. (*See* Defs.' Opp'n 44.) Based on the range of charges leveled at the RNC arrestees, Defendants contend that the term "mass arrest" is simply a convenient gloss on a series of arrest decisions triggered by complex and variable circumstances. (*Id.* at 43, 46.)

[37] Upon careful consideration of the foregoing arguments and the relative cohesion of each Mass Arrest Subclass, *see In re Nassau County,* 461 F.3d at 225, the Court finds that Subclasses One and Three fail the predominance requirement. Significantly, it appears that group arrests did not occur at the Subclass One and Three locations. There were no police barricades (Pls.' Mem. 11), assigned arresting officers (*id.* at 13), or incident commanders making group arrest decisions (Tr. at 42:21–43:20). Instead, the available facts indicate that the Subclass One and Three arrests were conducted by officers exercising individual discretion rather than following mass arrest orders. (*See, e.g.,* Decl. of Jonathan C. Moore, July 20, 2007 ("Moore Decl."), Ex. 32 at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

17:20–22; [FN11] *id.,* Ex. 39 at 7:15–19; [FN12] *id.,* Ex. 39 at 13:8–15.[FN13]). Indeed, even Plaintiffs' counsel conceded at oral argument that Subclasses One and Three "are the least clean in terms of the facts." (Tr. at 113:4.)

*17 In the absence of group arrest decisions or procedures, the Court is persuaded that individualized probable cause inquiries would dictate the course of litigation with respect to Subclasses One and Three. Such a result would deprive the class action device of the efficiency and economy that form the principal purpose of the procedure. *See generally Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (holding that "the efficiency and economy of litigation ... is a principal purpose of the [class action] procedure"). Accordingly, the Court concludes that the Subclasses One and Three fail for lack of predominance.

By contrast, the record with respect to the remaining Subclasses manifests "a sufficient constellation of common issues bind[ing] class members together." *Brown,* 609 F.3d at 483 (internal citation and quotation marks omitted). At the remaining Subclass locations, police erected barricades or employed orange netting to corral and trap large groups of individuals who were thereafter arrested. (Pls.' Mem. 11.) Subclasses Two, Five, Six and Eight also involved an alleged procedure whereby an arresting officer was assigned to five arrestees "regardless of whether the officer had seen any of the five individuals prior to their arrest or had even been present at the scene when the decision to arrest was made." (*Id.* at 13.) The deposition testimony of various police officers further confirms that Defendants made arrest decisions based on group conduct at the remaining Subclass locations.[FN14]

Because the remaining Subclasses comprise individuals who were arrested as a group based on the alleged conduct of the group, the Court finds that common issues predominate with respect to liability. Although assessment of damages may ultimately require individualized inquiries, that possibility is no bar to class certification here. *See In re WorldCom,* 219 F.R.D. at 302 ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification"). Whether Defendants employed an

unlawful mass arrest policy at the remaining Subclass locations is a fundamental question both common to the putative Subclass members and subject to generalized proof. *See Vodak v. City of Chi.,* No. 03 C 2463, 2006 WL 1037151, at *9 (N.D.Ill. Apr. 17, 2006) ("[I]f the decision to seize or arrest a class of individuals is based upon facts and circumstances common to the class then the issue may be adjudicated through a class action."). Accordingly, the Court finds predominance with respect to liability for the constitutional claims brought by Subclasses Two, Four, Five, Six, Seven, and Eight.

[38][39] In so holding, the Court rejects the argument that individualized probable cause inquiries will overwhelm the remaining Mass Arrest Subclasses. Although probable cause is a complete defense to an individual false arrest claim, *see Weyant,* 101 F.3d at 852 (internal citation and quotation marks omitted), the predominant issue here turns not on the circumstances of particular arrests, but on the existence of a policy or practice of conducting mass arrests whether or not individualized probable cause existed. Thus, the fact that a probable cause defense "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 138 (2d Cir.2001), *overruled on other grounds by In re Initial Pub. Offerings,* 471 F.3d at 42 (internal citation omitted). Because the claim of an overarching policy unites the remaining Mass Arrest Subclasses, the Court is persuaded that common liability issues predominate. *See In re Nassau,* 461 F.3d at 229 (finding predominance based on "two broad common liability issues: whether the blanket policy existed and whether defendants are liable for its implementation").

*18 The fact that the SAC includes as-applied challenges to the New York City parade ordinance [FN15] and New York state disorderly conduct statutes [FN16] does not defeat predominance with respect to the Mass Arrest Subclasses. Although Defendants devote their supplemental brief to the argument that Plaintiffs' as-applied claims may not be adjudicated on a class basis (*see* Defs.' Sur–Reply 6), their argument appears to rest on a premature assessment of the merits. Defendants claim that "[a]fter ... years of exhaustive documentary and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

testimonial discovery in the Consolidated RNC Cases, plaintiffs can point to no evidence of an 'indiscriminate mass arrest policy' designed to retaliate against protestors based upon the content of their speech." (Defs.' Sur–Reply 8–9.) In the absence of such evidence, they argue, the Court will have to consider the particular circumstances of each RNC arrestee to determine whether the challenged statutes were unconstitutionally applied. (*Id.* at 9.) Thus, Defendants oppose the predominance of the as-applied claims primarily by disputing the existence of the alleged policy—and prematurely addressing the merits of the case. Because courts "should not assess any aspect of the merits unrelated to a Rule 23 requirement" on a motion for class certification, *In re Initial Pub. Offerings,* 471 F.3d at 41, the Court declines to do so here.[FN17]

The Court further notes that the fact of a conviction or guilty plea by a subset of RNC arrestees does not alter the foregoing predominance analysis. Citing *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Defendants argue that false arrest claims by putative class members who were convicted or pled guilty are barred in the absence of proof that the conviction has been reversed, expunged, or otherwise declared invalid. (Defs.' Opp'n 48–49.) But because the names of the 178 RNC arrestees who were convicted or pled guilty are readily identifiable from discovery documents (Pls.' Reply 20 n. 59, 21), the exclusion "is a purely ministerial issue that can be determined prior to trial and will not predominate." *Dunn v. City of Chicago,* 231 F.R.D. 367, 377 (N.D.Ill.2005).[FN18] Thus the *Heck* doctrine poses no bar to certification of the Mass Arrest Subclasses. To the extent that application of the *Heck* exclusion subsequently undermines the numerosity of particular Mass Arrest Subclasses, the Court may, of course, alter, amend, or decertify those classes as necessary. Fed.R.Civ.P. 23(c)(1)(C).

ii. Other Claims

[40] Despite the predominance of common issues with respect to the constitutional claims, the Court declines to grant class certification with respect to the remaining supervisory liability, *respondeat superior,* and pendent state law claims. Although neither party briefs the predominance inquiry in this context, the Court is persuaded that each of these claims "bristles with individual issues" that render class certification improper. *Blyden v. Mancusi,* 186 F.3d 252, 271 (2d Cir.1999).

**\*19** [41] With respect to the supervisory liability claims, the Court notes that a supervisor may not be held liable "simply because one or more of his subordinates committed a constitutional tort." *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007). Rather, a plaintiff must establish an affirmative causal link between the supervisor's inaction and his injury. *See Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). Thus, Plaintiffs' supervisory liability claim would require the Court to separately determine the liability of approximately 40 individual Defendants. Because such an inquiry involves "varying components as to each defendant," *Blyden,* 186 F.3d at 271 (2d Cir.1999), the Court finds that individual issues overwhelm the supervisory liability claim.

The *respondeat superior* and pendent state law claims fail the predominance requirement for substantially similar reasons. The *respondeat superior* claims asserts that the City is liable for the actions of approximately 60 individual Defendants because their conduct "occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions" as members of the NYPD. (SAC ¶ 265.) The pendent state law claims assert that approximately 20 individual Defendants committed a host of mass torts, including assault and battery, trespass, false arrest and imprisonment, malicious prosecution, intentional infliction of emotional distress, and negligent hiring. (*See id.* ¶¶ 261–63.) Because these claims are susceptible to unique defenses that require extensive individualized inquiries, the Court declines to certify the *respondeat superior* and pendent state law claims.[FN19]

Since the foregoing analysis is not limited to the Mass Arrest Subclasses, the Court also excludes the supervisory liability, *respondeat superior,* and pendent state law claims from all proposed classes in order to "reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson,* 267 F.3d at 167 (internal citation and quotation marks omitted).

b. Superiority

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

[42] In addition to the predominance criterion, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). As previously stated, factors relevant to the superiority analysis include: the interest of class members in controlling separate actions; the extent and nature of existing litigation concerning the controversy; the desirability or undesirability of concentrating litigation of the class claims in the particular forum; and the likely difficulties in managing a class action. *See id.*

In this case, some 565 RNC arrestees have clearly expressed interest in controlling separate actions by filing and pursuing approximately 80 parallel suits. (*See* Pls.' Mem. 44; *cf.* Defs.' Opp'n 73.) Nevertheless, given the length of time that has now elapsed since the underlying events occurred, it appears that the remaining putative class members have not expressed a similar interest by filing separate actions. The desirability of concentrating the RNC litigation in this forum is equally indeterminate as a superiority factor, since the related RNC cases would remain before this Court regardless of the outcome of the class certification motion. Finally, the Court concludes that the "management difficulties" that might accompany the proposed certification are certainly no greater than the management difficulties that would inevitably result from hundreds of separate trials. *See In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 529 (S.D.N.Y.1996) ("[D]ifficulties in management are of significance only if they make the class action a less 'fair and efficient' method of adjudication than other available techniques.").

**\*20** In the end, the Court is persuaded that "[f]rom the standpoint of judicial economy, the only rational way to proceed is to concentrate the class [ ] claims in a single action, rather than have numerous separate trials on the same issue, based on the same evidence." *Jermyn v. Best Buy Stores, L.P.,* 256 F.R.D. 418, 436–37 (S.D.N.Y.2009). Certifying the Mass Arrest Subclasses for purposes of determining liability will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615, 117 S.Ct.

2231 (internal citation and quotation marks omitted). Accordingly, the Court finds that a class action would be the most fair and efficient method of resolving the issues in this case.

### C. Excessive Detention Class

The Court next examines the Excessive Detention Class, which comprises all persons arrested during the Class Period and processed at Pier 57 pursuant to the MAPP. (SAC ¶ 52(b).)

#### 1. Section 23(a) Analysis

##### a. Numerosity

[43] Numerosity is clearly met for the Excessive Detention Class. Plaintiffs contend that approximately 1,800 RNC arrestees were processed pursuant to the MAPP. (*See* Pls.' Mem. 26.) For reasons discussed below, the Court narrows the class to arrestees charged only with violations, leaving approximately 1,480 putative class members. (*Id.* at 22 n. 35.) The Court further subtracts the 102 arrestees who were not detained at Pier 57. (*Id.* at 16.) Defendants do not appear to dispute that joinder of nearly 1,400 class members is clearly impracticable.[FN20] *Cf. Consol. Rail Corp.,* 47 F.3d at 483 (noting that "numerosity is presumed at a level of 40 members"). Accordingly, the Court finds that the Excessive Detention Class satisfies the numerosity requirement.

##### b. Commonality

[44] The commonality of the Excessive Detention Class is not seriously disputed. Plaintiffs allege that because the MAPP unreasonably prolonged their time in custody, their injuries derived from a "unitary course of conduct by a single system." *Spicer,* 269 F.R.D. at 337 (quoting *Marisol A.,* 126 F.3d at 377). Because all class members were processed pursuant to the MAPP, they were subject to policies prohibiting the issuance of summonses and requiring mandatory fingerprinting and criminal background checks, even though Defendants failed to equip Pier 57 with the necessary facilities to timely process the RNC arrestees. (Pls.' Mem. 23.) In response, Defendants weakly assert that the Excessive Detention Class cannot satisfy the commonality requirement because the applicable legal standards will differ based on the length of the individual confinement. (*See* Defs.' Opp'n

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

36.) But commonality does not require identical claims or circumstances. *See Damassia,* 250 F.R.D. at 156. Rather, the requisite common questions of fact or law can derive from a "pattern of behavior that commonly affects all of the proposed class members." *See Marisol A.,* 126 F.3d at 377.

**\*21** Here, Plaintiffs claim that the Excessive Detention Class raises the following common questions: (1) whether Defendants detained the RNC arrestees for unreasonable periods of time; (2) whether such detainment violated the First, Fourth, or Fourteenth Amendments; and (3) whether such detainment resulted from a municipal policy or practice. (*See* Pls.' Mem. 40.) Because the challenged detention procedures primarily affected arrestees charged only with violations (who were otherwise eligible for summonses) and arrestees detained at Pier 57 (where no fingerprinting equipment was available), the Court limits the Excessive Detention Class to arrestees in those categories. With these provisos, it is clear that "at least one common question of fact or law is evident." *In re Currency Conversion Fee Antitrust Litig.,* 224 F.R.D. 555, 562 (S.D.N.Y.2004). Accordingly, the Court finds that the commonality requirement is satisfied for the Excessive Detention Class.

### c. Typicality

**[45]** Typicality is satisfied for substantially similar reasons. As previously stated, all members of the Excessive Detention Class were processed pursuant to the MAPP and detained at Pier 57. As a result, the excessive detention claims "arise[ ] from the same course of events" and depend on "similar legal arguments" to prove liability. *In re Flag Telecom Holdings,* 574 F.3d at 35 (citing *Robidoux,* 987 F.2d at 936). Although Defendants note that the prospective class members were detained for varying lengths of time, "[t]he typicality criterion does *not* require that the factual predicate of each claim be identical to that of all class members." *Shakhnes,* 740 F.Supp.2d at 625 (internal citations and quotation marks omitted). In this case, "the same unlawful conduct" affected both the named Plaintiffs and the prospective class members, because all were subject to the alleged policy or practice of unnecessarily detaining RNC arrestees. *Robidoux,* 987 F.2d at 936–37. Accordingly, the Court concludes that typicality is met with respect to the Excessive Detention

Class. *Id.*

### d. Adequacy

**[46]** Finally, the Excessive Detention Class easily satisfies the adequacy requirement. Because the named Plaintiffs were detained alongside the prospective class members, they clearly "possess the same interest and suffer [ed] the same injury." *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364. Defendants make no suggestion that the named Plaintiffs have interests antagonistic to the rest of the class, *see Brown,* 609 F.3d at 479, or are otherwise unable to "fairly and adequately protect the interest of the class," Fed.R.Civ.P. 23(a)(4). For the reasons previously stated, Plaintiffs' counsel will supply fully adequate legal representation. *See supra* Part III.B.1.d. In the absence of any indication that a "fundamental" conflict of interest impairs the proposed representation, *In re Flag Telecom Holdings,* 574 F.3d at 35, the Court finds that the adequacy requirement is satisfied as to the Excessive Detention Class.

### 2. Section 23(b)(3) Analysis

**\*22** Because the Excessive Detention Class survives the Rule 23(a) inquiry, the Court now proceeds to the Rule 23(b)(3) analysis.

### a. Predominance

**[47]** The predominance inquiry once again forms the crux of the class certification dispute. Plaintiffs argue that because the excessive detention claims all arise out of the design and implementation of the MAPP (*see* Pls.' Mem. 40–41), common questions and common legal theories predominate. In their view, the constitutionality of the MAPP detention procedures forms the nucleus of "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole." *Cordes,* 502 F.3d at 107–08.

In response, Defendants argue at length that the variance in the detention times of the RNC arrestees is fatal to the predominance inquiry. (*See* Defs.' Opp'n 65–71.) To that end, Defendants primarily rely on *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), in which the Supreme Court held that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement" and therefore "be immune from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

systemic challenges," *id. at 56, 111 S.Ct. 1661.* Citing *County of Riverside,* Defendants argue that RNC arrestees who were detained for less than 48 hours have no constitutional claim unless "the arrested individual can prove that his or her probable cause determination was delayed unreasonably." (Defs.' Opp'n 66 (quoting *County of Riverside,* 500 U.S. at 56, 111 S.Ct. 1661).) Because the majority of the RNC arrestees were processed and released within 48 hours, Defendants argue that "the Court would have to conduct mini-hearings for each arrestee" to establish the cause of the delay. (Defs.' Opp'n 69.) Thus, Defendants urge that "the class action mechanism is unsuitable" because "the primary issues to be litigated are subject to such individualized proof." (*Id.*)

This argument misunderstands the nature of the excessive detention claims at issue. The central and predominant focus of the class action suit is not the mere length of detention for RNC arrestees, but the existence of a policy to detain them longer than would otherwise be required. Such a policy, if proven, would surely demonstrate that the probable cause determinations for individual RNC arrestees were unreasonably and deliberately delayed. Because class certification is appropriate where a "sufficient constellation of common issues binds class members together," *Brown,* 609 F.3d at 483, the Court is persuaded that claims based on an alleged policy of unlawful detention are suitable for class adjudication.

The Court also notes that Defendants' predominance argument derived from the *County of Riverside* holding applies only to Plaintiffs' Fourth Amendment claim. Additional common questions bind the Excessive Detention Class with respect to the First and Fourteenth Amendment claims, including: (1) whether Defendants intended to punish or deter First Amendment activity by subjecting the RNC arrestees to MAPP procedures; and (2) whether such practices breached the Equal Protection Clause of the Fourteenth Amendment. (Pls.' Reply 27.) Thus, even if Defendants were to prevail on the Fourth Amendment claim, the First and Fourteenth Amendment claims would survive the predominance requirement. Accordingly, the Court finds that the resolution of the excessive detention claims "can be achieved through generalized proof," and that the class-wide detention

issues predominate over "issues subject only to individualized proof." *Moore,* 306 F.3d at 1252.

### b. Superiority

***23** [48] The superiority analysis for the Excessive Detention Class closely tracks the superiority analysis for the Mass Arrest Subclasses outlined above. Once again, the existence of parallel suits filed by a significant minority of RNC arrestees indicates some interest in controlling the prosecution of separate actions. Given the related status of all RNC actions, the inevitable concentration of the RNC litigation before this Court remains a neutral factor in the superiority analysis. Finally, the Court perceives little difficulty in managing the Excessive Detention Class on the issue of liability, since individualized inquiries will primarily relate to damages calculations.

The utility of the "pertinent" but nonexclusive superiority factors is admittedly limited in this instance. Fed.R.Civ.P. 23(b)(3)(A)–(D). Nonetheless, there can be no doubt that certifying the Excessive Detention Class will permit the Court to try common issues related to the alleged unlawful policy once, rather than dozens or hundreds of times, thereby simplifying and streamlining the litigation process. *See In re Nassau,* 461 F.3d at 230. Accordingly, the Court finds that the superiority criterion is met with respect to the Excessive Detention Class.

### D. Conditions of Confinement Class

Finally, the Court considers the Conditions of Confinement Class, which comprises all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57. (SAC ¶ 52(c).)

### 1. Section 23(a) Analysis

#### a. Numerosity

[49] The numerosity of the Conditions of Confinement Class is clear. Out of approximately 1,800 RNC arrestees, all but 102 arrestees were allegedly handcuffed with plastic flex cuffs and detained at Pier 57. (Pls.' Mem. 26.) Because the remaining class comprises approximately 1,700 prospective members, the numerosity of the Conditions of Confinement Class is beyond serious dispute.[FN21] *Cf. In re WorldCom,* 219 F.R.D. at 305–06

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

("Here, the class is massive: there is no question regarding numerosity or the impracticability of joinder.").

### b. Commonality

[50] For the Conditions of Confinement Class, commonality is a "minimal burden" readily satisfied. *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.,* 211 F.R.D. 228, 231 (S.D.N.Y.2002). Plaintiffs contend that detention at Pier 57 subjected the prospective class members to a host of common conditions, including prolonged handcuffing, inadequate seating and sanitary facilities, and exposure to various chemicals. (Pls.' Mem. 15–19.) Defendants counter that "non[e] of these alleged conditions can be classified as common to the class, as none of the class representatives or potential class members were exposed to all of the alleged conditions." (Defs.' Opp'n 25.)

But Defendants' worn attempt to defeat commonality by mincing the prospective class claims once again fails. Although some degree of disparity in the detention experience of RNC arrestees is perhaps inevitable, factual variations in individual grievances do not preclude a finding of commonality where the injuries "derive from a unitary course of conduct by a single system." *Spicer,* 269 F.R.D. at 337 (quoting *Marisol A.,* 126 F.3d at 377). Here, the alleged injuries derive from the detention conditions at Pier 57. Because all class members were subject to a common detention system at a single location, they share the following common questions: (1) whether the terms and conditions of confinement at Pier 57 were unreasonable and punitive; and (2) whether those conditions resulted from a municipal policy or practice. (Pls.' Mem. 29). That the deposed class members object to different combinations of detention conditions does not negate the fact "that common issues of fact or law affect all class members." *Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168, 175 (S.D.N.Y.2008) (internal citations and quotation marks omitted). Accordingly, the Court finds that the commonality requirement is satisfied for the Conditions of Confinement Class.

### c. Typicality

**\*24** [51] Once again, the typicality requirement is satisfied for reasons that overlap with the commonality analysis above. *See Brown,* 609 F.3d at 475. As previously noted, all members of the Conditions of Confinement Class were handcuffed with plastic flex cuffs and detained at Pier 57. Thus, the conditions of confinement claims "arise[ ] from the same course of events" and pose similar legal and constitutional challenges. *In re Flag Telecom Holdings,* 574 F.3d at 35 (citing *Robidoux,* 987 F.2d at 936). Although Defendants protest that "the circumstances of the putative class representatives differ[ed] greatly" (Defs.' Opp'n 36), they provide no explanation or supporting citations for such an assertion. Instead, the evidence indicates that the prospective class members were treated "in the same general fashion," *Robidoux,* 987 F.2d at 937 (emphasis omitted), despite individual permutations of the detention narrative (*see* Pls.' Mem. 32, 42). Because the class claims arise from "the same unlawful conduct," *Robidoux,* 987 F.2d at 936, the Court finds that the Conditions of Confinement Class clears the "relatively low threshold" of typicality, *Karvaly v. eBay, Inc.,* 245 F.R.D. 71, 82 (E.D.N.Y.2007).

### d. Adequacy

[52] Finally, the Conditions of Confinement Class also complies with the adequacy requirement. Because all class members were detained under substantially common conditions at Pier 57, the named Plaintiffs "suffer[ed] the same injury" as the absent class members. *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364. Because all class members share a common interest in establishing liability for their detention conditions, the interests of the named Plaintiffs and prospective class members are properly aligned. As previously stated and reiterated, class counsel is "qualified, experienced, and able to conduct the litigation." *Cordes,* 502 F.3d at 99; *see supra* Part III.B.1.d. Accordingly, the Court finds that the named Plaintiffs "will fairly and adequately protect the interests" of the Conditions of Confinement Class. Fed.R.Civ.P. 23(a)(4).

### 2. Section 23(b)(3) Analysis

Because the Conditions of Confinement Class meets the Rule 23(a) requirements, the Court will now consider the Rule 23(b)(3) inquiry.

### a. Predominance

[53] Although Defendants nominally oppose the preceding Rule 23(a) analysis, they vigorously dispute that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

the Conditions of Confinement Class is "sufficiently cohesive" to satisfy the predominance requirement. *Brown,* 609 F.3d at 476. Plaintiffs contend that while the details of individual detention experiences may have varied, the overall conditions at Pier 57 were sufficiently similar to warrant class adjudication. (Pls.' Mem. 42.) In response, Defendants parse the individual conditions of confinement and argue that claims based on each condition will require individualized inquiries to establish a constitutional violation. (Defs.' Opp'n 52–65.)

Plaintiffs identify key factual questions that unite the Conditions of Confinement Class by addressing the nature and severity of the alleged conditions. Did the substance on the floor of Pier 57 pose potential health hazards? Were requests for medical attention by RNC arrestees routinely ignored? How many toilets were provided per number of detainees? (*See* Pls.' Reply 32.) "The legal counterpart of these factual questions is the issue of whether and to what extent the existence of conditions of this severity—whether separately or in combination—constituted a violation of the [detainees'] constitutional rights." *Langley v. Coughlin,* 715 F.Supp. 522, 556 (S.D.N.Y.1989). Under *Langley,* the relevant question is whether the "cumulative effect" of the alleged conditions was "sufficiently bad to have fallen below constitutional minima." *Id.* at 543, 556; *see, e.g., Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention ..., the proper inquiry is whether those conditions amount to punishment of the detainee.").

**\*25** Defendants, in turn, assert that common questions do not predominate because determining the constitutionality of the confinement conditions will require "mini-trials" regarding the length of individual detention and the degree of individual injury. (Defs.' Opp'n 52–53.) But the fact that the eventual assessment of damages may require individualized proof of injury does not preclude class treatment of allegations that the shared confinement conditions were unlawful. "That some detainees may have been more or less deprived ... does not impede the court's ability to adjudicate whether the shared deprivations suffered by all [class] members ... violated the Constitution." *Dunn,* 231 F.R.D. at 377. In one recent prison conditions case, a Massachusetts district court

analyzed the common issues as follows:

If the asserted injury is the denial of access to a bathroom at a specific moment of need then the government is correct that the plaintiffs have not demonstrated a likelihood that other inmates have suffered similarly. If, on the other hand, the injury arises simply out of being housed in a facility in which bathroom access is unreliable, then all of the approximately 4,000 inmates housed in Building 4 during the subject period share the claim.

*Tyler v. Suffolk County,* 253 F.R.D. 8, 10 (D.Mass.2008). Here, the conditions of confinement claims clearly fall into the latter category, since Plaintiffs allege constitutional injury from being housed in a makeshift detention center unfit for human occupancy. (*See* Pls.' Mem. 16.)

Moreover, the primary cases Defendants cite to contest the predominance requirement do not address class certification. Instead, Defendants assemble a series of summary judgment and appellate opinions that address the merits of various conditions claims. (*See* Defs.' Opp'n 52–53.) Although the predominance inquiry may implicate the *elements* of prospective class claims, *see Freeland v. AT & T Corp.,* 238 F.R.D. 130, 142 (S.D.N.Y.2006), courts are barred from considering "any aspect of the merits unrelated to a Rule 23 requirement" on a motion for class certification, *In re Initial Pub. Offerings,* 471 F.3d at 41. Here, while Defendants purport to establish only the particular findings required to assess both liability and damages (Defs.' Opp'n 52), the analysis that follows frequently shades into forbidden merits territory.[FN22]

Defendants do identify a single case, *Burley v. City of N.Y.,* No. 03 Civ. 735 (WHP), 2005 WL 668789, at *8–9 (S.D.N.Y. Mar. 23, 2005), denying certification of a conditions class. (Defs.' Opp'n 54–55.) In *Burley,* the court declined to certify a putative "handcuff class" comprising all arrestees who were subject to "unreasonable" or "excessive" handcuffing with plastic cuffs. *Burley,* 2005 WL 668789, at *8. Because plaintiffs were unable to provide a clear definition of "unreasonable" cuffing, the court held that the class failed the implicit "definiteness" requirement of Rule 23. *Id.* at *8–9. Here, by contrast, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Conditions of Confinement Class is limited to RNC arrestees who were detained at Pier 57 and handcuffed with plastic flex cuffs. (SAC ¶ 52(c).) As such, the "definiteness" of the class is easily established, since the names of all RNC arrestees are readily ascertainable from records produced during discovery. (Pls.' Mem. 26 n. 41, 27.) Because the class definition hinges on the fact that RNC arrestees were handcuffed, and not on "subjective determinations" about the meaning of "excessive" handcuffing, *Burley,* 2005 WL 668789, at *9, the holding of *Burley* is inapposite. [FN23]

**\*26** Upon careful consideration, the Court is persuaded that the common questions of fact and law identified above predominate over the individual questions implicated by the Conditions of Confinement Class. The core class allegation is that the RNC arrestees were improperly detained in a facility unfit for human occupancy. Whether the "cumulative effect" of the conditions at Pier 57 created a constitutional violation is an issue that unifies the Conditions of Confinement Class and satisfies the predominance requirement. *Langley,* 715 F.Supp. at 543–44.

**b. Superiority**

[54] The Conditions of Confinement Class satisfies the superiority requirement for reasons that parallel the analysis articulated and reiterated above. Because certifying as to liability will permit hundreds of RNC conditions claims to be resolved in a single proceeding, the Court concludes that proceeding as a class action is manifestly "superior to other available methods for fairly and efficiently adjudicating" the Conditions of Confinement claims. Fed.R.Civ.P. 23(b)(3).

**E. Appointment of Class Counsel**

Having completed the Rule 23 class certification analysis, the only question that remains is whether Plaintiffs' counsel should be appointed counsel for the classes. As discussed above in connection with the adequacy requirement of Rule 23(a), *see supra* Part III.B.1.d, Plaintiffs contend that proposed class counsel, Beldock Levine & Hoffman LLP, is experienced in handling complex federal litigation and committed to the vigorous pursuit of the class claims. Defendants do not

dispute these assertions. Accordingly, the Court appoints Beldock Levine & Hoffman LLP as class counsel pursuant to Rule 23(g). Fed.R.Civ.P. 23(g).

**IV. CONCLUSION**

For the foregoing reasons, the motion for class certification pursuant to Rule 23(a) and Rule 23(b)(3) is HEREBY GRANTED as to the following classes:
1) Mass Arrest Subclasses Two, Four, Five, Six, Seven and Eight, comprising all RNC arrestees from the foregoing Subclass locations, except that Subclass Four may not assert a First Amendment claim;

2) The Excessive Detention Class, comprising all RNC arrestees who were processed pursuant to the MAPP, detained at Pier 57, and charged only with violations; and

3) The Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57.

Pursuant to Rule 23(c)(4), the Court certifies the foregoing classes to determine liability arising from the constitutional claims, but declines to certify the supervisory liability, *respondeat superior,* and pendent state law claims.

The motion to certify Mass Arrest Subclasses One and Three is HEREBY DENIED due to lack of predominance. The motion for class certification pursuant to Rule 23(b)(2) is HEREBY DENIED due to lack of standing to pursue declaratory and injunctive relief. Plaintiffs in the certified classes and subclasses are appointed Class Representatives, and Beldock Levine & Hoffman LLP is appointed class counsel.

**\*27** IT IS FURTHER ORDERED THAT: (1) Plaintiffs shall submit to the Court a proposed notice to all putative class members pursuant to Rule 23(c)(2)(B) no later than May 31, 2011; and (2) the parties in this action and all other consolidated RNC cases shall appear for a status conference in Courtroom 21C on June 6, 2011, at 4:30 p.m.

SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

**FN1.** The following facts are derived from the allegations in the Second Amended Complaint ("SAC"), which the Court accepts as true in considering a motion for class certification. *See Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978).

**FN2.** Defendants had "set up a 24–hour demonstration zone on Eighth Avenue, just a few blocks south of the convention site at Madison Square Garden, open to anyone wishing to protest any issue." (Defs.' Sur–Reply 4.)

**FN3.** "New York Criminal Procedure Law § 160.10 does not require an arrestee accused of committing a violation to be fingerprinted prior to release from custody with a summons or a Desk Appearance Ticket, unless the arrestee lacks valid identification." (SAC ¶ 93.)

**FN4.** By Order dated February 1, 2007, Judge Karas denied the motion for class certification without prejudice because "[t]he parties were directed to file the motion papers electronically only when the motion has been fully briefed." (Doc. No. 128.) Thus, although Plaintiffs' Notice of Motion is dated January 31, 2007, the motion papers were electronically filed on July 20, 2007.

**FN5.** In ruling on the instant motion, the Court has considered Plaintiffs' Memorandum of Law in Support of Class Certification ("Pls.' Mem."); Defendants' Memorandum of Law in Opposition to Class Certification ("Defs.' Opp'n"); Plaintiffs' Reply Memorandum of Law in Support of Class Certification ("Pls.' Reply"); Defendants' Memorandum of Law in Further Opposition to Class Certification ("Defs.' Sur–Reply"); and Plaintiffs' Memorandum of Law in Further Support for Class Certification ("Pls.' Sur–Reply").

**FN6.** The Second Circuit granted the writ of mandamus in an opinion dated June 9, 2010. *In re City of N.Y.,* 607 F.3d 923 (2d Cir.2010).

**FN7.** "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed.R.Civ.P. 23(c)(5).

**FN8.** Other Plaintiffs, including Deirdre MacNamara, were similarly engaged in personal or recreational activities prior to their arrests. (*See* SAC ¶ 170–72.) However, only Subclass Four lacks a named Plaintiff who was engaged in some form of First Amendment activity. *See infra* Part III.B.1.d.

**FN9.** Specifically, Plaintiffs contend that Mass Arrest Subclass One comprises at least 40 individuals (Pls.' Mem. 5); Mass Arrest Subclass Two comprises at least 100 individuals (*id.* at 6); Mass Arrest Subclass Three comprises at least 50 individuals (*id.* at 7); Mass Arrest Subclass Four comprises at least 50 individuals (*id.*); Mass Arrest Subclass Five comprises at least 200 individuals (*id.* at 8); Mass Arrest Subclass Six comprises at least 300 individuals (*id.* at 9); Mass Arrest Subclass Seven comprises at least 75 individuals (*id.* at 10); and Mass Arrest Subclass Eight comprises at least 150 individuals (*id.* at 11).

**FN10.** Although attorneys from Moore & Goodman, LLP also appear on the docket sheet for this case, Plaintiffs have represented to the Court that only Beldock Levine & Hoffman LLP will continue as class counsel.

**FN11.** Testimony of Randall Steketee: "Q: Did you see other people being handcuffed before you were handcuffed? A: No." (Moore Decl., Ex. 32, 17:20–22.)

**FN12.** Testimony of Phillip Ellmann: "Q: Was there a police blockade when you reached that location? A: No, I think the street was blocked but there was no obvious police blockade visible." (Moore Decl., Ex. 39,7:15–19.)

**FN13.** Testimony of Marcellas Hall: "Q: How

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

many people were in the group that you referred to at that time? A: Well, you know, I'm just talking about a clump of people that would have been able to hear that order ... it's not that we were a cohesive group, it was a random group of people." (Moore Decl., Ex. 39, 13:13–15.)

FN14. (*See, e.g.,* Moore Decl., Ex. 44, 271:17–272:12 (Subclass Two); Norins Decl., Ex. 45, 281:10–25 (Subclass Four); Moore Decl., Ex. 50, 131:24–133:23 (Subclass Five); *id.* at 41, 159:22–160:20 (Subclass Six); Norins Decl., Ex. 35, 63:20–25, 67:3–18 (Subclass Seven); Moore Decl., Ex. 45, 324:18–325:23, 373:24–375:15 (Subclass Eight).) The Court notes that the examples of individualized probable cause proffered by Defendants primarily relate to Subclass Three and non-Subclass arrests. (*See* Defs.' Sur–Reply 13–14.)

FN15. New York City Administrative Code § 10–110 requires a permit to conduct a parade or procession on New York City streets. N.Y. City Admin. Code § 10–110.

FN16. N.Y. Penal Code § 240.20(5) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... he obstructs vehicular or pedestrian traffic."); *Id.* § 240.20(6) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.").

FN17. Defendants also cite *Hudson v. City of Chicago* for the proposition that as-applied challenges fail the Rule 23(b)(3) predominance requirement because they "necessarily entail an analysis of how the [ordinance] was applied to each individual class member." (Defs.' Sur–Reply 11 (citing *Hudson v. City of Chicago,*

242 F.R.D. 496, 505 (N.D.Ill.2007)).) What Defendants neglect to disclose is that *Hudson* explicitly distinguished cases involving mass arrests. *Hudson,* 242 F.R.D. at 507.

FN18. In a pair of dueling footnotes, the parties dispute whether RNC arrestees who accepted adjournments in contemplation of dismissal (ACDs) are similarly barred from asserting false arrest claims. (*See* Defs.' Opp'n 49 n. 210; Pls.' Reply 21 n. 60.) Because "favorable termination of the proceedings is not an element of [false arrest]," *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995), the Court finds that acceptance of an ACD does not bar Plaintiffs from pursuing false arrest claims or participating in the Mass Arrest Subclasses.

FN19. Although Plaintiffs are unlikely to prevail against the City on a *respondeat superior* theory, *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."), the Court declines to decide "any aspect of the merits unrelated to a Rule 23 requirement," *In re Initial Pub. Offerings,* 471 F.3d at 41.

FN20. (*See* Defs.' Opp'n 33 (arguing only that "joinder of the remaining plaintiffs arrested *at the Proposed False Arrest Subclass Locations ...* is not impracticable") (emphasis added).)

FN21. Because Defendants appear to confine their *Robidoux* numerosity arguments to the Mass Arrest Subclasses (*see* Defs.' Opp'n 33), the Court declines to reiterate the *Robidoux* analysis outlined in Part III.B.1.a above.

FN22. (*See, e.g.,* Defs.' Opp'n 53 ("not a single class representative has produced any evidence of injuries suffered" due to the holding cells at Pier 57); *id.* at 59 ("48 of the 49 plaintiffs deposed thus far in the RNC litigations have admitted that they had access to bathroom facilities while in custody"); *id.* at 61 ("not a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

single class representative has produced any evidence, nor have they specifically alleged, any constitutional injuries resulting from the lack of telephones" at Pier 57).)

FN23. The Court notes, however, that in order to avoid the "mini-trial" phenomenon (*see* Defs.' Opp'n 55–56), the factfinding inquiry will be limited to the use of flex cuffs as a matter of policy rather than the allegedly "excessive" tightness of the flex cuffs as applied by individual NYPD officers to individual Plaintiffs.

S.D.N.Y.,2011.

MacNamara v. City of New York
--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Deirdre MacNAMARA, et al., Plaintiffs,

v.

CITY OF NEW YORK, et al., Defendants.

No. 04 Civ. 9216(RJS)(JCF).

May 19, 2011.

**Background:** Group of arrestees during protests held in connection with national political convention in New York City brought putative class action against city, its mayor, and its police department and various police officials, alleging violations of First, Fourth, Sixth, and Fourteenth Amendments, and parallel state constitution provisions arising from their arrests. Arrestees moved to certify three classes, one of which comprised eight subclasses.

**Holdings:** The District Court, Richard J. Sullivan, J., held that:

(1) arrestees lacked standing to bring claims for declaratory and injunctive relief;

(2) named plaintiffs arrested while observing protest activity had standing to assert First Amendment claim on behalf of mass arrest subclass, whereas named plaintiff arrested while rollerblading for recreation and exercise did not, and First Amendment claims asserted by her subclass failed for lack of adequate class representative;

(3) while first and third mass arrest subclasses failed predominance requirement for maintainability, other mass arrest subclasses met all requirements for certification with respect to constitutional claims;

(4) court would decline to grant class certification with respect to supervisory liability, respondeat superior, and pendent state law claims on behalf of mass arrest subclasses, and all proposed classes;

(5) excessive detention class otherwise met all requirements for certification; and

(6) conditions of confinement class otherwise met all

requirements for certification.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **161.1**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General
    170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

If numerosity, commonality, typicality, and adequacy prerequisites are satisfied, proposed class must also qualify under at least one of the categories for maintainability before it may be certified as class action. Fed.Rules Civ.Proc.Rule 23(a, b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🔑 **172**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)2 Proceedings
    170Ak172 k. Evidence; Pleadings and Supplementary Material. Most Cited Cases

Each of the certification requirements of class action rule must be satisfied by a preponderance of the evidence, and burden to prove each element is on party seeking certification. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑 **161.1**

170A Federal Civil Procedure

 170AII Parties
  170AII(D) Class Actions
   170AII(D)1 In General

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

In order to certify class, court must resolve factual disputes relevant to each requirement and find that whatever underlying facts are relevant to particular requirement of class action rule have been established. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ☜    174**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)2 Proceedings
        170Ak174 k. Consideration of Merits. Most Cited Cases

Although requirements for class certification may overlap with merits issues, district judge ruling on certification motion should not assess any aspect of the merits unrelated to a requirement of class action rule. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜    162**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak162 k. Discretion of Court. Most Cited Cases
**Federal Civil Procedure 170A ☜    173**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)2 Proceedings
        170Ak173 k. Hearing and Determination; Decertification; Effect. Most Cited Cases

District court is afforded broad discretion in class certification questions due to fact that district court is often in best position to assess propriety of class action and has ability to alter or modify class, create subclasses, and decertify class whenever warranted. Fed.Rules

Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ☜    163**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases
**Federal Civil Procedure 170A ☜    164**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak164 k. Representation of Class; Typicality. Most Cited Cases
**Federal Civil Procedure 170A ☜    165**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Proposed class must satisfy four prerequisites in order to qualify for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☜    163**

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases

Certification prerequisite that proposed class is so numerous that joinder of each member is "impracticable"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

does not mean impossible; rather, impracticability exists where individual adjudication would take an extended period of time and joinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[8]** Federal Civil Procedure 170A ⚷ **163**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases
    Courts will generally find that "numerosity" requirement for class certification is satisfied when class comprises 40 or more members and not satisfied when class comprises 21 or fewer, and in deciding numerosity, particularly in gray area between those parameters, courts must consider factors other than class size; additional factors include (1) judicial economy of avoiding multiple suits, (2) geographic dispersion of proposed class members, (3) financial resources of proposed class members, (4) ability of proposed class members to file individual suits, and (5) requests for prospective injunctive relief which would involve future class members. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[9]** Federal Civil Procedure 170A ⚷ **165**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
    "Commonality" requirement for class certification does not mean that all issues must be identical as to each member, but requires that plaintiffs identify some unifying thread among members' claims that warrants class treatment; single common issue of law may be sufficient to satisfy commonality requirement where common question is at core of cause of action alleged. Fed.Rules

Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[10]** Federal Civil Procedure 170A ⚷ **164**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak164 k. Representation of Class; Typicality. Most Cited Cases
    "Typicality" prong of class action rule requires that each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[11]** Federal Civil Procedure 170A ⚷ **164**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak164 k. Representation of Class; Typicality. Most Cited Cases
    Plaintiff's claims are "typical" of class claims where plaintiff's and class members' injuries derive from unitary course of conduct by single system. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[12]** Federal Civil Procedure 170A ⚷ **164**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak164 k. Representation of Class; Typicality. Most Cited Cases
    Typicality criterion for class certification does not require that factual predicate of each claim be identical to that of all class members; when it is alleged that same unlawful conduct was directed at or affected both named plaintiff and class sought to be represented, typicality requirement is usually met irrespective of minor variations in fact patterns underlying individual claims. Fed.Rules

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[13]** Federal Civil Procedure 170A ⌐⌐⊃ 164

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak164 k. Representation of Class;
Typicality. Most Cited Cases
**Federal Civil Procedure 170A** ⌐⌐⊃ 165

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common Interest in Subject
Matter, Questions and Relief; Damages Issues. Most Cited
Cases
    Commonality and typicality requirements for class
certification often tend to merge into one another, so that
similar considerations animate the analysis of both;
although court will consider the two requirements
separately, both inquiries serve as guideposts for class
certification inquiry. Fed.Rules Civ.Proc.Rule 23(a)(2, 3),
28 U.S.C.A.

**[14]** Federal Civil Procedure 170A ⌐⌐⊃ 164

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak164 k. Representation of Class;
Typicality. Most Cited Cases
    In order for class representative to meet "adequacy"
requirement for class certification, class members must not
have interests that are antagonistic to one another and
class counsel must be qualified, experienced, and able to
conduct litigation. Fed.Rules Civ.Proc.Rule 23(a), 28
U.S.C.A.

**[15]** Federal Civil Procedure 170A ⌐⌐⊃ 164

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak164 k. Representation of Class;
Typicality. Most Cited Cases
    Adequacy inquiry serves to uncover conflicts of
interest between named parties and class they seek to
represent; however, in order to defeat motion for class
certification, conflict must be fundamental. Fed.Rules
Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[16]** Declaratory Judgment 118A ⌐⌐⊃ 305

118A Declaratory Judgment

  118AIII Proceedings
    118AIII(C) Parties
      118Ak305 k. Representative or Class Actions.
Most Cited Cases
**Federal Civil Procedure 170A** ⌐⌐⊃ 165

170A Federal Civil Procedure

  170AII Parties
    170AII(D) Class Actions
      170AII(D)1 In General
        170Ak165 k. Common Interest in Subject
Matter, Questions and Relief; Damages Issues. Most Cited
Cases
    Class action maintainable on ground that party
opposing class has acted or refused to act on grounds that
apply generally to class is intended for cases where broad,
classwide injunctive or declaratory relief is necessary to
redress groupwide injury; it does not extend to cases in
which appropriate final relief relates exclusively or
predominantly to money damages. Fed.Rules
Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[17]** Declaratory Judgment 118A ⌐⌐⊃ 305

118A Declaratory Judgment

  118AIII Proceedings
    118AIII(C) Parties
      118Ak305 k. Representative or Class Actions.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Most Cited Cases
**Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Second Circuit has adopted ad hoc approach to evaluating predominant type of final relief sought in proposed class action under which district court should, at minimum, determine that (1) reasonable plaintiffs would bring suit to obtain injunctive or declaratory relief sought even in absence of possible monetary recovery and (2) injunctive or declaratory relief sought would be both reasonably necessary and appropriate were plaintiffs to succeed on the merits; insignificant or sham requests for injunctive relief should not provide cover for certification of claims that are brought essentially for monetary recovery. Fed.Rules Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[18] Federal Civil Procedure 170A** ☞ **177.1**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)2 Proceedings
          170Ak177 Notice and Communications
            170Ak177.1 k. In General. Most Cited Cases

To alert class members to their right to opt out, class action rule requires the best notice that is practicable under the circumstances. Fed.Rules Civ.Proc.Rule 23(c)(2)(B), 28 U.S.C.A.

**[19] Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Inquiry into whether common questions predominate over any questions affecting only individual class members tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation; "predominance" requirement is met if plaintiff can establish that issues in class action that are subject to generalized proof, and thus applicable to class as whole, predominate over those issues that are subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[20] Federal Civil Procedure 170A** ☞ **165**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Although predominance inquiry at maintainability stage of class certification is more demanding than commonality inquiry at prior stage, mere existence of individualized defenses does not preclude finding of predominance; as long as sufficient constellation of common issues binds class members together, variations in sources and application of defense will not automatically foreclose class certification on this basis. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.

**[21] Federal Civil Procedure 170A** ☞ **161.2**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)1 In General
          170Ak161.2 k. Superiority, Manageability, and Need in General. Most Cited Cases

"Superiority" analysis for maintaining class action requires courts to consider four nonexclusive factors: (1) interest of class members in controlling litigation of separate actions, (2) extent and nature of any litigation concerning controversy already begun by or against class

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

members, (3) desirability or undesirability of concentrating litigation of claims in particular forum, and (4) likely difficulties in managing class action. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[22] Federal Civil Procedure 170A ☞ 103.2**

170A Federal Civil Procedure

    170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
    Whether plaintiff has standing is threshold question in every federal case, determining power of court to entertain suit.

**[23] Federal Civil Procedure 170A ☞ 103.2**

170A Federal Civil Procedure

    170AII Parties
      170AII(A) In General
        170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
    To satisfy constitutional standing requirements, plaintiff must allege, inter alia, that he has suffered an injury in fact which is (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[24] Federal Civil Procedure 170A ☞ 103.7**

170A Federal Civil Procedure

    170AII Parties
      170AII(A) In General
        170Ak103.7 k. Class Actions. Most Cited Cases

**Federal Civil Procedure 170A ☞ 164**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions

      170AII(D)1 In General
        170Ak164 k. Representation of Class; Typicality. Most Cited Cases
    Actual injury requirement for standing is no less applicable to class action than to other suits; accordingly, if none of named plaintiffs purporting to represent class establishes the requisite injury, none may seek class action relief. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[25] Injunction 212 ☞ 114(2)**

212 Injunction

    212III Actions for Injunctions
      212k114 Parties
        212k114(2) k. Complainants. Most Cited Cases
    In order to meet constitutional minimum of standing to seek injunctive relief, plaintiff must carry burden of establishing that he has sustained or is immediately in danger of sustaining some direct injury as result of challenged official conduct and in so doing cannot rely on past injury to satisfy injury requirement but must show likelihood that he will be injured in the future; accordingly, plaintiff seeking injunctive relief must demonstrate both likelihood of future harm and existence of official policy or its equivalent.

**[26] Declaratory Judgment 118A ☞ 305**

118A Declaratory Judgment

    118AIII Proceedings
      118AIII(C) Parties
        118Ak305 k. Representative or Class Actions. Most Cited Cases

**Federal Civil Procedure 170A ☞ 186.10**

170A Federal Civil Procedure

    170AII Parties
      170AII(D) Class Actions
        170AII(D)3 Particular Classes Represented
          170Ak186.10 k. Prisoners and Inmates. Most Cited Cases
    Arrestees during protests held in connection with national political convention in New York City who were seeking to maintain class action on ground that injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

or declaratory relief was appropriate respecting class as whole failed to demonstrate likelihood of future harm and therefore lacked standing to seek injunctive relief; conclusory allegations that arrest and detention policies were ongoing and that several class representatives "plan to attend demonstrations in New York in the future" were insufficient. Fed.Rules Civ.Proc.Rule 23(b)(2), 28 U.S.C.A.

**[27]** Constitutional Law 92 ☞ 1490

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
            92XVIII(A)1 In General
                92k1490 k. In General. Most Cited Cases
**Constitutional Law 92 ☞ 1502**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
            92XVIII(A)1 In General
                92k1502 k. Receipt of Information or Ideas; Listeners' Rights. Most Cited Cases

First Amendment protects and promotes interests of audience, which have primary interest in having information readily available to it, as well as speaker. U.S.C.A. Const.Amend. 1.

**[28]** Constitutional Law 92 ☞ 859

92 Constitutional Law

    92VI Enforcement of Constitutional Provisions
        92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
            92VI(A)9 Freedom of Speech, Expression, and Press
                92k858 Criminal Law
                92k859 k. In General. Most Cited Cases
**Federal Civil Procedure 170A ☞ 186.10**

170A Federal Civil Procedure

    170AII Parties

170AII(D) Class Actions
    170AII(D)3 Particular Classes Represented
        170Ak186.10 k. Prisoners and Inmates. Most Cited Cases

In proposed class action by persons arrested during protests held in connection with national political convention in New York City, named plaintiffs who were arrested while observing protest activity at national political convention had standing to assert First Amendment free speech claim on behalf of mass arrest subclass, whereas named plaintiff who was arrested while rollerblading for recreation and exercise did not. U.S.C.A. Const.Amend. 1.

**[29]** Federal Civil Procedure 170A ☞ 163

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak163 k. Impracticability of Joining All Members of Class; Numerosity. Most Cited Cases
**Federal Civil Procedure 170A ☞ 180**

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak180 k. Options; Withdrawal. Most Cited Cases

Under class action rule, individuals are considered class members until they opt out of suit, and mere possibility that members of potential class may choose to opt out in the future is not enough to preclude finding of numerosity. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[30]** Federal Civil Procedure 170A ☞ 186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Most Cited Cases

Existence of parallel actions by prospective subclass members did not defeat finding of numerosity at class certification stage in action by persons who were subject to mass arrest during protests held in connection with national political convention in New York City; in addition to raw number of plaintiffs included in each subclass the class members appeared to be geographically dispersed, and fact that some individuals within subclasses possessed the inclination and resources to pursue their own claims should not deprive those without such resources of opportunity to pursue action. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[31]** Federal Civil Procedure 170A ⟜ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Mass arrest subclasses satisfied commonality prerequisite for certification, as numerous legal and factual issues united claims of the putative class members; these included whether, at time, date, and location of each subclass, defendants conducted mass arrests without individualized probable cause, whether defendants issued audible dispersal orders followed by reasonable opportunities to disperse, and whether defendants acted pursuant to unlawful policy or practice of indiscriminate mass arrest. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[32]** Federal Civil Procedure 170A ⟜ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Typicality prerequisite for certification was satisfied by mass arrest subclass members; because each of them was arrested at particular time, date and location in

connection with real or perceived protest activity at national political convention, subclass injuries derived from unitary course of conduct, and because each of them alleged defendants employed unlawful policy or practice of indiscriminate mass arrest, subclass claims relied on similar legal arguments to prove liability, and status of various class members as protestors, observers or bystanders did not render their claims atypical given that the same unlawful conduct was directed at or affected both named plaintiff and class sought to be represented. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[33]** Constitutional Law 92 ⟜ 859

92 Constitutional Law

92VI Enforcement of Constitutional Provisions
92VI(A) Persons Entitled to Raise Constitutional Questions; Standing
92VI(A)9 Freedom of Speech, Expression, and Press
92k858 Criminal Law
92k859 k. In General. Most Cited Cases
Federal Civil Procedure 170A ⟜ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Named plaintiff who was arrested during protests held in connection with national political convention in New York City while she was rollerblading for recreation and exercise lacked standing to assert First Amendment free speech claims on behalf of mass arrest subclass, and those claims failed for lack of adequate class representative. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[34]** Federal Civil Procedure 170A ⟜ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Proposed class counsel representing mass arrestees during protests held in connection with national political convention in New York City were qualified, experienced, and able to conduct litigation, and to extent named plaintiffs would also fairly and adequately represent the putative class members, adequacy prerequisite for subclass certification was satisfied. Fed.Rules Civ.Proc.Rule 23(a)(4), (g)(1), 28 U.S.C.A.

**[35]** Federal Civil Procedure 170A ☞ 165

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases

Predominance criterion for maintaining class action is more stringent and far more demanding than commonality prerequisite for certification, and to satisfy former plaintiff must establish not only existence of common questions, but predominance of such questions over other issues that are subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(a)(2), (b)(3), 28 U.S.C.A.

**[36]** Federal Civil Procedure 170A ☞ 161.1

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases

District courts should take full advantage of provision allowing action to be brought or maintained as class action with respect to particular issues to certify separate issues in order to reduce range of disputed issues in complex litigation and achieve judicial efficiencies. Fed.Rules Civ.Proc.Rule 23(c)(4), 28 U.S.C.A.

**[37]** Federal Civil Procedure 170A ☞ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

First and third subclasses of persons who were subject to mass arrest during protests held in connection with national political convention in New York City failed to satisfy predominance requirement for maintaining class action, as group arrests did not occur at their locations; there were no police barricades, assigned arresting officers, or incident commanders making group arrest decisions, and instead available facts indicated those arrests were conducted by officers exercising individual discretion rather than following mass arrest orders, and individualized probable cause inquiries would dictate course of litigation with respect to those subclasses. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[38]** False Imprisonment 168 ☞ 13

168 False Imprisonment

168I Civil Liability
168I(A) Acts Constituting False Imprisonment and Liability Therefor
168k9 Defenses
168k13 k. Probable Cause. Most Cited Cases

Probable cause is complete defense to individual false arrest claim.

**[39]** Federal Civil Procedure 170A ☞ 186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Fact that probable cause defense might arise and may affect different class members differently did not compel finding that individual issues predominated over common ones for purposes of determining maintainability of class action on behalf of mass arrest subclasses, nor did fact of conviction or guilty plea by subset of arrestees. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[40]** Federal Civil Procedure 170A  ⌐○  186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Despite predominance of common issues with respect to their constitutional claims, district court would decline to grant certification with respect to supervisory liability, respondeat superior, and pendent state law claims on behalf of mass arrest subclasses. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[41]** Civil Rights 78  ⌐○  1355

78 Civil Rights

    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General.
Most Cited Cases

Supervisor may not be held liable under § 1983 simply because one or more of his subordinates committed a constitutional tort; rather, plaintiff must establish affirmative causal link between supervisor's inaction and his injury. 42 U.S.C.A. § 1983.

**[42]** Federal Civil Procedure 170A  ⌐○  186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented

                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Class action was superior method of adjudicating constitutional claims on behalf of subclasses of persons who were subject to mass arrest during protests held in connection with national political convention in New York City. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[43]** Federal Civil Procedure 170A  ⌐○  186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Numerosity prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; of approximately 1,800 arrestees processed pursuant to Mass Arrest Processing Plan (MAPP), 1,480 were charged with more than violations and only 102 of those were not detained, leaving nearly 1400 class members. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[44]** Federal Civil Procedure 170A  ⌐○  186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Commonality prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; that class claimed common questions of whether defendants detained convention arrestees for unreasonable periods of time, whether such detention violated First, Fourth, or Fourteenth Amendments, and whether it resulted from municipal policy or practice. U.S.C.A. Const.Amends. 1, 4, 14;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[45]** Federal Civil Procedure 170A ⟶      186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases
    Typicality prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; all members of "Excessive Detention" class were processed pursuant to Mass Arrest Processing Plan (MAPP), and as result claims arose from the same course of events and depended on the same legal arguments to prove liability. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[46]** Federal Civil Procedure 170A ⟶      186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases
    Adequacy prerequisite for certification was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; because named plaintiffs were detained alongside prospective class members, they clearly possessed the same interest and suffered the same injury, and plaintiffs' counsel would supply full adequate legal representation. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[47]** Federal Civil Procedure 170A ⟶      186.10

170A Federal Civil Procedure

    170AII Parties

170AII(D) Class Actions
    170AII(D)3 Particular Classes Represented
        170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases
    Predominance requirement for maintainability was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; because excessive detention claims all arose out of design and implementation of Mass Arrest Processing Plan (MAPP), common questions and legal theories predominated, and defendants' argument that variance in arrestees' detention times was fatal to predominance inquiry applied only to Fourth Amendment claim, not claims under First and Fourteenth Amendments. U.S.C.A. Const.Amends. 1, 4, 14; Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[48]** Federal Civil Procedure 170A ⟶      186.10

170A Federal Civil Procedure

    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases
    Superiority requirement for maintainability was satisfied by class of persons asserting they were subjected to unreasonably prolonged detention after their arrests during protests held in connection with national political convention in New York City; existence of parallel suits filed by significant minority of arrestees indicated some interest in controlling prosecution of separate actions, given related status of all the actions, the inevitable concentration of the litigation in the Southern District of New York remained neutral factor in superiority analysis, and there was little difficulty in managing "Excessive Detention Class" on issue of liability, since individualized inquiries would primarily relate to damages calculations. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[49]** Federal Civil Procedure 170A ⟶      186.10

170A Federal Civil Procedure

    170AII Parties

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Numerosity prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; out of approximately 1,800 arrestees, all but 102 were allegedly handcuffed with plastic flex cuffs and detained at one location. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[50]** Federal Civil Procedure 170A  186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Commonality prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; arrestees' detention at one location subjected them to host of common conditions, including prolonged handcuffing, inadequate seating and sanitary facilities, and exposure to various chemicals. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[51]** Federal Civil Procedure 170A  186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Typicality prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; all class members

were handcuffed with plastic flex cuffs and detained at one location. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[52]** Federal Civil Procedure 170A  186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Adequacy prerequisite for certification was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; because all class members were detained under substantially common conditions at the same location, named plaintiffs suffered the same injury as absent class members, and class counsel was qualified, experienced, and able to conduct litigation. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[53]** Federal Civil Procedure 170A  186.10

170A Federal Civil Procedure

170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases

Predominance requirement for maintainability was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; while details of individual detention experiences may have varied, overall conditions at location where they were detained were sufficiently similar to warrant class adjudication. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[54]** Federal Civil Procedure 170A  186.10

170A Federal Civil Procedure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

170AII Parties
    170AII(D) Class Actions
        170AII(D)3 Particular Classes Represented
            170Ak186.10 k. Prisoners and Inmates.
Most Cited Cases
    Superiority requirement for maintainability was satisfied by class of persons asserting they were subjected to cruel and inhumane confinement conditions resulting from their arrests during protests held in connection with national political convention in New York City; certifying as to liability would permit hundreds of conditions claims to be resolved in single proceeding. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Jonathan C. Moore and Clare Rivka Norins, Beldock Levine & Hoffman LLP, New York, NY, for Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City of New York, and Curt Peter Beck, Jeffrey Anthony Dougherty, Peter Gerard Farrell, Tonya Jenerette, and Raju Sundaran, Assistant Corporation Counsel of the City of New York, New York, NY, for Defendants.

## OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

    **\*1** Plaintiffs are a group of 24 individuals who were arrested by the New York City Police Department (the "NYPD") in connection with a series of protests held during the 2004 Republican National Convention (the "RNC"), Plaintiffs bring this putative class action against Defendants the City of New York (the "City") and numerous New York City officials and police officers, alleging violations of their rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as various state law claims. Specifically, Plaintiffs contend that Defendants subjected them to indiscriminate mass arrests without individualized probable cause, unreasonably prolonged detention, and cruel and inhumane confinement conditions.

    Before the Court is Plaintiffs' motion to certify three classes, one of which comprises eight subclasses, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. For the reasons that follow, Plaintiffs' motion for class certification is granted in part and denied in part.

## I. BACKGROUND[FN1]

    This action is part of a larger group of cases relating to mass protests that occurred immediately prior to and during the RNC, which was held at Madison Square Garden from August 30, 2004 to September 2, 2004. These cases have been assigned to this Court as related and consolidated for discovery purposes. Because the Court presumes the parties' familiarity with the facts and procedural history of this action, the Court will briefly recite only those facts necessary to the resolution of the instant motion.

### A. Parties

    Plaintiffs bring this action individually and on behalf of approximately 1,800 individuals who were arrested immediately prior to or during the RNC. (SAC ¶ 1.) The proposed Mass Arrest Subclasses include all persons arrested during the Class Period at eight specified locations, dates, and times. (*Id.* ¶ 52(a).) The proposed Excessive Detention Class includes all persons arrested during the Class Period who were processed pursuant to the RNC Mass Arrest Processing Plan ("MAPP") and detained at Pier 57. (*Id.* ¶ 52(b).) The proposed Conditions of Confinement Class includes all persons arrested during the Class Period who were handcuffed with plastic flex cuffs and detained at Pier 57. (*Id.* ¶ 52(c).)

    Defendants include the City; Mayor Michael Bloomberg; NYPD Commissioner Raymond Kelly; Assistant Chief Terence Monahan; Inspector Thomas Galati ("Galati"); and various named and unnamed New York City officials and police officers (collectively, "Defendants").

### B. Facts

    Months before the scheduled start of the RNC, Defendants were aware that numerous political demonstrations were planned to coincide with the Convention. (*Id.* ¶ 63.) In anticipation of the expected volume of protest activity, the City began to prepare for any arrests and prosecutions that might follow the RNC demonstrations. (*Id.* ¶ 65.) Plaintiffs allege that the contingency plans and arrest procedures developed by the NYPD were designed to discourage political protest and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

slow down the processing of individuals arrested during the RNC in order to maximize the amount of time the arrestees would be held in detention. (*Id.* ¶ 67.)

### 1. Mass Arrests

**\*2** During the RNC, Defendants allegedly employed an indiscriminate mass arrest policy to arrest large groups of people who were engaging in protected First Amendment activity, observing such activity, or simply passing by at the time of the arrests. (*Id.* ¶ 72.) The alleged policy involved, *inter alia,* the use of mesh netting or lines of police officers to corral large groups of protestors or perceived protestors; failure to distinguish bystanders, media personnel, and legal observers from the corralled groups prior to effecting arrests; failure to give dispersal orders that were audible to prospective arrestees; and failure to provide a reasonable opportunity to disperse. (*Id.* ¶ 73.) Plaintiffs allege that they were subjected to the mass arrest policy at the following locations:

### a. Mass Arrest Subclass One

On August 27, 2004, on Seventh Avenue between 34th and 35th Streets, between 6:30 p.m. and 9:30 p.m., the NYPD arrested individuals who were or were perceived to be participating in a monthly bike event known as "Critical Mass." (*Id.* ¶¶ 52(a), 74(A).) To effectuate these arrests, Defendants used mesh nets and lines of police officers on foot or on scooters to trap and arrest groups of cyclists. (*Id.* ¶ 74(A).) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Michael Binder, a cyclist who was arrested at the intersection of Seventh Avenue and 35th Street. (*Id.* ¶¶ 116–17.) While stopped at a red light, Binder observed NYPD officers arresting a number of cyclists and pulled out his camera to take a photograph of the intersection. (*Id.* ¶¶ 117–18.) As soon as Binder had taken the photograph, Defendants removed him from his bicycle, forced him to the ground, and handcuffed him. (*Id.* ¶ 119.) Binder was thereafter detained for approximately 16–20 hours. (*Id.* ¶ 116.)

### b. Mass Arrest Subclass Two

On August 27, 2004, on 35th Street between Tenth Avenue and Dyer Avenue, between 8:00 p.m. and 11:00

p.m., the NYPD arrested individuals who were or were perceived to be participating in the Critical Mass bike event. (*Id.* ¶¶ 52(a), 74(A).) Defendants allegedly effectuated the arrests at this site by trapping cyclists between two lines of police officers. (*Id.* ¶ 74(B).) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Elizabeth Fleischman, a Critical Mass cyclist who was arrested on 35th Street between Tenth Avenue and Dyer Avenue. (*Id.* ¶¶ 141–42.) After directing Fleischman and other cyclists onto 35th Street, NYPD officers barricaded the entrances and exits at both 10th Avenue and Dyer Avenue, thereby preventing the Critical Mass cyclists from leaving the scene. (*Id.* ¶ 143.) Fleischman was arrested, handcuffed, and transported to the detention facility at Pier 57, where she was detained for approximately 20 hours. (*Id.* ¶¶ 141, 143.)

### c. Mass Arrest Subclass Three

**\*3** On August 27, 2004, on Second Avenue between 9th and 10th Streets, between 8:00 p.m. and 11:00 p.m., the NYPD arrested individuals who were or were perceived to be participating in the Critical Mass bike event. (*Id.* ¶¶ 52(a), 74(A).) Plaintiffs allege that the arrestees at the Second Avenue site were given no dispersal order or meaningful opportunity to disperse. (*Id.* ¶ 74(C).)

Among those arrested was Plaintiff Randall Steketee, who was arrested near the intersection of Second Avenue and 10th Street while riding his bike home from a play. (*Id.* ¶¶ 74(C), 195.) Steketee rode to the intersection of Second Avenue and 9th Street to observe the crowd, but found his path blocked by a row of police officers when he attempted to leave. (*Id.* ¶ 196.) Although Steketee explained that he was not participating in any protest or demonstration, he was arrested, handcuffed, and transported to Pier 57, where he was detained for approximately 33 hours. (*Id.* ¶¶ 195–97, 199.)

### d. Mass Arrest Subclass Four

On August 29, 2004, on 37th Street between Seventh Avenue and Broadway, between 12:00 p.m. and 3:00 p.m., the NYPD arrested individuals who were riding bikes,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

rollerblading, or walking in the vicinity. (*Id.* ¶¶ 52(a), 74(E).) Once again, Plaintiffs allege that NYPD officers used mesh nets and police lines to surround the arrestees and failed to provide a meaningful opportunity to disperse prior to making the arrests. (*Id.* ¶ 74(E).)

Among those arrested was Plaintiff Carolyne Ali–Khan, who was arrested near the intersection of 37th Street and Broadway while she was rollerblading in the area. (*Id.* ¶¶ 100–01.) Ali–Khan and a group of cyclists were penned in by NYPD officers, ordered onto the sidewalk, and placed under arrest. (*Id.* ¶¶ 101–02.) Ali–Khan was then handcuffed and transported to Pier 57, where she was detained for approximately 28–29 hours. (*Id.* ¶¶ 100, 102–03.)

### e. Mass Arrest Subclass Five

On August 31, 2004, on Fulton Street between Church Street and Broadway, between 4:00 p.m. and 7:00 p.m., the NYPD arrested more than 200 individuals who were or were perceived to be participating in a march organized by the War Resisters League (the "WRL"). (*Id.* ¶¶ 52(a), 74(F).) Following negotiations between the demonstrators and various NYPD officers, Inspector Galati announced that the march would be permitted so long as participants did not block traffic and obeyed traffic signals at all intersections. (*Id.* ¶ 74(F).) The march had proceeded for less than a block when NYPD officers halted the demonstration, surrounded more than 200 people with mesh nets, and placed them under arrest. (*Id.*) Plaintiffs allege that the arrestees were not given reasonably audible dispersal orders or a meaningful opportunity to disperse. (*Id.*)

Among those arrested were Plaintiffs Simon Harak, Diana Raimondi, and William Steyert, Jr., who had attended a vigil at the World Trade Center site before joining the WRL march. (*Id.* ¶¶ 74(F), 156–58, 186–87, 201–02.) Harak was thereafter detained for approximately 20–25 hours (*id.* ¶ 156), Raimondi for approximately 50–52 hours (*id.* ¶ 186), and Steyert for approximately 16–17 hours (*id.* ¶ 201).

### f. Mass Arrest Subclass Six

*4 On August 31, 2004, on 16th Street between Union Square East and Irving Place, between 7:00 p.m.

and 10:00 p.m., the NYPD arrested individuals who were participating in, observing, or standing in the vicinity of a march that began in Union Square Park. (*Id.* ¶¶ 52(a), 74(G).) At the direction of NYPD officers, the demonstrators turned east onto 16th Street, where they were barricaded by a line of police officers who refused to allow them to exit. (*Id.* ¶ 74(G).) Everyone trapped on that block of 16th Street—including protestors, observers, and bystanders—was placed under arrest. (*Id.*) Plaintiffs allege that the arrestees were given no dispersal order or meaningful opportunity to disperse. (*Id.*)

Among those arrested were Plaintiffs Erika Biddle, Sonia Chandra, Emily Friedman, Deepa Majmudar, Celine Malanum, and Danielle Walsh. (*Id.*) Biddle was thereafter detained for approximately 50–52 hours (*id.* ¶ 110); Chandra for approximately 35–40 hours (*id.* ¶ 123); Friedman for approximately 45–50 hours (*id.* ¶ 146); Majmudar for approximately 45–50 hours (*id.* ¶ 177); Malanum for approximately 35–40 hours (*id.* ¶ 182); and Walsh for approximately 48 hours (*id.* ¶ 218).

### g. Mass Arrest Subclass Seven

On August 31, 2004, on 17th Street between Fifth Avenue and Broadway, between 8:00 p.m. and 10:00 p.m., the NYPD arrested a group of individuals that included both protestors en route to the "Free Speech Zone" at Madison Square Garden and bystanders who happened to be in the vicinity.[FN2] (*Id.* ¶¶ 52(a), 74(H).) At the direction of NYPD officers, these individuals turned west onto 17th Street, where they were stopped by a police line in full riot gear and told they could go no further. (*Id.* ¶¶ 74(H), 171.) After complying with orders to form a line and then move to the sidewalk, they were surrounded by police officers and arrested. (*Id.* ¶ 74(H).) Plaintiffs allege that the arrestees were neither ordered to disperse nor advised that they were in violation of any New York law or ordinance. (*Id.*)

Among those arrested were Plaintiff Deirdre MacNamara, who was in the area after browsing at the Barnes & Noble bookstore in Union Square (*id.* ¶¶ 170–71), and Plaintiff Rebecca Stoneback, who had traveled to New York City from her home in Asbury, New Jersey to participate in the RNC demonstrations (*id.* ¶¶ 205–06). Both MacNamara and Stoneback were handcuffed, transported to Pier 57, and detained for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

approximately 45–50 hours. (*Id.* ¶¶ 170–75, 205–08.)

### h. Mass Arrest Subclass Eight

On August 31, 2004, on 35th Street between Fifth and Sixth Avenues, between 7:00 p.m. and 10:00 p.m., the NYPD arrested individuals who were participating in, observing, or standing in the vicinity of a march proceeding west on 35th Street. (*Id.* ¶¶ 52(a), 74(J).) As these individuals traveled along 35th Street, they were stopped by a police line and told they could go no further. (*Id.* ¶ 74(J).) When they turned around to leave, they were blocked by another line of police officers on scooters and then arrested. (*Id.*) Plaintiffs allege that the arrestees were given no dispersal order and no meaningful opportunity to disperse. (*Id.*)

**\*5** Among those arrested were Plaintiff Jason Barrus, an RNC protestor (*id.* ¶¶ 105–06); Plaintiff Shahrzad Ghahremani–Ghadjar, a 15–year–old on her way to a movie theater (*id.* ¶¶ 151–52); and Plaintiff William Hobbs, a real estate agent on his way home from work (*id.* ¶¶ 165–66). Barrus was thereafter detained for 46 hours (*id.* ¶ 105), Ghahremani–Ghadjar for approximately four hours (*id.* ¶ 151), and Hobbs for approximately 36 hours (*id.* ¶ 165).

### 2. Excessive Detention

Plaintiffs further allege that Defendants implemented policies and practices designed to detain the RNC arrestees for unnecessary and prolonged periods of time in order to prevent them from participating in further demonstration or protest activity during the RNC. (*Id.* ¶ 91.) The alleged policies included, *inter alia,* (1) a "no summons" policy requiring custodial arrest for all RNC arrestees, no matter how minor the infraction (*id.*); (2) a blanket fingerprinting policy for RNC arrestees, despite the fact that the "overwhelming majority" were detained only on minor violations for which fingerprinting is not typically required (*id.* ¶¶ 91, 93); [FN3] (3) the use of a post-arrest staging facility without fingerprinting equipment (*id.* ¶¶ 91–92); and (4) the practice of requiring completed criminal background checks from both the New York State Division of Criminal Justice Services and the Federal Bureau of Investigation prior to arraignment (*id.* ¶ 91). Plaintiffs allege that these and similar procedures

unnecessarily and unreasonably extended the period of time the RNC arrestees spent in custody. (*Id.*)

### 3. Conditions of Confinement

Finally, Plaintiffs allege that Defendants implemented policies and practices designed to detain RNC arrestees in cruel and inhumane conditions both at the arrest sites and at Pier 57. (*Id.* ¶¶ 76–77.) During the mass arrests described above, Plaintiffs were handcuffed with plastic flex cuffs and remained in handcuffs for hours thereafter as they awaited transport to Pier 57. (*Id.* ¶ 89.) In some cases, the arrestees remained in handcuffs even after they arrived at the detention facility. (*Id.*) Numerous Plaintiffs allege that the excessively tight and prolonged handcuffing caused extreme pain, discomfort, numbness, bruising, and discoloration. (*See, e.g., id.* ¶¶ 103, 108, 113, 125, 130.)

Plaintiffs were then transported to the "Post Arrest Staging Site" at Pier 57, an empty storage facility on the west side of Manhattan that had previously been used to house City buses. (*Id.* ¶ 77.) Defendants had entered an agreement to use Pier 57 as a detention center during the RNC on July 28, 2004—a month before the start of the Convention. (*Id.* ¶ 78.) Although recent environmental reports on the facility had identified the presence of asbestos, the prevalence of oily waste on the concrete floors, and code deficiencies with the electrical, plumbing, and fire protection systems, Defendants failed to undertake an environmental review of the premises or obtain a certificate of occupancy. (*Id.* ¶¶ 77–78.) Instead, Defendants prepared Pier 57 for use as a detention facility by constructing holding cells using chain-link fence topped with razor wire. (*Id.* ¶ 79.)

**\*6** Upon arrival at Pier 57, Plaintiffs were searched, their property was confiscated, and they were placed in the makeshift holding cells. (*Id.* ¶ 80.) Because there were not enough benches in each cell, many arrestees were forced to sit in the "oily filth" on the floor, and in some cases developed rashes and blisters as a result. (*Id.* ¶ 82.) Due to the poor air quality, many arrestees developed stinging eyes and coughs or breathing difficulties. (*Id.*) Because the restroom facilities at Pier 57 were "grossly inadequate," arrestees were also required to wait in line for many hours to use the portable lavatories put in place for the RNC. (*Id.* ¶ 85.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

In addition to their complaints about the physical conditions at Pier 57, Plaintiffs claim that Defendants denied or ignored their requests for medical attention and access to medication (*id.* ¶ 82); access to telephones (*id.* ¶ 84); and access to attorneys (*id.* ¶ 86). Plaintiffs further allege that Defendants harassed, humiliated, embarrassed, and, in one instance, sexually harassed the RNC arrestees. (*Id.* ¶¶ 87–88, 184.)

### C. Procedural History

Plaintiffs commenced this action by filing a Complaint in the Southern District of New York on November 22, 2004. By Order filed September 21, 2005, this action was consolidated with 43 other cases—involving approximately 226 named plaintiffs—related to RNC protest and arrest activity. The consolidated cases were referred to the Honorable James C. Francis, Magistrate Judge, for discovery purposes. Plaintiffs filed an Amended Complaint on July 15, 2005, an initial motion for class certification on January 31, 2007,[FN4] and a further motion to amend on August 27, 2007. The case was reassigned to my docket on October 2, 2007.

Judge Francis granted partial leave to amend by Order dated January 23, 2008, and Plaintiffs filed a Second Amended Complaint (the "SAC") on January 29, 2008. The SAC primarily alleges violations of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, but also includes facial and as-applied challenges to New York City Administrative Code § 10–110 and New York Penal Law § 240.20(5)–(6), as well as supervisory liability, *respondeat superior,* and pendent state law claims. The parties filed supplemental briefs tailoring the outstanding class certification motion to the SAC. The supplemental briefs were fully submitted on March 7, 2008.[FN5]

By Order dated March 16, 2010, the Court denied the motion for class certification without prejudice to renewal in light of the petition for a writ of mandamus then pending before the Second Circuit regarding the disclosure of confidential NYPD intelligence documents prepared for the RNC.[FN6] Plaintiffs thereafter renewed their motion, and the Court held oral argument on May 21, 2010. By letter dated May 3, 2011, counsel in two related RNC cases

indicated that fact discovery in all consolidated RNC cases would conclude within the next several weeks. By endorsement dated May 9, 2011, Judge Francis ordered the parties in all consolidated RNC cases to appear for a discovery conference on May 26, 2011.

### II. LEGAL STANDARDS

**\*7** [1] Rule 23 of the Federal Rules of Civil Procedure governs class certification. In order to proceed as a class action, the proposed class must meet the following Rule 23(a) prerequisites:

(1) [T]he class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see also* *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 98–99 (2d Cir.2007). If the Rule 23(a) criteria are satisfied, the proposed class must also qualify under at least one of the categories provided in Rule 23(b) before it may be certified as a class action. *See* *Cordes,* 502 F.3d at 104. In this case, Plaintiffs seek certification under Rules 23(b)(2) and 23(b)(3). (Pls.' Mem. 1.)

[2][3][4][5] Each of the Rule 23 requirements must be satisfied by a preponderance of the evidence, *see* *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008), and the burden to prove each element is on the party seeking certification, *see* *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In order to certify a class, the Court must "resolve [ ] factual disputes relevant to each Rule 23 requirement" and find that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 41 (2d Cir.2006). Although Rule 23 requirements may overlap with merits issues, "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Id.* Moreover, the district court is afforded broad discretion in class certification questions due to the fact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

that "the district court is often in the best position to assess the propriety of the class [action] and has the ability ... to alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.,* 262 F.3d 134, 139 (2d Cir.2001).

### A. Rule 23(a) Requirements

[6] As previously noted, a proposed class must satisfy the following four prerequisites in order to qualify for class certification: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed.R.Civ.P. 23(a); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 504 F.3d 229, 244 (2d Cir.2007).

#### 1. Numerosity

[7] Under the first prong of Rule 23(a), a plaintiff must establish that the proposed class is "so numerous that joinder of each member is impracticable." Fed.R.Civ.P. 23(a). "Impracticable does not mean impossible." *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). Rather, "[i]mpracticability exists where individual adjudication would take an extended period of time," *Savino v. Computer Credit, Inc.,* 173 F.R.D. 346, 351 (E.D.N.Y.1997), and "[j]oinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible," *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992).

**\*8** [8] Courts will generally find that the numerosity requirement is satisfied when a class comprises 40 or more members, *see Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995), and not satisfied when the class comprises 21 or fewer, *see Ansari v. N.Y. Univ.,* 179 F.R.D. 112, 114 (S.D.N.Y.1998). In deciding numerosity, particularly in the "gray area" between these parameters, courts must consider factors other than class size. *See id.* Those additional factors include (1) the judicial economy of avoiding multiple suits; (2) the geographic dispersion of the proposed class members; (3) the financial resources of the proposed class members; (4) the ability of the proposed class members to file individual suits; and (5) requests for prospective injunctive relief which would involve future class members. *See Robidoux,* 987 F.2d at 936.

#### 2. Commonality

[9] "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Cent. States,* 504 F.3d at 245 (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997)). "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 156 (S.D.N.Y.2008) (Lynch, J.) (quotation marks and alterations omitted). "A single common issue of law may be sufficient to satisfy the commonality requirement" where the common question is "at the core of the cause of action alleged." *Friedman–Katz v. Lindt & Sprungli (USA), Inc.,* 270 F.R.D. 150, 155 (S.D.N.Y.2010) (internal citations and quotation marks omitted).

#### 3. Typicality

[10][11][12] The typicality prong of Rule 23(a) requires that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir.2009) (quoting *Robidoux,* 987 F.2d at 936). A plaintiff's claims are typical of the class claims "where the plaintiff's and the class members' 'injuries derive from a unitary course of conduct by a single system.' " *Spicer v. Pier Sixty LLC,* 269 F.R.D. 321, 337 (S.D.N.Y.2010) (quoting *Marisol A.,* 126 F.3d at 377). However, "[t]he typicality criterion does *not* require that the factual predicate of each claim be identical to that of all class members." *Shakhnes ex rel. Shakhnes v. Eggleston,* 740 F.Supp.2d 602, 625 (S.D.N.Y.2010) (internal citations and quotation marks omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux,* 987 F.2d at 936–37.

[13] "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate [the] analysis' of both." *Brown v. Kelly,* 609 F.3d 467, 475 (2d Cir.2010) (quoting *Marisol*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

*A.,* 126 F.3d at 376); *see Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Although the Court will consider the two requirements separately, both inquiries "serve as guideposts" for the class certification inquiry. *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

### 4. Adequacy

**\*9** [14][15] Finally, Rule 23(a) requires class representatives who "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In order for a class representative to meet the adequacy requirement, "the class members must not have interests that are antagonistic to one another," *Brown,* 609 F.3d at 479 (internal citation and quotation marks omitted), and class counsel must be "qualified, experienced, and able to conduct the litigation," *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir.2000). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. "In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings,* 574 F.3d at 35 (internal quotation marks and citation omitted).

### B. Rule 23(b)(2) Requirements

[16] Under Rule 23(b)(2), plaintiffs seeking class certification must also show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). Thus, "[t]he (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro–North Commuter RR Co.,* 267 F.3d 147, 162 (2d Cir.2001). Although "the text of Rule 23(b)(2) is silent as to what extent—if at all—monetary relief may also be sought," *id.,* the advisory committee's note indicates that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages," Fed.R.Civ.P. 23(b)(2) advisory committee's note (1966).

[17] In *Robinson v. Metro–North Commuter Railroad*

*Company,* the Second Circuit adopted an ad hoc approach to evaluating predominance for purposes of Rule 23(b)(2). Under the *Robinson* balancing test, the district court should, at a minimum, determine that (1) reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought even in the absence of possible monetary recovery; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits. 267 F.3d at 164. "Insignificant or sham requests for injunctive relief should not provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery." Id.

### C. Rule 23(b)(3) Requirements

[18] Under Rule 23(b)(3), class certification is appropriate if common questions "predominate over any questions affecting only individual members" and if class resolution "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). To alert class members to their right to "opt out," Rule 23 also requires "the best notice that is practicable under the circumstances." Fed.R.Civ.P. 23(c)(2)(B); *see Amchem,* 521 U.S. at 617, 117 S.Ct. 2231.

### 1. Predominance

**\*10** [19][20] "As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Brown,* 609 F.3d at 476 (quoting *In re Nassau County Strip Search Cases,* 461 F.3d 219, 225 (2d Cir.2006)). "The predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *Cordes,* 502 F.3d 91, 107–08 (internal citation, quotation marks and alterations omitted). Although predominance "is a more demanding criterion than the commonality inquiry under Rule 23(a)," *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002), the mere existence of individualized defenses does not preclude a finding of predominance, *see Brown,* 609 F.3d at 485. "As long as a sufficient constellation of common issues binds class members

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* at 483 (internal citations and quotation marks omitted).

2. Superiority

[21] "For Rule 23(b)(3) certification to be proper, a class action also must be the most 'fair and efficient' method of resolving this case." *In re Nassau,* 461 F.3d at 230 (citing Fed.R.Civ.P. 23(b)(3)). The superiority analysis requires courts to consider four nonexclusive factors: (1) the interest of the class members in controlling the litigation of separate actions; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed.R.Civ.P. 23(b)(3).

D. Rule 23(g) Requirements

Rule 23(g) further provides that "a court that certifies a class must also appoint class counsel." Fed.R.Civ.P. 23(g)(1). In doing so, a court must consider the following: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1)(B).

III. DISCUSSION

Plaintiffs seek to certify eight Mass Arrest Subclasses, an Excessive Detention Class, and a Conditions of Confinement Class, each comprised of individuals who were arrested and detained by Defendants prior to or during the RNC.[FN7] In what follows, the Court considers each proposed class in the context of the certification requirements imposed by Rule 23.

A. Standing

**\*11** [22] As a preliminary matter, Defendants contend that Plaintiffs lack standing to maintain a class action for

(1) injunctive or declaratory relief under Rule 23(b)(2), and (2) First Amendment retaliation claims. Because whether a plaintiff has standing is "the threshold question in every federal case, determining the power of the court to entertain the suit," *In re Gucci,* 126 F.3d 380, 387–88 (2d Cir.1997) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)), the Court will examine these standing challenges at the outset.

[23][24] To satisfy constitutional standing requirements, a plaintiff must allege, *inter alia,* that he has suffered an "injury in fact" which is (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The actual injury requirement is no less applicable to a class action than to other suits. "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal citations and quotation marks omitted). Accordingly, if none of the named plaintiffs purporting to represent a class establishes the requisite injury, none may seek class action relief. *See O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

1. Declaratory and Injunctive Relief

[25] Under the aegis of Rule 23(b)(2), Plaintiffs seek both a declaratory judgment that the alleged policies, practices, and customs are unconstitutional and a permanent injunction against their continued implementation. (SAC ¶ 5.) "In order to meet the constitutional minimum of standing to seek injunctive relief, [a plaintiff] must carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' " *Shain v. Ellison,* 356 F.3d 211, 215 (2d Cir.2004) (quoting *City of L.A. v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). In doing so, he "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he ... will be injured in the future." *Deshawn E. by Charlotte E.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

*v. Safir,* 156 F.3d 340, 344 (2d Cir.1998). Accordingly, "a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." *Shain,* 356 F.3d at 216.

[26] Here, Plaintiffs contend that a likelihood of future harm exists because the alleged arrest and detention policies are ongoing, and because several class representatives "plan to attend demonstrations in New York in the future." (Pls.' Reply 37–38.) To support their assertion of likely future harm, Plaintiffs cite the depositions of RNC arrestees who have indeterminate future plans to participate in New York City protests (*see* Decl. of Clare Norins, July 23, 2007 ("Norins Decl."), Ex. 25, Steyert Tr. at 528:18–529:4) or do not plan "to avoid protest in New York City" (*id.* at Ex. 10, Fleischman Tr. at 367:21–25; *id.* at Ex. 24, Raimondi Tr. at 540:2–9).

*12 Such conclusory allegations are insufficient to establish the likelihood of a future encounter with the NYPD likely to result in unconstitutional arrests and detentions. That some Plaintiffs *may* participate in future demonstrations of unspecified date, duration, or scope does not translate into a "real and immediate threat of future injury." *Shain,* 356 F.3d at 215; *see Lyons,* 461 U.S. at 111, 103 S.Ct. 1660 ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen....") The chain of inferences required to find a sufficient threat of future injury on these facts is "simply too speculative and conjectural to supply a predicate for prospective injunctive relief." *Shain,* 356 F.3d at 216. Accordingly, the Court finds that Plaintiffs have failed to demonstrate a likelihood of future harm and therefore lack standing to seek injunctive relief. Because certification under Rule 23(b)(2) is appropriate only where injunctive or declaratory relief applies to the class as a whole, the Court denies the motion for class certification pursuant to Rule 23(b)(2).

### 2. First Amendment Claims

Defendants also challenge the First Amendment standing of RNC arrestees who were not engaged in protest activity at the time of their arrests. Specifically, Defendants note that Plaintiff Steketee of Subclass Three, Plaintiff Ali–Khan of Subclass Four, and Plaintiff

Malanum of Subclass Six all testified they were not involved in the demonstrations and were merely passing through the Subclass locations immediately prior to their arrests. (Defs.' Opp'n at 35.) Because these Plaintiffs "were not engaged in First Amendment activity," Defendants conclude that "they do not have standing to claim that [D]efendants acted in response to their exercise of First Amendment activity." (*Id.*)

[27][28] What Defendants fail to consider are the First Amendment rights of the audience, which "has a primary interest i[n] having information readily available to it." *Loper v. N.Y. City Police Dep't,* 802 F.Supp. 1029, 1042 (S.D.N.Y.1992). Because the First Amendment "protects and promotes" the interests of the audience as well as the speaker, *id.,* Plaintiffs who were present as observers of a political protest fall within the ambit of constitutional protection. In this case, Plaintiffs Steketee and Malanum were arrested while observing RNC protest activity (SAC ¶¶ 196, 183), while Plaintiff Ali–Khan was arrested while rollerblading for recreation and exercise (*id.* ¶ 101). Accordingly, the Court finds that Plaintiffs Steketee and Malanum have standing as audience members to pursue a First Amendment claim, but that Plaintiff Ali–Khan lacks standing to pursue a First Amendment claim on behalf of Subclass Four because she suffered no cognizable First Amendment injury.[FN8]

### B. Mass Arrest Subclasses

With these threshold matters resolved, the Court now proceeds to examine the Mass Arrest Subclasses, beginning with the Rule 23(a) prerequisites to certification.

### 1. Rule 23(a) Analysis

#### a. Numerosity

*13 As previously noted, the numerosity analysis begins with the presumption that a class comprising 40 or more members is generally sufficient. *See Consol. Rail Corp.,* 47 F.3d at 483 (noting that "numerosity is presumed at a level of 40 members"). Based on RNC arrest records produced during discovery (Pls.' Mem. 27), Plaintiffs here contend that each Mass Arrest Subclass comprises at least 40 putative class members (*id.* at 5–11).

[29] Defendants do not dispute the total number of RNC arrests, but instead challenge the numerosity of the

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Mass Arrest Subclasses based on the number of prospective class members who have filed suits on their own behalf. (Defs.' Opp'n 32.) Defendants argue that when each subclass is discounted by the number of class members who are named plaintiffs in other RNC actions, several subclasses drop below the presumptive threshold and no subclass is so numerous that joinder is impracticable. (Oral Arg. Tr., May 21, 2010 ("Tr."), at 56:20–57:25.) But Defendants supply no authority for the proposition that the existence of parallel actions should automatically reduce the number of prospective class members for purposes of the class certification inquiry. See *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 305 (S.D.N.Y.2003) (holding that "although scores of Individual Actions have been filed, the presence of those actions does not militate against class certification"). Under Rule 23, individuals are considered class members until they opt out of the suit, see *Cuzco v. Orion Builders, Inc.,* 477 F.Supp.2d 628, 632 n. 2 (S.D.N.Y.2007), and "the mere possibility that members of a potential class may choose to opt out in the future is not enough to preclude a finding of numerosity," ( *Gortat v. Capala Bros., Inc.,* No. 07 Civ. 3629 (ILG), 2010 WL 1423018, at *3 (E.D.N.Y. Apr. 9, 2010)). See *Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519, 533 (S.D.N.Y.1972). Accordingly, the Court adopts the subclass calculations derived from the RNC arrest records and the corresponding presumption that numerosity is satisfied.

Because a determination of practicability does not hinge on "mere numbers," Defendants also appeal to the *Robidoux* numerosity factors. *Robidoux,* 987 F.2d at 936. With respect to the first factor, they argue that the prevalence of parallel individual suits undermines the judicial economy of a class resolution. (Defs.' Opp'n 32.) As an initial matter, the Court notes that the case law on parallel claims by potential class members is not uniform. Some courts have identified the absence of individual claims as a factor weighing against class certification, see *Novella v. Westchester County,* 443 F.Supp.2d 540, 546 (S.D.N.Y.2006) (finding the fact that "no individual member of the prospective class has filed or threatened to file his own action" to constitute a factor weighing "against class certification"), while others have reached the opposite result, see *Primavera Familienstiftung v. Askin,* 178 F.R.D. 405, 410 (S.D.N.Y.1998) (finding the

"multiplicity of actions" already filed to constitute a factor weighing against class certification). Here, Defendants clearly ascribe to the latter view, arguing that "Plaintiffs have submitted 'no evidence that permitting this suit to go forward as a class action is necessary to avoid a multiplicity of redundant lawsuits.' " (Defs.' Opp'n 32 (citing *Ansari,* 179 F.R.D. at 115).)

**\*14** [30] The Court is unpersuaded that the existence of parallel actions by prospective class members defeats a finding of numerosity in this case. In addition to the raw number of plaintiffs included in each subclass, the class members appear to be geographically dispersed. According to the NYPD, 65 percent of the RNC arrestees were out-of-state residents. (Norins Decl., Ex. 51.) *Cf. Koss v. Wackenhut Corp.,* No. 03 Civ. 7679 (SCR), 2009 WL 928087, at *5 (S.D.N.Y. Mar. 30, 2009) (finding that dispersion "across seven New York counties and three states" supported a finding of numerosity). And the fact that some individuals within the Mass Arrest Subclasses possess the inclination and resources to pursue their own claims should not deprive those without such resources of the opportunity to pursue this action. See *In re WorldCom,* 219 F.R.D. at 306 ("Individual investors, small entities, and the many large investors who have not filed individual actions should not be deprived of their opportunity to pursue this [class] action simply because some larger litigants with greater financial resources are presently pursuing parallel actions.").

Although the remaining *Robidoux* factors are sparsely briefed, Plaintiffs have shown that the Mass Arrest Subclasses are sufficiently numerous to make joinder impracticable. Based on the numerosity presumption accorded to each Subclass, the geographic dispersion of class members, and the fact that separate actions or a multitude of joinder actions "would substantially increase the burden on the parties and courts," *Cromer Fin. Ltd. v. Berger,* 205 F.R.D. 113, 121 (S.D.N.Y.2001), the Court finds that the numerosity requirement is satisfied. Of course, in the event that a significant number of class members decide to opt out of the Mass Arrest Subclasses, the Court may alter, amend, or decertify those classes pursuant to Rule 23(c)(1)(C). See Fed.R.Civ.P. 23(c)(1)(C).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

### b. Commonality

[31] The Mass Arrest Subclasses also satisfy the commonality requirement, as numerous legal and factual issues unite the claims of the putative class members. *See Damassia,* 250 F.R.D. at 156. Plaintiffs characterize the class allegations as "replete with interwoven questions of law and fact," including: (1) whether, at the time, date, and location of each Subclass, Defendants conducted mass arrests without individualized probable cause; (2) whether Defendants issued audible dispersal orders followed by reasonable opportunities to disperse; and (3) whether Defendants acted pursuant to an unlawful policy or practice of indiscriminate mass arrest. (Pls.' Mem. 28–30.) In response, Defendants simply recite the standards for class relief and assert that "each of Plaintiffs' proposed classes fail to meet Rule 23(a) commonality and typicality requirements." (Defs.' Opp'n 34.)

The Court is persuaded that the grievances of the Mass Arrest Subclass members "share a common question of law or of fact," *Robinson,* 267 F.3d at 155, due to the alleged policy or practice of indiscriminate mass arrest. Whether Plaintiffs will ultimately carry the burden of demonstrating such a policy or practice is, of course, beyond the scope of the Rule 23 inquiry. But because the common question of the alleged policy or practice is "at the core of the cause of action," *Friedman–Katz,* 270 F.R.D. at 155, the Court finds that the commonality requirement is met with respect to each Mass Arrest Subclass.

### c. Typicality

**\*15** [32] For reasons that merge with the commonality analysis, *see Brown,* 609 F.3d at 475, the typicality requirement is also satisfied. Because each Subclass member was arrested at a particular time, date, and location in connection with real or perceived RNC protest activity, the Subclass injuries derive from a "unitary course of conduct." *Spicer,* 269 F.R.D. at 337 (quoting *Marisol A.,* 126 F.3d at 377). Because each Subclass member alleges that Defendants employed an unlawful policy or practice of indiscriminate mass arrest, the Subclass claims rely on "similar legal arguments to prove ... liability." *In re Flag Telecom Holdings,* 574 F.3d at 35 (quoting *Robidoux,* 987 F.2d at 936).

The Court further notes that the status of various class members as protestors, observers, or bystanders does not render their claims atypical where, as here, "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Robidoux,* 987 F.2d at 936–37. Accordingly, the Court concludes that typicality is met for the Mass Arrest Subclasses "irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 937.

### d. Adequacy

[33] Finally, the Rule 23(a) adequacy prong requires the Mass Arrest Subclass representatives to "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). As previously stated, Plaintiff Ali–Khan experienced no cognizable First Amendment injury and therefore lacks standing to assert a First Amendment claim on behalf of Subclass Four. *See supra* Part III.A.2. Although framed as a standing challenge (Defs.' Opp'n 34–35), the absence of First Amendment injury also carries implications for the adequacy of Subclass Four. Because an adequate class representative must "suffer the same injury as the class members," *Amchem,* 521 U.S. at 625–26, 117 S.Ct. 2231, and the named Subclass Four representative lacks standing to bring a First Amendment claim, the Court finds that the First Amendment claims asserted by Subclass Four fail for lack of an adequate class representative.

The remaining Mass Arrest Subclasses suffer no such deficiency. Defendants have not identified interests of the named Plaintiffs that are antagonistic to those of the Subclass members. *See Baffa,* 222 F.3d at 60. Similarly, there is no dispute that if the named Plaintiffs prevail, the putative class members will also benefit, since all were subject to the same allegedly unconstitutional course of conduct. *See Hirschfeld v. Stone,* 193 F.R.D. 175, 183 (S.D.N.Y.2000). Thus, it is clear that no "fundamental" conflict of interest impairs the representation of the remaining Mass Arrest Subclasses by the named Plaintiffs. *In re Flag Telecom Holdings,* 574 F.3d at 35.

[34] The named Plaintiffs are, in turn, represented by attorneys from Beldock, Levine & Hoffman LLP.[FN10] Under Rule 23(g)(1), which governs adequacy of class counsel, the Court must consider "the work counsel has

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

done in identifying or investigating potential claims in the action, ... counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, ... counsel's knowledge of the applicable law, and ... the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g). In this case, Plaintiffs contend that proposed class counsel is well-acquainted with the relevant facts, having represented Plaintiffs in this action since 2004. (Pls.' Mem. 35.) Plaintiffs further contend that the firms at issue bring a wealth of collective experience in complex federal litigation and a stated commitment to continued and vigorous pursuit of this litigation. (*Id.*) Defendants do not dispute these assertions. Accordingly, the Court finds that the proposed class counsel is "qualified, experienced, and able to conduct the litigation." *Baffa,* 222 F.3d at 60.

**\*16** Because the named Plaintiffs and the proposed class counsel will fairly and adequately represent the putative class members, the Court concludes that with the exception of the First Amendment claims brought by Subclass Four, the Mass Arrest Subclasses satisfy the adequacy requirement.

2. Rule 23(b)(3) Analysis

After completing the Rule 23(a) inquiry and declining to certify under Rule 23(b)(2), the Court now proceeds to analyze the remaining Mass Arrest Subclasses under the rubric of Rule 23(b)(3).

a. Predominance

[35][36] It is well established that the predominance criterion of Rule 23(b)(3) is "more stringent" and "far more demanding" than the commonality requirement of Rule 23(a). *Amchem,* 521 U.S. at 609, 623–24, 117 S.Ct. 2231. To satisfy Rule 23(b)(3) class certification requirements, a plaintiff must establish not only the existence of common questions, but the predominance of such questions over other issues that are subject only to individualized proof. *See Cordes,* 502 F.3d at 107–08. In conducting the predominance inquiry, the Court is also mindful that pursuant to Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues...." Fed.R.Civ.P. 23(c)(4). District courts should "take full advantage of this provision to certify

separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson,* 267 F.3d at 167 (internal citation, quotation marks, and alterations omitted).

i. Constitutional Claims

Plaintiffs argue that common questions regarding the alleged unconstitutional policy or practice of conducting indiscriminate mass arrests during the RNC "can only be answered with reference to the over[all] police conduct at each mass arrest site, and not by examining any one arrest in isolation." (Pls.' Mem. 37.) Plaintiffs further contend that the common questions at issue are subject to generalized proof because the police officers who made the arrest decisions made no individualized determinations of probable cause. (*Id.* at 37–38.)

Defendants counter that individual issues "overwhelm" the Mass Arrest Subclasses because probable cause inquiries will be necessary to determine liability. (Defs.' Opp'n 40.) Since the existence of probable cause is a complete defense to an action for false arrest, *see Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (internal citation and quotation marks omitted), Defendants argue that litigation of the Mass Arrest Subclasses will splinter into "mini-trials" regarding the facts and circumstances of individual arrest decisions. (*See* Defs.' Opp'n 44.) Based on the range of charges leveled at the RNC arrestees, Defendants contend that the term "mass arrest" is simply a convenient gloss on a series of arrest decisions triggered by complex and variable circumstances. (*Id.* at 43, 46.)

[37] Upon careful consideration of the foregoing arguments and the relative cohesion of each Mass Arrest Subclass, *see In re Nassau County,* 461 F.3d at 225, the Court finds that Subclasses One and Three fail the predominance requirement. Significantly, it appears that group arrests did not occur at the Subclass One and Three locations. There were no police barricades (Pls.' Mem. 11), assigned arresting officers (*id.* at 13), or incident commanders making group arrest decisions (Tr. at 42:21–43:20). Instead, the available facts indicate that the Subclass One and Three arrests were conducted by officers exercising individual discretion rather than following mass arrest orders. (*See, e.g.,* Decl. of Jonathan C. Moore, July 20, 2007 ("Moore Decl."), Ex. 32 at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

17:20–22, [FN11] *id.,* Ex. 39 at 7:15–19; [FN12] *id.,* Ex. 39 at 13:8–15.[FN13]). Indeed, even Plaintiffs' counsel conceded at oral argument that Subclasses One and Three "are the least clean in terms of the facts." (Tr. at 113:4.)

**\*17** In the absence of group arrest decisions or procedures, the Court is persuaded that individualized probable cause inquiries would dictate the course of litigation with respect to Subclasses One and Three. Such a result would deprive the class action device of the efficiency and economy that form the principal purpose of the procedure. *See generally Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (holding that "the efficiency and economy of litigation ... is a principal purpose of the [class action] procedure"). Accordingly, the Court concludes that the Subclasses One and Three fail for lack of predominance.

By contrast, the record with respect to the remaining Subclasses manifests "a sufficient constellation of common issues bind[ing] class members together." *Brown,* 609 F.3d at 483 (internal citation and quotation marks omitted). At the remaining Subclass locations, police erected barricades or employed orange netting to corral and trap large groups of individuals who were thereafter arrested. (Pls.' Mem. 11.) Subclasses Two, Five, Six and Eight also involved an alleged procedure whereby an arresting officer was assigned to five arrestees "regardless of whether the officer had seen any of the five individuals prior to their arrest or had even been present at the scene when the decision to arrest was made." (*Id.* at 13.) The deposition testimony of various police officers further confirms that Defendants made arrest decisions based on group conduct at the remaining Subclass locations.[FN14]

Because the remaining Subclasses comprise individuals who were arrested as a group based on the alleged conduct of the group, the Court finds that common issues predominate with respect to liability. Although assessment of damages may ultimately require individualized inquiries, that possibility is no bar to class certification here. *See In re WorldCom,* 219 F.R.D. at 302 ("When liability can be determined on a class-wide basis, individualized damage issues are not ordinarily a bar to class certification"). Whether Defendants employed an

unlawful mass arrest policy at the remaining Subclass locations is a fundamental question both common to the putative Subclass members and subject to generalized proof. *See Vodak v. City of Chi.,* No. 03 C 2463, 2006 WL 1037151, at \*9 (N.D.Ill. Apr. 17, 2006) ("[I]f the decision to seize or arrest a class of individuals is based upon facts and circumstances common to the class then the issue may be adjudicated through a class action."). Accordingly, the Court finds predominance with respect to liability for the constitutional claims brought by Subclasses Two, Four, Five, Six, Seven, and Eight.

[38][39] In so holding, the Court rejects the argument that individualized probable cause inquiries will overwhelm the remaining Mass Arrest Subclasses. Although probable cause is a complete defense to an individual false arrest claim, *see Weyant,* 101 F.3d at 852 (internal citation and quotation marks omitted), the predominant issue here turns not on the circumstances of particular arrests, but on the existence of a policy or practice of conducting mass arrests whether or not individualized probable cause existed. Thus, the fact that a probable cause defense "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 138 (2d Cir.2001), *overruled on other grounds by In re Initial Pub. Offerings,* 471 F.3d at 42 (internal citation omitted). Because the claim of an overarching policy unites the remaining Mass Arrest Subclasses, the Court is persuaded that common liability issues predominate. *See In re Nassau,* 461 F.3d at 229 (finding predominance based on "two broad common liability issues: whether the blanket policy existed and whether defendants are liable for its implementation").

**\*18** The fact that the SAC includes as-applied challenges to the New York City parade ordinance [FN15] and New York state disorderly conduct statutes [FN16] does not defeat predominance with respect to the Mass Arrest Subclasses. Although Defendants devote their supplemental brief to the argument that Plaintiffs' as-applied claims may not be adjudicated on a class basis (*see* Defs.' Sur–Reply 6), their argument appears to rest on a premature assessment of the merits. Defendants claim that "[a]fter ... years of exhaustive documentary and

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

testimonial discovery in the Consolidated RNC Cases, plaintiffs can point to no evidence of an 'indiscriminate mass arrest policy' designed to retaliate against protestors based upon the content of their speech." (Defs.' Sur–Reply 8–9.) In the absence of such evidence, they argue, the Court will have to consider the particular circumstances of each RNC arrestee to determine whether the challenged statutes were unconstitutionally applied. (*Id.* at 9.) Thus, Defendants oppose the predominance of the as-applied claims primarily by disputing the existence of the alleged policy—and prematurely addressing the merits of the case. Because courts "should not assess any aspect of the merits unrelated to a Rule 23 requirement" on a motion for class certification, *In re Initial Pub. Offerings,* 471 F.3d at 41, the Court declines to do so here.[FN17]

The Court further notes that the fact of a conviction or guilty plea by a subset of RNC arrestees does not alter the foregoing predominance analysis. Citing *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Defendants argue that false arrest claims by putative class members who were convicted or pled guilty are barred in the absence of proof that the conviction has been reversed, expunged, or otherwise declared invalid. (Defs.' Opp'n 48–49.) But because the names of the 178 RNC arrestees who were convicted or pled guilty are readily identifiable from discovery documents (Pls.' Reply 20 n. 59, 21), the exclusion "is a purely ministerial issue that can be determined prior to trial and will not predominate." *Dunn v. City of Chicago,* 231 F.R.D. 367, 377 (N.D.Ill.2005).[FN18] Thus, the *Heck* doctrine poses no bar to certification of the Mass Arrest Subclasses. To the extent that application of the *Heck* exclusion subsequently undermines the numerosity of particular Mass Arrest Subclasses, the Court may, of course, alter, amend, or decertify those classes as necessary. Fed.R.Civ.P. 23(c)(1)(C).

### ii. Other Claims

[40] Despite the predominance of common issues with respect to the constitutional claims, the Court declines to grant class certification with respect to the remaining supervisory liability, *respondeat superior,* and pendent state law claims. Although neither party briefs the predominance inquiry in this context, the Court is persuaded that each of these claims "bristles with individual issues" that render class certification improper. *Blyden v. Mancusi,* 186 F.3d 252, 271 (2d Cir.1999).

**\*19** [41] With respect to the supervisory liability claims, the Court notes that a supervisor may not be held liable "simply because one or more of his subordinates committed a constitutional tort." *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007). Rather, a plaintiff must establish an affirmative causal link between the supervisor's inaction and his injury. *See Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). Thus, Plaintiffs' supervisory liability claim would require the Court to separately determine the liability of approximately 40 individual Defendants. Because such an inquiry involves "varying components as to each defendant," *Blyden,* 186 F.3d at 271 (2d Cir.1999), the Court finds that individual issues overwhelm the supervisory liability claim.

The *respondeat superior* and pendent state law claims fail the predominance requirement for substantially similar reasons. The *respondeat superior* claims asserts that the City is liable for the actions of approximately 60 individual Defendants because their conduct "occurred while they were on duty and in uniform, and during the course and scope of their duties and functions" as members of the NYPD. (SAC ¶ 265.) The pendent state law claims assert that approximately 20 individual Defendants committed a host of mass torts, including assault and battery, trespass, false arrest and imprisonment, malicious prosecution, intentional infliction of emotional distress, and negligent hiring. (*See id.* ¶¶ 261–63.) Because these claims are susceptible to unique defenses that require extensive individualized inquiries, the Court declines to certify the *respondeat superior* and pendent state law claims.[FN19]

Since the foregoing analysis is not limited to the Mass Arrest Subclasses, the Court also excludes the supervisory liability, *respondeat superior,* and pendent state law claims from all proposed classes in order to "reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson,* 267 F.3d at 167 (internal citation and quotation marks omitted).

### b. Superiority

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

[42] In addition to the predominance criterion, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). As previously stated, factors relevant to the superiority analysis include: the interest of class members in controlling separate actions; the extent and nature of existing litigation concerning the controversy; the desirability or undesirability of concentrating litigation of the class claims in the particular forum; and the likely difficulties in managing a class action. *See id.*

In this case, some 565 RNC arrestees have clearly expressed interest in controlling separate actions by filing and pursuing approximately 80 parallel suits. (*See* Pls.' Mem. 44; *cf.* Defs.' Opp'n 73.) Nevertheless, given the length of time that has now elapsed since the underlying events occurred, it appears that the remaining putative class members have not expressed a similar interest by filing separate actions. The desirability of concentrating the RNC litigation in this forum is equally indeterminate as a superiority factor, since the related RNC cases would remain before this Court regardless of the outcome of the class certification motion. Finally, the Court concludes that the "management difficulties" that might accompany the proposed certification are certainly no greater than the management difficulties that would inevitably result from hundreds of separate trials. *See In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 529 (S.D.N.Y.1996) ("[D]ifficulties in management are of significance only if they make the class action a less 'fair and efficient' method of adjudication than other available techniques.").

**\*20** In the end, the Court is persuaded that "[f]rom the standpoint of judicial economy, the only rational way to proceed is to concentrate the class [ ] claims in a single action, rather than have numerous separate trials on the same issue, based on the same evidence." *Jermyn v. Best Buy Stores, L.P.,* 256 F.R.D. 418, 436–37 (S.D.N.Y.2009). Certifying the Mass Arrest Subclasses for purposes of determining liability will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615, 117 S.Ct.

2231 (internal citation and quotation marks omitted). Accordingly, the Court finds that a class action would be the most fair and efficient method of resolving the issues in this case.

C. Excessive Detention Class

The Court next examines the Excessive Detention Class, which comprises all persons arrested during the Class Period and processed at Pier 57 pursuant to the MAPP. (SAC ¶ 52(b).)

1. Section 23(a) Analysis

a. Numerosity

[43] Numerosity is clearly met for the Excessive Detention Class. Plaintiffs contend that approximately 1,800 RNC arrestees were processed pursuant to the MAPP. (*See* Pls.' Mem. 26.) For reasons discussed below, the Court narrows the class to arrestees charged only with violations, leaving approximately 1,480 putative class members. (*Id.* at 22 n. 35.) The Court further subtracts the 102 arrestees who were not detained at Pier 57. (*Id.* at 16.) Defendants do not appear to dispute that joinder of nearly 1,400 class members is clearly impracticable.[FN20] *Cf. Consol. Rail Corp.,* 47 F.3d at 483 (noting that "numerosity is presumed at a level of 40 members"). Accordingly, the Court finds that the Excessive Detention Class satisfies the numerosity requirement.

b. Commonality

[44] The commonality of the Excessive Detention Class is not seriously disputed. Plaintiffs allege that because the MAPP unreasonably prolonged their time in custody, their injuries derived from a "unitary course of conduct by a single system." *Spicer,* 269 F.R.D. at 337 (quoting *Marisol A.,* 126 F.3d at 377). Because all class members were processed pursuant to the MAPP, they were subject to policies prohibiting the issuance of summonses and requiring mandatory fingerprinting and criminal background checks, even though Defendants failed to equip Pier 57 with the necessary facilities to timely process the RNC arrestees. (Pls.' Mem. 23.) In response, Defendants weakly assert that the Excessive Detention Class cannot satisfy the commonality requirement because the applicable legal standards will differ based on the length of the individual confinement. (*See* Defs.' Opp'n

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

36.) But commonality does not require identical claims or circumstances. *See Damassia,* 250 F.R.D. at 156. Rather, the requisite common questions of fact or law can derive from a "pattern of behavior that commonly affects all of the proposed class members." *See Marisol A.,* 126 F.3d at 377.

**\*21** Here, Plaintiffs claim that the Excessive Detention Class raises the following common questions: (1) whether Defendants detained the RNC arrestees for unreasonable periods of time; (2) whether such detainment violated the First, Fourth, or Fourteenth Amendments; and (3) whether such detainment resulted from a municipal policy or practice. (*See* Pls.' Mem. 40.) Because the challenged detention procedures primarily affected arrestees charged only with violations (who were otherwise eligible for summonses) and arrestees detained at Pier 57 (where no fingerprinting equipment was available), the Court limits the Excessive Detention Class to arrestees in those categories. With these provisos, it is clear that "at least one common question of fact or law is evident." *In re Currency Conversion Fee Antitrust Litig.,* 224 F.R.D. 555, 562 (S.D.N.Y.2004). Accordingly, the Court finds that the commonality requirement is satisfied for the Excessive Detention Class.

### c. Typicality

[45] Typicality is satisfied for substantially similar reasons. As previously stated, all members of the Excessive Detention Class were processed pursuant to the MAPP and detained at Pier 57. As a result, the excessive detention claims "arise[ ] from the same course of events" and depend on "similar legal arguments" to prove typicality. *In re Flag Telecom Holdings,* 574 F.3d at 35 (citing *Robidoux,* 987 F.2d at 936). Although Defendants note that the prospective class members were detained for varying lengths of time, "[t]he typicality criterion does *not* require that the factual predicate of each claim be identical to that of all class members." *Shakhnes,* 740 F.Supp.2d at 625 (internal citations and quotation marks omitted). In this case, "the same unlawful conduct" affected both the named Plaintiffs and the prospective class members, because all were subject to the alleged policy or practice of unnecessarily detaining RNC arrestees. *Robidoux,* 987 F.2d at 936–37. Accordingly, the Court concludes that typicality is met with respect to the Excessive Detention

Class. *Id.*

### d. Adequacy

[46] Finally, the Excessive Detention Class easily satisfies the adequacy requirement. Because the named Plaintiffs were detained alongside the prospective class members, they clearly "possess the same interest and suffer [ed] the same injury." *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364. Defendants make no suggestion that the named Plaintiffs have interests antagonistic to the rest of the class, *see Brown,* 609 F.3d at 479, or are otherwise unable to "fairly and adequately protect the interest of the class," Fed.R.Civ.P. 23(a)(4). For the reasons previously stated, Plaintiffs' counsel will supply fully adequate legal representation. *See supra* Part III.B.1.d. In the absence of any indication that a "fundamental" conflict of interest impairs the proposed representation, *In re Flag Telecom Holdings,* 574 F.3d at 35, the Court finds that the adequacy requirement is satisfied as to the Excessive Detention Class.

### 2. Section 23(b)(3) Analysis

**\*22** Because the Excessive Detention Class survives the Rule 23(a) inquiry, the Court now proceeds to the Rule 23(b)(3) analysis.

### a. Predominance

[47] The predominance inquiry once again forms the crux of the class certification dispute. Plaintiffs argue that because the excessive detention claims all arise out of the design and implementation of the MAPP (*see* Pls.' Mem. 40–41), common questions and common legal theories predominate. In their view, the constitutionality of the MAPP detention procedures forms the nucleus of "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole." *Cordes,* 502 F.3d at 107–08.

In response, Defendants argue at length that the variance in the detention times of the RNC arrestees is fatal to the predominance inquiry. (*See* Defs.' Opp'n 65–71.) To that end, Defendants primarily rely on *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), in which the Supreme Court held that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement" and therefore "be immune from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

systemic challenges," *id.* at 56, 111 S.Ct. 1661. Citing *County of Riverside,* Defendants argue that RNC arrestees who were detained for less than 48 hours have no constitutional claim unless "the arrested individual can prove that his or her probable cause determination was delayed unreasonably." (Defs.' Opp'n 66 (quoting *County of Riverside,* 500 U.S. at 56, 111 S.Ct. 1661).) Because the majority of the RNC arrestees were processed and released within 48 hours, Defendants argue that "the Court would have to conduct mini-hearings for each arrestee" to establish the cause of the delay. (Defs.' Opp'n 69.) Thus, Defendants urge that "the class action mechanism is unsuitable" because "the primary issues to be litigated are subject to such individualized proof." (*Id.*)

This argument misunderstands the nature of the excessive detention claims at issue. The central and predominant focus of the class action suit is not the mere length of detention for RNC arrestees, but the existence of a policy to detain them longer than would otherwise be required. Such a policy, if proven, would surely demonstrate that the probable cause determinations for individual RNC arrestees were unreasonably and deliberately delayed. Because class certification is appropriate where a "sufficient constellation of common issues binds class members together," *Brown,* 609 F.3d at 483, the Court is persuaded that claims based on an alleged policy of unlawful detention are suitable for class adjudication.

The Court also notes that Defendants' predominance argument derived from the *County of Riverside* holding applies only to Plaintiffs' Fourth Amendment claim. Additional common questions bind the Excessive Detention Class with respect to the First and Fourteenth Amendment claims, including: (1) whether Defendants intended to punish or deter First Amendment activity by subjecting the RNC arrestees to MAPP procedures; and (2) whether such practices breached the Equal Protection Clause of the Fourteenth Amendment. (Pls.' Reply 27.) Thus, even if Defendants were to prevail on the Fourth Amendment claim, the First and Fourteenth Amendment claims would survive the predominance requirement. Accordingly, the Court finds that the resolution of the excessive detention claims "can be achieved through generalized proof," and that the class-wide detention

issues predominate over "issues subject only to individualized proof." *Moore,* 306 F.3d at 1252.

b. Superiority

**\*23** [48] The superiority analysis for the Excessive Detention Class closely tracks the superiority analysis for the Mass Arrest Subclasses outlined above. Once again, the existence of parallel suits filed by a significant minority of RNC arrestees indicates some interest in controlling the prosecution of separate actions. Given the related status of all RNC actions, the inevitable concentration of the RNC litigation before this Court remains a neutral factor in the superiority analysis. Finally, the Court perceives little difficulty in managing the Excessive Detention Class on the issue of liability, since individualized inquiries will primarily relate to damages calculations.

The utility of the "pertinent" but nonexclusive superiority factors is admittedly limited in this instance. Fed.R.Civ.P. 23(b)(3)(A)–(D). Nonetheless, there can be no doubt that certifying the Excessive Detention Class will permit the Court to try common issues related to the alleged unlawful policy once, rather than dozens or hundreds of times, thereby simplifying and streamlining the litigation process. *See In re Nassau,* 461 F.3d at 230. Accordingly, the Court finds that the superiority criterion is met with respect to the Excessive Detention Class.

D. Conditions of Confinement Class

Finally, the Court considers the Conditions of Confinement Class, which comprises all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57. (SAC ¶ 52(c).)

1. Section 23(a) Analysis

a. Numerosity

[49] The numerosity of the Conditions of Confinement Class is clear. Out of approximately 1,800 RNC arrestees, all but 102 arrestees were allegedly handcuffed with plastic flex cuffs and detained at Pier 57. (Pls.' Mem. 26.) Because the remaining class comprises approximately 1,700 prospective members, the numerosity of the Conditions of Confinement Class is beyond serious dispute.[FN21] *Cf. In re WorldCom,* 219 F.R.D. at 305–06

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

("Here, the class is massive: there is no question regarding numerosity or the impracticability of joinder.").

b. Commonality

[50] For the Conditions of Confinement Class, commonality is a "minimal burden" readily satisfied. *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*, 211 F.R.D. 228, 231 (S.D.N.Y.2002). Plaintiffs contend that detention at Pier 57 subjected the prospective class members to a host of common conditions, including prolonged handcuffing, inadequate seating and sanitary facilities, and exposure to various chemicals. (Pls.' Mem. 15–19.) Defendants counter that "non[e] of these alleged conditions can be classified as common to the class, as none of the class representatives or potential class members were exposed to all of the alleged conditions." (Defs.' Opp'n 25.)

But Defendants' worn attempt to defeat commonality by mincing the prospective class claims once again fails. Although some degree of disparity in the detention experience of RNC arrestees is perhaps inevitable, factual variations in individual grievances do not preclude a finding of commonality where the injuries "derive from a unitary course of conduct by a single system." *Spicer,* 269 F.R.D. at 337 (quoting *Marisol A.,* 126 F.3d at 377). Here, the alleged injuries derive from the detention conditions at Pier 57. Because all class members were subject to a common detention system at a single location, they share the following common questions: (1) whether the terms and conditions of confinement at Pier 57 were unreasonable and punitive; and (2) whether those conditions resulted from a municipal policy or practice. (Pls.' Mem. 29). That the deposed class members object to different combinations of detention conditions does not negate the fact "that common issues of fact or law affect all class members." *Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168, 175 (S.D.N.Y.2008) (internal citations and quotation marks omitted). Accordingly, the Court finds that the commonality requirement is satisfied for the Conditions of Confinement Class.

c. Typicality

**\*24** [51] Once again, the typicality requirement is satisfied for reasons that overlap with the commonality analysis above. *See Brown,* 609 F.3d at 475. As previously

noted, all members of the Conditions of Confinement Class were handcuffed with plastic flex cuffs and detained at Pier 57. Thus, the conditions of confinement claims "arise[ ] from the same course of events" and pose similar legal and constitutional challenges. *In re Flag Telecom Holdings,* 574 F.3d at 35 (citing *Robidoux,* 987 F.2d at 936). Although Defendants protest that "the circumstances of the putative class representatives differ[ed] greatly" (Defs.' Opp'n 36), they provide no explanation or supporting citations for such an assertion. Instead, the evidence indicates that the prospective class members were treated "in the same general fashion," *Robidoux,* 987 F.2d at 937 (emphasis omitted), despite individual permutations of the detention narrative (*see* Pls.' Mem. 32, 42). Because the class claims arise from "the same unlawful conduct," *Robidoux,* 987 F.2d at 936, the Court finds that the Conditions of Confinement Class clears the "relatively low threshold" of typicality, *Karvaly v. eBay, Inc.,* 245 F.R.D. 71, 82 (E.D.N.Y.2007).

d. Adequacy

[52] Finally, the Conditions of Confinement Class also complies with the adequacy requirement. Because all class members were detained under substantially common conditions at Pier 57, the named Plaintiffs "suffer[ed] the same injury" as the absent class members. *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364. Because all class members share a common interest in establishing liability for their detention conditions, the interests of the named Plaintiffs and prospective class members are properly aligned. As previously stated and reiterated, class counsel is "qualified, experienced, and able to conduct the litigation." *Cordes,* 502 F.3d at 99; *see supra* Part III.B.1.d. Accordingly, the Court finds that the named Plaintiffs "will fairly and adequately protect the interests" of the Conditions of Confinement Class. *Fed.R.Civ.P.* 23(a)(4).

2. Section 23(b)(3) Analysis

Because the Conditions of Confinement Class meets the Rule 23(a) requirements, the Court will now consider the Rule 23(b)(3) inquiry.

a. Predominance

[53] Although Defendants nominally oppose the preceding Rule 23(a) analysis, they vigorously dispute that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

the Conditions of Confinement Class is "sufficiently cohesive" to satisfy the predominance requirement. _Brown_, 609 F.3d at 476. Plaintiffs contend that while the details of individual detention experiences may have varied, the overall conditions at Pier 57 were sufficiently similar to warrant class adjudication. (Pls.' Mem. 42.) In response, Defendants parse the individual conditions of confinement and argue that claims based on each condition will require individualized inquiries to establish a constitutional violation. (Defs.' Opp'n 52–65.)

Plaintiffs identify key factual questions that unite the Conditions of Confinement Class by addressing the nature and severity of the alleged conditions. Did the substance on the floor of Pier 57 pose potential health hazards? Were requests for medical attention by RNC arrestees routinely ignored? How many toilets were provided per number of detainees? (_See_ Pls.' Reply 32.) "The legal counterpart of these factual questions is the issue of whether and to what extent the existence of conditions of this severity—whether separately or in combination—constituted a violation of the [detainees'] constitutional rights." _Langley v. Coughlin_, 715 F.Supp. 522, 556 (S.D.N.Y.1989). Under _Langley_, the relevant question is whether the "cumulative effect" of the alleged conditions was "sufficiently bad to have fallen below constitutional minima." _Id._ at 543, 556; _see, e.g., Bell v. Wolfish_, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention ..., the proper inquiry is whether those conditions amount to punishment of the detainee.").

**\*25** Defendants, in turn, assert that common questions do not predominate because determining the constitutionality of the confinement conditions will require "mini-trials" regarding the length of individual detention and the degree of individual injury. (Defs.' Opp'n 52–53.) But the fact that the eventual assessment of damages may require individualized proof of injury does not preclude class treatment of allegations that the shared confinement conditions were unlawful. "That some detainees may have been more or less deprived ... does not impede the court's ability to adjudicate whether the shared deprivations suffered by all [class] members ... violated the Constitution." _Dunn_, 231 F.R.D. at 377. In one recent prison conditions case, a Massachusetts district court

analyzed the common issues as follows:

> If the asserted injury is the denial of access to a bathroom at a specific moment of need then the government is correct that the plaintiffs have not demonstrated a likelihood that other inmates have suffered similarly. If, on the other hand, the injury arises simply out of being housed in a facility in which bathroom access is unreliable, then all of the approximately 4,000 inmates housed in Building 4 during the subject period share the claim.

_Tyler v. Suffolk County_, 253 F.R.D. 8, 10 (D.Mass.2008). Here, the conditions of confinement claims clearly fall into the latter category, since Plaintiffs allege constitutional injury from being housed in a makeshift detention center unfit for human occupancy. (_See_ Pls.' Mem. 16.)

Moreover, the primary cases Defendants cite to contest the predominance requirement do not address class certification. Instead, Defendants assemble a series of summary judgment and appellate opinions that address the merits of various conditions claims. (_See_ Defs.' Opp'n 52–53.) Although the predominance inquiry may implicate the _elements_ of prospective class claims, _see Freeland v. AT & T Corp._, 238 F.R.D. 130, 142 (S.D.N.Y.2006), courts are barred from considering "any aspect of the merits unrelated to a Rule 23 requirement" on a motion for class certification, _In re Initial Pub. Offerings_, 471 F.3d at 41. Here, while Defendants purport to establish only the particular findings required to assess both liability and damages (Defs.' Opp'n 52), the analysis that follows frequently shades into forbidden merits territory.[FN22]

Defendants do identify a single case, _Burley v. City of N.Y._, No. 03 Civ. 735 (WHP), 2005 WL 668789, at \*8–9 (S.D.N.Y. Mar. 23, 2005), denying certification of a conditions class. (Defs.' Opp'n 54–55.) In _Burley_, the court declined to certify a putative "handcuff class" comprising all arrestees who were subject to "unreasonable" or "excessive" handcuffing with plastic cuffs. _Burley_, 2005 WL 668789, at \*8. Because plaintiffs were unable to provide a clear definition of "unreasonable" cuffing, the court held that the class failed the implicit "definiteness" requirement of Rule 23. _Id._ at \*8–9. Here, by contrast, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

Conditions of Confinement Class is limited to RNC arrestees who were detained at Pier 57 and handcuffed with plastic flex cuffs. (SAC ¶ 52(c).) As such, the "definiteness" of the class is easily established, since the names of all RNC arrestees are readily ascertainable from records produced during discovery. (Pls.' Mem. 26 n. 41, 27.) Because the class definition hinges on the fact that RNC arrestees were handcuffed, and not on "subjective determinations" about the meaning of "excessive" handcuffing, *Burley,* 2005 WL 668789, at *9, the holding of *Burley* is inapposite. [FN23]

**\*26** Upon careful consideration, the Court is persuaded that the common questions of fact and law identified above predominate over the individual questions implicated by the Conditions of Confinement Class. The core class allegation is that the RNC arrestees were improperly detained in a facility unfit for human occupancy. Whether the "cumulative effect" of the conditions at Pier 57 created a constitutional violation is an issue that unifies the Conditions of Confinement Class and satisfies the predominance requirement. *Langley,* 715 F.Supp. at 543–44.

### b. Superiority

[54] The Conditions of Confinement Class satisfies the superiority requirement for reasons that parallel the analysis articulated and reiterated above. Because certifying as to liability will permit hundreds of RNC conditions claims to be resolved in a single proceeding, the Court concludes that proceeding as a class action is manifestly "superior to other available methods for fairly and efficiently adjudicating" the Conditions of Confinement claims. Fed.R.Civ.P. 23(b)(3).

### E. Appointment of Class Counsel

Having completed the Rule 23 class certification analysis, the only question that remains is whether Plaintiffs' counsel should be appointed counsel for the classes. As discussed above in connection with the adequacy requirement of Rule 23(a), *see supra* Part III.B.1.d, Plaintiffs contend that proposed class counsel, Beldock Levine & Hoffman LLP, is experienced in handling complex federal litigation and committed to the vigorous pursuit of the class claims. Defendants do not

dispute these assertions. Accordingly, the Court appoints Beldock Levine & Hoffman LLP as class counsel pursuant to Rule 23(g). Fed.R.Civ.P. 23(g).

### IV. CONCLUSION

For the foregoing reasons, the motion for class certification pursuant to Rule 23(a) and Rule 23(b)(3) is HEREBY GRANTED as to the following classes:
1) Mass Arrest Subclasses Two, Four, Five, Six, Seven and Eight, comprising all RNC arrestees from the foregoing Subclass locations, except that Subclass Four may not assert a First Amendment claim;

2) The Excessive Detention Class, comprising all RNC arrestees who were processed pursuant to the MAPP, detained at Pier 57, and charged only with violations; and

3) The Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs and detained at Pier 57.

Pursuant to Rule 23(c)(4), the Court certifies the foregoing classes to determine liability arising from the constitutional claims, but declines to certify the supervisory liability, *respondeat superior,* and pendent state law claims.

The motion to certify Mass Arrest Subclasses One and Three is HEREBY DENIED due to lack of predominance. The motion for class certification pursuant to Rule 23(b)(2) is HEREBY DENIED due to lack of standing to pursue declaratory and injunctive relief. Plaintiffs in the certified classes and subclasses are appointed Class Representatives, and Beldock Levine & Hoffman LLP is appointed class counsel.

**\*27** IT IS FURTHER ORDERED THAT: (1) Plaintiffs shall submit to the Court a proposed notice to all putative class members pursuant to Rule 23(c)(2)(B) no later than May 31, 2011; and (2) the parties in this action and all other consolidated RNC cases shall appear for a status conference in Courtroom 21C on June 6, 2011, at 4:30 p.m.

SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

FN1. The following facts are derived from the allegations in the Second Amended Complaint ("SAC"), which the Court accepts as true in considering a motion for class certification. *See Shelter Realty Corp. v. Allied Maint. Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978).

FN2. Defendants had "set up a 24–hour demonstration zone on Eighth Avenue, just a few blocks south of the convention site at Madison Square Garden, open to anyone wishing to protest any issue." (Defs.' Sur–Reply 4.)

FN3. "New York Criminal Procedure Law § 160.10 does not require an arrestee accused of committing a violation to be fingerprinted prior to release from custody with a summons or a Desk Appearance Ticket, unless the arrestee lacks valid identification." (SAC ¶ 93.)

FN4. By Order dated February 1, 2007, Judge Karas denied the motion for class certification without prejudice because "[t]he parties were directed to file the motion papers electronically only when the motion has been fully briefed." (Doc. No. 128.) Thus, although Plaintiffs' Notice of Motion is dated January 31, 2007, the motion papers were electronically filed on July 20, 2007.

FN5. In ruling on the instant motion, the Court has considered Plaintiffs' Memorandum of Law in Support of Class Certification ("Pls.' Mem."); Defendants' Memorandum of Law in Opposition to Class Certification ("Defs.' Opp'n"); Plaintiffs' Reply Memorandum of Law in Support of Class Certification ("Pls.' Reply"); Defendants' Memorandum of Law in Further Opposition to Class Certification ("Defs.' Sur–Reply"); and Plaintiffs' Memorandum of Law in Further Support for Class Certification ("Pls.' Sur–Reply").

FN6. The Second Circuit granted the writ of mandamus in an opinion dated June 9, 2010. *In re City of N.Y.,* 607 F.3d 923 (2d Cir.2010).

FN7. "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed.R.Civ.P. 23(c)(5).

FN8. Other Plaintiffs, including Deirdre MacNamara, were similarly engaged in personal or recreational activities prior to their arrests. (*See* SAC ¶ 170–72.) However, only Subclass Four lacks a named Plaintiff who was engaged in some form of First Amendment activity. *See infra* Part III.B.1.d.

FN9. Specifically, Plaintiffs contend that Mass Arrest Subclass One comprises at least 40 individuals (Pls.' Mem. 5); Mass Arrest Subclass Two comprises at least 100 individuals (*id.* at 6); Mass Arrest Subclass Three comprises at least 50 individuals (*id.* at 7); Mass Arrest Subclass Four comprises at least 50 individuals (*id.*); Mass Arrest Subclass Five comprises at least 200 individuals (*id.* at 8); Mass Arrest Subclass Six comprises at least 300 individuals (*id.* at 9); Mass Arrest Subclass Seven comprises at least 75 individuals (*id.* at 10); and Mass Arrest Subclass Eight comprises at least 150 individuals (*id.* at 11).

FN10. Although attorneys from Moore & Goodman, LLP also appear on the docket sheet for this case, Plaintiffs have represented to the Court that only Beldock Levine & Hoffman LLP will continue as class counsel.

FN11. Testimony of Randall Steketee: "Q: Did you see other people being handcuffed before you were handcuffed? A: No." (Moore Decl., Ex. 32, 17:20–22.)

FN12. Testimony of Phillip Ellmann: "Q: Was there a police blockade when you reached that location? A: No, I think the street was blocked but there was no obvious police blockade visible." (Moore Decl., Ex. 39,7:15–19.)

FN13. Testimony of Marcellas Hall: "Q: How

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

many people were in the group that you referred to at that time? A: Well, you know, I'm just talking about a clump of people that would have been able to hear that order ... it's not that we were a cohesive group, it was a random group of people." (Moore Decl., Ex. 39, 13:13–15.)

FN14. (*See, e.g.,* Moore Decl., Ex. 44, 271:17–272:12 (Subclass Two); Norins Decl., Ex. 45, 281:10–25 (Subclass Four); Moore Decl., Ex. 50, 131:24–133:23 (Subclass Five); *id.* at Ex. 41, 159:22–160:20 (Subclass Six); Norins Decl., Ex. 35, 63:20–25, 67:3–18 (Subclass Seven); Moore Decl., Ex. 45, 324:18–325:23, 373:24–375:15 (Subclass Eight).) The Court notes that the examples of individualized probable cause proffered by Defendants primarily relate to Subclass Three and non-Subclass arrests. (*See* Defs.' Sur–Reply 13–14.)

FN15. New York City Administrative Code § 10–110 requires a permit to conduct a parade or procession on New York City streets. N.Y. City Admin. Code § 10–110.

FN16. N.Y. Penal Code § 240.20(5) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... he obstructs vehicular or pedestrian traffic."); *Id.* § 240.20(6) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... he congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse.").

FN17. Defendants also cite *Hudson v. City of Chicago* for the proposition that as-applied challenges fail the Rule 23(b)(3) predominance requirement because they "necessarily entail an analysis of how the [ordinance] was applied to each individual class member." (Defs.' Sur–Reply 11 (citing *Hudson v. City of Chicago,*

242 F.R.D. 496, 505 (N.D.Ill.2007)).) What Defendants neglect to disclose is that *Hudson* explicitly distinguished cases involving mass arrests. *Hudson,* 242 F.R.D. at 507.

FN18. In a pair of dueling footnotes, the parties dispute whether RNC arrestees who accepted adjournments in contemplation of dismissal (ACDs) are similarly barred from asserting false arrest claims. (*See* Defs.' Opp'n 49 n. 210; Pls.' Reply 21 n. 60.) Because "favorable termination of the proceedings is not an element of [false arrest]," *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995), the Court finds that acceptance of an ACD does not bar Plaintiffs from pursuing false arrest claims or participating in the Mass Arrest Subclasses.

FN19. Although Plaintiffs are unlikely to prevail against the City on a *respondeat superior* theory, *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."), the Court declines to decide "any aspect of the merits unrelated to a Rule 23 requirement," *In re Initial Pub. Offerings,* 471 F.3d at 41.

FN20. (*See* Defs.' Opp'n 33 (arguing only that "joinder of the remaining plaintiffs arrested *at the Proposed False Arrest Subclass Locations ...* is not impracticable") (emphasis added).)

FN21. Because Defendants appear to confine their *Robidoux* numerosity arguments to the Mass Arrest Subclasses (*see* Defs.' Opp'n 33), the Court declines to reiterate the *Robidoux* analysis outlined in Part III.B.1.a above.

FN22. (*See, e.g.,* Defs.' Opp'n 53 ("not a single class representative has produced any evidence of injuries suffered" due to the holding cells at Pier 57); *id.* at 59 ("48 of the 49 plaintiffs deposed thus far in the RNC litigations have admitted that they had access to bathroom facilities while in custody"); *id.* at 61 ("not a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)

(Cite as: 2011 WL 1991144 (S.D.N.Y.))

single class representative has produced any evidence, nor have they specifically alleged, any constitutional injuries resulting from the lack of telephones" at Pier 57).)

FN23. The Court notes, however, that in order to avoid the "mini-trial" phenomenon (*see* Defs.' Opp'n 55–56), the factfinding inquiry will be limited to the use of flex cuffs as a matter of policy rather than the allegedly "excessive" tightness of the flex cuffs as applied by individual NYPD officers to individual Plaintiffs.

S.D.N.Y.,2011.

MacNamara v. City of New York
--- F.R.D. ----, 2011 WL 1991144 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Pete THOMAS, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, DIVISION OF
CORRECTIONAL INDUSTRIES a/k/a Corcraft, Glen
S. Goord, John Conroy, William Mazzuca, Donald
Schramm Sr., John Fabian, Michael McDonough and
Robert Mccarroll, Defendants.
No. 00 Civ. 7163(NRB).

Feb. 23, 2006.
MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** Pete Thomas ("Thomas" or "plaintiff"), a former
inmate at Fishkill Correctional Facility ("Fishkill"), is the
only remaining plaintiff in this § 1983 case, which was
originally filed as a purported class action involving
eleven named plaintiffs.[FN1] Plaintiff claims that he was
exposed to toxic substances in Fishkill's paint shop
without proper safety equipment or training in violation of
the Eighth and Fourteenth Amendments to the U.S.
Constitution. Second Amended Complaint ("SAC") at ¶ 1.
Plaintiff seeks monetary damages as well as declarative
and injunctive relief.[FN2]

> FN1. The class allegations were eventually
> dropped in the second amended complaint filed
> by plaintiff's appointed counsel. Ten of the
> original plaintiffs have been dismissed from this
> action. Eight plaintiffs were voluntarily
> dismissed without prejudice pursuant to
> Fed.R.Civ.P. 41(a)(2). See Thomas, et al. v. New
> York State Department of Correctional Services,
> et al., 00 Civ. 7163(NRB), 2004 WL 1871060
> (S.D.N.Y. Aug. 20, 2004). Two plaintiffs were
> dismissed from this case after this Court
> determined that their claims had not been

administratively exhausted. See Thomas, et al. v.
New York State Department of Correctional
Services, et al., 00 Civ. 7163(NRB), 2003 WL
22671540 (S.D.N.Y. Nov. 10, 2003)(granting
partial summary judgment). See also Thomas, et
al. v. New York State Department of
Correctional Services, et al., 00 Civ.
7163(NRB), 2002 WL 31164546 (S.D.N.Y.
Sept. 30, 2002)(declining to grant summary
judgment on exhaustion grounds). Familiarity
with prior decisions in this case is assumed.

> FN2. We agree with defendants that plaintiff's
> request for prospective injunctive relief must be
> dismissed for lack of standing because Thomas
> is no longer incarcerated and does not face a
> likelihood of returning to Fishkill under similar
> conditions. See Shain v. Ellison, 356 F.3d 211,
> 215 (2d Cir.2004)(quoting City of Los Angeles v.
> Lyons, 461 U.S. 91, 105-06 (1983)).

After completing fact and expert discovery in this
case, defendants filed a motion for summary judgment on
August 3, 2005. Although plaintiff received proper notice
[FN3] of this motion, he has not filed any submissions to
oppose the motion. For the reasons set forth below, the
defendants' motion is granted.

> FN3. See "Notice to Pro Se Litigant Opposing
> Motion for Summary Judgment" filed August 3,
> 2005.

BACKGROUND

*Plaintiff's Employment and Alleged Injuries*

Plaintiff's claims concern working conditions in a
paint shop at Fishkill that employs prison inmates.[FN4]
Plaintiff worked in this paint shop between February 1998
and October 2000 while he was incarcerated at Fishkill.
See SAC at ¶ 8, Decl. of Michael Peeples in Support of
Defs. Mot. for Summ. Judgment, Ex. A ("Thomas Dep.")
at 12-13. When Thomas started working in the paint shop,
his responsibilities included cleaning and moving items to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

be painted, as well as spray painting. *See* Thomas Dep. at 12-14. At some point between October 1998 and January 1999, Thomas was promoted to become the "lead man" of the shop. *See id.* at 19. As lead man, Thomas continued to spray paint, but he also helped coordinate work flow in the shop, assigned projects to co-workers and communicated with civilians about projects. *Id.* at 19-20, 28-29.

> FN4. The industry paint shop at Fishkill is one of many work programs organized and run by defendant the Division of Correctional Industries, a/k/a Corcraft, a manufacturing division of the New York State Department of Corrections Services. *See* SAC at ¶¶ 20, 28; Defs. Mem. of Law at 4.

Thomas claims that he was exposed to toxic substances while he was working in the paint shop, and that prison officials and employees failed to provide proper safety equipment and training for paint shop workers despite numerous complaints. *See* SAC at ¶¶ 31-41. As the record currently stands, it is unclear what specific chemical compounds or products were used in the paint shop during the relevant time period. However, liquid spray paint, powder paint [FN5] and "mineral spirits" [FN6] appear to have been commonly used in the paint shop. Thomas Dep. 143-45; Olmsted Aff. at ¶ 12.

> FN5. Without explaining the relevance of the information, defendants' industrial safety expert has stated that "mostly solvent-based" paints are used in the liquid paint booth. Olmsted Aff. at ¶ 7. Powder paints used in the paint shop apparently do not contain solvents. *Id.* at ¶ 10. Neither party has submitted scientific evidence concerning the toxicity of any of the products or substances used in the paint shop.

> FN6. Mineral spirits are apparently used in the paint shop to thin liquid paint and to clean equipment. *See* Olmsted Aff. at ¶ 12. There is no indication from the record concerning the toxicity of particular mineral spirits used in the paint shop.

Thomas specifically alleges that his workplace exposure to toxic chemicals has caused him to suffer headaches, sinus congestion and tightness or congestion in his chest. *See* Thomas Dep. at 61-62. Thomas also claims that this exposure has increased his future risk of developing respiratory or cardiac health ailments. SAC at ¶ 50.

The medical evidence in the record consists of the declaration of defendants' medical expert, Dr. Charles A. Powell ("Dr.Powell"), who has physically examined Thomas and evaluated his medical records. *See generally* Powell Decl. [FN7] Plaintiff has not submitted expert testimony or his medical records.

> FN7. Dr. Powell is a licensed physician in the State of New York and an Assistant Professor of Medicine in the Division of Pulmonary, Allergy and Critical Care Medicine at Columbia University Medical Center. *See* Powell Decl. at ¶¶ 1-2. Dr. Powell specializes in treating respiratory diseases and has conducted research in the field of environmental toxins, particularly cigarette smoke. *See id.* at ¶ 3.

> Dr. Powell's declaration indicates that he reviewed Thomas' medical records for the period between 1993 through June 2004. *See* Powell Decl. at ¶ 6.

**\*2** Upon examination, Dr. Powell found that Thomas had no symptoms of pulmonary or heart disease and that chest x-rays showed no signs of abnormality. *Id.* at ¶ 7. Dr. Powell's declaration also states that Thomas suffered from childhood asthma and has some history of smoking cigarettes. *Id.* at ¶ 8. *See also* Thomas Dep. at 5-10, 44-45. Plaintiff also has a history of headaches and apparently sought treatment for them in 1995, indicating at that time that he had been experiencing headaches since approximately 1990. *See* Powell Decl. at ¶ 8; Thomas Dep. at 45-46. During the time period relevant to this case, plaintiff experienced symptoms of an upper respiratory tract infection as well as headaches, cough, nasal congestion and wheezing. *See id.* at ¶ 9.

Dr. Powell concluded that Thomas has "mild intermittent asthma, allergic rhinitis and sinusitis" and that it is "extremely unlikely that exposure to paints, primers

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

and mineral spirits from February 1998 until October 2000 resulted in Mr. Thomas's headaches, asthma, or sinus problems. These are all very common conditions that can have multiple causes." Powell Decl. at 11-12.

*Working Conditions in the Fishkill Paint Shop*

The paint shop includes a liquid paint booth and a powder paint booth, both of which are at issue in this litigation. SAC at ¶ 29; Answer at ¶ 7. The liquid paint booth is approximately 12 feet wide and 15 feet long, enclosed on three sides and at the top. There is a bank of filters near the rear of the booth. Olmsted Aff. at ¶ 7. Painters apparently stand at the front of the booth and aim the spray gun at the item being painted and at the bank of filters. Olmsted Aff. at ¶ 7. An exhaust system draws the paint away from the painter through the bank of filters and then out of the paint shop. *Id.* at ¶ 8.

The powder paint booth is approximately 8 feet wide and 10 feet long and is enclosed on two sides and at the top with a curtain.[FN8] *Id.* at ¶ 10. A painter stands at the front of the booth, closes the curtain behind him and aims at the item to be painted and the filter banks. *Id.* An exhaust ventilation system draws powder paint away from the painter and toward two banks of filters at the end of the booth. *Id.*

FN8. Based on the record, it is unclear what this curtain is made of or how it works. *See* Defs. Mem. of Law at 5; Olmsted Aff. at ¶ 10.

Defendants' industry safety expert, Edward Olmsted ("Olmsted"), inspected both booths in October 2004 and concluded that their design was consistent with OSHA requirements for spray finishing operations, and that their design and operation provided for "adequate capture of paint-related material" and protected workers from harmful exposure. Olmsted Aff. at ¶¶ 8-11. During the inspection, Olmsted also conducted ventilation smoke tube tests, which measure air velocity in feet per minute and air velocity flow rate, in both work areas. *Id.* at ¶¶ 9, 11. Olmsted concluded that the liquid paint booth had an acceptable air flow velocity that was within the range recommended by the American Conference of Governmental Industrial Hygienists ("ACGIH") industrial ventilation manual. *Id.* at ¶ 9.[FN9] Olmsted also concluded

that air flow velocity in the powder paint booth on average was slightly below the range recommended by the ACGIH, but that "powder and vapor in the powder paint booth is effectively captured" and contaminants moved away from workers in the booth. *Id.* at ¶ 11.

FN9. This manual is apparently a widely accepted guide for evaluating exhaust ventilation. Olmsted Aff. at ¶ 3.

**\*3** In contrast, while the second amended complaint generally alleges that ventilation and filtering systems in the paint booths were inadequate and contributed to unsafe working conditions,[FN10] Thomas has not submitted any evidence to support this allegation.

FN10. *See* SAC ¶¶ 36, 38, 40.

The parties also disagree about whether proper safety equipment was available in the paint shop during the relevant period. Plaintiff has alleged that the safety equipment available to workers was deficient in a number of respects. First, plaintiff claims that there were not enough respirators for all workers so many of them used paper masks that did not provide adequate protection. *See id.* at ¶ 34.[FN11] Second, plaintiff alleges that the paint shop had an inadequate supply of filters and cartridges for the masks and respirators that were available to workers. *See id.* at ¶ 35. Third, plaintiff claims that the filters used in the liquid and powder paint booths were not changed frequently enough. *See id* . at ¶¶ 37-38. Plaintiff claims that these deficiencies in safety equipment caused him to ingest and inhale toxic fumes and/or particles. *See id.* at ¶¶ 34-39.

FN11. In earlier versions of the complaint, Thomas alleged that the respirators he used between February 1998 and August 1998 were old and in poor condition. *See* Original Complaint at ¶¶ 37-39. Thomas acknowledged that new respirators arrived in the paint shop in September 1998, but claimed that the paint shop did not maintain an adequate supply of respirator filters, thereby reducing their effectiveness. *See id.* at ¶¶ 40, 54-56.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

However, defendants' industry safety expert has concluded that safety equipment in the paint shop is adequate. Based on his October 2004 inspection, Olmsted found that "rubber gloves, protective coveralls, respirators, particle masks and goggles are all available" to inmates working in the paint shop, and that such equipment is "certified and recommended for use with liquid and powder paint and mineral spirits." Olmsted Aff. at ¶ 14.[FN12]

> FN12. Specifically, Olmsted stated that the respirators he found in the paint shop were "half-face dual cartridge respirators manufactured by Moldex, have respirator cartridges and filters, are approved and certified by the National Institute of Occupational Safety and Health, and meet the requirements of the OSHA." Olmsted Aff. at ¶ 15. He also stated that the rubber gloves, protective coveralls and Uvex clear goggles were consistent with the OSHA requirements for personal protective equipment. Id. at ¶¶ 16-18. We recognize that the condition or availability of safety equipment in the paint shop could have been different during the relevant period.

Plaintiff also alleges that prison officials failed to give adequate training to workers on how to safely handle toxic substances used in the paint shop. SAC at ¶ 32. Defendants have not submitted any evidence of formal safety training given to paint shop workers during the relevant period. Instead, informal on-the-job training appears to have been the norm. See Thomas Dep. at 21-28; Reid Dep. at 11-13. During the October 2004 inspection, defendants' expert found that a manual of material safety data sheets was available to paint shop workers and that hazard warnings on container labels conformed to the OSHA hazard communication standards. Id. at ¶ 18.

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted only when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that there is no genuine issue of material fact. See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir.2002). See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995) (stating that movant may meet burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim.") Once movant satisfies this burden, the non-moving party must respond by setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In determining whether summary judgment is appropriate, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir.2004).

*4 The fact that a motion for summary judgment is unopposed does not necessarily mean that it should be granted. "[T]he district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004). In addition, pro se litigants must be given extra latitude, particularly on a summary judgment motion. See McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (pro se's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest").[FN13]

> FN13. Although plaintiff was represented by appointed counsel when the Second Amended Complaint was filed and for a period of time thereafter, this Court granted counsel's unopposed application to withdraw on August 24, 2004.

### II. Fourteenth Amendment Claim

Thomas claims that defendants' actions and/or inaction with respect to working conditions in the paint shop violated his "rights secured by the Eighth and Fourteenth Amendments to the United States Constitution not to be subjected to cruel and unusual punishment." SAC at ¶ 52. Defendants contend that plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

substantive due process claims should be dismissed because the types of claims asserted by plaintiff clearly fall within the scope of the Eighth Amendment. *See* Defs. Mem. of Law at 17-18. We agree.

The Supreme Court has instructed that where "an explicit textual source of constitutional protection against ... physically intrusive governmental conduct, that Amendment, not the generalized notion of 'substantive due process' must be the guide for analyzing [the] claims." *Graham v. Connor,* 490 U.S. 386, 395 (1989) (holding that § 1983 claim based on officers' use of excessive force during investigatory stop must be analyzed under Fourth Amendment). *See also Albright v. Oliver,* 510 U.S. 266, 271-72 (1994); *Bryant v. City of New York,* 404 F.3d 128, 135-36 (2d Cir.2005).

The Eighth Amendment prohibits cruel and unusual punishment in conditions of confinement. *See Helling v. McKinney,* 509 U.S. 25, 31 (1993)("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") The core of plaintiff's complaint is the assertion that defendants were deliberately indifferent to hazardous working conditions in the Fishkill paint shop. Thomas alleges that he and other inmates were exposed to toxic chemicals without proper training, safety equipment and ventilation. Such claims clearly fall within the scope of the Eighth Amendment and it would be improper to analyze them under the Fourteenth Amendment. Plaintiff's Fourteenth Amendment claim is therefore dismissed.

III. Eighth Amendment Claim

The Eighth Amendment imposes a duty upon prison officials to "provide humane conditions of confinement" for prison inmates. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference to a prisoner's serious illness or injury" creates a valid cause of action under the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).

**\*5** As with any deliberate indifference claim, plaintiffs must satisfy a two-part test with both objective and subjective components in order to successfully challenge environmental conditions at a prison facility. [FN14] "Objectively the alleged deprivation must be sufficiently

serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain" exists. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotes and citations omitted). *See also Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (presenting non-exhaustive list of factors to consider in evaluating seriousness of prisoner's medical condition). To establish the subjective element, plaintiff must demonstrate that defendants were deliberately indifferent. A prison official acts with deliberate indifference when he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (quoting *Farmer,* 511 U.S. at 847). *See also LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). Plaintiff must establish more than simply defendants' lack of due care. *See LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998).

> FN14. Most § 1983 cases in this Circuit litigating toxic exposure claims have involved either environmental tobacco smoke ("ETS") or asbestos. *See, e.g., Davis v. New York,* 316 F.3d 93 (2d Cir.2002) (ETS); *Warren v. Keane,* 196 F.3d 330, 332-33 (2d Cir.1999) (ETS); *Johnson v. Goord,* No. 01 Civ. 9587(PKC), 2005 WL 2811776 (S.D.N.Y. Oct. 27, 2005) (ETS); *Nunes v. Artuz,* No. 01 Civ. 1141(DC), 2003 WL 22952743 (S.D.N.Y. Dec. 12, 2003)(asbestos); *Gill v. Bracey,* No. 99 Civ. 10429(LMM), 2001 WL 34045758 (S.D.N.Y. July 17, 2001) (ETS). *But see LaBounty v. Coughlin,* 137 F.3d 68 (2d Cir.1998) (chemicals in drinking water and asbestos).

In *Helling v. McKinney,* a case involving a prisoner exposed to high levels of environmental tobacco smoke, the Supreme Court held that plaintiffs may state a valid § 1983 claim by alleging that prison officials were deliberately indifferent to conditions that created an unreasonable risk of serious damage to future health. *See* 509 U.S. at 32-35. After *Helling,* a present, manifest injury is not necessarily required to state a valid Eighth Amendment claim based on toxic exposure. *Id.*

However, a plaintiff who alleges an increased risk of

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

future health problems is still required to prove his or her deliberate indifference claim by introducing evidence to satisfy the two-part test. *Id.* at 35. To establish the objective element in a toxic exposure case, plaintiff must demonstrate that he was exposed to an unreasonably high level of a dangerous substance and that this exposure posed an "unreasonable risk of serious damage to his future health." *See Warren v. Keane,* 196 F.3d 330, 332-33 (2d Cir.1999)(quoting *Helling,* 509 U.S. at 33). Scientific or statistical evidence also must be introduced to establish the seriousness and likelihood of harm caused by the exposure in question. *See Helling,* 509 U.S. at 35-36. Finally, the fact-finder must determine "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 36.

A. Present Injuries

Thomas alleges that his exposure to paints, primers and mineral spirits in the paint shop has caused chest tightness and congestion, sinus congestion and headaches. Powell Decl. at ¶ 10; Thomas Dep. at 61-62. Significantly, plaintiff has not alleged that these conditions either cause him chronic pain or interfere with his daily activities. *See Chance,* 143 F.3d at 702 (suggesting that existence of chronic or substantial pain and impact on daily activities are significant factors in determining whether prisoner's medical condition is objectively "serious").

**\*6** While plaintiff has not introduced any medical records or expert testimony about his injuries, defendants' medical expert, Dr. Powell, has concluded that plaintiff's symptoms are consistent with "mild intermittent asthma, allergic rhinitis and sinusitis" and observed that "these health problems are not severe or life threatening, and do not cause debilitation or extreme pain." Powell Decl. at ¶ 11. Dr. Powell also found that plaintiff had "no symptoms of pulmonary or heart disease" and that his chest x-rays were "unremarkable." *Id.* at 7. On balance, this evidence strongly suggests that plaintiff's current injuries are not serious enough to satisfy the objective component of a deliberate indifference claim.

In addition to plaintiff's failure to bring forward evidence to support a finding that he has suffered a serious

injury, he has also introduced no evidence to support a finding that he was exposed to an unreasonably high level of a toxic substance in the paint shop or that his injuries were actually caused by such exposure. With respect to the issue of causation,[FN15] Dr. Powell observed that headaches, asthma and sinus problems are "common conditions that can have multiple causes." *Id.* at ¶ 12. Plaintiff's history of smoking cigarettes [FN16] and the fact that he experienced headaches, asthma and sinus problems before he started working in the paint shop also indicates that workplace exposure to chemicals was not the "direct cause" of his current symptoms. *See id.* at ¶¶ 8, 12-13. Dr. Powell concluded that "it is extremely unlikely that exposure to paints, primers and mineral spirits from February 1998 until October 2000 resulted in Thomas's headaches, asthma, or sinus problems." *Id.* at ¶ 12.

> FN15. Defendants address causation as an issue distinct from the deliberate indifference analysis. *See* Defs. Mem. of Law at 9-12. Because *Helling* established that causation is an important part of the objective element in a § 1983 toxic exposure case, we address causation within the framework of the deliberate indifference analysis. *See Helling,* 509 U.S. at 35-36.

> FN16. Plaintiff's deposition testimony indicates that he has smoked cigarettes intermittently in the past. *See* Thomas Dep. at 5-20.

Defendants' expert testimony is persuasive, and it suggests both that plaintiff's current injuries are not severe and that they were not caused by plaintiff's workplace exposure to paints, primers or mineral spirits. Critically, plaintiff has failed to introduce any evidence to contradict defendants' expert testimony. Summary judgment is appropriate, in a case such as this one, where defendants present expert medical testimony undermining plaintiff's allegations concerning causation and the severity of his injuries, and plaintiff completely fails to rebut it with contrary evidence.[FN17]

> FN17. *See Johnson v. Goord,* No. 01 Civ. 9587(PKC), 2005 WL 2811776, at \*7 (S.D.N.Y. Oct. 27, 2005)(granting summary judgment on ETS claim because plaintiff failed to establish

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

causation); *Nunes v. Artuz,* No. 01 Civ. 1141(DC), 2003 WL 22952743, at *7 (S.D.N.Y. Dec. 12, 2003) (granting summary judgment in asbestos exposure case where plaintiff presented no evidence to rebut doctor's affidavit); *Gill v. Bracey,* No. 99 Civ. 10429(LMM), 2001 WL 34045758, at *4 (S.D.N.Y. July 17, 2001) (granting summary judgment on ETS claim where plaintiff offered no scientific or medical evidence of serious damage to his present or future health).

**B. Increased Risk of Future Health Problems**

Plaintiff also alleges that his workplace exposure to toxic chemicals has increased his risk of developing respiratory and cardiac complications in the future. SAC at ¶ 50. Once again, plaintiff has not submitted any medical or expert evidence to support his conclusory allegations about increased health risks. We note that Thomas has not even identified the specific chemicals to which he was exposed.[FN18] Similarly, he has failed to introduce any scientific evidence concerning the toxicity of particular chemicals that he worked with or any evidence documenting concentration levels in the paint shop during the relevant period.[FN19]

> **FN18.** The original complaint included copies of labels taken from paint, primer and mineral spirits containers as exhibits. *See* Original Complaint, Ex. 9. These labels included hazard warnings and indicate that inhalation of some of the products could cause respiratory irritation, headache, nausea and dizziness. Even if we assume that such products were used in the paint shop, plaintiff failed to specify which chemicals caused him harm.

> **FN19.** We note that defendants have not submitted any evidence that the paint shop was subject to regular safety inspections or air quality tests during the relevant period. *But see* Decl. of Michael Peeples in Support of Defs. Mot. for Summ. Judgment, Ex. B (presenting deposition testimony from defendant, John Fabian, suggesting that air quality in paint shop was tested on one occasion).

However, plaintiff has the burden of proof on this issue and has not introduced any reliable evidence establishing critical facts about toxicity, concentration levels or the duration of his exposure. *See Warren,* 196 F.3d at 332-33 (stating that plaintiff must demonstrate that he was exposed to an unreasonably high level of a dangerous substance) (quoting *Helling,* 509 U.S. at 33).

**\*7** In contrast, defendants have introduced expert testimony suggesting that working conditions in the paint shop are not hazardous, and that Thomas is unlikely to develop future health problems that can be attributed to his exposure to paints, primers or mineral spirits. *See* Olmsted Aff. at ¶ 19 (expressing industrial safety expert's opinion that design and operation of equipment in the paint shop "prevents the accumulation of hazardous levels of liquid paint, powder paint and mineral spirits and adequately protect workers in the paint shop.")[FN20] *See also* Powell Decl. at ¶ 15 (stating that "it is extremely unlikely that [Thomas] will experience any serious health problem in the future attributable to his exposure to paints, primers or mineral spirits").

> **FN20.** We note that the testimony of the defendants' industrial expert, based largely on observations made during an inspection that occurred in October 2004, does not definitively prove what conditions were like between February 1998 and October 2000.

Absent any evidence to demonstrate the extent of exposure or the health hazard posed by particular substances used in the paint shop, plaintiff cannot show that the conditions of his confinement created an unreasonable risk of serious harm. *See Warren,* 196 F.3d at 332-33 (quoting *Helling,* 509 U.S. at 33); *LaBounty v. Coughlin,* No. 93 Civ. 3443(BSJ), 2003 WL 21692766, *4 (S.D.N.Y. July 21, 2003). Because plaintiff has failed to introduce any evidence to support a jury decision in his favor on the objective element of his Eighth Amendment claim, defendants are entitled to summary judgment.[FN21]

> **FN21.** Given this conclusion, we do not address

Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)

(Cite as: 2006 WL 435718 (S.D.N.Y.))

defendants' remaining arguments.

CONCLUSION

Defendants' motion for summary judgment is granted with respect to all claims. The Clerk of Court is respectfully requested to close this case.

IT IS SO ORDERED.

S.D.N.Y.,2006.

Thomas v. New York State Dept. of Correctional Services, Div. of Correctional Industries
Not Reported in F.Supp.2d, 2006 WL 435718 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.